## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBA

**GERALD WALPIN,**
 **875 Park Avenue**
**New York, NY  10075,**

           **Plaintiff,**

**v.**

**THE CORPORATION FOR NATIONAL AND**
**COMMUNITY SERVICES, NICOLA O.**
**GOREN, as Acting Chief Executive Officer**
**thereof, RAYMOND LIMON, as Chief Human**
**Capital Officer thereof, and FRANK TRINITY,**
**as General Counsel thereof,**

           **Defendants.**

**COMPLAINT**
**FOR MANDAMUS AND**
**DECLARATORY RELIEF**

## INTRODUCTION

1.     This is an action brought by Plaintiff Gerald Walpin ("Mr. Walpin"), Inspector General

of the Corporation for National and Community Services ("CNCS"), for a writ of mandamus

directing CNCS, Nicola O. Goren, its Acting Chief Executive Officer, Raymond Limon, its

Chief Human Capital Officer, and Frank Trinity, its General Counsel, to reinstate Mr. Walpin as

the Inspector General and to declare unlawful and ineffective the efforts to date to terminate him

from his office.  There exists at the present time, an actual controversy between the parties within

the meaning of Title 28, U.S.C.A., Section 2201, "Declaratory Judgment," and actual justiciable

issues exist between the parties.

2.     On January 6, 2007, Mr. Walpin assumed his position as Inspector General of CNCS,

after having been duly nominated for that position by the President of the United States and duly

confirmed for that position by the United States Senate.

3.      From January 6, 2007, until on or about June 10, 2009, Mr. Walpin duly performed the responsibilities of his position as Inspector General at the CNCS.

4.      On or about June 10, 2009, Mr. Walpin was unlawfully removed and transferred from his position as Inspector General precisely *because* he had performed his responsibilities in an effective manner, supporting his career staff in their objective findings of wrongdoing, based on their audits and investigations, the truth of which those who sought to remove him did not want published.

5.      Mr. Walpin's unlawful removal and transfer to administrative leave, and his imminent, unlawful and procedurally-defective termination, are clearly contrary to the statutory command of the Inspector General Reform Act of 2008, and constitute violations of law for which Inspector General Walpin is without relief absent the requested writ.  Mr. Walpin has suffered and continues to suffer very real reputational, vocational and economic injuries as a result of the Defendants' actions, from the obvious loss of his post and the associated income and health insurance, to having his mental faculties questioned with not-so-subtle, and completely unfounded, suggestions of senility.[1]

6.      The harm complained of in this action is not only to Mr. Walpin personally, but also to the integrity of Inspector General system.  By passing the Inspector General Reform Act of 2008 Congress intended to curb efforts to improperly influence or control the independent investigative powers of Inspectors General by insulating them from politically motivated adverse job actions.  To this end, the Act requires that, thirty (30) days *prior* to any transfer or

---

[1] While not the object of the instant pleading, it is plain that without the relief sought by this complaint the conduct at issue raises serious questions of age discrimination, retaliation against whistleblowers and defamation.

termination of an Inspector General, written notice of the reasons for the action be provided to both chambers of the Congress. As is recounted below, in the politically driven effort to remove from office an Inspector General who has performed his duties without regard for partisanship, there has been a transparent and clumsily conducted effort to circumvent the protections the Act affords.

## THE PARTIES

7.     Plaintiff Mr. Walpin, a resident of New York State, is an attorney in good standing, duly licensed to practice in the State of New York, the United States Supreme Court, and several United States Circuit Courts of Appeals and District Courts. He left private practice and his home and family in New York City to enter government service and accepted an appointment as the CNCS Inspector General on January 6, 2007.   His transfer, to administrative leave on June 10, 2009, and imminent termination are the subject of this action.  The CNCS "Office of Inspector General (OIG) conducts and supervises independent and objective audits and investigations of [CNCS] programs and operations. Based on the results of these audits, reviews, and investigations, the OIG recommends policies to promote economy and efficiency and prevent and detect fraud and abuse in the Corporation's programs and operations." *See* CNCS Website, "Office of the Inspector General," http://www.americorps.gov/about/oig/index.asp (as of July 15, 2009).

