IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GERALD WALPIN,

        Plaintiff,

v.

THE CORPORATION FOR NATIONAL AND
COMMUNITY SERVICE, NICOLA O.
GOREN, as Acting Chief Executive Officer
thereof, RAYMOND LIMON, as Chief Human
Capital Officer thereof, and FRANK TRINITY,
as General Counsel thereof,

        Defendants.

Civil Action No.  1:09-cv-01343 (RWR)

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>
<u>IN SUPPORT OF</u>
<u>MOTION FOR PRELIMINARY INJUNCTION</u>

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS ..................................................................................... 3

III.  ARGUMENT ......................................................................................................... 10

    A.   Summary............................................................................................................ 10

    B.   Elements For A Preliminary Injunction ........................................................ 11

        i.     Mr. Walpin's Likelihood of Prevailing On The Merits.......................... 11

        ii.    Irreparable Harm.......................................................................................... 20

        iii.   No Harm To Other Parties In Interest ..................................................... 21

        iv.   Public Interest................................................................................................ 22

IV.  CONCLUSION...................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Berry v. Reagan,* No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) .................... passim

*Citizens for Responsibility and Ethics in Washington v. Cheney,* 577 F. Supp. 2d 328
    (D.D.C. 2008) ........................................................................................... 1, 11

*Humphrey's Executor v. United States,* 295 U.S. 602 (1935) ............................. 18, 19, 21

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803)..................................... 15, 16, 17, 18

*Myers v. United States,* 272 U.S. 52 (1925)..................................................................... 18

*Wiener v. United States,* 357 U.S. 349 (1958) ...................................................... 18, 19, 20

**Statutes**

5 U.S.C. 3 § 3(b) ............................................................................................................ 11

Inspector General Reform Act of 2008, H.R. 928, 110th Cong. (2007)........................... 11

**Other Authorities**

Nancy Lewis, *Same Old Money Problems at CNCS,* Youth Today, August 20, 2009,
    *available at* http://www.youthtoday.org/publication/article.cfm?article_id=3477 ...... 21

OFFICE OF THE INSPECTOR GEN., EVALUATION OF THE FISCAL YEAR 2008, OIG Report 09-
    16 (Corp. Nat'l & Cmty. Serv. 2009), *available at*
    http://www.cncsig.gov/AuditReports.html ................................................................ 21

154 CONG. REC. S10054-55 (daily ed. September 29, 2008) .......................................... 12

154 CONG. REC. H9881 (daily ed. Sept. 25, 2008) ........................................................ 12

154 CONG. REC. H9882 (daily ed. Sept. 25, 2008) ........................................................ 12

SEN. REP. NO. 95-1071.............................................................................................. 12, 13

Plaintiff Gerald Walpin, by and through undersigned counsel, submits this Memorandum of Points and Authorities in support of his request for an order of mandamus, in the form of a preliminary injunction, directing defendants, the Corporation for National and Community Service ("CNCS"), Nicola O. Goren, as Acting Chief Executive Officer thereof, Raymond Limon, as Chief Human Capital Officer thereof, and Frank Trinity, as General Counsel thereof (collectively, "Defendants"), to reinstate him as Inspector General of CNCS -- the position to which he had been duly nominated by the then-President, and confirmed by the Senate, and in which he had already served for approximately 2 ½ years. The facts supporting Mr. Walpin's Motion for Preliminary Injunction are detailed in Mr. Walpin's accompanying Affidavit of Gerald Walpin ("Affidavit").

## I.     INTRODUCTION

A motion for a preliminary injunction should normally be granted where the plaintiff-movant demonstrates (1) there is a substantial likelihood that plaintiff will succeed on the merits of his claim, (2) he will suffer irreparable harm if the requested relief is denied, (3) there will be no substantial harm to other parties of interest if the requested relief is granted; and (4) the public interest favors the issuance of a preliminary injunction. *Citizens for Responsibility and Ethics in Washington v. Cheney*, 577 F. Supp. 2d 328, 334 (D.D.C. 2008); *see also Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983). Here, all four factors, taken together, weigh in favor of the injunction. Moreover, in contrast with most applications for an injunction, one of the Defendants -- the CNCS -- also will suffer irreparable harm if interim relief is not granted. The absence of a strong Inspector General exposes the CNCS to new abuses that

1

adversely affect the credibility of their programs as well as waste public funds. (See page 23 *infra*.)

Plaintiff purposely delayed making this motion in the hope that the facts set forth in the Complaint would result in an expeditious resolution of this dispute, and thereby reduce the litigation burdens on all parties from this lawsuit. Unfortunately, the Government has not so responded, but rather has filed for a significant extension of time to file a response, essentially guaranteeing it will be next year before the plaintiff can get any relief, making this motion now necessary in order to seek a prompt decision. This reality leaves Mr. Walpin with little choice but to seek this Court's assistance, not only to prevent irreparable harm to himself, as Plaintiff, but also to prevent irreparable harm to CNCS.

