IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GERALD WALPIN,

       Plaintiff,

v.

THE CORPORATION FOR NATIONAL AND COMMUNITY SERVICE, NICOLA O. GOREN, as Acting Chief Executive Officer thereof, RAYMOND LIMON, as Chief Human Capital Officer thereof, and FRANK TRINITY, as General Counsel thereof,

       Defendants.

Civil Action No.  1:09-cv-01343 (RWR)

## AFFIDAVIT OF GERALD WALPIN

**Table of Contents**

(A)   Outline of My Background ................................................................................1
(B)   My Removal As Inspector General ................................................................2
(C)   Only White House Notice To Both Houses Of Congress .........................5
(D)   Correspondence Between White House and Individual Senators or Members of Congress, But Not to Both Houses of Congress .....................5
(E)   No Prior Notice By White House Of Dissatisfaction ...............................6
(F)   No Reasonable Investigation Of Facts By White House ..........................6
(G)   The OIG Career Staff Opposed My Departure as Inspector General ...7
(H)   My Teleworking ...............................................................................................8
(I)   OIG Special Report To Congress ................................................................11
(J)   OIG Audit Report Concerning CUNY ......................................................13
(K)   Complaint To Integrity Committee ...........................................................14
(L)   Miscellaneous Later Expressed Reasons For My Removal .....................17
   i.   Board Request To White House .........................................................17
   ii.   "Confused, Disoriented and Unable To Answer Questions" .........20
   iii.   "Lack Of Candor" ...............................................................................28
   iv.   "Other Troubling and Inappropriate Conduct" ............................29
   v.   "Disruptive To Agency Operations, Impairing [My] Effectiveness" ...........29
(M)   Commendation Of My Work By CNCS Management and Board ....................30

## AFFIDAVIT OF GERALD WALPIN

| | | |
|---|---|---|
| DISTRICT OF COLUMBIA | ) | |
| | ) | SS: |
| CITY OF WASHINGTON | ) | |

GERALD WALPIN, being duly sworn, deposes and says:

1.     I am the plaintiff in the above-captioned lawsuit.  I submit this affidavit in support of my motion for an order of mandamus in the form of a preliminary injunction directing defendants to reinstate me as Inspector General of the Corporation For National And Community Service ("CNCS").

2.     I submit this affidavit to set forth the facts on which this motion is based. I also set forth other facts relevant to the allegations belatedly made against me so as to allow this Court the opportunity, if it is so inclined, to understand the circumstances surrounding my removal, although they are not material to the legal basis for this motion.  I refer the Court to the accompanying Memorandum In Support of this motion for the controlling law and analysis that establishes my right to the issuance of a Preliminary Injunction.

**(A)     Outline of My Background**

3.     I did not become Inspector General of CNCS because I needed a job.  This country had been very good to me in allowing me to have a successful legal career.  I graduated from Yale Law School in 1955 with a degree *cum laude* and was selected to serve as the Managing Editor of the Yale Law Journal.  I first served as Law Clerk to two Federal District Judges in the Southern District of New York, and then served three years as a JAG officer in the United States Air Force.  When I returned to civilian

life in 1960, I became an Assistant United States Attorney in the Southern District of New York where, for most of my tenure, I was Chief of Special Prosecutions. In 1965, I joined the law firm generally known as Rosenman & Colin (with periodic changes of following names), in which I became a partner and Chairman of its large Litigation Department. In 2006, when the White House called to ask if I would accept the nomination as Inspector General, I was, due to my firm's age limit for partners, Counsel to the firm, but still with an active and successful litigation practice. Indeed, I had been listed in all approximately twenty years of publication of Best Lawyers in America. I readily agreed to leave that practice in order to accept this opportunity to give something back to this Country that had given me so much.

4.      I have been honored with various awards, including the Human Relations award from the Anti-Defamation League, the Learned Hand award from the American Jewish Committee, and, in 2003, the American Inns of Court Professionalism Award, presented to me by Justices Ruth Bader Ginsburg and Stephen Breyer.

5.      On January 6, 2007, following then President Bush's nomination, and confirmation by the United States Senate, I assumed the duties of Inspector General for CNCS, and continued serving in that position until June 10, 2009.

### (B)     My Removal As Inspector General

6.      In the late afternoon on June 10, 2009, I was in a car, then being driven by my wife, to attend the Second Circuit Judicial Conference, to which I had been invited by the Chief Judge of that Circuit. At about 5:20 p.m., I received a telephone call from a person who identified himself as Norman Eisen,  Special Counsel to the President. My first thought was that Mr. Eisen was calling me about the same matter on which I

2

had already very recently received several calls from White House staff, being the nomination of Sonia Sotomayor to the Supreme Court, and requesting my assistance with her Senate confirmation (to which I had agreed and thereafter provided a submission in her support). Instead, Mr. Eisen informed me that the President wanted him to communicate to me the President's appreciation for the good service I had given to the country, but that he felt that it was time for me to move on, and therefore requested that I resign. He further stated that, if I did not resign, the President would order my removal. Mr. Eisen said that I had one hour to tender my resignation or I would be removed. I asked him the reason for the removal, to which he responded that it was "time to move on." I also mentioned to him that I had recently issued two reports highly critical of CNCS's operations and asked him the relationship between the removal decision and those reports. He stated that it was a "coincidence."

7.     Mr. Eisen called me back in about 45 minutes and asked for my decision. I stated that I could not make such an important decision in such a short time, and thus could not provide an answer without more time. I asked to be given until the following Tuesday or Wednesday. Mr. Eisen said that additional time was not possible, and then immediately informed me that I was removed from my position as Inspector General and transferred to Administrative Leave status for 30 days, following which I would have no relationship to the Government.

8.     At 7:32 p.m., when I arrived at the Conference site, I sent an email to Mr. Eisen, summarizing our telephone call and the reasons for my response. (A copy of that email is annexed as Exhibit A hereto.)