8.     Defendant CNCS is an independent agency of the United States Government, with headquarters in Washington, D.C.  Established in 1993, CNCS "was created to connect Americans of all ages and backgrounds with opportunities to give back to their communities and their   nation."      *See*      CNCS    website,    "Our    History    and    Legislation,"

http://www.nationalservice.gov/about/role_impact/history.asp (as of July 15, 2009).  As part of its mission, CNCS administers the AmeriCorps program.

9.      Defendant Nicola O. Goren is the Acting Chief Executive Officer of CNCS, and is based in and performs a significant amount of her duties at its Washington D.C. headquarters.

10.     Defendant Raymond Limon is the Chief Human Capital Officer of CNCS, and is based in and performs a significant amount of his duties at its Washington D.C. headquarters.

11.     Defendant Frank Trinity is General Counsel of CNCS, and is based in and performs a significant amount of his duties at its Washington D.C. headquarters.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to, without limitation, 28 U.S.C. § 1331, 5 U.S.C. 3 § 1 *et seq.*, and 28 U.S.C. § 1361.

13.     Venue lies properly with this Court pursuant to pursuant 28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

### DUTIES AND RESPONSIBILITIES OF INSPECTOR GENERAL

14.     Congress created the position of Inspector General "to more effectively combat fraud, abuse, waste and mismanagement in the programs and operations of" the agency for which the Inspector General is responsible to oversee.  S. REP. No. 95-1071 (1978).  For that purpose, the Inspector General, such as Mr. Walpin, is made independent of the agency, here CNCS, in performing his duties and responsibilities.  Those duties and responsibilities include:

(a)   "providing policy direction for the auditing and investigating activities" by his office of CNCS;

(b)   "supervising other activities for the purpose of promoting economy, efficiency and effectiveness in the administration of [CNCS] programs, or preventing or detecting fraud and abuse in such programs"; and

(c)   "keeping the head of [CNCS] and Congress fully and currently informed concerning fraud and other serious problems in the operation of programs."

15.   The investigative and "watchdog" nature of the Offices of Inspectors General renders them likely targets of political and other pressures from which they must be insulated in order to vigorously perform their duties in the public interest.   To protect Inspector General in doing so, Congress mandated that the Inspector General shall have the responsibility and duty "to make all investigations and reports relating to programs that he judges necessary."

16.   Congress made clear that the "head of the agency may not prohibit, prevent or limit the Inspector ... General from undertaking and completing any audits and investigations which the Inspector ... General deems necessary."   Further, if the Inspector General discovers a particularly serious flagrant abuse, the legislation requires that he immediately notify the head of the agency and that the head of the agency transmit such notification to the Congress within 7 calendar days."   The independence of Inspectors General has been recognized as critical by the Congress, and most recently strengthened by the Inspector General Reform Act of 2008, which was signed into law October 14, 2008.   Representative Jim Cooper (D, TN-5) sponsored the bill that was introduced in the House on February 8, 2007, joined by seven co-sponsors from both the Democratic and Republican parties.   The bill was introduced in the Senate on November 8, 2007, sponsored by Senator Claire McCaskill (D,MO), with co-sponsors from both the Democratic and Republican parties, among them then-Senator Barack Obama (D, IL).   The purpose of the Inspector General Reform Act, as noted in H.R. 928, was to "amend the Inspector General Act of

1978 *to enhance the independence of the Inspectors General*, to create a Council of the Inspectors General on Integrity and Efficiency, and for other purposes." Inspector General Reform Act of 2008, H.R. 928, 110th Cong. (2007) (emphasis added).