Simply put -- as more fully discussed below -- the controlling statute prohibits the President from removing an Inspector General unless the President first provides to both Houses of Congress 30 days notice, in advance of removing the Inspector General from his duties, together with the reason for the removal. Mr. Walpin was removed from his duties **without** 30 days notice to both Houses of Congress; in addition, the only notice sent to both Houses of Congress -- the day **after** Mr. Walpin was removed -- contained no reason, but only the conclusion that the President wanted him out of his position. The subsequent justification offered by the White House -- outside of the statutorily prescribed procedure -- constitutes nothing more than character assassination and demonstrates that the termination is in violation of the statute.

These undisputable facts establish that the removal of Mr. Walpin violated the specific requirements imposed by the Congress on the President's ability to remove him.

Unless such a clear violation of statutory requirements is to be ignored, making the President and Administration above the law, the likelihood of Mr. Walpin's success on the merits is thus established. And, as discussed below, Mr. Walpin has already suffered and would continue to suffer irreparable harm if immediate relief is not granted. Further, the public interest and the integrity of the cause can be protected only by ordering immediate enforcement of the statutory requirements.

## II.  STATEMENT OF FACTS

Mr. Walpin assumed his position as Inspector General of CNCS on January 6, 2007, following confirmation by the United States Senate of his nomination by then-President Bush to that position. He served in that position, with many commendations of his service (discussed below) until June 10, 2009. In the late afternoon of that date, Mr. Walpin was in a car driving to attend the Second Circuit Judicial Conference, to which he had been invited by the Chief Judge of that Circuit, when he received a telephone call on his cell phone from Norman L. Eisen, who identified himself as Special Counsel to the President. Mr. Eisen stated that Mr. Walpin had one hour to agree to tender his resignation or he would be removed from his position. In response to Mr. Walpin's question as to the reason for removal, Mr. Eisen's only explanation was that it was "time to move on."

When Mr. Eisen called back in slightly less than one hour, Mr. Walpin stated that he could not make such an important decision in such a short time, and thus could not agree to provide his answer without more time. Mr. Eisen immediately informed him that he was removed from his post as Inspector General, and transferred to Administrative Leave status for 30 days, following which he would be dropped from any

3

government status.  Almost immediately thereafter on the same evening, Mr. Walpin's removal from any possibility of continued performance of his duties was effected by, among other actions, the shut off of his access to his email address, his access to his office, and his access to his staff to direct, and even discuss, any continuing conduct of the Office of Inspector General ("OIG").[1]

On the following day, June 11, 2009, the only notice that was ever provided to both Houses of Congress concerning Mr. Walpin's termination, was issued over President Obama's signature.  Addressed to each of Vice-President Joseph R. Biden, in his capacity as the Presiding Officer of the United States Senate, and to Speaker Nancy Pelosi, in her capacity as Presiding Officer of the House of Representatives, the letter informed each that he was "exercising [his] power as President to remove [Mr. Walpin] from office," citing, as his authority to do so, his power to remove the incumbents in all "positions where I, as President, have the power of appointment, by and with the advice and consent of the Senate."  (Exhibits F and G).[2]  This letter to both Houses of Congress contained no specification of any reason for the removal; it only asserted his conclusion that he "no longer" has "the fullest confidence in" Mr. Walpin, without providing any basis for that asserted conclusion.

Thereafter, the President's representatives had communications with individual Senators, concerning those Senators' criticisms and questions on the President's termination of Mr. Walpin, which, those Senators stated, violated the controlling statute.

---

[1] On July 10, 2009, the White House, without explanation, extended the administrative leave status another week, until July 18 (Exhibit E).  That extension had no effect on this motion as the removal of Mr. Walpin from the performance of his duties and transfer to administrative leave status occurred on June 10th without the required 30-days advance notice (with reasons) to both Houses of Congress.

[2] Cited exhibits in this memorandum are to the respective exhibit attached to the accompanying affidavit of Gerald Walpin.

4

The first letter, on June 11th, from Senator Charles Grassley to the President (Exhibit H), cited the latter's role while in the Senate in co-sponsoring the Inspector General Reform Act, referred to that law's mandated condition precedent before an Inspector General could be removed, and stated that he was "deeply troubled to learn of the ultimatum given Inspector General Walpin absent Congressional notification." Senator Grassley continued: "We cannot afford to have Inspector General independence threatened," and urged the President "to review the Inspector General Reform Act you cosponsored and to follow the letter of the law should you have cause to remove any Inspector General." Finally, Senator Grassley further commented:

> There have been no negative findings against Mr. Walpin by the Integrity Committee of the Council of the Inspectors General on Integrity and Efficiency (CIGIE), and he has identified millions of dollars in AmeriCorps funds either wasted outright or spent in violation of established guidelines. *In other words, it appears he has been doing his job.* [emphasis added].

In response to Senator Grassley, Gregory B. Craig, Counsel to the President, repeated that the basis for the removal was the conclusory statement that "the President does not have full confidence in" Mr. Walpin. (Exhibit I). Further, Mr. Craig confirmed that Mr. Walpin had been immediately removed from his ability to continue to perform his duties as Inspector General by being placed in the status of "suspended, with pay," without providing any advance notice to Congress.