9.      Later that evening, when I attempted to send and receive emails, using the Inspector General email address through the server and equipment of the Office of Inspector General ("OIG"), I learned that I no longer had access to that means of communication.  On the following day, I was informed by the person in the OIG who had been appointed (by management of CNCS) as Acting Inspector General in my place, that he had been instructed to shut off my email, that my security card access to the Office of Inspector General had been revoked, that I could not come to the office during normal work hours, and that any communication with anyone in the Office should be through him unless he otherwise authorized.  I quickly realized that my continued performance of my duties as Inspector General had been barred.

10.     Other than the telephonic notice from Mr. Eisen in the late afternoon of June 10, 2009, I never received from the President or any of his staff any notice that I was removed from my position as Inspector General.

11.     On June 26, 2009, a person in the Office of Human Capital at CNCS was speaking to me about the documentation I needed to complete in connection with my termination, including to continue health insurance.  I stated that I had never received any written notice of my removal.  That person then informed me that her files contained both an email and a letter to me reflecting formal notice of removal.  At my request, she faxed a copy of both to me.  (A copy of each that I thus received is annexed as Exhibits B and C hereto.)  On June 29, 2009, I emailed to Mr. Eisen, advising him of my receipt of the email and letter and how I had received them (Exhibit D).  I received no response from Mr. Eisen.[1]

---

[1] On July 10, 2009, I was telephonically informed by Ms. Lisa P. Love-Adams, of the CNCS Office of Human Capital, that CNCS's Office Of General Counsel had asked her to notify me that my administrative leave had been extended by

**(C)     Only White House Notice To Both Houses Of Congress**

12.     Third parties provided me with a copy of two identical letters, over President Obama's signature, each dated June 11, 2009, one addressed to Vice-President Joseph R. Biden, in his capacity as Presiding Officer of the United States Senate, and one to Speaker Nancy Pelosi, in her capacity as Presiding Officer of the House of Representatives (Exhibits F and G).

**(D)     Correspondence Between White House and Individual Senators or Members of Congress, But Not to Both Houses of Congress**

13.     I have since received from third parties, including Congressional staff and media personnel (who asked for my comment on such documents) the following letters relevant to my removal:

    a.  Letter dated June 11, 2009, from Senator Charles E. Grassley to the President (Exhibit H).

    b.  Letter dated June 11, 2009, from Gregory B. Craig, Counsel to the President, to Senator Grassley (Exhibit I).

    c.  Letter dated June 15, 2009, from Congressman Darrell Issa to Mr. Craig (Exhibit J).

    d.  Letter dated June 16, 2009, from Congressman Edolphus Towns to Mr. Craig (Exhibit K).

---

the White House for an additional week, until July 18. When I asked if any reason had accompanied the extension, she replied in the negative. At my request, she thereafter confirmed the extension by email (Exhibit E hereto). This extension has no effect on this motion as the removal from my performance of duties and transfer to administrative leave status occurred on June 10th, without 30 days advance notice (with reasons) to both Houses of Congress.

e. Lettter dated June 16, 2009, from Mr. Eisen to Senators Joseph I. Lieberman and Susan M. Collins, with copy to Senator Claire McCaskill (Exhibit L).

f. Letter dated June 17, 2009, from Senator Grassley to Mr. Craig (Exhibit M).

g. Letter dated June 18, 2009, from Senators Michael B. Enzi and Orrin G. Hatch to Mr. Craig and Ms. Nicola O. Goren, with opinion of Congressional Research Services attached (Exhibit N).

h. Letter dated June 19, 2009, from Senators Lieberman, Collins, and McCaskill, to President Obama (Exhibit O).

i. Letter dated June 30, 2009, from Mr. Craig to Senator Grassley (Exhibit P).

**(E)      No Prior Notice By White House Of Dissatisfaction**

14.      Prior to Mr. Eisen's telephone call in the late afternoon of June 10, 2009, no one from or on behalf of the White House had given me any notice or reason to think that my service as Inspector General was subject to any criticism.

**(F)      No Reasonable Investigation Of Facts By White House**

15.      Concerning the belatedly provided reasons provided to certain individual Senators for my removal, as set forth in the letter dated June 16, 2009 (Exhibit L), no one at or on behalf of the White House ever performed even the most elementary steps of an investigation into their merits:  I was never interviewed or asked to provide my understanding of the facts relevant to those allegations; and, although many members of my staff -- all but one were career non-political employees -- were directly involved in the front lines of the actions taken by my Office that were at the heart of the

allegations belatedly made against me, none of them was interviewed to provide their knowledge of the relevant facts.

**(G)      The OIG Career Staff Opposed My Departure as Inspector General**

16.      I know, from personal knowledge, that my staff not only fully supported me, but they wanted me to remain as Inspector General.   This conclusion is substantiated by, among other facts, the following event in early January 2009:  My wife of then 51 years of marriage was not happy with, as she put it, a commuting marriage, in which, for two years, I left our home in New York early on Monday morning of each week and returned on Friday evening.  I therefore sent a letter to then President Bush, thanking him for allowing me to serve our Country in this position, and informing him, as a courtesy, that I would be resigning to the new President at the end of January.  I then called a meeting of the full OIG staff, and so informed them. The next morning, a delegation of the OIG Staff came to my office, requesting that I not resign, but continue.  They informed me that they had never had an Inspector General who worked as hard as I did, who motivated and supported the Staff as much as I did, and who, thereby, had instilled a great positive spirit in the Office.  They pointed to the several major investigations and audits undertaken while I was the Inspector General and stated that those investigations and audits caused the Staff to believe that they are making a meaningful impact of uncovering and dealing with misuse of Government funds.  They said that they understood my family reasons for wanting to resign, but suggested that my family needs could be reconciled with the continued performance of my duties as Inspector General, by telecommuting from my home in New York three days each week, and working from the Office two days a week, meaning that I would be away from my wife at night only one night each week.