17.     As noted by Representative Henry A. Waxman (D, CA-30) in debate on the bill before the House: "This bill strengthens the good IGs by giving them greater independence. Under this legislation, they will have new budgetary independence, and the President or agency head *will have to* inform Congress thirty (30) days *before* any IG is removed." 154 CONG. REC. H9882 (daily ed. Sept. 25, 2008) (statement of Rep. Waxman) (emphasis added).  The importance of providing Inspectors General independence in order that they be "free from political interference" in their duties to root out and prevent fraud and abuse was emphasized throughout debates on the bill:

> •     "We all agree IGs should operate independently, free from political interference.  After all, both agency heads and Congress often rely on IG reports to provide frank assessments of the effectiveness of federal programs." 154 CONG. REC. H9882 (daily ed. Sept. 25, 2008) (statement of Rep. Davis).

> •     I really feel that this legislation is so timely, because when you talk to people, when we had hearings that Inspectors General would come in and talk about the fact that sometimes they would be in the middle of an investigation of some type and that the budget would be cut *or in some instances they were actually fired.*  So I think this kind of brings about the independence that they need regardless in terms of the fact that if there is an investigation, if there's problems, it gives them the freedom to be able to move and get the things they need to get done." 154 CONG. REC. H9881 (daily ed. Sept. 25, 2008) (statement of Rep. Towns ) (emphasis added).

> •     "It is vital that Congress reiterate its strong support for the internal oversight IGs can provide and ensure they have the independence they need to carry out this vital, but often unpopular work." 154 CONG. REC. S 10054, 10055 (daily ed. Sept. 29, 2008) (statement of Sen. Lieberman).

- It includes an array of measures designed to strengthen the independence of the inspectors general, such as requiring the administration to notify Congress thirty (30) days *before* attempting to remove or transfer an IG. *This would give us time to consider whether the administration was improperly seeking to displace an inspector general for political reasons because the IG was, in effect, doing his or her job too well.* It requires that all IGs be chosen on the basis of qualifications, without regard to political affiliation." 154 CONG. REC. S 10054, 10055 (daily ed. Sept. 29, 2008) (statement of Sen. Lieberman ) (emphasis added).

18. To enhance their independence, the Act incorporates strict requirements for the termination of Inspectors General:

(a) "If an Inspector General is removed from office or is transferred to another position or location within an establishment, the President *shall* communicate in writing the reasons for any such removal or transfer to both Houses of Congress, not later than 30 days *before* the removal or transfer." 5 U.S.C.A. . 3 § 3(b) (emphasis added).

(b) If an Inspector General is removed from office or is transferred to another position or location within a designated Federal entity, the head of the designated Federal entity *shall* communicate in writing the reasons for any such removal or transfer to both Houses of Congress, not later than 30 days *before* the removal or transfer." *Id.* at § 8G(e) (emphasis added).

This notice requirement unambiguously is intended by the Congress to prevent the politically motivated termination of Inspectors General, as is expressly stated in the Senate Committee Report: "The requirement to notify the Congress *in advance* of the reasons for the removal should serve to ensure that Inspectors General are not removed for political reasons." Senate Committee Report (S. REP. 110-262). (emphasis added)

19. The Inspector General Reform Act also established a Council of the Inspectors General on Integrity and Efficiency to, *inter alia*, institute a process for reviewing allegations against Inspectors General. The Act, in Section 11(d), provides: "The Council shall have an Integrity Committee, which shall receive, review, and refer for investigation allegations of wrongdoing that are made against Inspectors General." The Council, in tandem with the notice requirement

and 30 day period, was intended to provide an additional filter against politically motivated

removals of Inspectors General.

COMMENDATIONS OF MR. WALPIN'S WORK AS INSPECTOR GENERAL

20.     Mr. Walpin's work as Inspector General has been commended both within and outside

of CNCS.  For example, in a report written by CNCS's then CEO Mr. Eisner on August 27,

2008:

> Corporation management and the Office of Inspector General continue to derive
> mutual benefit from a relationship that is direct, candid, and robust ....

> I believe that this positive, constructive relationship is in the agency's best
> interest.  That is not to say that we agree on every issue.  But even when we
> disagree, we continue to benefit from transparent and direct communications,
> enabling us to better understand each other's position and perhaps identify areas
> of common ground and potential solutions.