On June 16, in response to inquiries from three other Senators concerning the legality of Mr. Walpin's removal, Mr. Eisen wrote to those three individual Senators, "recogniz[ing] [those Senators'] view of the requirements for the formal notice letter which we submitted to Congress last week." (Exhibit L). Mr. Eisen asserted "[t]hat letter was prepared based upon long practice with respect to the form of such letters,"

without any factual basis of the use of the term "long practice," given that the Administration had been installed less than five months before, and had removed no other Inspector General. He also asserted that the letter to both Houses was based on "the Administration's view of the statute," without explaining that "view." Mr. Eisen then proceeded to purport to cure the failure to include any reasons for the removal in the letter to both Houses of Congress by specifying reasons in this letter addressed only to three Senators -- not to the full Senate and not to any member of the House of Representatives.[3]

---

[3] These belatedly-provided reasons -- never provided to both Houses of Congress -- were: 1) "a review was unanimously requested by the bi-partisan Board of [CNCS]" due to "a May 20, 2009 Board meeting at which Mr. Walpin was confused, disoriented, unable to answer questions and exhibited other behavior that led the Board to question his capacity to serve;" 2) "the Acting United States Attorney for the Eastern District of California… had filed a complaint about Mr. Walpin's conduct with the oversight body for Inspectors General, including for failure to disclose exculpatory evidence;" 3) Mr. Walpin had been absent from … [CNCS's] headquarters, insisting upon working from his home in New York over the objections of the Corporation's Board;" 4) "he had exhibited a lack of candor in providing material information to decision makers;" and 5) "he had engaged in other troubling and inappropriate conduct."

If the validity of these charges were to be litigated, the facts would establish that, if the White House had in fact investigated them, they provided no reason for removal. (See detailed response to each of these charges in ¶¶ 31-48 of the accompanying Walpin affidavit). As an example, "reason" no. 2 above relies on a complaint filed with the Integrity Committee of the organization of Inspectors General, but ignores that a point-by-point refutation of that complaint, signed by Mr. Walpin and each of the involved members of his staff (including four career non-political auditors, investigators, and communication expert), who had front-line responsibility for the conduct being attacked, had been filed with the Integrity Committee, and that Mr. Walpin was removed without allowing the Integrity Committee to investigate the facts and reach its conclusion. Likewise, "reason" no. 3 above in fact referred to Mr. Walpin's telecommuting pursuant to established Government policy, with notice to and approval of CNCS Management and members of the CNCS Board.

But these assertions are not material to the merits of this motion, which depends solely on the undisputable fact that Mr. Walpin was removed without compliance with the statutory conditions precedent to removal. It is therefore unnecessary to decide at this time whether, if these grounds had been set forth in a letter to both Houses of Congress 30 days in advance of removal, they had any factual basis or whether they were makeweights to cover over the real purpose of removing Mr. Walpin -- because he was doing too good a job as Inspector General in uncovering fraud, waste, and abuse, which made persons in power uncomfortable. As the Senate Report accompanying the Inspector General statute stated: that the Inspector General "is performing his duties in a way which embarrasses the Executive" does not meet the requirements for removing the Inspector General. Rather, there must be "some justification." See p. 13 *infra*.

Three days later, those three Senators wrote Mr. Eisen that they had concluded that the White House had not violated the statute by the manner of removing Mr. Walpin. We have provided this Court with a copy

On June 17, following that day's meeting between Senator Grassley and Mr. Eisen, Senator Grassley wrote Mr. Craig (Exhibit M) criticizing Mr. Eisen's "refusal to answer several direct questions posed to him about the representations made in his letter" of the reasons for Mr. Walpin's removal. Senator Grassley then proceeded to set forth questions, to which he requested written responses, concerning the newly stated putative reasons for Mr. Walpin's termination set forth in Mr. Eisen's June 16th letter. Among these questions were:

- If the initial and primary concern had to do with Mr. Walpin's capacity to serve for potential health reasons, why was he only given one hour to decide whether to resign or be fired?

- If Mr. Walpin's telecommuting arrangements since the beginning of this year were a major concern, then why was Mr. Walpin not simply asked to stop telecommuting?[4]

The record of commendations that Mr. Walpin had received as Inspector General were totally inconsistent with the White House decision to remove him and its belatedly-offered reasons. Shortly before the departure of David Eisner, who had served as the Chief Executive Officer of CNCS for all of the first 1 ½ years of Mr. Walpin's service as Inspector General, he wrote the following about Mr. Walpin:

> Corporation management and the Office of Inspector General continue to derive mutual benefit from a relationship that is direct, candid, and robust.
>
> I believe that this positive, constructive relationship is in the agency's best interest. That is not to say that we agree on every issue. But even when we disagree, we continue to benefit from transparent and direct communications, enabling us to better understand each other's position and perhaps identify areas of common ground and potential solutions.