They pointed out that the Government had expressly approved telecommuting to keep personnel who would otherwise have to leave because of family obligations. I replied that I was honored to receive such a request, and that I would discuss it with my wife and respond later. Either the following day or the day thereafter, I informed them that I was willing to do it, subject to the following conditions: 1. I would get an opinion from the OIG Counsel (a long-time career government attorney) that it was proper; 2. I would inform CNCS management and receive no reasonable objection; and 3. I would resign if, during a six month test period, I, my wife, the OIG Staff, or CNCS management reasonably believed it was not working in the best interests of either the OIG or my family.

17.    Thereafter, I so informed my staff, in an all-hands meeting, of my decision to remain, subject to determining that it would work during a six month test period. I specifically instructed my Staff that I wanted them to inform me if the telecommuting arrangement was not working in a manner that the Office work was being adversely affected. I never received any such notice.

**(H)    My Teleworking**

18.    As an Office independent of CNCS control, I was not required to obtain CNCS approval as to how I managed my Office; the OIG Policy Manual, adopted before the question of my teleworking arose, expressly prescribed that all decisions as to telecommuting were to be made by the Inspector General (see Exhibit Q). However, I believed it in the best interest of my Office that I obtain and consider CNCS management's view on the telecommuting arrangement. I therefore then met with top CNCS management, Nicola Goren, the Acting CEO, and Frank Trinity, CNCS Counsel, and informed them of my initial intention to resign, the request from my staff,

and my decision with its conditions.  Both stated that they had no objection and saw no reason why it would not work without adversely affecting CNCS or OIG.   I emphasized to them that I wanted them to inform me if at any time they saw any adverse effect on CNCS or my Office from my telecommuting; they agreed to do so.  I never received any such notice from either.

19.     Again, although the CNCS Board had no jurisdiction over the independent operation of my Office, I believed it appropriate to inform the Board's Management and Governance ("MAG") Committee (equivalent to the Audit Committee on most Boards), in order to consider that Committee's views.  I therefore telephoned Eric Tanenblatt, the MAG Committee Chair, and informed him of what had occurred and my plans for telecommuting.  He thanked me for the information, and later called back to suggest a telephonic conference on the subject with the three members of the MAG Committee, composed of Mr. Tanenblatt, Alan Solomont (then Chair of the Board), and Stephen Goldsmith (then Vice-Chair of the Board and formerly its Chair).   On January 23, 2009, I received an email from Mr. Tanenblatt that he sent on behalf of all three MAG Committee members (the other two were cc'd on it).  (A copy of that email, with my response, is annexed as Exhibit R hereto.)  He therein informed me of concerns that they had about the telecommuting that they would like to discuss in the scheduled telephonic meeting.

20.     I provided a copy of the MAG Committee's email to my Executive Staff (including the Assistant Inspectors General, and my Counsel; all are career employees who were in the Office when I arrived).  Each had previously advised me that he believed that the telecommuting proposal would work and not adversely affect the

Office's work. I asked them to review the MAG Committee email and provide their views. Each informed me that the concern expressed did not have merit. Three of them, the OIG Counsel, the Assistant IG for Audits, and the Assistant IG for Support (who is now Acting Inspector General), provided me with written responses specifying their views of how I should respond to the MAG Committee concerns expressed in the email. (Those written response are annexed as Exhibits S, T, and U hereto.)

21.    My telephonic meeting with the MAG Committee took place on January 26, 2009. Before that meeting, I had emailed to the three of them authorities supporting my position on teleworking and on the other subject raised in Mr. Goldsmith's included email (see ¶ 33 *infra*). Mr. Goldsmith replied "Thank you for your helpful response." At the meeting, I recall that I made a presentation concerning the telecommuting plan, including my intention to resign which led to my Staff's request to telecommute; that my teleworking was consistent with Government policies on teleworking; that I would be doing it for a test period of six months to see if it works in the best interests of both my Office and my family; and that I wanted input on that issue from OIG Staff, CNCS's Management, and the MAG Committee.

22.    Among the Government pronouncements on teleworking that I provided to them in advance of the telephonic meeting, and included in my presentation, were those that had been provided to me by OIG Counsel in support of his opinion that the teleworking program I would be following was a proper one. They included a report of then President-Elect Obama's "support" for "increased Teleworking [in] the federal government" (Exhibit V), and "A Guide To Telework In The Federal Government"

published by the Government Office of Personnel Management (Exhibit W), which

included the following:

> The Office of Personnel Management defines telework as "work arrangements in which an employee regularly performs officially assigned duties at home …."
>
> *****
> [B]enefits: Recruiting and retaining the best possible work force …; Helping employees manage long commutes and other work/life issues that, if not addressed, can have a negative impact on their effectiveness *or lead to employees leaving Federal employment* [emphasis added].

The OPM Guide continued to note that each federal agency is required, by statute, to

"establish a policy under which eligible employees of the agency may participate in

telecommuting to the maximum extent possible without diminished employee

performance."   The Guide specifically approved of telecommuting on a "regular"

basis "3 days per week."   I pointed out that the program that I would be following for

a test period meets the OPM prescriptions.

     23.    At the end of my presentation, the MAG Committee members expressed

no objection to my telecommuting program, and agreed to see how it worked during

the six month test period.   I asked them to advise me if, at any time, they saw any

problems caused by my telecommuting.   Following this telephonic meeting, no

member of the MAG Committee ever communicated to me any objection to continuing

the telecommuting procedure.

    **(I)**    **OIG Special Report To Congress**

    24.    In early May 2009, my Office submitted a Special Report to Congress,

pursuant to the statutory mandate that the Office of Inspector General keep Congress

"fully and currently informed … concerning … serious problems, abuses and

deficiencies relating to the administration of programs and operations administered or

financed by" CNCS.  5 U.S.C ¶ App. §§ 3, 4, 5.  The Report was signed by me and by the two Assistant Inspectors General, for Audits and for Investigations, who supervised and participated in the audit and investigative work, and the conclusions reached, that were the subject of the Report.  The Special Report (Exhibit X) sets forth all relevant facts concerning the investigation and audit of the grants to St. HOPE Academy, in Sacramento, California, of which Kevin Johnson was the principal; the OIG referral to the United States Attorney for criminal and/or civil prosecution; the settlement of those charges without OIG's participation and over OIG's objections; and the Order of Suspension of St. HOPE and Mr. Johnson issued based on OIG's factual showing, and the lifting of that suspension over OIG's objections.