21.     Until the events giving rise to this action, CNCS continued to extol and commend the

performance of Mr. Walpin as Inspector General.  For example, the three members of the CNCS

Board of Directors' Management and Governance ("MAG") Committee (the equivalent to an

Audit Committee of most boards of directors), composed of Eric Tanenblatt, Chairman of the

MAG Committee, Alan Solomont, Chairman of the CNCS Board of Directors, and Stephen

Goldsmith, formerly Chairman of the Board and then Vice-Chairman of the Board, in an email

dated January 23, 2009, described Mr. Walpin's performance as demonstrating his "deep and

personal commitment to [his] responsibilities as Inspector General," and who has "been a hands-

on Inspector General, one who is willing to take the time to work through issues principally

through face to face meetings, where candid give and take has yielded in many instance better

decisions for the agency."

22.     Other members of CNCS management extolled Mr. Walpin's performance of his

responsibilities as Inspector General.  For example, by email dated November 18, 2008, Elson

Nash, Acting Director of Learn and Serve America, a major CNCS program, described Mr.

Walpin's ability to communicate, following Mr. Walpin's presentation at a conference of Learn

and Serve personnel, as follows: "You have a remarkable way of putting your audience at ease

while delivering a powerful warning of their responsibility as stewards of federal funds.  I just

received the participant evaluations and it's clear that our attendees welcomed this important

message."

23.     As recently as June 9, 2009, the day before Mr. Walpin was informed that he was to be

removed from his position as Inspector General, Gretchen Van der Veer, CNCS Director for

Leadership and Training, visited Mr. Walpin to requesting that he change his decision not to

attend and speak at the CNCS Conference to be attended by more than 2000 CNCS leaders, staff

and grantees, and stating that CNCS so valued Mr. Walpin's speaking ability that it was offering

him more time to speak and answer questions than each of the Acting CEO and the Chairman of

the Board of Directors would be given.

### MR. WALPIN'S PROPER PERFORMANCE OF HIS DUTIES AS INSPECTOR GENERAL PROMPTED THE UNLAWFUL ATTEMPTS AT HIS TERMINATION

24.     In April through early June 2009, the Office of Inspector General issued various reports,

including:

(a) The investigation conducted by the Investigations unit of the Office of

Inspector General, performed by  able and experienced career personnel who had

concluded that CNCS funds, totaling about $850,000, had been misused by the

grantee, St. HOPE Academy, of which the principal wrongdoer was its then -

Executive Director and President, Kevin Johnson.  The investigation was initiated

at the request of CNCS management, based on information it provided to the Office of Inspector General. Further, CNCS, by and through its Suspension and Debarment official, with the advice and counsel of Defendant Trinity, found that the facts uncovered by the Office of Inspector General's Investigative unit were sufficient to establish grounds to suspend Mr. Johnson from any further receipt of Federal funds, and CNCS so suspended Mr. Johnson. The United States Attorney's office agreed that the facts provided by the Office of Inspector General were sufficient to seek recovery of funds so misused by the grantee. Despite the foregoing facts, in April 2009, CNCS management, bowing to media and political pressures, decided to settle all claims, including those against Mr. Johnson, and provide all defendants, including Mr. Johnson, with an all-encompassing general release, over the objections of the Office of Inspector General. CNCS Management thereby violated the above-described statute barring CNCS from prohibiting, preventing, and limiting the Inspector General from completing any investigation that the Inspector General deems necessary. Because that investigation was ongoing and continuing, the Office of Inspector General believed that what CNCS did was a particularly serious flagrant abuse, and the Office of Inspector General issued a Special Report to Congress on that abuse by CNCS.

(b) The audit conducted by the Audit unit of the Office of Inspector General, performed by able and experienced career personnel, with the assistance, in part, of an outside auditing firm, concluded that about $80,000,000 of grant funds had been improperly provided to and accepted by City University of New York

("CUNY"), in violation of the statutory requirement that such funds can be used only to meet an "unmet need," while the need in the community already had been met by a separate CUNY program, without the CNCS funds. This audit report was therefore critical of the failure of CNCS properly to have monitored the grant awards to ensure that the CNCS funds were in fact needed to provide the services to the community. It was particularly important because the CUNY grant involved the largest grant by CNCS of this type of funding and a large number of AmeriCorps members.