(Exhibit MM).

---

of that letter (Exhibit O), in the spirit of full disclosure. We note that the Senators' letter provides no analysis of the statutory language nor any explanation of how immediate removal from performance of his IG duties could be consistent with the 30-day advance notice requirement.

[4] When we sought to obtain whatever answers were provided by the White House, we were informed that the White House never furnished any answers in writing to these questions.

After a little over two years of Mr. Walpin's service as Inspector General, a January 23, 2009, email from the Chairman of the CNCS Board of Directors, Alan Solomont, Stephen Goldsmith, then Vice-Chairman of the Board and formerly its Chairman, and Eric Tanenblatt, Chairman of the Board's Management and Governance ("MAG") Committee (equivalent to the Audit Committee on most boards of directors), described Mr. Walpin's performance as demonstrating his "deep and personal commitment to [his] responsibilities as Inspector General," and that he has "been a hands-on Inspector General, one who is willing to take the time to work through issues principally through face to face meetings, where candid give and take has yielded in many instances better decisions for the agency." (Exhibit R).

Not too long before that, on November 18, 2008, Elson Nash, Acting Director of Learn and Serve America, a major CNCS program, described Mr. Walpin's ability to communicate, following Mr. Walpin's presentation at a conference of Learn and Serve leaders and personnel, as follows: Mr. Walpin has "a remarkable way of putting [his] audience at ease while delivering a powerful warning of their responsibility as stewards of federal funds. … [I]t is clear that our attendees welcomed this important message." (Exhibit NN).

On June 9, 2009 -- the day before Mr. Walpin was telephonically informed that he was being removed -- Gretchen Van der Veer, CNCS Director for Leadership and Training, visited Mr. Walpin in his office, and asked Mr. Walpin to change his decision of declining to attend and speak at the forthcoming CNCS conference in San Francisco to be attended by more than 2000 CNCS leaders, staff and grantees. Ms. Van der Veer stated that CNCS so valued Mr. Walpin's speaking ability that CNCS was offering Mr.

Walpin more time to speak and answer questions than each of the Acting CEO and the Chairman of the Board would be allotted.

Significantly, the White House removed Mr. Walpin without performing any investigation into Mr. Walpin's performance of his duties as Inspector General during his almost 2 ½ years tenure in that position, nor into any of the bases of the decision to remove him set forth in letters to individual Senators. The White House made no attempt to interview Mr. Walpin or any members of the Staff of the Office of Inspector General -- all, but one, long-time government career employees -- who were personally involved in activities of that Office, and had personal knowledge of  Mr. Walpin's performance and supposed bases for his removal.  Further, the White House did not seek consideration of any issue relating to Mr. Walpin from the Integrity Committee of CIGIE, the body expressly created by Congress under the Inspector General Reform Act for the purpose of reviewing, and providing its conclusion on, allegations against Inspectors General.[5]

Not only did the White House fail to provide 30 days' advance notice to both Houses of Congress of Mr. Walpin's removal and the reasons therefore, the White House

---

[5] While not necessary to granting this motion, the undisputable sequence of events leading to Mr. Walpin's sudden and immediate removal strongly suggests that his removal was ordered to prevent him from continuing his performance of duties, in violation of Congress' purpose when it mandated conditions precedent to removal, including a minimum of 30 days for an Inspector General to continue his work -- and also allow Congress that time to intervene -- before being removed.  Mr. Walpin had only recently issued two critical reports which disturbed both CNCS Management and the CNCS Board: 1) one to Congress, strongly critical of a settlement CNCS had reached, of charges brought by Mr. Walpin's Office based on never-disputed facts, uncovered by career investigators and auditors, of misuse of a CNCS grant of over $800,000 by Kevin Johnson, reported to be a supporter and friend of the President -- a settlement reached without the participation of, and over the objection of, Mr. Walpin; and 2) one to CNCS of an audit finding that approximately $80 million had been provided to a grantee not lawfully entitled to receive those funds. The removal order followed closely on these reports; indeed, the request of the CNCS Board for a "review," which, the White House asserts, was the trigger for the removal decision (see n. 3 *supra*), was made the same day and immediately after Mr. Walpin announced the need for a reopening of his Office's investigation of Mr. Johnson due to newly discovered evidence of obstruction of justice by destroying and concealing documents subpoenaed by Mr. Walpin's Office.  See also, e.g., ¶41 of the accompanying Walpin affidavit for further facts demonstrating that the Board was troubled by the impact on them of the two reports and determined to make a "record" in support of action against Mr. Walpin.

never directly formally notified Mr. Walpin of his removal.  On June 20, 2009, ten days after Mr. Eisen telephonically informed Mr. Walpin that he was being removed, Mr. Walpin happened to be talking to a person in the Office of Human Capital at CNCS.  In response to Mr. Walpin's comment that he had never received any written notice of his removal, that person informed Mr. Walpin that their files reflected both an email and a letter to Mr. Walpin containing formal notice of removal.  Those writings (Exhibits B and C), when a copy of each was provided to Mr. Walpin following that telephone conversation at his request, were (i) an email, directed to Mr. Walpin's office email account, to which he had been stripped of access, promptly after Mr. Eisen's telephonic notice that he was removed, which was before the email was sent, and (ii) a letter bearing the salutation "Dear Mr. Walpin," without any address.