25.  Instead of providing CNCS's response to the Special Report within seven days as required by statute, Ms. Goren, on May 12, 2009, advised various Senators and Congresspersons that she was "constrained" not to do so because of the pendency of the complaint before the Integrity Committee (Exhibit Y).  I objected to CNCS for its failure to comply with the statutory mandate of filing any response in seven days, and the use of the unauthorized explanation for delaying the response in order to disclose wholesale the existence of the complaint to the Integrity Committee which is supposed to remain confidential unless and until sustained by a decision of the Integrity Committee.  I also then requested of various recipients of her letter that CNCS be required to abide by the seven-day rule.  On June 18, 2009, Senators Enzi and Hatch forwarded to Ms. Goren a copy of the opinion from the Congressional Research Service, dated June 12, 2009 (part of Exhibit N), which concluded that the "constraint"

relied on by Ms. Goren "does not appear to be legal in nature." On June 18, Ms. Goren complied, and submitted the CNCS response (Exhibit Z).

**(J)    OIG Audit Report Concerning CUNY**

26.    On June 4, 2009, my office submitted to CNCS and to the Grantee, the City University of New York ("CUNY"), OIG's Final Audit Report on grants of more than $80 million from CNCS, through AmeriCorps -- one of the largest, if not the largest, AmeriCorps grants -- concluding that the entire amount was improperly granted to and accepted by CUNY in violation of statutory and grant requirements. This Final Audit Report (Exhibit AA) confirmed and expanded upon a preliminary audit report (part of Exhibit AA) which had reported the same finding, but was provided to CNCS and to CUNY to allow them to provide any response which would alter the findings.

27.    In addition to the CNCS formal response (part of Exhibit AA), CNCS Management and the Board communicated to me their strong disagreement with, and objection to, OIG's Audit Report on CUNY. Although given opportunity to support their objections with facts refuting OIG's audit findings, neither did so. Instead each essentially rested on conclusory assertions that the teaching program involved was a good one -- a conclusion not disputed by OIG -- and ignored the audit-reported facts that the teaching program was successful independent of the CNCS funding and on which the recruitment of teachers did not depend, thus violating the statutory and regulatory requirement that AmeriCorps funding be used only to meet "unmet needs" in a community.

**(K)      Complaint To Integrity Committee**

28.      By letter dated April 29, 2009, Lawrence G. Brown, then Acting United

States Attorney for the Eastern District of California, submitted a complaint to the

Integrity Committee of CIGIE, concerning the conduct of "Gerald Walpin and his staff

in the handling of United States v. St. HOPE Academy, Kevin Johnson & Dana

Gonzalez" (Exhibit BB).  Acting U.S. Attorney Brown had a copy of his Complaint to

the Integrity Committee sent simultaneously to CNCS Counsel Trinity (see Exhibit

CC).  This strongly suggests that Mr. Brown did not make the complaint independent

from discussion with Mr. Trinity.

29.      By letter dated May 20, 2009, I forwarded to the Integrity Committee

OIG's response, consisting of 18 pages and various exhibits (Exhibit DD).   The

response was signed by me and five members of my staff who were most directly

responsible for the audit and investigative work and conclusions concerning St. HOPE

and Mr. Johnson, because, as the complaint stated, the complaint was against my staff

as well as against me.   Indeed, as discussed in the OIG response, most of the

"specifications" in the complaint were addressed to conduct of my staff, which, after

learning the facts, I supported.  The five members of my staff who signed the response

included four career non-political employees whose only reason for being attacked was

that they had performed their responsibilities in an effective manner.

30.      For undisclosed reasons, the Integrity Committee has never rendered its

decision on the complaint, despite my request for an "expedited determination." (See

the second, two-page, covering letter in Exhibit DD).  While the facts refuting the

complaint are set forth in the OIG Response and need not be repeated in this affidavit,

it is important to set forth certain facts concerning Mr. Brown's motivation in making the complaint:

   a.  This complaint was filed following the settlement that Mr. Brown and CNCS Counsel had signed with the defendants in that action, after Mr. Brown and CNCS Counsel had shut me and all OIG staff out from any role in the settlement decisions -- even though OIG was the referring agency and prosecuting offices always dealt with the referring agency. Mr. Brown excluded OIG because, when Mr. Brown first discussed with me the settlement terms that he was considering, he informed me that the "800 pound gorilla" (his words) in the settlement discussions that he had been conducting (without my knowledge or participation) was the suspension of Mr. Johnson, which had been ordered by the Suspension and Debarment Official, based on the factual record presented by my Office.  He informed me that rescission of that suspension would have to be part of the settlement.

   b.  I informed Mr. Brown that, while I thought that the settlement dollar amounts being considered were too low, I was certain that we would agree on an amount, as long as payment was guaranteed by security or personal guaranty. But I stated that I could not agree to include as a *quid pro quo*, in a monetary settlement, the lifting of the suspension for two reasons: (i)   the suspension procedure was separate and apart from the civil/criminal prosecution jurisdiction of the U. S. Attorney, and was within the jurisdiction on the Suspension and Debarment Official who had

granted the order of suspension based on a factual record, but specifically affording Mr. Johnson the opportunity to seek to rescind the suspension by presenting facts rebutting the findings made by that Official in ordering the suspension -- an opportunity never used by Mr. Johnson; and (ii) the suspension procedure was created to protect the Government from providing further federal funds to any one who, by past conduct, had shown that he had misused funds previously provided; the payment of an amount to reimburse the Government for a prior defalcation, when discovered, does not establish responsibility to receive further federal funds, and any lifting of a suspension, based on the supposed payment of a sum of money,[2] would make a mockery of the suspension procedure. Significantly, the Settlement Agreement (Exhibit EE), thereafter signed without OIG participation, itself expressly recognized that inclusion of the lifting of the suspension, in the settlement terms, departed from accepted practice in that "issues of suspension and possible debarment are ordinarily addressed separately from resolution of any civil claims" (*id.,* p. 2 ¶ G). The Settlement Agreement continues to state that the settling parties departed from accepted practice to bow to "the request of St. HOPE, Johnson and Gonzalez," exemplifying the extent to which the Acting U.S. Attorney and CNCS management departed from accepted practice to meet the St. HOPE/Johnson demands, over OIG objections.