(c) At the request of the House of Representatives Committee on Labor, Health and Human Services, the Inspector General's staff performed an analysis of budgeting, information technology, and personnel problems in CNCS operations during the previous calendar year (2008). A draft of the analysis was presented to CNCS management in the Spring of 2009. The draft was critical of CNCS's operations in these three areas, while also reflecting that some corrective steps were being taken. Inspector General Walpin kept both CNCS management and its Board of Directors informed of the progress and findings of the analysis. On June 3, 2009, Inspector General Walpin and his staff provided CNCS management with the final report's findings and conclusions, and thereafter reported them to House Committee. The House Committee clearly accepted and approved that report, as is documented in its appropriation proposal reducing CNCS's budgeting request by $90 million, explaining:

> The Subcommittee will consider further expansion of service and volunteer programs once CNCS has demonstrated that it has made improvements in its internal operations.

25.     CNCS management strenuously objected to the issuance by the Office of Inspector General of the first two of these reports, and was not pleased with the consequences of the third. The Board of Directors, for its part, declined to examine the merits of the first two reports. Mr. Walpin attempted to focus the MAG Committee members on their responsibility to analyze for themselves and make their own decision on the merits of those two reports. Mr. Walpin requested and then conducted a teleconference with them for this purpose, but the MAG Committee members declined to discuss the merits, instead stating only that they relied on the opinion of Defendant Frank Trinity, CNCS's General Counsel. Mr. Walpin then explained, as he had previously done, that the responsibility of Board members was not to rubber stamp management assertions, but to analyze the facts and law for themselves to reach their own conclusion. However, the Board members refused to do so.

26.     On May 20, 2009, Mr. Walpin made a presentation to the CNCS Board of Directors, as was his practice at each quarterly meeting of the Board. He frankly informed the Board of his Office's view -- held by his career staff who had performed their responsibilities over many years -- that, since the departure of former CNCS CEO David Eisner, there had been a change in the culture, enforcement of rules, and attitude at CNCS towards the Office of Inspector General, with an "anything goes" attitude at CNCS, rather than abiding by controlling rules and regulations. He further reported his office's view that attributed this change in attitude at CNCS to the fact that the General Counsel had been assigned responsibility for all matters involving the Office of Inspector General, and that the General Counsel, Frank Trinity, had become essentially adversarial to the Office of Inspector General, and had expressed both hostility to and loss of trust in and respect for the people in that Office. Mr. Walpin then gave a detailed description of the Office of Inspector General's Special Report to Congress on the St. HOPE/Johnson matter,

and the specific bases for its objections to the settlement agreed to by CNCS.  Thereafter, he stated that he had already -- that morning -- issued a statement calling for a new FBI/Grand Jury investigation based on the information, which had just become public, that Mr. Johnson's successor as Executive Director of St. HOPE had resigned on, among other grounds:  that an ally of Mr. Johnson had, without authority, entered the St. HOPE offices and erased Mr. Johnson's emails, which were then under subpoena by the Office of Inspector General, and that Mr. Johnson had taken custody of St. HOPE's financial records, which also were under subpoena by, but not produced to, the Office of Inspector General.  Mr. Walpin described these facts as a possible obstruction of justice, which required reopening the investigation.

### CNCS MANAGEMENT AND BOARD MEMBERS' HOSTILE REACTION TO MR. WALPIN'S PERFORMANCE OF HIS DUTIES

27.    On information and belief, based on media reports of notes made of that meeting by CNCS personnel and Directors present, Board members fully understood and took umbrage at Mr. Walpin's approach to holding them to their responsibilities and his comments that they had not been fulfilling these responsibilities.  They fully understood and were particularly bothered by the fact that Mr. Walpin was then calling for a renewed and deeper probe in a politically sensitive case which the Board and CNCS management  thought they had put to bed permanently by a settlement agreement and general release given to St. HOPE and Mr. Johnson.  These Board members' notes establish that this presentation was fully and clearly communicated by Mr. Walpin and understood by the Board.  As the media also reported, senior CNCS management chafed under Mr. Walpin's proper performance of his duties in performing oversight over CNCS's operations, highlighting waste, fraud and abuse, and communicated this to the Board, which "rubber stamped senior management" and took that view to the White House which

"rubber stamped the Board."