## III.   ARGUMENT

### A.   Summary

The White House removed Mr. Walpin and transferred him from his position as Inspector General into an administrative leave status without complying with the statutory requirement that, at least "30 days before the removal or transfer" the "President shall communicate in writing the reasons for any such removal or transfer to both Houses of Congress."   That condition precedent to an order of removal or transfer was specifically mandated by Congress in order to ensure the independence of Inspectors General, his/her ability to operate free from political interference, and to provide time for the Inspector General to complete any pending investigations.

10

**B.**     **Elements For A Preliminary Injunction**

On a motion for preliminary injunction in the context of preventing interference with a duly-appointed Federal official, the preliminary injunction should issue if the plaintiff establishes that (1) there is a substantial likelihood that plaintiff will succeed on the merits of his claim; (2) he will suffer irreparable harm if the requested relief is denied; (3) there will be no substantial harm to other parties of interest if the requested relief is granted; and (4) the public interest favors the issuance of a preliminary injunction. *Citizens for Responsibility and Ethics in Washington v. Cheney*, 577 F. Supp. 2d 328, 334 (D.D.C. 2008); *see also Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983).   As discussed below, the evidence in this record for a preliminary injunction establishes each of these four elements.  A preliminary injunction should therefore issue.

**i.**     **Mr. Walpin's Likelihood of Prevailing On The Merits**

In creating the position of Inspector General, Congress provided that, once duly appointed, the Inspector General could not be removed nor transferred solely at the will of the President.  The controlling statute expressly mandated that an Inspector General may not be removed or transferred unless the President first "communicate[s] in writing the reasons for any such removal or transfer to *both* Houses of Congress, not later than 30 days *before* the removal or transfer"  Inspector General Reform Act of 2008, 5 U.S.C. App. 3 § 3(b) (West 2009)  (emphasis added).  This mandated condition precedent to any removal or transfer was added to the pre-existent Inspector General statute by the Inspector General Reform Act of 2008 in order "to enhance the independence of the Inspectors General."   Inspector General Reform Act of 2008, H.R. 928, 110th Cong. (2007).

11

The debates on that Bill emphasized its purpose. Congressman Henry A. Waxman (D, CA-30) stated that this statute provided Inspectors General with "greater independence ... and the President will have to inform Congress thirty (30) days before any IG is removed." 154 CONG. REC. H9882 (daily ed. Sept. 25, 2008). Congressman Edolphus Towns also emphasized that the purpose of this condition precedent to removal was to prevent an Inspector General from being "fired" while "in the middle of an investigation," so that "it gives them the freedom to be able to move and get the things they need to get done." 154 CONG. REC. H9881 (daily ed. Sept. 25, 2008). Senator Joseph Lieberman likewise emphasized that the purpose of this addition to the Inspector General statute was "to ensure that they have the independence they need to carry out this vital, but often unpopular work," by "requiring the Administration to notify Congress thirty (30) days before attempting to remove or transfer an IG," so as to "give us [Congress] time to consider whether the Administration was improperly seeking to displace an Inspector General for political reasons because the IG was, in effect, doing his or her job too well." 154 CONG. REC. S10054-55 (daily ed. September 29, 2008).

These comments concerning this 2008 amendment effectively reiterated and strengthened the purpose of the Inspector General Act of 1978. The Senate Report accompanying the 1978 Act made clear that its purpose was to "confer upon the Inspector General a unique status within the executive branch," by guarantying Inspectors General "the requisite independence to do an effective job." SEN. REP. NO. 95-1071, pp. 2706, 2682. To implement that goal, Inspectors General were to be freed from the possibility of being prevented "from undertaking and completing any audits and investigations which the Inspector ... General deems necessary." SEN. REP. NO. 95-1071 p. 2677. The

Senate Report was prescient as to what occurred here to Mr. Walpin, where it is apparent

that Reports his Office issued were not happily received by the Executive Branch.  As the

Senate Report recognized,

> There is a natural tendency for an agency administrator to be protective of the
> programs that he administers. ... Even if he is not personally implicated,
> revelations of wrongdoing or waste may reflect adversely on his programs and
> undercut public and congressional support for them. ... For that reason, the audit
> and investigative functions should be assigned to an individual whose
> independence is clear and whose responsibility runs ... ultimately to the
> Congress, [*i.e.,* an Inspector General.]

*Id.* at 2682.

The Senate Report also explained its requirement that the President must communicate to

Congress his reasons for the removal: it must communicate "some justification – other

than the desire to remove an Inspector ... General who is performing his duties in a way

which embarrasses the executive – to warrant the removal action." *Id.* at 2701.