---

[2] The Special Report to Congress details that the settlement agreement was a sham in so far as even ensuring that the Government would receive the amount to be paid to the Government. The only defendant bound to make payment of that amount to the Government was St. HOPE Academy, then an insolvent entity with no likelihood of being solvent. The settlement agreement contained no provision for a guaranty by Mr. Johnson or of any identified security. The only obligation Mr. Johnson assumed was to loan St. HOPE the downpayment, which was a fraction of the total amount to be paid over ten years, with a right for him to obtain it back from St. HOPE.

c.  I therefore informed Mr. Brown that, while I could not stop Mr. Brown from signing such a settlement, if he did so, I would consider it to be my statutory duty under 5 U.S.C App. 3, § 5(d) to report to Congress what I regarded as a "serious or flagrant problem[], abuse[] and deficienc[y] relating to the administration of programs and operations administered or financed by" CNCS.  As I related to the Integrity Committee in the covering letter, "In what appears to have been the invocation of the axiom 'the best defense is a good offense,' the Acting U.S. Attorney sent the complaint letter to the Integrity Committee."

**(L)   Miscellaneous Later Expressed Reasons For My Removal**

31.    The White House letter, dated June 16, 2009 (Exhibit L), to three individual Senators -- Senators Lieberman, Collins, and McCaskill -- but not to both Houses of Congress, set forth supposed reasons for my removal.  I therefore discuss each of them:

**i.     Board Request To White House**

32.    One of the White House's belatedly-provided reasons for removing me was that it was pursuant to a unanimous request of the CNCS Board.  But, in fact, all that the White House asserts is that the request then made by the Board was for the White House to "review" my work, not to remove me.  The White House never did the work that would be a reasonable "review," *i.e.,* a reasonable attempt to determine the facts from those who have personal knowledge.  See ¶ 15 *supra.*  However, in relying on the Board request that the White House do something about me, the White House ignores that the dislike of the "watchdog" by those being watched is close to axiomatic. Indeed, Congress, in enacting the Inspector General Act, expressly recognized this

reality.  As discussed at length in the accompanying memorandum in support of this motion, Senator Lieberman described the Inspector General's work as "often unpopular," and noted that an agency's desire to get rid of an Inspector General can be due to the fact that "the IG was, in effect, doing his or her job too well."  Further, the Senate Report recognized that, even if those in an agency responsible for overseeing the agency's operations  -- here, including both CNCS management and its Board -- were "not personally implicated, revelations of wrongdoing or waste may reflect adversely on [their] programs."  The position of Inspector General was not created necessarily to make friends of those he/she oversees, but where the uncovered facts establish wrongdoing or waste, to report such failures -- all too often causing, in those so spotlighted, to want the Inspector General to exit.

33.   The Board here made clear to me that it did not like the fact that I, as Inspector General, was interfering in CNCS's and the Board's performance of what they believed they should be doing in operating CNCS.  Indeed, as noted in the MAG Committee email to me (Exhibit R), Mr. Goldsmith, formerly Chair of the Board and then Vice-Chair, expressed his objection to my interference in the following language: "why [the CNCS] Board confirmed by the Senate for the purpose of imposing accountability on [CNCS] .. is [not] to be totally independent in how it prioritizes policy, conducts risk analyses and protects the taxpayers from the IG."  As I had previously made clear that I believed strongly that the CNCS Board had the obligation to impose accountability on CNCS (which I later chastised the Board for not doing – see ¶ 40 and p. 26 *infra*), it was clear that Mr. Goldsmith's question was an objection to the OIG's involving itself in the same subject.  In fact, this was not the first time Mr.

Goldsmith questioned my jurisdiction to review CNCS operations directed by CNCS management and its Board.  Earlier in my service, Mr. Goldsmith, then Chair of the Board, summoned me to his office to chastise me for getting involved in, what he called, management prerogatives by examining whether management methods were efficient or wasteful.  I disagreed with him and cited statutes and regulations which required me to report on waste and inefficiency.  While, at that time, Mr. Goldsmith grudgingly dropped his objection, he repeated the same objection in the MAG Committee email this year.

34.    It is ironic, and, I believe, demonstrates the lengths that certain Board members have gone to get rid of me as a thorn in their side, that Mr. Goldsmith, who, as just quoted, at least twice objected to IG interference in management prerogatives and decisions, asserted to Senator Grassley that the Board members "rely heavily on the Office of Inspector General to provide leadership, expertise, and resources in making sure the Corporation is managed properly" (Exhibit FF).   And then he joins in stating in this letter that a strong and effective IG is desired, when he has been objecting to my taking strong audit and investigative positions based on facts developed by OIG's career staff.

35.    My conduct to which he -- and other members of the Board -- objected is just what the statute requires an Inspector General to do: to oversee and criticize what the management and the Board were doing in running CNCS, to the extent that OIG finds any waste, fraud, or abuse in the operation.  The more diligent my Office was in reporting criticism of the Board's running of CNCS, the more this Board did not want me there.  It was to prevent action being taken on such desire to remove me that the

Inspector General statute was enacted, with the conditions precedent to removal, which were violated here.

### ii.   "Confused, Disoriented and Unable To Answer Questions"

36.   The White House's belatedly-provided reasons include, as I believe to be the most amazing, that, at the May 20, 2009, meeting of the Board, it was reported that I "was confused, disoriented, and unable   to answer questions and exhibited [unidentified] behavior that led the Board to question [my] capacity to serve."