THE UNLAWFUL ATTEMPTS TO REMOVE MR. WALPIN FROM HIS POST

28.      There have been at least three attempts to unlawfully remove Mr. Walpin from his post: the first orally on June 10; the second by writing on June 11; and a third by writing on June 16.

29.      On June 10, 2009,  when he knew Mr. Walpin was not in his office, Mr. Norman L. Eisen, Special Counsel to the President, called Mr. Walpin on his cell phone and issued the ultimatum that he either tender his resignation as Inspector General, or be terminated from his post.  Mr. Eisen told Mr. Walpin he had one hour in which to make his decision.  When Mr. Walpin asked what the basis was for this action, Mr. Eisen told him that it was "time to move on."  Approximately 45 minutes later, Mr. Eisen called back for Mr. Walpin's answer.  Mr. Walpin, citing the unreasonably short amount of time given, declined to make a decision. Whereupon Mr. Eisen informed him that he was being removed from his post as Inspector General.

30.      The following day, a letter was issued over President Obama's signature to Vice-President Joseph R. Biden, Jr. and Speaker Nancy Pelosi, advising each that he was "exercising [his] power as President to remove from office" Mr. Walpin, with the only ground set forth being the conclusion that he "no longer" has "the fullest confidence in" Mr. Walpin.  The letter expressly equated the President's power to remove Mr. Walpin with all "other positions where I, as President, have the power of appointment, by and with the advice and consent of the Senate."

31.      Those letters to Vice-President Biden and Speaker Pelosi were the only written communications from the President, or anyone purporting to act on his behalf, addressed to someone in both Houses of Congress.  The letters, however, provided no reasons for the removal

of Mr. Walpin. Instead, the putative notice contained only the conclusory statement that "the President does not have full confidence in" Mr. Walpin, thereby providing, in substance, that the President is removing Mr. Walpin because he longer is comfortable with having Mr. Walpin continue in that position, effectively stating that he is removing Mr. Walpin because he wants to remove Mr. Walpin.

32.     Also on June 11, Senator Grassley wrote to the President, citing the latter's role while in the Senate in co-sponsoring the Inspectors General Reform Act, and that law's requirements, and stating that he was "deeply troubled to learn of the ultimatum given Inspector General Walpin absent Congressional notification." Senator Grassley continued: "We cannot afford to have Inspector General independence threatened." "I urge you to review the Inspector General Reform Act you cosponsored and to follow the letter of the law should you have cause to remove any Inspector General." Senator Grassley further noted:

> There have been no negative findings against Mr. Walpin by the Integrity Committee of the Council of the Inspectors General on Integrity and Efficiency (CIGIE), and he has identified millions of dollars in AmeriCorps funds either wasted outright or spent in violation of established guidelines. In other words, it appears he has been doing his job.

33.     Also on June 11, Gregory B. Craig, Counsel to the President, wrote in reply to Senator Grassley, advising him that Congress was purportedly notified earlier that day of the intent to remove Mr. Walpin from his post, and that the basis for this action was that "the President does not have full confidence in him," thereby reiterating that the sole basis for Mr. Walpin's removal was the conclusion--not the reasons for that conclusion--that the President had lost confidence in him. The letter further advised that Mr. Walpin had been "suspended, with pay."

34.     The failure of the June 11 letter to comply with the statutorily-mandated notice requirements prompted the following June 16, 2009, statement from Senator Claire McCaskill,

the author of the Inspector General Reform Act:

> The White House has failed to follow the proper procedure in notifying Congress
> as to the removal of the Inspector General for the [CNCS]. The legislation which
> was passed last year requires that the president give a reason for the removal.
> "Loss of confidence" is not a sufficient reason. I'm hopeful the White House will
> provide a more substantive rationale, in writing, as quickly as possible.