Mr. Walpin was removed from his position as Inspector General without any prior

notice to Congress.  He was telephonically given an ultimatum on June 10, 2009, that he

had to resign or be fired, and that he had one hour to choose between those options.  Less

than one hour later, when Mr. Walpin declined to make that decision in such a limited

time, he was told that he was being removed and transferred to the status of

administrative leave for thirty days.  Almost immediately, his access to his emails, his

office, and his staff was denied, thereby immediately removing him from his ability to

continue to perform his duties as Inspector General.  This action thus violated the

requirement that no removal or transfer take place before thirty days advance notice to

both Houses of Congress.

13

Significantly, even then, the President did not give -- and in fact never gave -- any notice to both Houses of Congress of the decision to remove Mr. Walpin and "the reasons" therefore. The **only** letter sent to both Houses of Congress, over the signature of the President, was dated June 11, 2009 -- the day after the removal had been effected -- addressed to Vice-President Biden, as the Presiding Officer of the Senate, and to Speaker Nancy Pelosi, as the Presiding Officer of the House. While it thereby informed both Houses that he was removing Mr. Walpin, it provided no reason for doing so. Instead, he merely stated that he "no longer" has "the fullest confidence in" Mr. Walpin, but failed to state any reason for that supposed loss of confidence. That he asserted that he no longer had the fullest confidence in Mr. Walpin is a conclusion, equivalent to the conclusion that he did not want Mr. Walpin to remain, without any reason for reaching that conclusion. Indeed, the President's letter contained what the Senate Report had stated was insufficient: no "justification -- other than the desire to remove" the Inspector General (see p. 13 *supra*). Further, the letter specified that he was acting pursuant to the same President's power to remove all "other positions where I, as President, have the power of appointment, by and with the advice and consent of the Senate," thereby expressly announcing that he was ignoring the Congressionally-mandated condition precedent to removal of an Inspector General which does not apply to his right to remove all "other positions where [he], as President, ha[s] the power of appointment, by and with the advice and consent of the Senate."

Controlling authorities have held that, in these circumstances of depriving a duly-appointed federal official of his position and ability to perform his duties, contrary to the

statutory conditions imposed by Congress, that official is entitled to a judicial remedy in the form of mandamus or injunction reinstating him in his position.

This line of authorities starts with the seminal decision of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), which involved the Executive Branch's refusal to allow Marbury to serve in his duly-appointed position, set by Congress as a five-year tenure. Marbury, while he had been duly appointed, had not yet received his formal commission, which the Court held was a ministerial act -- described by the Court as "a duty distinct from the appointment, the performance of which ... could not legally be refused.[6]   In words even more applicable to this case, the Supreme Court held that "if he was not removable at the will of the President," it "would either give [the duly-appointed officer] a right to his commission [formalizing his holding the position], or enable him to perform the duties without it." *Id.* at 156.   Further, the Court explained that "when the constitutional power of appointment has been exercised" -- as is undisputed as to Mr. Walpin's appointment -- "the power of the Executive over an officer, not removable at his will, must cease." *Id.* at 157.   The Court repeated and emphasized this holding thereafter:

> [W]hen the officer is not removable at the will of the executive, the appointment is not revocable and cannot be annulled.  It has conferred legal right which cannot be resumed.  ....  The right to the office is then in the person appointed, and he has the absolute, unconditional power of accepting or rejecting it.

*Id.* at 162.

Again, it is undisputable that Congress specifically withdrew Inspectors General from the category of Presidential appointees removable at will, requiring instead that a removal may be ordered only if, thirty days in advance of the removal, the President

---

[6] At this early point in the opinion, the Court used the word "perhaps" as modifying "could not legally be refused."  But the ultimate decision of the Court, after its full discussion, was that it could not be refused.

notifies both Houses of Congress of the intended removal and the reasons therefore.  The facts establish that the President did not comply with that statutory prerequisite to Mr. Walpin's removal.  Therefore, as the *Marbury* Court held, "the right to the office" of Inspector General is "in the person appointed," Mr. Walpin, "and he has the absolute, unconditional power" to opt to remain in it, because the removal, without complying with the statutory condition precedent is "violative of a vested legal right." *Id.*

The *Marbury* Court continued to address the obligation of the ministerial actor within the Government -- there the Secretary of State and here the named defendants who have the duty to keep Mr. Walpin's employment records -- who is given an illegal order to deprive the duly-appointed official of his position and ability to perform his duties:

> It is the duty of the Secretary of State to conform to the law, and in this he is an officer of the United States, bound to obey the laws.  He acts, in this respect, ... under the authority of law, *and not by the instructions of the President.*  It is a ministerial act which the law enjoins on a particular officer for a particular purpose.

*Id.* at 158 (emphasis added).

The Supreme Court then turned to the issue of the remedy that exists for this violation of the appointee's "vested legal right" in the position.  Commencing from the general principle that "every right, when withheld, must have a remedy," it held that "where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems ... clear that the individual who considers himself injured has a right to resort to the laws of his country for a remedy." *Id.* at 163, 166.  Thus, "if the officer is by law not removable at the will of the President, the rights he has acquired are protected by the law, and are not resumable by the President.  They cannot

be extinguished by executive authority, and he has the privilege of asserting them in like manner as if they had been derived from any other source." *Id.* at 167.