37.   Assuming *arguendo* that description of my speaking ability at that one meeting were accurate (it is not), the suggestion that a single such event could result in questioning my capacity to serve is, on its face, not a basis for removal. It would never be acceptable to conclude that President Obama does not have the capacity to serve because he was confused in saying that there were 56 states or in referring to Congressman Spencer Bachus as "Sheldon Bachus"; or Vice-President Biden because of his various expressed confusions; or the first President Bush because he in fact collapsed at a meeting overseas. Obviously, it is not rational to conclude that a person is disabled based on one meeting (even assuming, contrary to fact, that I exhibited any confusion at the meeting not caused by the Board's management of the meeting). In that regard, it is most significant that, on the Tuesday preceding my firing, as discussed ¶ 50(d) *infra,* CNCS sent one of its highest level managers to beg me to speak to thousands of the CNCS staff and grantees because they valued my speaking ability -- objective proof that CNCS was well aware that I did not suffer from confusion and being disoriented when I spoke. Indeed, at every of the many CNCS conferences at which I spoke, I was told by CNCS representatives that my speech was a great hit.

38.     The validity of this reason for removing me must also take into account the meetings that I had with CNCS management shortly before the May 20, 2009, Board meeting, and the meeting that I had with Board members after the May 20, 2009 Board meeting, but before I was removed.   I regularly met at least every two weeks with the CNCS CEO and her Counsel, and separately with the CNCS CFO.   There has never been any suggestion of "confusion" on my part at any of these meetings. Further, about two weeks after that May 20th meeting, I had a long telephonic meeting with the MAG Committee of the Board, in which I clearly voiced my views on the two reports (Special Report to Congress and the CUNY audit) and the need for the Board to perform its oversight duties.   The only "confusion" exhibited at that meeting was the Board members' confusion as to their responsibilities -- to act independent of management in evaluating Inspector General reports.   They declined to do so, responding that they were relying totally on management's general counsel (who was himself active in CNCS management) for rejecting the reports -- a total abdication of their responsibility, which I pointed out to them, and they didn't like.   This fact is reinforced by the Board's refusal to allow me to address the last subject in my presentation (the OIG Report on CNCS management problems, requested by a House Committee).   I was quickly denied time to do so and instead was told that I had to leave because the Board was too busy.

39.     It is a fact that during my presentation at the May 20th meeting, I felt physically ill and was ill that night.   But, by the next day, I was fine.   I do not know what caused that illness.

40.     The bottom line on this charge is that as detailed in management's contemporaneous summary of my remarks (*see* ¶ 41(b) *infra*), there was no confusion as to what I said, and there was no confusion at my opening remarks at that meeting, chastising the Board for what appeared to be a refusal of the Board to perform its duty to act independently of management in overseeing what management was doing, particularly to determine the merits of the two reports my office had issued. The Board members were clearly angry at my "temerity" in telling them that they should not be acting in the manner of many for-profit boards, who had been recently correctly criticized for abdicating their oversight of corporate management during the period preceding the economic crisis. There was also no confusion about OIG's two reports and their clear findings.

41.     Internal documents by CNCS only recently produced belie this charge, and shed light on the actual -- *i.e.* not manufactured -- reason for the Board's calling me "confused." The Board recognized that the OIG findings in its Special Report to Congress and Report on CUNY would demonstrate an embarrassing reality -- the Board's failed performance of its oversight duties:

a.   the day before I made my presentation to the Board, the Board members met and expressly noted, as reflected in the Board Retreat Notes (Exhibit GG): "IG – meeting tomorrow. Concern about potential for damage being done. Bad timing." Significantly, the Board Retreat Notes' specification of what was causing this "damage" made no mention of disability or

ineffectiveness in my performance, but instead cited "St. HOPE" and "CUNY audit."[3]

b.  The memo prepared by Frank Trinity, CNCS Counsel, of what I said at the May 20th Board meeting (Exhibit HH), establishes that my presentation on the subjects that I intended to, and did, cover, was clear, well-stated, and fully understood.   I quote extensively from what Mr. Trinity labels his "Notes from IG Presentation to Board Of Directors 5-20-2009":

> Mr. Walpin expressed 'discomfort' at 'what is going on.'  He said there was an 'anything goes' attitude now with management, and no longer the mutual respect and constant communication that had existed under David Eisner.
>
> He said he had three things he wanted to discuss.
>
> **St. HOPE Academy** [emphasis in original]
> The U.S. Attorney's office said it was a 'good civil case'.
> Media and political pressure, particularly after passage of the Recovery Act, resulted in U.S. Attorney's office putting pressure on the IG to settle.  Nicky [Goren, CNCS Acting CEO] said CNCS couldn't keep stimulus money from Sacramento.  The suspension respondents submitted 'not one iota of fact' in opposition.  IG was cut out of the loop.
>
> FT [Frank Trinity] and the AUSA framed a settlement much less than what the Government would have received in Court and lifted the suspension, with payment required by an organization that 'totally insolvent' with no guarantee of payment or security.
>
> Mr. Walpin said he had warned he would not be silent in the face of a 'total waste of Corporation assets.'
>
> Mr. Walpin offered to provide copies of his report to the Board.
>
> Mr. Walpin said that the AUSA, in 'clear collaboration' with FT, sent a complaint to CIGIE.  He said he was responding today to the complaint.  He said that Nicky had disclosed the complaint and sent copies of it to Congress, when it was supposed to be

---

[3] It also specified the then forthcoming OIG Report on CNCS management controls, which OIG prepared at the request of the majority staff of the House Appropriations Committee.

confidential.  He also said he had learned that the AUSA had sent a copy of the complaint to 2 members of the Board.  He said the U.S. Attorney's letter was 'absolutely a farce.'

Mr. Walpin complained that the Corporation had avoided responding to his Special Report by referring to the Integrity Committee matter, which he said had 'nothing to do with' the Special Report.

Mr. Walpin said he was trying to protect the Corporation and now there was a breakdown in trust and communication that had adversely affected OIG staff, especially to have the St. HOPE matter taken away.