35.     That same day, June 16, 2009, apparently in response to inquiries concerning the propriety of Mr. Walpin's removal under the Inspector General Reform Act by Senator Joseph I. Lieberman and Senator Susan M. Collins, Special Counsel to the President Norman L. Eisen wrote them, with a copy to Senator Claire McCaskill, setting forth a new putative basis for Mr. Walpin's termination. In its closing paragraph, the letter expressly acknowledges the senators' concerns over the adequacy of the June 11th writing:

> We of course recognize your view of the requirements for the formal notice
> letter which we submitted to Congress last week. That letter was prepared
> based upon long practice with respect to the form of such letters and the
> Administration's view of the statute. However, in response to your concerns
> we are providing this additional information and we look forward to
> discussing the statutory requirements more fully with you. Please note that
> the Counsel to the President was unavailable today, and so in the interests of
> time I am responding on his behalf.

36.     Mr. Eisen's June 16th letter, apparently intended to cure the inadequacy of notice provided in the letters of June 10th, is addressed solely to three individual senators, not to Vice President Biden in his capacity as President of the Senate and, of greater moment, not to any member of the House of Representatives. As a result, the June 16th letter, on its face, does not provide the requisite notice to both houses of Congress mandated by the Inspector General Reform Act and, in view of Mr. Walpin's removal from his post on June 10th, manifestly fails to provide the required thirty (30) day advance notice.

37.     On June 17th, Mr. Eisen met with the staff of Senator Grassley to discuss Mr. Walpin's

removal from his post as Inspector General, and address concerns over compliance with the Inspector General Reform Act. As Senator Grassley wrote that same day to Mr. Craig, while appreciative of the effort to address his concerns and of Mr. Eisen's time: "Unfortunately, however, Mr. Eisen refused to answer several direct questions posed to him about the representations made in his letter." Senator Grassley proceeded to pose questions to which he requested written responses, concerning the putative bases for Mr. Walpin's termination articulated in the June 16th letter. Among these questions are:

> If the initial and primary concern had to do with Mr. Walpin's capacity to serve for potential health reasons, why was he only given one hour to decide whether to resign or be fired?

> If Mr. Walpin's telecommuting arrangements since the beginning of this year were a major concern, then why was Mr. Walpin not simply asked to stop telecommuting?

38.     It was not until June 20, 2009 that Mr. Walpin learned from a third-party that formal notices of his removal had been drafted to give him notice of his removal, although they were never provided to him:  the first was in the form of an email, directed to Mr. Walpin's office email account, to which he had been stripped of access before the email was sent; the second was in the form of a letter bearing the salutation "Dear Mr. Walpin" without any address..

39.     On June 29, 2009, Senators Orrin Hach and Michael Enzi, wrote a letter to Senator Edward Kennedy, Chairman of the Senate Committee on Health, Education, Labor and Pensions requesting a public hearing to "examine President Obama's removal of the Inspector General (IG) of the Corporation for National and Community Service (CNCS), Gerald Walpin.  In particular, Senators Hatch and Enzi stated: "[s]ince then, there have been reports of an FBI investigation regarding potential obstruction of justice by St. HOPE, as well as significant questions raised regarding the propriety of the decision to remove the IG.  We have asked for

information from the White House Counsel and CNCS, but they have not been forthcoming to date nor willing to commit to a timeframe."

40.     In the haste to remove Mr. Walpin from his post, not only were there the above  failures to comply with statutorily-mandated procedures to preserve the integrity of the Inspector General post from politically motivated adverse job actions, no investigation was made into the facts alleged as the basis for Mr. Walpin's termination.   In particular, there was no attempt to interview Mr. Walpin or any members of the Staff of the Office of Inspector General who were personally involved in each of the reports, nor any of the Board members. The Integrity Committee of the Counsel of the Inspectors General on Integrity and Efficiency, a body expressly created by Congress under the Inspectors General Reform Act for purpose of reviewing allegations against Inspectors General, was not provided an opportunity to review the matter before the precipitous termination.   The Act's requirement of "reasons" necessarily requires explaining a reasonable basis for the act, and not an arbitrary or impermissible one.  To have set forth the basis for removal, even if it had met statutory requirements of pre-removal notice, without performing a reasonable investigation and inquiry to determine the actual facts, is antithetical to the words and purpose of the statute, as it allows for the easy window-dressing of the removal of an Inspector General for political reasons.