The Supreme Court therefore held that a duly-appointed federal official, on whose removal Congress has imposed conditions limiting the President's firing-at-will authority, has the right to keep his position unless and until those conditions are met.[7]

More than 150 years after *Marbury,* the Supreme Court reached the same conclusion and provided a remedy in *Wiener v. United States,* 357 U.S. 349 (1958). There, as here, a new President, Eisenhower, asked for the resignation of Wiener, who had been duly appointed by the preceding President, Truman, because President Eisenhower stated that he wanted "personnel of my own selection." *Id.* at 350. When, as here, Wiener refused to resign, President Eisenhower removed him. Rather than seeking the remedy of reinstatement, Wiener elected to sue in the Court of Claims for recovery of his salary for the period for which he was wrongly removed. The Supreme Court reversed the Court of Claims' dismissal of the complaint and ordered full reimbursement to Wiener.

The *Wiener* Court first noted that *Myers v. United States,* 272 U.S. 52 (1925), which had been cited as upholding a President's inherent right to remove Presidential appointees, had been severely limited "to include only 'all purely executive officers." *Id.* at 352. Quoting *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), the Court referred to "a sharp line of cleavage between officials who were part of the Executive establishment and were thus removable by virtue of the President's constitutional powers, and those who are members of a body 'to exercise its judgment without the leave or

---

[7] The Court declined to provide the relief only because the Constitution provided that original jurisdiction lay in that Court and not in the court in which the action had been commenced.

17

hindrance of any other official or any department of the government.'" 357 U.S. at 353, quoting 295 U.S. at 625-26. Clearly, based on the Inspector General statute and the Congressional history for its enactment, Inspectors General fit into the latter category granted independent judgment.

The reason for this special protection against the President's unconditioned right to fire was explained by the *Wiener* Court, again quoting from the *Humphrey's Executor* opinion: "'one who holds office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will.'" 357 U.S. at 357, quoting from 295 U.S. at 629. Wiener was held to have a valid cause of action because Congress, in creating the position to which Wiener had been appointed, had fixed the term for that position as three years after certain filings. That Congressionally-imposed condition on that appointment was held inconsistent with an inherent Presidential right to terminate a prior appointee; it "was not the conception of Congress in creating" the position that an appointee who had not finished his term could be removed because the President wished to appoint someone else. 357 U.S. at 354.

Significantly, the Supreme Court, in both *Humphrey's Estate* and *Wiener* recognized that Congress had not specifically imposed any condition that limited the President's right of removal. Yet, it held that the President was precluded from exercising that right because the statutory purpose was to ensure independence of the appointee from any pressure: "Congress did not wish to have hang over the [appointee] the Damocles' sword of removal for no reason other than that he preferred to have … men of his own choosing." 357 U.S. at 356. *A fortiori* here, where Congress expressly imposed the condition precedent of thirty days advance notice to Congress of the

18

intended removal with the reasons therefore as the mean of protecting Inspectors General from "the Damocles' sword of removal for no reason other than [the President] preferred to have … men of his own choosing" (or for political reasons), the removal of Mr. Walpin without compliance with the Congressionally-imposed condition establishes the right of Mr. Walpin to the remedy of reinstatement.

In line with these Supreme Court decisions, this Court (Johnson, J.) granted a preliminary injunction to reinstate a prior President's appointees whom the succeeding President removed, in *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983). The plaintiffs there had been duly appointed by President Carter and confirmed by the Senate to positions as Commissioners of the Civil Rights Commission, and then, when President Reagan assumed the presidency, removed by him. Plaintiffs sought an injunction to prevent any interference with their positions and the performance of their duties in their positions. This Court granted the requested preliminary injunction. Relying on both *Humphrey's Executor* and *Wiener,* this Court reasoned that the President's unrestricted right of removal of Presidential appointees is limited to those who are purely executive officers, but not to those who perform investigations and reports thereon to Congress and exercise judgment "without the leave or hindrance of any other official or any department of the government." *Id.* at *2, quoting from 295 U.S. at 625-26.

As the above excerpts from the Inspector General statute and the Congressional history related thereto express, Inspectors General fit within the latter category: the Inspector General's "independence is clear and [his] responsibility runs … ultimately to Congress (see Senate Report quoted at p. 13 *supra*).

Significantly, as this Court in *Berry* stated, the statute creating the Civil Rights Commission did not expressly impose any limitation on the President's inherent right of removal of those appointees.  Yet, the Court relied on "extensive legislative history … that Congress intended to create a Commission … independent of Presidential control and directive … free from any control or coercive influence by the President.  *Id.* at *4. *A fortiori* here, where the statute expressly imposes a condition precedent on the President's ability to remove an Inspector General *and* the legislative history makes clear that Congress intended to protect the Inspector General's independence by limiting the President's power to remove, Mr. Walpin has established not only the likelihood of prevailing on the merits, but has so established beyond any doubt.