Mr. Walpin said there was a 'sequel'.  The Executive Director St. HOPE Academy resigned because two St. HOPE directors at the behest of Kevin Johnson 'cleansed' Johnson's emails.  Johnson still controls the board.  Financial records are under Johnson's control in a private storage place.

Mr. Walpin said he would be asking for the FBI and a Special Prosecutor, not the current U.S. Attorney, to convene a grand jury to investigate these allegations.

**CUNY**
Mr. Walpin reported that the audit had revealed sloppiness but that the auditors came to him and said that the grant and education awards should never have been paid to CUNY, upwards of $80 million.  The program doesn't meet an unmet need, because the program met needs in the absence of AmeriCorps funding.  The New York Times is reporting that NYC will allow in ½ the number of Teaching Fellows this year.  A final report will be issued next week.

The Corporation's response was 'not at all appropriate for the merits.'  We're paying out money that shouldn't be paid out.

At that point, I was interrupted by questions relating to St. HOPE.  Mr. Trinity's Notes now provide an explanation of the totally false assertion of my supposed confusion and inability to answer questions.  As Mr. Trinity's Notes reflect, my presentation was interrupted by the question of my "plan to issue another public statement on the St. HOPE matter."  What followed was a

several minute back-and-forth in which I denied that I had said that I plan to issue "another" public statement. What I had previously said was that I was issuing a public statement asking for the FBI and a Special Prosecutor to convene a grand jury to investigate these allegations. Before coming to the Board meeting, I had left the text of that statement with the OIG Communications official who had agreed to issue it promptly, and, I believed, had already done so by the time of my presentation on that subject.

As Mr. Trinity's Notes reflect, I had already summarized the text of the statement that I had already issued. Because of that, when asked about my "plan" to issue another public statement, I correctly stated that I did not intend to -- and in fact I did not -- issue "another" public statement after the one that I had told them that I was already issuing. Significantly, the handwritten notes made by Mr. Tanenblatt (Exhibit II) use the present tense, not the future tense, in reflecting what I had said concerning the public statement: "IG issuing a statement calling for an FBI investigation and a crt apptd special prosecutor." Because some on the Board repeatedly insisted that I had said that I would be issuing "another" public statement, it then was clear to me that they understood that I had already issued one statement, and I knew that I had not said that I intended to issue "another" one. Thus, whatever confusion occurred was due to some Board members' use of "another" for a statement that I informed them had been issued. Mr. Trinity's Notes conclude with:

> Once he finished his presentation, he was unable to engage substantively with the Board on any questions they raised; he simply argued that what they were saying was not the case.

But, the only two questions that, Mr. Trinity's Notes reflect, were repeated questions based on the incorrect premise that I had said that I would be issuing "another" public statement, and Mr. Goldsmith's asking for my view on his assertion that, as a former prosecutor, he knew that it was unethical to make public statements on the St. HOPE matter.  On that latter question, I paused to determine how I might diplomatically respond to what I believed was a totally false assertion, one that he must know was false, because, as a former prosecutor myself and having attended programs detailing to Inspectors General the importance of making public statements, I knew that public statements were both proper and appropriate, depending on the circumstances. Before I could decide on the wording of my response, John Park, Special Assistant in OIG, responded, as Mr. Trinity's Notes reflect, that "Pat Fitzgerald made lots of public statements as U.S. Attorney in Chicago, and that a public statement was permissible."

Thereafter, Mr. Solomont announced to me that the Board saw no reason to question either the St. HOPE settlement or the CUNY grants, relying essentially on the fact that CNCS management agreed with them, the former in conjunction with the Acting U.S. Attorney, and the latter on the assertion that Congress had authorized a program model like CUNY's -- but declined to discuss any of the details that I had set forth on the bases of OIG's position. He then chastised me for "personal attacks on Board members and staff." As to Board members, I had made no personal attacks; I had at most suggested that the Board should focus more on its required role as an overseer of CNCS

management, and not simply accept what management says and does. Apparently, Mr. Solomont translated my spotlighting the Board's oversight responsibility as an accusation that the Board was "negligent" (see Exhibit HH, p. 4); perhaps he concluded that Board members are negligent if they do not perform their oversight duties, but I did not use that adjective -- consistent with my obligation as IG, I merely sought to draw their attention to what they should be doing  As to attacks on staff, I was honestly informing the Board of a serious problem, which my Executive Staff (consisting of all Assistant IGs, Counsel and Special Assistant) all believed was the problem and should be reported to the Board, that, since David Eisner's departure, there had been a change in culture, enforcement of rules, and attitude towards OIG, which we all agreed was properly laid at the doorstep of Frank Trinity, who appeared to be in charge of all matters in which OIG was involved, had shown both hostility to OIG and loss of trust and confidence in OIG, and had become essentially hostile.  Indeed, I specifically stated that OIG continued to have excellent relations with the CNCS operating staff.[4]

42.     Finally, on this charge, the view of almost 150 leading lawyers who knew me and have known me for years is most probative on the merits of this charge. Annexed as Exhibit JJ hereto is a letter, dated June 23, 2009, to Senators Lieberman and Baucus, Congressman Towns, and Mr. Craig, endorsed by those lawyers, who, as

---

[4] In view of the record, reflected in the above discussion, that the Board fully understood the points that I had made, and attempted to bait me with its suggestion that I had said that I would be issuing another public statement and that I had personally attacked the Board, among other items, it raises the question whether this was a planned attempt to create a record to support my removal. This possibility is given weight by Mr. Tanenblatt's handwritten notes from that meeting that "I wonder if we should shut down the discussion due to the IG's obvious confusion [even though there was no IG confusion] *and let the record reflect so*" [emphasis added], in conjunction with the Board's pre-meeting expression of "concern" about the "damage" being done, presumably to the reputation of both CNCS and Board by OIG's reports (see Exhibit GG hereto).

the letter states, include both Democrats and Republicans, who assert that this charge "is totally inconsistent with our personal knowledge of Mr. Walpin." I am informed that this letter was organized by four of the signatories who obtained all of these signatures in 24 hours (and received additional consents after the letter was sent).