41.     Mr. Walpin was effectively removed from his post as Inspector General on June 10, 2009, prior to any colorable claim of a start of the required thirty (30) day notice-to-Congress period, rather than following a thirty (30) day notice period, as required by statute.  On June 10, 2009, the White House ordered that Mr. Walpin be immediately denied all attributes of his post, including access to his office, continued access to his staff, and access to email communications. Together with the denial of these attributes of his office, the White House ordered that Mr.

Walpin be transferred from his ability to perform his duties as Inspector General to the status of administrative leave, thereby effectively removing Mr. Walpin from his position as Inspector General.

## COUNT I - MANDAMUS

42.    Plaintiff repeats and re-alleges paragraphs 1 through 42, inclusive, as though fully set forth herein.

43.    Pursuant to the Inspectors General Reform Act, Mr. Walpin could not be removed or reassigned from his duly appointed and Senate-confirmed position as Inspector General until 30 days had elapsed from the date of the submission by the President to both Houses of the Congress of a statement of reasons for that removal or transfer. Without compliance by the President with these Congressionally mandated conditions precedent to removal, any attempted removal or order therefore is null and void.

44.    Defendants have the responsibility to administer and implement all lawful personnel actions – but not unlawful ones – involving personnel in the Office of the Inspector General for the CNCS. These responsibilities are ministerial, not discretionary.

45.    Defendants, by removing and transferring Mr. Walpin to administrative leave from his post as Inspector General in violation of the notice requirements of the Inspectors General Reform Act, are violating their clearly mandated ministerial duties, thereby harming Mr. Walpin by denying him the statutory procedural protections afforded to sitting Inspectors General.

## COUNT II - DECLARATORY RELIEF

46.    Plaintiff repeats and re-alleges paragraphs 1 through 45, inclusive, as though fully set forth herein.

47.     Plaintiff respectfully requests that this Court declare that the June 10th letters fail to comply with the notice requirements of the Inspectors General Reform Act;

48.     Plaintiff respectfully requests that this Court declare that the June 16th letters fail to comply with the notice requirements of the Inspectors General Reform Act;

49.     Plaintiff respectfully requests that this Court declare that Mr. Walpin was unlawfully transferred, and or constructively terminated in violation of the notice requirements of the Inspectors General Reform Act;

WHEREFORE, Plaintiff Mr. Walpin respectfully requests that this Court:

a.      Declare that the June 10th letters fail to comply with the notice requirements of the Inspectors General Reform Act;

b.      Declare that the June 16th letter fails to comply with the notice requirements of the Inspectors General Reform Act;

c.      Declare that Mr. Walpin was unlawfully transferred, and or constructively terminated in violation of the notice requirements of the Inspectors General Reform Act;

d.      Issue a Writ of Mandamus directing Defendants to restore Mr. Walpin to his duly appointed position as Inspector General;

e.      Award Mr. Walpin his costs and legal fees associated with this action; and

f.      Grant such other or further relief as may be appropriate in this matter.

Respectfully submitted,

Joe D. Whitley
Email: whitleyj@gtlaw.com
Sanford M. Saunders, Jr.
Email: saunderss@gtlaw.com
Nicole Kardell
Email: kardelln@gtlaw.com
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Telephone: 202.331.3100
Facsimile: 202.331.3101
Washington, DC  20037

Of Counsel:

A. John  Pappalardo
Email: pappalardoj@gtlaw.com
Evan Georgopoulos
Email: georgopoulose@gtlaw.com
Greenberg Traurig, LLP
One International Place
Telephone: 617.310.6000
Facsimile: 617.310.6001
Boston, MA  02110