### ii.     **Irreparable Harm**

Mr. Walpin has suffered, and will continue to suffer, irreparable harm in being deprived of his statutory right to function as Inspector General unless and until the condition precedent fixed by Congress to his removal is met. *Berry*, 1983 WL at *5.  As this Court held in *Berry*, these facts establish "the type of injury … [which] is sufficient in kind and degree" for the issuance of a preliminary injunction to maintain him in his position as Inspector General.  Moreover, here, a preliminary injunction is particularly appropriate to prevent the complications and confusion that would occur in awaiting a permanent injunction to reinstate him, given the normal duration of such litigation proceedings and the likelihood that, at that time, the current President would have appointed a replacement.  The preliminary injunction at this time, before appointment of a replacement, would avoid that complication and adverse effect on any successor-appointee.

### iii.    **No Harm To Other Parties In Interest**

There is no harm to the named Defendants who are named as defendants solely in their ministerial capacities as keepers of the employment record of Mr. Walpin.  If they had not received the illegal order to record the removal of Mr. Walpin in the employment records, they would have continued to reflect in his employment records his service as Inspector General.  *Id.* at \*6.  Rather, there is harm to the corporate Defendant CNCS if the injunction is not granted.

As noted above, CNCS has operated without an appointed IG since June.  Two recent reports underline the harm to CNCS due to Mr. Walpin' removal and the public interest in having Mr. Walpin promptly returned to his Presidentially-appointed position as Inspector General, to fill the vacuum created by his illegal removal.  First, Congress only recently noted serious management/budgetary problems at CNCS, based on a report prepared by Mr. Walpin's Office before his removal.  A review of CNCS's budget process identified, *inter alia*, outdated budget policies, absence of an IT strategic plan, and a poor command structure.  *See e.g.,* OFFICE OF THE INSPECTOR GEN., EVALUATION OF THE FISCAL YEAR 2008, OIG Report 09-16 (Corp. Nat'l & Cmty. Serv. 2009), *available at* http://www.cncsig.gov/AuditReports.html; *and* Nancy Lewis, *Same Old Money Problems at CNCS*, Youth Today, August 20, 2009, *available at* http://www.youthtoday.org/publication/article.cfm?article_id=3477.  Second, CNCS set up a conference call with the White House involved, held on August 27, 2009, in which persons from around the country interested in the arts would listen to a White House presentation seeking to obtain assistance to "work together to tackle some of the nation's toughest issues: ... health, energy and the environment ...." -- all involved in the President's political agenda.  (Exhibit PP).  CNCS is prohibited from becoming involved

in political issues. Finally, in light of the first-lady's noted and professed interest in the CNCS, there is heightened focus and pressure on the organization. This added pressure will contribute to an environment subject to abuse due to the absence of a fully confirmed IG.

### iv.  **Public Interest**

As this Court stated, in considering the same issue in *Berry*, "[t]he public interest strongly favors the issuance of a preliminary injunction in this case." *Id.*  First, any Governmental violation of statutory requirements is contrary to the public interest. Here, the removal of an Inspector General, in violation of the protection against such removal imposed by Congress, must have a chilling and adverse impact on all Inspectors General, creating substantial worries about performing their responsibilities to root out fraud and waste if the subject of their inquiry happens to be a friend of a highly-placed political personage, or might result in public disparagement of a Presidential program. Inspectors General were created to perform their responsibilities without worrying about their personal job and financial security. This unlawful removal of Mr. Walpin is contrary to the public interest in having independent watchdogs against fraud, waste and abuse, unafraid to report the facts as they find them. Issuance of a preliminary injunction to void the removal of Mr. Walpin would further the public interest by assuring all other Inspectors General that tampering with their independence will not be permitted. Finally, the removal of Mr. Walpin as Inspector General has left CNCS without a Presidentially-appointed Inspector General to lead the continued watchdog scrutiny which Congress felt necessary to prevent waste, fraud, and abuse in CNCS programs.

## IV.   **CONCLUSION**

WHEREFORE, for the foregoing reasons, Plaintiff Gerald Walpin respectfully requests that the Court grant his Motion for Preliminary Injunction against Defendants the Corporation for National and Community Service, Nicola O. Goren, as Acting Chief Executive Officer thereof, Raymond Limon, as Chief Human Capital Officer thereof, and Frank Trinity, as General Counsel thereof.


Dated: September 17, 2009

Respectfully submitted,
GREENBERG TRAURIG, LLP

Sanford M. Saunders, Jr.
D.C. Bar No. 376098
Joe D. Whitley
D.C. Bar. No. 422385
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone:   (202) 331-3130
Facsimile:   (202) 261-0150
saunderss@gtlaw.com
whitleyj@gtlaw.com

*Counsel for Plaintiff Gerald Walpin*


Gerald Walpin
Of Counsel
875 Park Avenue
New York, New York 10075