### iii.    "Lack Of Candor"

43.    The charge that I exhibited a "lack of candor in providing material information to decision makers," a conclusory accusation made without any details, is a total lie. The only lack of candor exhibited with regard to St. HOPE/Johnson -- to which this accusation purports to refer -- was by the Acting U.S. Attorney and CNCS Counsel in concealing from me and all OIG staff the terms of the settlement agreement until after it was signed.

44.    Recently-produced CNCS documents establish that the Acting U.S. Attorney and CNCS intentionally withheld from OIG the terms of the settlement and disclosed them to OIG only after the settlement had been signed and publically announced on the morning of April 9, 2009. Discussion of the settlement agreement provisions among the Acting U.S. Attorney and his staff, various persons in CNCS (including Counsel Trinity and his staff), and defense counsel Matthew G. Jacobs, had been ongoing for many days before all parties signed -- but noticeably excluding OIG. See, e.g., email from AUSA Kendall Newman to Mr. Jacobs, with copy to Mr. Trinity and others, dated April 8, 2009 (Exhibit KK), enclosing "revised settlement agreement," which "contains all of the changes we discussed."

45.    Instead of including OIG in those discussions, Mr. Trinity waited until 12:51 p.m. on April 9, 2009 -- after the settlement had been executed -- to request an opportunity for him and CFO William Anderson to "brief" me on the "St. HOPE

Academy matter" (Exhibit LL).  He gave me that briefing by phone at 2:15 p.m., thereby for the first time advising me and members of OIG staff  that the settlement had been executed and its terms.

46.     The charge of "lack of candor" is particularly ironic given my attempt to obtain the MAG Committee's involvement in the St. HOPE matter, to perform MAG's responsibility to oversee management's decisions adversely affecting CNCS, and to exercise its judgment by obtaining all relevant facts from OIG.  As the Board Retreat notes for May 19, 2009 (Exhibit GG) reflect, the IG request "for a hearing with MAG prior to settlement" was "declined as premature" -- an obviously irrational reason for MAG's unwillingness to get involved in questioning management's decisions:  MAG could have no impact **after** the settlement agreement was executed; for MAG to wait until the settlement agreement was signed would be akin to a Board of Directors declining to review the terms of an officer's employment contract until after it was signed.

### iv.     "Other Troubling and Inappropriate Conduct"

47.     The charge that I engaged in "other troubling and inappropriate conduct" is made without any details, making it impossible to respond, other than that I deny any inappropriate conduct.  To the extent that my and OIG staff's criticisms of CNCS's operations and of the Board's refusal to perform its duties was "troubling" to them, I am proud that I and my staff acted as we were supposed to act.

### v.     "Disruptive To Agency Operations, Impairing [My] Effectiveness"

48.     To the extent that I performed my responsibility to put the spotlight on improper, wasteful and inefficient CNCS activities, I admit that I was disrupting the

*status quo* at CNCS.  But that was what I was appointed to do, where the facts warranted.

**(M)    Commendation Of My Work By CNCS Management and Board**

49.    For more than two years, I had an excellent working relationship with CNCS and the CNCS management and the Board repeatedly commended me.  Both the repeated commendations and the working relationship are inconsistent with the reasons given for my removal.  Until animosity expressed to my Office by CNCS's counsel in connection with the settlement of the St. HOPE/Johnson matter, the relationship between OIG and CNCS had been a very good one.  While CNCS management and OIG did not always agree, there were not many disagreements, and, even as to those, both CNCS and OIG expressed and discussed the disagreement without being disagreeable.

50.    CNCS expressed only commendations of my conduct as Inspector General, as exemplified by the following

a.    David Eisner, the Presidentially-appointed CEO of CNCS during the first one and one half years of my tenure as Inspector General, commended my "positive, constructive relationship ... in [CNCS's] best interest," on August 27, 2008, shortly before he resigned his position (Exhibit MM).

b.    In the January 23, 2009, email from Mr. Tanenblatt, Chairman of the MAG Committee (Exhibit R and discussed in ¶ 19 *supra*), writing as well on behalf of the other two members of the MAG Committee, described my performance as demonstrating my "deep and personal commitment to [my] responsibilities as Inspector General," and stated that I have "been a hands-on Inspector General, one who is willing to take the time to work

through issues principally through face to face meetings where candid give and take has yielded in many instances better decisions for the agency."[5]

c. On November 18, 2008, Elson Nash, Acting Director of Learn and Serve America, a major CNCS program, described me by letter (Exhibit NN), as having "a remarkable way of putting [my] audience at ease while delivering a powerful warning [of] their responsibility as stewards of federal funds."

d. On June 9, 2009 -- the day before I was fired -- I was visited by Gretchen Van der Veer, CNCS Director for Leadership and Training. I had previously been asked if I would travel to San Francisco to speak for ten minutes at the then forthcoming conference to be attended by more that 2000 CNCS leaders, staff and grantees. I had declined, explaining that it did seem to me that it was the best use of my time to fly 3000 miles for a ten minute talk. Ms. Van der Veer asked me to reconsider, explaining that she so valued my speaking ability that she had arranged to offer me more time to speak and answer questions -- even more than granted to the Acting CEO and to the Chairman of the Board. Based on her pleading, I agreed to speak at the Conference.

---

[5] This commendation of me, by CNCS Board members Tanenblatt, Solomont and Goldsmith on January 23, 2009, puts the lie to their assertion in their June 17, 2009, letter to Senator Grassley (Ex. M hereto), that "[o]ver an extended period of time, we observed how Gerald Walpin's effectiveness as Inspector General significantly diminished." In fact, the only change that had occurred in the less-than-five months between the January email and the May Board meeting, was OIG's issuance of the two Reports to which CNCS management and the Board vehemently objected. Thus, they wanted me out because I was doing the job I had been assigned.

_____
Gerald Walpin

Subscribed and sworn before
me this _17_ day of _September_ 2009,

_____
Notary Public

My Commission expires: _____
SANDRA C. PRICE
Notary Public District of Columbia
My Commission Expires January 2, 2010

32