# EXHIBIT A





gwalpin@earthlink.net

16% of 100 MB used.

(MED)

(0)

(243)

(0)

(305)

[    ]

## Attached Message

**From:** Gerald Walpin <G.Walpin@cncsoig.gov>
**To:** "Eisen, Norman L."
**Subject:** RE: [NEWSENDER] - test -- from Norm Eisen - Message is from an unknown sender
**Date:** Jun 10, 2009 7:32 PM

My email responds to your telephone call to me while I was in a car driving on a highway, at about 5:20 p.m. I have now reached a destination and therefore can write you this email.

In your telephone call, you informed me that the President wishes me to resign my post as IG of CNCS. You told me that I could take no more than an hour to make a decision.

As you knonw, Congress intended the Inspector General of CNCS to have the utmost independence of judgment in his deliberations respecting the propriety of the agency's conduct and the actions of its officers. That is why the relevant statute provides that the President may remove the IG only if he supplies the Congress with a statement of his reasons -- which is quite a different matter than Executive Branch officials who serve at his pleasure and can therefore be removed for any reason and without notification to Congress.

I take this statutorily-mandated independence of my office very seriously, and, under the present circumstances, I simply cannot make a decision to respect or decline what you have said were the President's wishes within an hour or indeed any such short time. As you are aware, I have just issued two reports highly critical of the actions of CNCS, which is presently under the direction of the President's appointee and, I am advised, someone with a meaningful relationship with the President. Chairman Solomont and I have had significant disagreements about the findings and conclusions contained in these reports. It would do a disservice to the independent scheme that Congree has mandated -- and could ptentially raise questions about my own integrity -- if I were to render what would seem to many a very hasty reponse to your request. I heard your statement that this request that you communicated on behalf of the President and the timing of our reports and disagreement with the CNCS Board and management are "coincidence", as you put it on the phone, but I would suggest that there is a high likelihood that others may see it otherwise.

I suspect that, when presented with the circumstances I have just discussed, the President will see the propriety of providing me additional time to reflect on his request. If however he believes that my departure is a matter of urgency, the he will have to take the appropriate steps toward ordering my removal, without my agreement.

Gerald Walpin

(please excuse any typos as I am sending this on my blackjack)

-----Original Message-----
From: "Eisen, Norman L." <Norman_L._Eisen@who.eop.gov>
To: "g.walpin@cncsoig.gov" <g.walpin@cncsoig.gov>
Sent: 6/10/2009 6:15 PM
Subject: [NEWSENDER] - test -- from Norm Eisen - Message is from an unknown sender

# EXHIBIT B

**Trinity, Frank**

| | |
|---|---|
| **From:** | Eisen, Norman L. [Norman_L._Eisen@who.eop.gov] |
| **Sent:** | Wednesday, June 10, 2009 9:29 PM |
| **To:** | Walpin, Gerald |
| **Subject:** | Corporation for National and Community Service |

**Attachments:** Walpin 090610.pdf

Dear Mr. Walpin:

As we discussed, the President will be removing you from the Inspector General post, effective 30 days from tomorrow. Until that time, you will be placed on administrative leave with pay, effective immediately. Please see the enclosed letter to that effect. For the record, I disagree with a number of the statements in your email to me this evening. Thank you for your service.

Sincerely yours,

Norman L. Eisen

*Copy received by fax from Charlene*
*Alexander of CNCS Human Capital*
*at 6:18 pm on 6/8/09*
*JW*

# EXHIBIT C

## THE WHITE HOUSE

### WASHINGTON

June 10, 2009

Dear Mr. Walpin:

You are hereby notified that the President has decided to suspend your service effective June 10, 2009. We have implemented administrative leave with pay for you for 30 days from June 11, 2009

Sincerely,

Don Gips
Assistant to the President
For Presidential Personnel

*Copy received by fax from Charlene Alexander & CNCS Human Capital at 6:18 p.m. on 6/10/09*

# EXHIBIT D



EarthLink.net | My Start Page | myVoice | My Account | Support | web search powered by Google    Search

TECHNOLOGYDEGREES-ONLINE.COM
Debug. Decode. Degree. At Your Fingertips.    Ride the wave of the high-tech boom with a flexible degree program.    GET FREE INFO

ADVERTISEMENT

**WEB MAIL**
gwalpin@earthlink.net

CreditReport.com™
82% of 100 MB used.    Empty Trash
Increase Storage Space

Check Mail
Write Message
News Headlines
spamBlocker (MED)

Folders
  Known spam (0)
  INBOX (602) new
  Drafts (0)
  Sent (627)
  Trash (561) [Empty]

Address Book
Preferences
Search Messages
Web Mail Help
Feedback
Sign Out

## Message

‹ Previous | Next › | « Back to Sent

Reply | Reply All | Forward... | Print | Delete | Move to... | More Actions...

**From:** Gerald Walpin <gwalpin@earthlink.net>
**To:** norman_L._eisen@who.eop.gov
**Subject:**
**Date:** Jun 29, 2009 9:58 PM

Dear Mr. Eisen:

On Friday, June 26, 2009, while talking with a person from CNCS Human Capital Department, I advised her that I had never received any writing informing me of my removal and thus was unaware of the dates of the administrative leave, if any, and the effective termination date. She stated that she had two writings addressed to me, both dated June 10, 2009. As a result of the conversation, she faxed me a copy of each.

I note that your purported email to me is dated June 10, 2009, at 9:29 p.m., and reflects an attachment which I still have not received or seen. While the email address you used is not reflected on the copy that I received, if it was sent to my IG email address, I understand that, when you sent it, you had already arranged to close down that address and shut me out of emails to that address.

The "letter" on White House stationery, signed by "Don Gibs, Assistant to the President For Presidential Personnel," also dated June 10, 2009, bears the salutation "Dear Mr. Walpin," but no address.

I, of course, have no personal knowledge as to whether these were in fact actually sent to me, and, if so, when and how. My only personal knowledge is that, until they were faxed to me on Friday, I had not received them.

I reserve any and all rights that I have concerning these facts.

Very truly yours,

Gerald Walpin

Reply | Reply All | Forward... | Print | Delete | Move to... | More Actions...
‹ Previous | Next › | « Back to Sent

# EXHIBIT E

From:    "Love-Adams, Lisa" <LLove-Adams@cns.gov>
Subject: **Extension of Administrative Leave**
Date:    July 10, 2009 9:54:57 AM EDT
To:      <gwalpin@earthlink.net>

Mr. Walpin –

As a follow up to our phone conversation this morning, we received guidance from OGC that your administrative leave has been extended by the White House for an additional week, until July 18.

Please let me know if you have any questions.

Thanks,
Lisa

*Lisa P. Love-Adams*
*Director of Personnel Operations*
*Office of Human Capital*
*Corporation for National & Community Service*
*1201 New York Avenue, N.W., Room 10709*
*Washington, DC  20525*
*202-606-6920 (Voice)*
*202-606-3466 (Fax)*
*llove-adams@cns.gov*

# EXHIBIT F

THE WHITE HOUSE

WASHINGTON

June 11, 2009

Dear Mr. President:

This is to advise that I am exercising my power as President to remove from office the Inspector General of the Corporation for National and Community Service, effective 30 days from today.

It is extremely important that we promote the economy, effectiveness, and efficiency of Federal programs and operations. The Inspectors General have a critical role in the achievement of these goals. As is the case with regard to other positions where I, as President, have the power of appointment, by and with the advice and consent of the Senate, it is vital that I have the fullest confidence in the appointees serving as Inspectors General. That is no longer the case with regard to this Inspector General.

I will be submitting to the Senate my nomination of an individual for this position at the Corporation for National and Community Service who has my full confidence and who meets the appropriate qualifications.

Sincerely,

The Honorable Joseph R. Biden, Jr.
President of the Senate
Washington, D.C.  20510

# EXHIBIT G

**THE WHITE HOUSE**

WASHINGTON

June 11, 2009

Dear Madam Speaker:

This is to advise that I am exercising my power as President to remove from office the Inspector General of the Corporation for National and Community Service, effective 30 days from today.

It is extremely important that we promote the economy, effectiveness, and efficiency of Federal programs and operations.  The Inspectors General have a critical role in the achievement of these goals.  As is the case with regard to other positions where I, as President, have the power of appointment, by and with the advice and consent of the Senate, it is vital that I have the fullest confidence in the appointees serving as Inspectors General.  That is no longer the case with regard to this Inspector General.

I will be submitting to the Senate my nomination of an individual for this position at the Corporation for National and Community Service who has my full confidence and who meets the appropriate qualifications.

Sincerely,

The Honorable Nancy Pelosi
Speaker of the
     House of Representatives
Washington, D.C.  20515

# EXHIBIT H

For Immediate Release
Thursday, June 11, 2009

### Grassley calls on administration to safeguard independence of Inspectors General

WASHINGTON --- Senator Chuck Grassley is urging the administration to follow the letter and spirit of the law, which the President co-sponsored as legislation as a U.S. senator in 2007, regarding the dismissal of the Inspector General for the AmeriCorps program, after reports last night that administration officials gave the watchdog an hour to resign or be terminated.

Grassley said it looks like the White House is today modifying its stance and saying that last night's ultimatum started the 30-day notification clock. "Either way, it looks like the letter and spirit of the law Congress passed last year to try to safeguard the independence of Inspectors General from the heavy hand of the executive branch that it's supposed to oversee might have been circumvented," he said.

Grassley has worked for many years to empower Inspectors General to act as effective watchdogs for taxpayers and federal program beneficiaries. He's also worked to hold Inspectors General accountable when they've failed to fulfill the responsibilities of the role. Grassley has conducted extensive and active oversight of the federal bureaucracy.

"The importance of constant, independent review of the work of federal agencies has been proven again and again, and Inspectors General are a key part of that effort," Grassley said. "Congress recognized the need for independence when it passed the reform legislation last year requiring congressional notification 30 days prior to removal. Inspectors General need to know they have independence and won't be removed for arbitrary reasons. The public needs confidence that the watchdogs can hold the bureaucracy accountable."

The text of Grassley's letter to the President is below.

June 11, 2009

Barack Obama
President of the United States of America
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Dear Mr. President:

I was troubled to learn that last night your staff reportedly issued an ultimatum to the Americorps Inspector General Gerald Walpin that he had one hour to resign or be terminated. As you know, Inspectors General were created by Congress as a means to combat waste, fraud, and abuse and to be independent watchdogs ensuring that federal agencies were held accountable for their actions. Inspectors General were designed to have a dual role reporting to both the President and Congress so that they would be free from undue political pressure. This independence is the hallmark of all Inspectors General and is essential so they may operate independently, without political pressure or interference from agencies attempting to keep their failings from public scrutiny.

Last year, President Bush signed the Inspector General Reform Act (P.L. 110-409) into law. Both you and I were cosponsors of this important legislation that was introduced to strengthen the independence and integrity of the Inspectors General. One of the most important provisions of the legislation we cosponsored was Section 3 which amended the procedures for the removal of Inspectors General. Specifically, Section 3 requires that, "the President shall communicate in writing the reasons for any such removal or transfer to both Houses of Congress, not later than 30 days before the removal or transfer." No such notice was provided to Congress in this instance.

As you may recall, the Senate Committee Report (S. Rep. 110-262) accompanying the Inspector General Reform Act stated the intent of Congress. That report stated:

\*\*\*

> "The Committee intends that Inspectors General who fail to perform their duties properly whether through malfeasance or nonfeasance, or whose personal actions bring discredit upon the office, be removed. The requirement to notify the Congress in advance of the reasons for the removal should serve to ensure that Inspectors General are not removed for political reasons."

\*\*\*

Given that you were a cosponsor of this vital legislation I am deeply troubled to learn of the ultimatum given Inspector General Walpin absent Congressional notification.

There have been no negative findings against Mr. Walpin by the Integrity Committee of the Council of the Inspectors General on Integrity and Efficiency (CIGIE), and he has identified millions of dollars in Americorps funds either wasted outright or spent in violation of established guidelines.[1] In other words, it appears he has been doing his job.

---

[1] Corporation for National and Community Service, OIG Report 09-11A, Evaluation of Corporation for National and Community   Service Grants Nos. 04EDHNY003 and 07EDHNY002, June 4, 2009; Corporation for National and Community Service, OIG Special Report to Congress, St. Hope Academy investigative summary, May 5, 2007.

We cannot afford to have Inspector General independence threatened. In light of the massive increases in federal spending of late, it is more critical than ever that we have an Inspector General community that is vigorous, independent, and active in rooting out waste, fraud, and abuse. I urge you to review the Inspector General Reform Act you cosponsored and to follow the letter of the law should you have cause to remove any Inspector General.

Sincerely,
Charles E. Grassley
United States Senator

# EXHIBIT I

THE WHITE HOUSE

June 11, 2009

The Honorable Charles E. Grassley
United States Senate
135 Hart Senate Office Building
Washington, DC  20510

Dear Senator Grassley:

I write in response to your letter to the President dated June 11, 2009, regarding the removal of Inspector General Gerald Walpin of the Corporation for National and Community Service. Thank you for your dedication and attention to matters involving the Inspectors General.

The President believes that Inspectors General fulfill a unique and important role in ensuring that agencies operate with efficiency, economy, and integrity. Moreover, the President shares your view that we ought to support fully the efforts of Inspectors General, with respect for the independent nature of those offices. It is for these reasons that it is vital that the President have full confidence in the Inspectors General who serve in Executive agencies. The President intends to remove Mr. Walpin because the President does not have full confidence in him. This action is fully supported by the Chair of the Corporation (a Democrat) and the Vice-Chair (a Republican).

The President notified Congress of his intent to remove Inspector General Walpin earlier today. I enclose a copy of the correspondence. Pending his removal, Mr. Walpin has been suspended, with pay. This suspension is fully consistent with the Inspector General Act. The section of the Act discussing the 30 days' notice to Congress also provides that "[n]othing in this subsection shall prohibit a personnel action otherwise authorized by law, other than transfer or removal." 5 U.S.C. App. 3, § 3(b).

As you note, the Acting United States Attorney for the Eastern District of California, a career prosecutor who was appointed to his post during the Bush Administration, has referred Mr. Walpin's conduct for review by the Integrity Committee of the Council of Inspectors General on Integrity and Efficiency (CIGIE). We are aware of the circumstances leading to that referral and of Mr. Walpin's conduct throughout his tenure and can assure you that that the President's decision was carefully considered.

I would be pleased to discuss this matter further with you and thank you for your dedication to these issues.

Sincerely,

/s/ Gregory B. Craig

Gregory B. Craig
Counsel to the President

EXHIBIT J

EDOLPHUS TOWNS, NEW YORK
CHAIRMAN

DARRELL E. ISSA, CALIFORNIA
RANKING MINORITY MEMBER

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 Rayburn House Office Building

Washington, DC 20515–6143

Majority (202) 225–5051
Minority (202) 225–5074

June 15, 2009

Mr. Gregory B. Craig
Counsel to the President
The White House
Washington, D.C. 20500

Dear Mr. Craig:

I am writing to express my concern that provisions of the Inspector General Act of 1978 (IG Act) may have been violated when Gerald Walpin was removed from his post as Inspector General at the Corporation for National and Community Service (CNCS).  As you know, Mr. Walpin received notice of his dismissal by the President on June 10.  The Inspector General Reform Act of 2008 (IG Reform Act), which President Obama co-sponsored last year as a Member of the Senate, amended the IG Act by requiring the President to give Congress 30 days notice before dismissing an IG.[1]  The IG Reform Act also requires the President to provide Congress an explanation of why such action is necessary.[2]

The Committee's investigation into this matter revealed Mr. Walpin was pressured by White House staff to resign in an apparent attempt to circumvent the requirements of the IG Act as amended.  Mr. Walpin was contacted by phone and presented with the choice to resign or be terminated.[3]  Mr. Walpin asked for time to consider his options, and was afforded one hour.[4]  Forty-five minutes later, he received another phone call asking for his decision.[5]  Mr. Walpin declined to tender his

---

[1] Inspector General Reform Act of 2008, P.L. 110-409, § 3(a) (enacted Oct. 14, 2008), amending the Inspector General Act of 1978, 5 U.S.C. § 3(b).
[2] Id.
[3] H. Oversight and Gov't Reform Comm. Minority Staff Interview with Gerald Walpin, June 11, 2009. [hereinafter Staff Interview June 11]
[4] Id.
[5] Id.

Mr. Gregory B. Craig
Page 2 of 4

resignation.[6] The next day, Mr. Walpin was placed on administrative leave and informed he is not permitted to return to the Office of the Inspector General.[7]

Section 3 of the IG Reform Act requires the President to notify Congress in writing at least 30 days before removing or transferring an IG.[8] This provision strengthens the IG Act, which previously only required the President to notify Congress of the reasons for such action.[9] The IG Reform Act leaves that requirement intact.

In an effort to comply with these requirements, the White House sent a letter to House and Senate leadership on June 11 providing notice to Congress that Mr. Walpin will be removed as IG, effective 30 days from the letter's date. The letter provides an insufficiently vague explanation of the reasons for this action:

> It is vital that I have the fullest confidence in the appointees serving as Inspectors General. That is no longer the case with regard to this Inspector General.

It is my conclusion that the immediate effective termination of Mr. Walpin and the vague explanation offered by the President as the reason for his decision are inadequate under the IG Act.

To ensure the independence and objectivity of IGs, Congress used the Inspector General Act to require the President appoint Inspectors General "without regard to political affiliation" and "solely on the basis of integrity and demonstrated ability."[10] Because of the President's failure to enunciate his rationale for removing Mr. Walpin in accordance with the IG Act, interested observers have been forced to search for an explanation in publicly-available material. Predictably, this has led to speculation that the removal of Mr. Walpin was politically motivated – a retaliation for activities within the scope of Mr. Walpin's work as Inspector General. There is also the appearance that Mr. Walpin's removal is intended to allow the Administration to exert greater influence over CNCS through personnel with ties to the White House.

---

[6] *Id.*
[7] H. Oversight and Gov't Reform Comm. Minority Staff Interview with Gerald Walpin, June 12, 2009. [hereinafter Staff Interview June 12]
[8] P.L. 110-409 § 3.
[9] The Inspector General Act of 1978, as amended, provides: "An Inspector General may be removed from office by the President. The President shall communicate the reasons for any such removal to both Houses of Congress." 5 U.S.C. App. § 3.
[10] The Inspector General Act of 1978, as amended, provides: "There shall be at the head of each Office an Inspector General who shall be appointed by the President, by and with the advice and consent of the Senate, without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations." 5 U.S.C. App. § 3.

Mr. Gregory B. Craig
Page 3 of 4

In order to dispel allegations that the removal of Mr. Walpin was the product of any inappropriate political motivation, please provide responses to the following by June 26:

1. A full and complete explanation of the White House's reason for terminating Mr. Walpin;

2. A full and complete explanation of whom the White House consulted in order to evaluate the performance of Mr. Walpin;

3. Given the White House considered Mr. Walpin's conduct as CNCS IG so unprofessional as to warrant his removal, please provide a full and complete explanation of why the White House gave him the option of resigning; and,

4. A full and complete explanation of why the White House decided to effectuate Mr. Walpin's removal through an ultimatum delivered over the phone.

During the President's term in the Senate, Congress expended a remarkable amount of energy and effort to scrutinize the dismissal of nine United States Attorneys by President Bush. That investigation is entering its third year and required the White House's involvement as recently as March.[11] The investigation's purpose is to explore the possibility that the firings were improper because they were politically motivated. The removal of Mr. Walpin raises the same concerns. In order to clarify the role of the Department of Justice (DOJ) in what may have been a political action, please provide the following:

5. All e-mail and other communications between the White House Counsel's office and the DOJ's Criminal Division regarding Mr. Walpin;

6. All e-mail and other communications between the White House Counsel's office and the United States Attorney's Office for the Eastern District of California regarding Mr. Walpin;

7. All e-mail and other communications between the White House Counsel's office and any other DOJ official regarding Mr. Walpin;

8. A full and complete explanation of White House policy applicable to communication with DOJ regarding Inspectors General or any other politically appointed individuals; and,

9. If the White House had discussions with DOJ regarding Mr. Walpin, a full and complete explanation of whether these were conducted in a manner consistent with White House policies.

---

[11] David Johnston, *Top Bush Aides to Testify in Attorney's Firings*, N.Y. TIMES (Mar. 4, 2009).

Mr. Gregory B. Craig
Page 4 of 4

 Providing material responsive to the above requests will represent an affirmative step toward fulfilling the President's commitment to create "an unprecedented level of openness in Government."[12]

 As Ranking Member of the House's main investigative Committee with direct responsibility for oversight of all Inspectors General, I look forward to working with the White House to ensure Inspectors General are allowed to conduct their important function in accordance with the protections of the IG Act as amended.

     Sincerely,

     Darrell Issa
     Ranking Member

cc: Chairman Edolphus Towns

---

[12] Memorandum, "Transparency and Open Gov't," 74 FR 4685 (Jan. 21, 2009).

# EXHIBIT K

EDOLPHUS TOWNS, NEW YORK
CHAIRMAN

DARRELL E. ISSA, CALIFORNIA
RANKING MINORITY MEMBER

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

Majority (202) 225-5051
Minority (202) 225-5074

June 16, 2009

The Honorable Gregory Craig
Counsel to the President
The White House
Washington, D.C.  20500

Dear Mr. Craig:

I am writing regarding the President's removal of Gerald Walpin from the office of Inspector General of the Corporation for National and Community Service. I have reviewed the letter from the President to the Speaker of the House notifying Congress of the removal on June 11, 2009, along with the letter from the Ranking Member of the Committee to you dated June 15, 2009 expressing concerns about the removal.

Ensuring the independence and accountability of Inspectors General is a priority for this Committee and the Congress. Last year, I worked extensively on the Inspector General Reform Act of 2008, which clarified the procedures through which the President may remove an Inspector General. Section 3 of that measure was the result of extensive negotiation. It required that the President provide 30 days notice to Congress before removing an Inspector General from office. However, the bill also expressly permitted the President to suspend an Inspector General from duty during that 30 day period. Therefore, I do not agree with the Ranking Member that the President's actions in this case are inconsistent with the law that was enacted last year.

Nonetheless, I believe a more through explanation for this Inspector General's removal is necessary for Congress to exercise its oversight responsibilities over Inspectors General, who by statute report to both the President and the Congress. Regrettably, the lack of information has prompted uninformed speculation in the media and by Members of Congress. Your office has offered to brief the Committee, and I

The Honorable Gregory Craig
Page 2

believe such a briefing would be productive. Although I understand your office's desire
to avoid an unnecessary invasion of the Inspector General's privacy regarding a
personnel matter, an important stated goal of last year's reform legislation is that
Inspectors General must be held accountable for their actions in office. Therefore, I
believe disclosure of the investigations of Mr. Walpin's conduct that prompted his
removal is necessary in the interests of transparency and accountability. Accordingly, I
request that your office arrange a briefing for the Committee on these investigations.

Sincerely,

Edolphus Towns
Chairman

cc: The Honorable Darrell Issa
    Ranking Minority Member

# EXHIBIT L

**THE WHITE HOUSE**

WASHINGTON

June 16, 2009

The Honorable Joseph I. Lieberman
United States Senate
706 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Susan M. Collins
United States Senate
413 Dirksen Senate Office Building
Washington, D.C. 20510

Dear Senators Lieberman and Collins:

We thank you for engaging in a constructive dialogue about the history and significance of the Inspector General Reform Act and the dismissal of Gerald Walpin. As you know, the President believes forcefully in the work and contributions of Inspectors General, and recognizes fully the importance of their independence.

Mr. Walpin was removed after a review was unanimously requested by the bi-partisan Board of the Corporation. The Board's action was precipitated by a May 20, 2009 Board meeting at which Mr. Walpin was confused, disoriented, unable to answer questions and exhibited other behavior that led the Board to question his capacity to serve. Upon our review, we also determined that the Acting United States Attorney for the Eastern District of California, a career prosecutor who was appointed to his post during the Bush Administration, had filed a complaint about Mr. Walpin's conduct with the oversight body for Inspectors General, including for failing to disclose exculpatory evidence. We further learned that Mr. Walpin had been absent from the Corporation's headquarters, insisting upon working from his home in New York over the objections of the Corporation's Board; that he had exhibited a lack of candor in providing material information to decision makers; and that he had engaged in other troubling and inappropriate conduct. Mr. Walpin had become unduly disruptive to agency operations, impairing his effectiveness and, for the reasons stated above, losing the confidence of the Board and the agency. It was for these reasons that Mr. Walpin was removed.

We of course recognize your view of the requirements for the formal notice letter which we submitted to Congress last week. That letter was prepared based upon long practice with respect to the form of such letters and the Administration's view of the statute. However, in response to your concerns we are providing this additional information and we look forward to

discussing the statutory requirements more fully with you.  Please note that the Counsel to the President was unavailable today, and so in the interests of time I am responding on his behalf.

Sincerely,

Norman L. Eisen
Special Counsel to the President

cc: The Honorable Claire McCaskill

# EXHIBIT M

# United States Senate
### WASHINGTON, DC 20510

June 17, 2009

**Via Electronic Transmission**

Gregory B. Craig
Counsel to the President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Dear Mr. Craig:

This morning my staff met with Norman Eisen regarding the removal of Gerald Walpin as the Inspector General at the Corporation for National and Community Service (CNCS).  Late on the evening of June 16, 2009, my office received a copy of Mr. Eisen's letter to the Chair and Ranking Member of the Committee on Homeland Security and Governmental Affairs.  I appreciate this effort to address the concerns of Congress that the Inspector General Reform Act of 2008 be complied with, and I appreciate Mr. Eisen's time in coming to my office to discuss these issues more fully in person.  His letter set forth the reasons for Mr. Walpin's dismissal for the first time.  Mr. Eisen said he conducted "an extensive review" at the request of the CNCS Board on or about May 20, 2009.  Unfortunately, however, Mr. Eisen refused to answer several direct questions posed to him about the representations made in his letter.  Since he was unwilling to answer them in person, please provide answers to the following questions in writing:

1) Did the CNCS Board communicate its concerns about Mr. Walpin to the White House in writing?

2) Specifically, which CNCS Board members came forward with concerns about Mr. Walpin's ability to serve as the Inspector General?

3) Was the communication about the Board's concerns on or about May 20, 2009 the first instance of any communications with White House personnel regarding the possibility of removing Mr. Walpin?

4) Which witnesses were interviewed in the course of Mr. Eisen's review?

5) How many witnesses were interviewed?

6) Were any employees of the Office of Inspector General, who may have had more frequent contact with Mr. Walpin than the Board members, interviewed?

7) Was Mr. Walpin asked directly during Mr. Eisen's review about the events of May 20, 2009?

8) Was Mr. Walpin asked for his response to the allegations submitted to the Integrity Committee by Acting U.S. Attorney Lawrence Brown?

9) What efforts were made during Mr. Eisen's review to obtain both sides of the story or to afford the Office of Inspector General an opportunity to be heard?

10) In addition to the claim that Mr. Walpin was "confused" and "disoriented," the letter also says he exhibited "other behavior" that led to questions about his capacity. What other behavior was Mr. Eisen referencing?

11) If the initial and primary concern had to do with Mr. Walpin's capacity to serve for potential health reasons, why was he only given one hour to decide whether to resign or be fired?

12) If Mr. Walpin's telecommuting arrangements since the beginning of this year were a major concern, then why was Mr. Walpin not simply asked to stop telecommuting?

Thank you in advance for your assistance and I would appreciate receiving a response to this inquiry by June 24, 2009. Should you have any questions about this letter, please contact Jason Foster at (202) 224-3605. Please send all replies electronically to Brian_Downey@finance-rep.senate.gov. Thank you for your prompt attention to these important matters.

Sincerely,

*Chuck Grassley*

Charles E. Grassley
United States Senator

# EXHIBIT N

EDWARD M KENNEDY, MASSACHUSETTS, CHAIRMAN

CHRISTOPHER J. DODD, CONNECTICUT
TOM HARKIN, IOWA
BARBARA A. MIKULSKI, MARYLAND
JEFF BINGAMAN, NEW MEXICO
PATTY MURRAY, WASHINGTON
JACK REED, RHODE ISLAND
BERNARD SANDERS (I), VERMONT
SHERROD BROWN, OHIO
ROBERT P. CASEY, JR., PENNSYLVANIA
KAY R. HAGAN, NORTH CAROLINA
JEFF MERKLEY, OREGON

MICHAEL B. ENZI, WYOMING
JUDD GREGG, NEW HAMPSHIRE
LAMAR ALEXANDER, TENNESSEE
RICHARD BURR, NORTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN MCCAIN, ARIZONA
ORRIN G. HATCH, UTAH
LISA MURKOWSKI, ALASKA
TOM COBURN, M.D., OKLAHOMA
PAT ROBERTS, KANSAS

J. MICHAEL MYERS, STAFF DIRECTOR AND CHIEF COUNSEL
FRANK J. MACCHIAROLA, REPUBLICAN STAFF DIRECTOR

**United States Senate**

COMMITTEE ON HEALTH, EDUCATION,
LABOR, AND PENSIONS

WASHINGTON, DC 20510–6300

June 18, 2009

Mr. Gregory B. Craig
Counsel to the President
The White House
Washington, DC 20500

Ms. Nicola O. Goren
Acting Chief Executive Officer
Corporation for National and Community Service
1201 New York Avenue, NW
Washington, DC 20525

Dear Mr. Craig and Ms. Goren,

We are writing to inquire into the recent decision to remove the Inspector General (IG) of the Corporation for National and Community Service (CNCS), Gerald Walpin. As you may know, a number of news reports have noted that the IG's removal coincides with the issuance of reports that were critical of CNCS grantees, including St. HOPE Academy and its then-head Kevin Johnson, now the Mayor of Sacramento, California. We are particularly concerned in this instance because of the Corporation's recent expansion of responsibilities under the Serve America Act, which created an even greater need to maintain public trust in the Corporation in meeting its now expanded responsibilities.

On June 11th, the President sent a letter stating an intention to terminate the Corporation's IG because of a loss of confidence. CNCS also placed the IG on administrative leave, precluded him from returning to the building and named an acting inspector general on that date. Subsequently on June 16th, the Special Counsel to the President provided additional information on the President's decision, citing a number of more specific reasons. Then, on June 17th, seven of nine CNCS Board members sent a letter vaguely referencing the IG's performance at an event in May, presumably a Board meeting, as the basis for terminating him.

We are concerned that the actions taken on June 11 do not comply with the requirements of the Inspector General Reform Act of 2008 (Pub. L. 110-409), legislation that President Obama co-sponsored while a Member of the Senate. To address our concerns, we ask that the White House counsel's office respond to the following inquiries:

1. Please explain whether, in your view, the statement in the June 11th letter that the IG no longer has the President's confidence complied with the requirements of the Inspector General Act (see 5 U.S.C. Appx. §3), as modified by Pub. L. 110-409, for notification of the specific reasons for termination or transfer of an IG.

2. Please explain whether the subsequent explanation from the Special Counsel on June 16 is intended to meet the requirements of 5 U.S.C. Appx. §3 and whether Mr. Walpin will be terminated 30 days from the first or second letter.

3. Please explain whether, in your view, the personnel actions taken by CNCS with regard to the IG on June 11th, the same day notice of termination was provided to Congress, comply with the 30-day prior notice requirement for removal of an IG.

4. Please explain the circumstances under which White House personnel strongly requested that the IG resign, as has been alleged in press reports, and whether, in your view, such action was appropriate in light of the requirements of 5 U.S.C. Appx. §3, as modified by Pub. L. 110-409.

Also, we request the production of all relevant documents relating to the decision to terminate the IG, including any legal analyses of the requirements of the IG Act by CNCS, Department of Justice (DOJ), the White House or other officials, to support said decision. To the extent the decision to remove the IG related to the alleged misconduct discussed in the Special Counsel's June 16th letter or the event referenced in the Board's June 17th letter, please provide contemporaneous documentation of all alleged misconduct and a list of those consulted in reaching that conclusion and when they were consulted. For example, the Special Counsel raised issues of the IG's periodically working from New York in his June 16th correspondence, but we unaware of any contemporaneous documentation of objections to that arrangement from the Board or otherwise.

Also, on June 17, 2009, CNCS finally responded to the issues raised in the IG's Special Report under Section 5(d) of the Inspector General Act regarding public grants to St. HOPE Academy and their use by Mayor Johnson. Section 5(d) requires that "a

report by the head of the establishment containing any comments such head deems appropriate" accompany the IG's report in its transmittal to Congress.  In a letter dated May 12[th], received May 14[th], CNCS initially indicated that:

> We are constrained from commenting substantively on the Inspector General's Special Report because we have been advised that the Acting United States Attorney for the Eastern District of California has formally communicated concerns about the Inspector General's conduct in this matter to the Chair of the Integrity Committee of the Council of the Inspectors General on Integrity and Efficiency.  Upon the completion of the Integrity Committee's consideration of this matter, we will promptly provide our comments on the Special Report.

The Congressional Research Service has reviewed the materials submitted by the Corporation and by the Inspector General and issued the enclosed legal opinion finding that, during a pending investigation of the Integrity Committee, the Corporation is not excused from fulfilling its obligations under Section 5(d).

Time is always of the essence in responding to allegations of misuse of public funds and/or concerns raised in the media regarding the appearance of impropriety in settling investigations involving such misuse.  It is also vital that the people's representatives in Congress are informed of all the relevant facts so we can address matters appropriately and expeditiously.  Pursuant to the CRS legal opinion, we request that in the future the Corporation commit to responding to IG Special Reports as required by Pub. L. 110-409.

Also, while we appreciate the fact that CNCS has now responded and enclosed a number of background documents to explain its decisions, we are concerned that the Acting Chief Financial Officer's Memorandum is dated June 16th, 2009, five days after the decision to terminate the IG was made and well after the settlement was finalized. Accordingly, we ask that the Corporation please provide all documents, including email and internal materials, supporting the underlying settlement in the St. HOPE Academy matter, including any legal analyses, that were created prior to June 11th, 2009.

While the White House and CNCS may be entitled to assert a privilege against disclosure of some of the documents and information that we have requested, we think it would be in the public interest for you to strongly consider waiving that privilege to help dispel public concerns regarding this matter.  We also believe doing so is appropriate in light of this administration's repeated commitments to transparency and accountability in government.

Please provide your response to our offices no later than close of business on Wednesday, June 24th, 2009.  If you have any questions, please have your staff

contact Amy Shank, Oversight and Investigations Director for Senator Enzi, at 202-224-6770, or Bryan Hickman, Counsel to Senator Hatch, at 202-224-5251.

Thank you for attention to this important matter.

Sincerely,

Michael B. Enzi
Ranking Member

Orrin G. Hatch
Senator

cc:    The Honorable Edward M. Kennedy, Chairman

Enclosure (CRS Opinion)



**Congressional
Research
Service**

**MEMORANDUM**                                                               June 12, 2009

**To:**         Senate Committee on Health, Education, Labor, and Pensions
              Attention: Adam Briddell, Professional Staff Member, Senator Mike Enzi

**From:**       Vanessa K. Burrows, Legislative Attorney, 7-0831

**Subject:**    **The Corporation for National and Community Service Inspector General's Seven-Day
              Report to Congress**

This memorandum responds to your request for a legal opinion on issues related to the Inspector General
(IG) at the Corporation for National and Community Service (the Corporation or CNCS). The IG at
CNCS is a federal establishment IG, appointed by the President with the advice and consent of the
Senate.[1] In May 2009, the then-CNCS IG issued a Special Report to Congress, which is known as a
seven-day report, regarding a settlement agreement reached between the Corporation and a grantee in
Sacramento.[2] Such seven-day reports are authorized under Section 5(d) of the Inspector General Act of
1978, as amended (IG Act). They address "particularly serious or flagrant problems, abuses, or
deficiencies relating to the administration of programs and operations."[3]

You have requested a memorandum on the legality of the Corporation's decision to refrain from comment
on the CNCS IG's Special Report. This memorandum will review the CNCS' response to the seven-day
Special Report by the CNCS IG and analyze the Corporation's decision to withhold comments on the
report. The correspondence between the CNCS IG, the Corporation, and Congress concern sections of the
IG Act that address IG reporting requirements and the Council of the Inspectors General on Integrity and

---

[1] 5 U.S.C. Appx. § 3. On June 11, 2009, Kenneth Bach was named Acting IG for CNCS. CNCS, Kenneth Bach Acting
Inspector And Assistant Inspector General for Support (June 11, 2009), http://www.cncsig.gov/PDF/Bios/Bach.pdf.

[2] Establishment IGs may be removed or transferred by the President after the President notifies Congress in writing at least 30
days before removing or transferring the IG. 5 U.S.C. Appx. § 3; *see also* P.L. 110-409, § 3. It appears that the former CNCS
IG, Gerald Walpin, was removed by or will be removed by the President within 30 days. *See, e.g.,* Ann Sanner and Pete Yost,
*Obama Removes AmeriCorps's IG in Spat with Friend,* Wash. Post (June 12, 2009); Nancy Lewis, *Obama Fires CNCS
Watchdog,* Youth Today (June 11, 2009), http://www.youthtoday.org/publication/article.cfm?article_id=2949; Suzanne Perry,
*Obama to Remove National-Service Inspector General,* The Chronicle of Philanthropy Government and Politics Watch (June 11,
2009), http://philanthropy.com/news/government/index.php?id=8528. It does not appear that the White House has issued an
official statement on the matter. News reports indicate that the President has notified Congress of his decision in a letter. Ann
Sanner and Pete Yost, *Obama to Fire Inspector General of AmeriCorps,* Wash. Post (June 11, 2009). The President must give
written notification within the 30 day time period prior to the IG's removal, and news reports state that the CNCS IG "is being
suspended with pay for the 30 days." *Id.* This memorandum does not address potential constitutional concerns with this
notification provision in the IG Act or the removal action itself. *See* Letter from Jim Nussle, Director, Executive Office of the
President, Office of Management and Budget, to The Honorable Joseph I. Lieberman, Chairman, Committee on Homeland
Security and Governmental Affairs, United States Senate (Jan. 9, 2008) ("Given that the Constitution vests solely in the President
the executive power and the duty to take care that the laws be faithfully executed, a President must have the ability to transfer or
remove subordinates, including IGs. . . . advance notice requirements for removal interfere with this constitutional authority.
Accordingly, the Administration objects to the advance notice provisions in section 3 of the bill...").

[3] 5 U.S.C. Appx. § 5(d).

---

Efficiency (CIGIE). The CIGIE was established in the Inspector General Reform Act of 2008 (IG Reform Act), which codified two existing councils of IGs established by executive order and merged them into a single council.[4] The IG Reform Act provides an interagency funding mechanism for the CIGIE and codifies the council's Integrity Committee, which handles allegations of wrongdoing by IGs and officials in their offices. The Integrity Committee of the CIGIE "shall receive, review, and refer for investigation allegations of wrongdoing that are made against Inspectors General and certain staff members of the various Offices of Inspector General."[5] These provisions of the IG Act will also be discussed below.

## The Special Report, Communications to Congress, and Applicable Provisions of the IG Act

On May 6, 2009, the CNCS IG delivered a Special Report to the Acting Chief Executive Officer of CNCS. The report criticized a settlement involving a CNCS grantee that received AmeriCorps funds and its two principals, one of whom became the Mayor of Sacramento.[6] On May 12, 2009, the CNCS forwarded the Special Report to Senator Kennedy, Chairman of the Senate Committee on Health, Education, Labor, and Pensions. The transmission of the IG report by the head of the establishment occurred within the seven calendar days provided for in § 5(d) of the IG Act, which will be discussed below. In a letter accompanying the enclosed Special Report, the CNCS noted that the IG had advised CNCS that the report was considered to be a § 5(d) communication to Congress.

IGs have reporting requirements to keep the head of the establishment (in this case, the CNCS) and Congress "fully and currently informed" through reports required by § 5 of the IG Act "and otherwise."[7] The reports required by § 5 include semi-annual reports as well as immediate reports regarding "particularly serious or flagrant problems."[8] For both types, the IG reports are submitted to the establishment head who transmits them unaltered, but with a report by the establishment head "containing any comments such head deems appropriate," to Congress within a designated period of time.[9] Section 5(d) of the IG Act, which concerns the immediate seven-day reports, states:

> Each Inspector General shall report immediately to the head of the establishment involved whenever the Inspector General becomes aware of particularly serious or flagrant problems, abuses, or deficiencies relating to the administration of programs and operations of such establishment. The head of the establishment shall transmit any such report to the appropriate committees or subcommittees of Congress within seven calendar days, *together with a report by the head of the establishment containing any comments such head deems appropriate.* [emphasis added]

The letter accompanying the IG's seven-day report to Chairman Kennedy from CNCS also stated:

> We are constrained from commenting substantively on the Inspector General's Special Report because we have been advised that the Acting United States Attorney for the Eastern District of California has formally communicated concerns about the Inspector General's conduct in this matter to the Chair of

---

[4] P.L. 110-409, § 7; 5 U.S.C. Appx. § 11.

[5] P.L. 110-409, § 7; 5 U.S.C. Appx. § 11(d).

[6] Office of the IG, CNCS, Special Report to Congress from the Office of the Inspector General of the Corporation for National and Community Service 1-3 (May 2009).

[7] 5 U.S.C. App. § 4(a)(5). Keeping Congress "fully and currently informed" includes testifying at hearings and meeting with Members and staff.

[8] 5 U.S.C. App. § 5(d).

[9] 5 U.S.C. Appx. §§ 5(b)(1), 5(d).

the Integrity Committee of the Council of the Inspectors General on Integrity and Efficiency. Upon the completion of the Integrity Committee's consideration of this matter, we will promptly provide our comments on the Special Report.[10]

As noted above, the Integrity Committee reviews the allegations of wrongdoing. The Integrity Committee must (1) "refer any allegation of wrongdoing to the agency of the executive branch with appropriate jurisdiction over the matter"[11] and (2) refer to the Chairperson of the Integrity Committee any allegation of wrongdoing that the Integrity Committee determined is "potentially meritorious that cannot be referred to an agency" of the executive branch with appropriate jurisdiction over the matter.[12] Next, the Chairperson of the Integrity Committee must thoroughly and timely investigate each referred potentially meritorious allegation.[13] The Chairperson of the Integrity Committee must report the results of the investigation of the potentially meritorious allegation to the Integrity Committee.[14] The Integrity Committee must then (1) assess the report; (2) within 30 days, forward the report to specified individuals "for resolution"; (3) include its recommendations; and (4) submit, within 30 days after forwarding the report, an executive summary of the report and recommendations to specified congressional committees.[15] For example, if the report relates to a presidentially-appointed IG or employee of such an IG, the report must be forwarded to the Executive Chairperson of the CIGIE and the President for resolution.[16] The Executive Chairperson of the CIGIE must then report to the Integrity Committee "the final disposition of the matter, including what action was taken by the President."[17] It would appear that Integrity Committee reports could be considered by the President in deciding whether to remove or take other action against an IG, but such reports and recommendations by the Integrity Committee are not binding on the President.

On May 13, 2009, the CNCS IG sent a letter to Senator Kennedy regarding the May 12th letter from CNCS.[18] The IG's letter highlighted the italicized language in § 5(d), above, regarding the submission of the seven-day report with a report containing comments deemed appropriate by the agency head, and reiterated the Corporation's grounds for not including comments on the seven-day report. In the letter, the CNCS IG stated that the May 12, 2009 letter from CNCS is "entirely separate from the Corporation's responsibility to provide its response to our Special report to Congress."[19] The CNCS IG also stated that "we believe the complaint of the Acting United States Attorney [to the CIGIE] to be without merit and

---

[10] Letter from Nicola Goren, Acting Chief Executive Officer, Corporation for National & Community Service, to The Honorable Edward M. Kennedy, Chairman, Committee on Health, Education, Labor, and Pensions, U.S. Senate (May 12, 2009).

[11] P.L. 110-409, § 7; 5 U.S.C. Appx. § 11(d)(5)(B). The head of the agency investigating these allegations must create a report containing the results of the investigation and provide the report to the Integrity Committee. P.L. 110-409, § 7; 5 U.S.C. Appx. § 11(d)(7).

[12] P.L. 110-409, § 7; 5 U.S.C. Appx. § 11(d)(5)(C).

[13] P.L. 110-409, § 7; 5 U.S.C. Appx. § 11(d)(6).

[14] P.L. 110-409, § 7; 5 U.S.C. Appx. § 11(d)(7).

[15] P.L. 110-409, § 7; 5 U.S.C. Appx. § 11(d)(8).

[16] P.L. 110-409, § 7; 5 U.S.C. Appx. § 11(d)(8). The IG Act addresses the authorities and duties of two types of IGs: (1) federal establishment IGs, who are appointed by the President with the advice and consent of the Senate and may be removed only by the President; and (2) designated federal entity (DFE) IGs, who are appointed and may removed by the agency head. If the report relates to a DFE IG, the Integrity Committee must forward the report to the head of the DFE. *Id.*

[17] P.L. 110-409, § 7; 5 U.S.C. Appx. § 11(d)(8). If the report concerns a DFE IG, the Executive Chairperson must report on the agency head's actions. *Id.*

[18] Letter from Gerald Walpin, Inspector General, Corporation for National & Community Service, to The Honorable Edward M. Kennedy, Chairman, Committee on Health, Education, Labor, and Pensions, U.S. Senate (May 13, 2009).

[19] *Id.*

will push for its prompt resolution by the Integrity Committee" and asked "Congress to direct the Corporation to furnish its comments at this time."[20]

## Analysis

This memorandum will examine §§ 5(d) and 11 of the IG Act, which concern, respectively, the seven-day reports and the Integrity Committee review of allegations of wrongdoing against IGs, under the principle of statutory interpretation known as a plain language analysis. There does not appear to be any case law discussing § 5(d) of the IG Act; and § 11, concerning the Integrity Committee, is newly codified. The legislative history of § 5(d) states:

> Subsection (d) requires each inspector and auditor general to report immediately to the agency head whenever he becomes aware of particularly flagrant problems and abuses or deficiencies in agency programs and operations. *The agency head is required to transmit the report, along with whatever comments the agency head wishes to append.* In this provision, the Committee follows the approach taken in the earlier HEW and Energy [IG] legislation. The provision obligates the inspector and auditor general to take steps which will result in the prompt notification of Congress if the inspector and auditor general becomes aware of the particularly serious or flagrant problems, abuses or deficiencies relating to the administration of programs or operation of the department. The judgment of what constitutes a serious or flagrant problem is to be made by the inspector and auditor general, and not by the agency head.[21] (emphasis added)

In a plain language analysis, the starting point in statutory construction is the language of the statute itself. The United States Supreme Court often recites the "plain meaning rule," which purports to bar courts from relying on legislative history when statutory language is plain, as courts sometimes look to the legislative history to determine congressional intent in cases where the statutory language is susceptible to more than one interpretation.[22]

The plain language of § 5(d) requires the head of the CNCS to transmit, within 7 calendar days of the CNCS IG's report, that IG report to the appropriate congressional committees "together with a report by the head of the [CNCS] containing any comments such head deems appropriate." Section 5(d), and in particular, the phrase "together with" provides that the head of the establishment must submit some type of report to Congress. Such report may contain "any comments [the CNCS] head deems appropriate," but it appears that the report does not necessarily need to include comments by the establishment head and could simply consist of a letter presenting the IG's report.

The phrase "containing any comments such head deems appropriate" appears to be broad language that arguably provides the establishment head with discretion to determine what comments are and are not appropriate.[23] If the establishment head did not deem any comments to be appropriate, the head of the establishment could apparently so specify. The Corporation head appears to have the discretion to not append comments to the IG seven-day report.

---

[20] *Id.*

[21] S. Rep. 95-1071, at 33 (Aug. 8, 1978).

[22] "In aid of the process of construction we are at liberty, if the meaning be uncertain, to have recourse to the legislative history of the measure and the statements by those in charge of it during its consideration by the Congress." United States v. Great Northern Ry., 287 U.S. 144 (1932). On the other hand, "we do not resort to legislative history to cloud a statutory text that is clear." Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994).

[23] 5 U.S.C. Appx. § 5(d).

As noted above, the head of the CNCS stated that the Corporation was "constrained from commenting substantively on the Inspector General's Special Report because we have been advised that" there was a formal communication about the IG's "conduct in this matter" to the CIGIE Integrity Committee.[24] It should be noted that § 11 does not impose a legal impediment to inclusion of comments by the establishment head when submitting the IG seven-day report to Congress. Any constraint identified by the CNCS head does not appear to be legal in nature.

---

[24] Letter from Nicola Goren, Acting Chief Executive Officer, Corporation for National & Community Service, to The Honorable Edward M. Kennedy, Chairman, Committee on Health, Education, Labor, and Pensions, U.S. Senate (May 12, 2009).

# EXHIBIT O



# Joe Lieberman
## UNITED STATES SENATOR

FOR IMMEDIATE RELEASE                                    Contact: Sara Lonardo
June 19, 2009

## Committee Reviews Walpin Termination

### *Requests White House Cooperation*

WASHINGTON - Homeland Security and Governmental Affairs Committee Chairman Joe Lieberman, ID-Conn., Ranking Member Susan Collins, R-Me., and Committee member Senator Claire McCaskill, D-Mo., Friday sent a letter to President Obama regarding the termination of Gerald Walpin as Inspector General of the Corporation for National and Community Service.


June 19, 2009


The Honorable Barack Obama
President of the United States of America
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Dear Mr. President:

We have received the White House's letter of June 16, 2009, supplementing your prior notification of June 11, 2009, regarding the decision to remove from office the Inspector General for the Corporation for National and Community Service, Mr. Gerald Walpin.

We appreciate your communications with the Committee on this matter. Based on the information you provided in the initial letter, and its supplement, we believe you have met the letter and spirit of the Inspector General Reform Act of 2008 with respect to congressional notifications of removal or transfer.

Inspectors General are vital partners in Congress's effort to identify inefficient, ineffective, and improper government programs. By leveraging the expertise and independence of Inspectors General and their staffs, Congress has been able to identify, and take action to stop, wasteful spending. The investigations and reports of Inspectors General throughout the government help Congress shape legislation and oversight activities - improving government performance, providing important transparency into federal programs, and giving Americans better value for their tax dollar.

The improvements in the Inspector General Reform Act relating to the removal or transfer of Inspectors General are designed to insulate and protect our nation's watchdogs from

inappropriate efforts to hinder their audits and investigations. Although Congress stopped short of requiring "for cause" removal of Inspectors General, the law and its legislative history indicate that the reasons included in the President's notification to Congress upon the removal or transfer of an Inspector General should be more than superficial or conclusory. We appreciate the efforts your staff has made to address our concerns on this issue. Discussions and briefing with Committee staff over the last several days, on both the question of proper notice and the substantive reasons for the termination decision, have been instructive. We request the White House's ongoing cooperation in providing requested information to the Committee to ensure that we are fully apprised of the circumstances surrounding Mr. Walpin's removal. Thank you for your assistance in this matter.

Sincerely,

Joseph I. Lieberman
Chairman

Susan M. Collins
Ranking Member

Claire McCaskill
U.S. Senator

-30-

# EXHIBIT P

**THE WHITE HOUSE**

WASHINGTON
June 30, 2009

The Honorable Charles E. Grassley
United States Senate
135 Hart Senate Office Building
Washington, DC 20510

Dear Senator Grassley:

I am writing in response to your letter of June 25, 2009. In that letter, you suggest that I have not been responsive to questions you have asked about the President's decision to remove Inspector General Gerald Walpin. I respectfully disagree. Over the past several weeks, both the White House and the Corporation for National and Community Service have cooperated with Congress and have voluntarily provided an extraordinary amount of information concerning Mr. Walpin's job performance. Representatives of the White House and the Corporation for National and Community Service have also described and detailed the many legitimate concerns that led to his removal.

As you know, the President notified Congress on June 11, 2009 that he intended to remove Mr. Walpin. The same day, I wrote to you with additional information about the President's decision. On June 16, Special Counsel Norman Eisen provided even more information in a supplemental letter to the Chair and Ranking Member of the Committee on Homeland Security and Government Affairs. The next day, Mr. Eisen briefed members of your staff. Throughout this entire period, members of the White House staff have been in constant contact – on a nearly daily basis – with your office and with other Members of Congress.

At the same time, the Corporation also has provided to Congress detailed information concerning Mr. Walpin's conduct as Inspector General. Last week, the Corporation produced several hundred pages of internal documents. These materials contain evidence that is more than sufficient to support the Board's decision to seek Mr. Walpin's removal. For example, the materials show that Mr. Walpin failed to disclose important information to key decision makers, that he engaged in inappropriate conduct over an extended period of time, including impeding an Equal Opportunity investigation into his office, and that he approved an offensive newsletter with ethnic and gender stereotypes. Yesterday, four representatives of the Corporation – including three bi-partisan Board members – briefed Congressional staff for two and one-half hours about these materials. I understand that members of your office were invited but declined to attend. Earlier today, representatives of the Corporation conducted another briefing for Senate staff on the same topic.

Although your staff did not attend these briefings, I understand that they have spoken separately with at least two Republican members of the Corporation's Board. Therefore, I presume that you are aware of the numerous grounds for the Board's unanimous decision to seek Mr. Walpin's removal.

Senator, I know from your long and distinguished record in the Senate that you support active and effective Inspectors General, and that you appreciate the critical role they play in promoting the efficiency of Federal programs and agencies. You have been a leader on these issues. I am therefore puzzled by your continued support for Mr. Walpin. By any reasonable measure, he fell far short of the high standard that the American people expect and deserve.

With respect, I would point out that your questions do not focus on Mr. Walpin's conduct or on the events leading up to the Board's unanimous decision to convey its concerns about Mr. Walpin's performance to the White House. Instead, your questions seek information about the White House's internal decision-making process. These questions implicate core Executive Branch confidentiality interests.

I assure you that this Administration will comply with congressional requests for information to the fullest extent possible consistent with constitutional and statutory obligations. As you know, this President supports increased transparency in government, and he has taken concrete steps to make this Administration the most open in history. He also has an obligation to preserve the confidentiality of core deliberative communications. Every president in our nation's history has taken the position that such confidentiality is absolutely essential to the effective functioning of the Executive Branch. Given the information that has already been shared with Congress, there can be no question or doubt that the President acted appropriately in removing Mr. Walpin. We apparently disagree on this issue, and I fear that there is no way to change your views.

I do appreciate your continued interest in promoting strong and independent Inspectors General. I hope we will be able to work with you in the future to ensure that all Inspectors General merit the trust that has been placed in them by Congress, the President, and the American people.

Very truly yours,

Gregory B. Craig
Counselor to the President

# EXHIBIT Q

# SECTION C - TELEWORK

## SECTION C INDEX

OFFICE OF INSPECTOR GENERAL TELEWORK REQUIREMENTS ......................................... 1
AUTHORIZATION FOR TELECOMMUTING ......................................................................... 2
TELECOMMUTING RESTRICTIONS FOR ALTERNATIVE, FLEXIBLE WORK SCHEDULES ...... 2

Office of Inspector ('OIG') staff may participate in the Telework Program. Public Law 106-346, § 359, requires that all Executive agencies establish Telework policies. Corporation for National & Community Service ('Corporation') Policy Number 200, Subject: Telecommuting, details the Corporation's implementation of the Public Law.

OIG staff's participating in the Telework Program are subject to the general guidance contained in the Corporation's policy and to the conditions contained in this policy. Additional information regarding Telework by Federal workers may be found at www.Telework.gov.

## Office of Inspector General Telework Requirements

Telework is not an employee right; it must not interfere with the OIG's mission, and may be denied by OIG Management at any time. The Inspector General ('IG') retains all final decision and approval authority regarding the OIG's Telework Program. Employees with a regularly scheduled Telework day must report to the office if requested to do so by their supervisor, Assistant Inspector General ('AIG') or IG. Employees are required to be at the Telework location during their regular duty hours and be available for work discussions with other OIG employees, supervisors, their respective AIG or the IG. Failure to be so available, without sufficient explanation, may result in cancellation of teleworking privileges.

Regularly scheduled Telework (working from home or other approved work place under a formal agreement) will be limited to Tuesdays, Wednesdays or Thursdays. Exceptions require IG or Assistant Inspector General ('AIG') approval. Episodic Telework may be authorized any time, Monday through Sunday with supervisory approval.

A formal arrangement between the employee and supervisor is required for all Telework. The employee must complete the Telecommuting Application (Appendix A), Telecommuting Agreement (Appendix B), Telecommuting Home Safety Checklist (Appendix C) and OIG Telework IT Home Checklist (Appendix D), if appropriate, before the first occasion of Telework. Once the formal application for Telework has been approved, the employee must obtain supervisor approval in advance of each episodic Telework request. The supervisor will approve specific requests either verbally or by e-mail. Regardless of the approval method, the employee and supervisor must have a clear, mutual understanding of the work to be performed.

Supervisors and employees will conduct an annual review of Telework arrangements for applicability and accuracy of information. If the supervisor approves a continuation of the Telework arrangement, the employee is not required to sign a new Telework agreement each calendar year.

The OIG Information Technology Specialist ('ITS') is solely responsible for issuing and maintaining OIG-provided information technology equipment and serves as the help desk for OIG Teleworkers requiring assistance. If the employee plans on connecting to the OIG network with his/her assigned token from a personally owned computer, the employee must complete the OIG Telework IT Checklist for each personally owned computer from which the employee plans to connect. The ITS will determine if the personally owned computer has sufficient security safeguards and will disapprove or approve the home computer for connection to the OIG network.

Copies of all Telework applications and approvals shall be maintained by the OIG support section in the employee's secondary personnel folder.

**Authorization for Telecommuting**

The IG will make the Telework determination for all IG direct reports. The respective AIG will make the determination of Telework eligibility of their employees.

**Telecommuting Restrictions for Alternative, Flexible Work Schedules**

Regularly-scheduled Telework is not authorized for employees working the 10-4 alternate flexible work schedule. Supervisors may authorize episodic Telework for those employees; however, as a general rule, regular days off ('RDO') shall not be combined with the Telework days and weekends to form a four-to-five consecutive day, out-of-office period.

Regularly-scheduled Telework may be authorized for employees working the 5-4-9 alternative flexible work schedule. As a general rule, RDO's shall not be combined with regularly scheduled Telework days and weekends to form a four-to-five consecutive day, out-of-office, period.

# EXHIBIT R

**Gerald Walpin**

| | |
|---|---|
| **From:** | Gerald Walpin |
| **Sent:** | Tuesday, January 27, 2009 9:47 AM |
| **To:** | John J. Park; Vincent A. Mulloy; Stuart G. Axenfeld; Robert J. Walters; Kenneth C. Bach |
| **Subject:** | FW: Telecommuting arrangement |

FYI

-----Original Message-----
From: Steve Goldsmith [mailto:goldsmith@iquest.net]
Sent: Monday, January 26, 2009 9:14 PM
To: Gerald Walpin; Tanenblatt, Eric
Cc: Alan D. Solomont
Subject: RE: Telecommuting arrangement

Thank you for your helpful response

-----Original Message-----
From: Gerald Walpin [mailto:G.Walpin@cncsoig.gov]
Sent: Monday, January 26, 2009 2:40 PM
To: Steve Goldsmith; Tanenblatt, Eric
Cc: Alan D. Solomont
Subject: RE: Telecommuting arrangement

Please see the attachment which, hopefully, will answer Steve's question and provide some
structure concerning Eric's subject. I thought that my getting this to you today, in
advance of the MAG meeting, would reduce the time that I needed to make my presentation in
response to Eric's email. I look forward to talking with you tomorrow. Jerry

-----Original Message-----
From: Steve Goldsmith [mailto:goldsmith@iquest.net]
Sent: Friday, January 23, 2009 10:40 PM
To: Gerald Walpin; Tanenblatt, Eric
Cc: Alan D. Solomont
Subject: RE: Telecommuting arrangement

Thank you for the note and we look forward to speaking with you. I will discuss with Eric.
I think there are many issues here. Gerry sometime can you send us just a little reasoning
why a board confirmed by the Senate for the purpose of imposing accountability on an
entity and instructed specifically by members of that body to report to them on these
subjects, is to be totally independent in how it prioritizes policy, conducts risk
analyses and protects the tax payers from the IG.

I understand that your judgment should be independent but you seem to have a view of how
this should work and our role in it that is different than past practices and seems more
applicable to a situation where there is no board.

-----Original Message-----
From: Gerald Walpin [mailto:G.Walpin@cncsoig.gov]
Sent: Friday, January 23, 2009 10:26 AM
To: Tanenblatt, Eric
Cc: Steve Goldsmith; Alan D. Solomont
Subject: RE: Telecommuting arrangement

Gentlemen: I appreciate the advance indication of your concerns (and, of course, the nice
words about my performance). I look forward to a candid discussion, during which I intend
to provide my comments on the points you have raised in this email as well as any other

points you raise during the discussion.  I understood, even before receiving this email, that, while you recognize the independence of OIG from Corporation control of its manner of operating, your interest (as mine) is what is in the best interests of the OIG, the Corporation, and the Government as a whole.  Given that identity of interest, I am hopeful that we will not disagree on the best procedure to determine whether what I suggest would, in fact, be in the best interests of OIG, the Corporation, and the Government.

Just to make sure that we are on the same discussion field, my plan does not involve "a full-time telecommute arrangement," as you state in the email.  But that, and any other misunderstandings that may exist, will, I hope and expect, be cleared up in our telephonic discussion next Tuesday.

Meanwhile, I hope each of you has a good weekend.

Sincerely (and with much appreciation for your service),

Jerry


-----Original Message-----
From: Tanenblatt, Eric [mailto:etanenblatt@mckennalong.com]
Sent: Friday, January 23, 2009 8:57 AM
To: Gerald Walpin
Cc: Steve Goldsmith; Alan D. Solomont
Subject: Telecommuting arrangement


Jerry:

In advance of our upcoming MAG committee meeting, I did want to provide you with feedback from the board regarding your proposed telecommuting arrangement.

First, we recognize and appreciate the sacrifices you and your family have made the past two years.  Your willingness to commute each week from New York City to Washington, D.C. speaks to your deep and personal commitment to your responsibilities as Inspector General.

Second, we have concerns about the viability of a long-term telecommuting arrangement for a position as important as the Inspector General.    It is our view that, given the need for effective leadership, and the high-profile and critical nature of the Inspector General position, a full-time telecommute arrangement is not acceptable.  You have been a hands-on Inspector General, one who is willing to take the time to work through issues principally through face to face meetings, where candid give and take has yielded in many instances better decisions for the agency.  While we would expect that you would make every effort to be in Washington for critical meetings, you would lose the in-person communications that currently take place on a daily basis.  Moreover, given the unexpected nature of IG-related matters, telecommuting would make it difficult for you to participate optimally and in person in issues and meetings that come up without notice.  In a year of transition, this is a critical time for the Corporation -- the in-person presence of the Inspector General will be important to ensuring the best possible oversight of our agency

Finally, in all candor, an Inspector General's recommendations are often made in contentious matters of great sensitivity and importance.  It is our expectation that your telecommuting arrangement would, fairly or unfairly, detract from the force and persuasiveness of your recommendations.  Thus, we are concerned that a long-term telecommuting arrangement would likely have the effect of weakening your effectiveness as Inspector General.

I thought it would be useful for you to have a clear understanding of

our position prior to Tuesday's call.

Sincerely,

Eric


Eric Tannenblatt


CONFIDENTIALITY NOTICE:
This e-mail and any attachments contain information from
the law firm of McKenna Long & Aldridge LLP, and are
intended solely for the use of the named recipient or
recipients. This e-mail may contain privileged
attorney/client communications or work product. Any
dissemination of this e-mail by anyone other than an
intended recipient is strictly prohibited. If you are not a
named recipient, you are prohibited from any further
viewing of the e-mail or any attachments or from making any
use of the e-mail or attachments. If you believe you have
received this e-mail in error, notify the sender
immediately and permanently delete the e-mail, any
attachments, and all copies thereof from any drives or
storage media and destroy any printouts of the e-mail or
attachments.

# EXHIBIT S

01/22/09

Jerry—

Here are some thoughts on Teleworking.

Vincent

## Justifications for the Inspector General to Telework

- Government recognizes and encourages Telework.
- Corporation policy encourages and permits it.
- Consistent with the Telework laws and policies, I believe there would be no adverse effect, and in fact, I would be just as productive and effective were I to work from my home office in New York several days a week.
- A Telework arrangement is not without precedent: Currently, a Corporation Assistant CFO directs his Washington staff from a Philadelphia location.

- I am capable of running this office from New York
    - When away from this office, I am in constant touch by phone, email, blackberry, and FedEx of documents. I have frequently exchanged memo's by Fed Ex, held teleconferences with OIG staff by teleconference phone when in New York and Connecticut.
    - As example, I worked on a personnel issue in this manner when in Africa this summer.

- With regard to accessibility by the Corporation officers, when in Washington, my primary contact with the Corporation has been through pre scheduled meetings, the most significant of which is the bi-weekly meeting I have with the CEO in which we discuss issues that have arose in the interim. This is something that does not occur ad hoc, or requires daily interaction, but is planned and contains its own agenda. In a similar fashion I have bi-weekly meetings with the CFO, in which we discuss issues and direction of ongoing audits.

# EXHIBIT T

Mr. Walpin, below are my comments that you requested regarding you continuous position as the IG, while telecommuting. The comments below are suggested points that you could make to the Board of Directors in an effort to convince them that telecommuting is feasible.

- Although I will be telecommuting from New York, I will not be a part-time IG;

- I have evaluated my effort over the prior two years that I have served as the IG and concluded that a great deal of my work effort can be conducted in a telecommuting capacity;

- I have been, and will continue to be more effective and more involved than the prior appointed IGs at the Corporation for National and Community Service;

- All regular meeting with the Board, MAG, CEO, and CFO (others?) will continue to be in-person meetings;

- We will continue to have weekly, in-person meetings with the OIG managers;

- I have taken the lead role in numerous ongoing investigations (USVI, ECC, St Hope) and it is necessary that I continue to direct these efforts. I have been the point of contact with the AUSAs on several investigations and intend to continue in this capacity;

- I can alter my telecommuting schedule to ensure that the office is properly managed;

POSSIBLE SUGGESTION

I intend to telecommute for a given amount of time (2-3 months?) and will reevaluate the effect that my absence from the office has on the efficiency of the OIG as a whole and also on my ability to manage the affairs of the office.

I believe it is important to point out that your staff first suggested that you remain as IG and consider telecommuting.

Stuart Axenfeld

# EXHIBIT U

## Kenneth C. Bach

| | |
|---|---|
| **From:** | Kenneth C. Bach |
| **Sent:** | Friday, January 23, 2009 10:15 AM |
| **To:** | Gerald Walpin |
| **Subject:** | Telecommute Comments |
| **Signed By:** | k.bach@cncsoig.gov |

Mr. Walpin, you will not be telecommuting on a full time basis but what is defined as a 'regular' telecommute. There are two types 'regular' and 'episodic.' 'Regular' has defined, scheduled days where you will be at home or another designated location, 'episodic' is a random telecommute occurrence, typically an employee may want to telecommute one day this and not telecommute again for a couple weeks. 'Episodic' is not scheduled it is random. Yours would a 'regular' telecommute.

From your home, you would be able to receive and send email from your cncsoig.gov email account. You will be accessible via your government issued Blackjack. While we are working on a better telecommunications arrange in the interim –

Your private OIG number can be forwarded to ring at any designated phone and can be turned off upon your arrival at our office.

You will have a federally issued calling card which will enable you to make calls from your home private number to any number. That call will be billed to our office.

You have a fax machine, documents can be faxed back and forth between our offices, we have done this before.

Regular schedule meetings with CNCS senior management can be schedule while he is on-site. You do not typically meet with any of the CNCS rank and file employees, as far as I know all your meetings are scheduled in advance.

Kenneth C. Bach
Assistant Inspector General for Support
Office of Inspector General
Corporation for National & Community Service
1201 New York Ave, NW
Washington, DC 20525
(202) 606-9377 - office
(202) 552-9975 - cell

*"Nothing stops an organization faster than people who believe that the way you worked yesterday is the best way to work tomorrow." -- Jon Madonna*

1/23/2009

# EXHIBIT V

Telecommuting Tips, Advice, Policy, and Updates

A Source of Telecommuting Research and Knowledge

Skip to Content ↓

- Home
- About
- Sample Policies and Procedures
- Telecommuting Consulting



# Obama to Expand Federal Telework Programs- Telecommuting maintaining momentum

Nov 8th, 2008
by *Brandon Dempsey*.

The Federal Government sees the vital role Telework/Telecommuting will play in America's future for both the public and private sector. Let's look at the latest steps.

President-Elect Barack-Obama has pledged to expand Telework for federal employees. In a series of October letters written to John Gage, national president of the American Federation of Government Employees, Obama claimed he would, "support efforts to bring paid family leave, flexible work schedules and increased Teleworking to the federal government." This latest development further supports recent moves by the federal government to increase the amount of Teleworkers and government support for the private sector.

The Energy Independence Act of 2007, signed by President Bush, specifically charged the Small Business Administration with developing a 4 year pilot program that encourages telecommuting for small businesses. Allocating $5 million in funds, the SBA is instructed to conduct presentations on the benefits of telecommuting and reach out to businesses considering telecommuting.

Lastly, The Telework Improvements Act of 2008 passed by the House on June 3, 2008, is a measure that would require agencies to develop Telework programs that let eligible employees Telework at least 20 percent of their working hours every two weeks. Under the legislation, passed June 3, agencies would have to designate a senior-level employee as a Telework managing officer and incorporate Teleworking into their continuity-of-operations planning. In addition, the bill would require the comptroller general, the head of the Government Accountability Office, to submit an annual report to Congress that would evaluate agencies' progress on their Telework programs.

What does all this mean for government employees and businesses considering Telework/Telecommuting? It means that both the private and public sector are going to see increased support for Remote Work Options. Telecommuting is a cheaper more productive way for organizations to get their work done. Combine that with the Real-Estate savings, increased employee productivity, better ability to attract and retain top talent, better employee work life balances, and of course increased Business Continuity capabilities, and you have the new standard of work for the 21st Century.

Ready to get started?


Brandon Dempsey
SuiteCommute
1-888-878-4832
Brandon@suitecommute.com

Posted in: Government Impacts, Green and Environmental.

← How to: Telecommute- "Do Your Homework Before Allowing Work From Home
St. Louis Highway 64 Opening/Closing Early: Increase in Telecommuting →

**0 Comments on "Obama to Expand Federal Telework Programs- Telecommuting maintaining momentum"**

1/15/2009 4:40 PM

# EXHIBIT W

# A Guide to Telework in the Federal Government

## Introduction

Late 20th-century technology revolutionized the workplace, and the 21st-century workplace is evolving even further. Computers, remote connectivity, voice and electronic communications, paperless work processes, and other innovations make information and work increasingly mobile.

Such innovations help the Federal Government, as the Nation's largest employer, serve the needs of the American public more efficiently and effectively. Federal employees have used mobile work technology for a long time. In recent years, telework has become increasingly widespread and formalized, with legislative mandates as well as new programmatic and policy supports and structures.

The Office of Personnel Management defines telework as "work arrangements in which an employee regularly performs officially assigned duties at home or other worksites geographically convenient to the residence of the employee." Telework is simply a way of getting work done from a different location. It can serve multiple purposes – and have multiple benefits – when it is implemented effectively in an organization.

For Federal agencies, telework is of particular interest for its benefits in the following areas:

- Recruiting and retaining the best possible workforce - particularly newer workers who have high expectations of a technologically forward-thinking workplace and any worker who values work/life balance
- Helping employees manage long commutes and other work/life issues that, if not addressed, can have a negative impact on their effectiveness or lead to employees leaving Federal employment
- Reducing traffic congestion, emissions, and infrastructure impact in urban areas, thereby improving the environment
- Saving taxpayer dollars by decreasing Government real estate costs
- Ensuring continuity of essential Government functions in the event of national or local emergencies

This guide is intended to help Federal managers and employees understand how to make telework a routine part of doing business, as well as how to integrate telework into emergency planning.

## Legislative Background

For over a decade, laws addressing telework (under various names – "work at home," "flexible work," "telecommuting," etc.) have been in effect for Federal employees. The main legislative mandate for telework was established in 2000 (§ 359 of Public Law 106-346). This law states that "[e]ach executive agency shall establish a policy under which eligible employees of the agency may participate in telecommuting to the maximum extent possible without diminished employee performance." Associated language in the conference report for this legislation expanded on that requirement:

*Each agency participating in the program shall develop criteria to be used in implementing such a policy and ensure that managerial, logistical, organizational, or other barriers to full implementation and successful functioning of the policy are removed. Each agency should also provide for adequate administrative, human resources, technical, and logistical support for carrying out the policy.*

Further legislation (Public Law 108-199, Division B, § 627 of January 23, 2004, and Public Law 108-447, Division B, § 622 of December 8, 2004) followed this mandate with directives to certain agencies to increase telework participation in the workforce by specified amounts.

As part of this congressional mandate, OPM began to survey Federal agencies about telework in 2000. This Call for Telework Data collects information about agency programs and participation rates.

## Joint OPM/GSA Support

OPM and the General Services Administration (GSA) work together to support telework in Federal agencies. The joint OPM/GSA Website www.telework.gov provides information to agencies, managers, and employees about how to effectively implement telework programs and arrangements. OPM and GSA also work directly with telework coordinators in each agency to provide guidance and assistance.

## Definitions/Types of Telework

The terms "telework," "telecommuting," "flexible workplace," "remote work," "virtual work," and "mobile work" are all used to refer to work done outside of the traditional on-site work environment. These terms are defined in different ways and used in different contexts to refer to anything from jobs that are completely "virtual" or "mobile," to arrangements that enable employees to work from home a few days per week or per month.

OPM uses the term "telework" for reporting purposes and for all other activities related to policy and legislation. OPM defines telework as "work arrangements in which an employee regularly performs officially assigned duties at home or other work sites geographically convenient to the residence of the employee."

Telework arrangements in the Federal Government are most often part-time rather than full-time, although full-time telework does exist. Agencies may, at their own discretion, define and use the types of telework that best fit their business needs. However, for purposes of reporting and judging progress towards meeting the legislative mandate, OPM will count employees whose telework frequency is in one of the following categories only:

- Regular/recurring at least 3 days per week
- 1 or 2 days per week
- Less often than once a week, but at least once a month

**As defined by OPM, telework is not—**

- Work extension: Many employees take work home with them. This is remote work, but it is not considered telework within the scope of the legislation.

- Mobile work: Some agencies have employees who, by the nature of their jobs, are generally off-site, and may even use their home as their "home base." Because their

work requires this setup and they travel much of the time, they are not considered teleworkers. This is different from "hoteling" arrangements, in which frequent teleworkers use shared space when they are on-site.

Telework is not an employee right. Federal law requires agencies to have telework programs, but does not give individual employees a legal right to telework.

## Sustaining a Successful Telework Program – A Manager's Perspective

## What's in it for me?

### Compliance with the Mandate

As described in **Legislative Background**, telework should be implemented to the maximum extent possible.

### Human Capital Management Tool

Telework, like other flexibilities, can assist managers in attracting, recruiting, and retaining the best possible workforce. In addition, by decreasing employee commute times and other work/life stressors, telework can help make employees more effective in their jobs. Telework may also be used as a reasonable accommodation for disability.

### Emergency Response

Integrating work fully into an organization's operations and culture can help maintain critical functionality in the event of an emergency.

## The Basics

### Know Your Telework Coordinator

Each agency should designate a telework coordinator who acts as the key contact for policy and program questions. Managers should maintain frequent contact with their telework coordinator to ensure the agency's policy and procedures are properly applied and to ensure they are aware of the full range of support and resources available to them.

### Know Your Policy and Procedures

As detailed in §359 of Public Law 106-346, all agencies must have a telework policy. Managers should familiarize themselves and their employees with their agency's policy to ensure they are in compliance with its requirements. Most agency policies will include additional procedures for establishing telework agreements, obtaining equipment, etc.

In addition, all agencies should have policies on information systems and technology security (see **Security**), and managers must ensure their equipment choices and telework agreements comply with this policy. Information security includes protection of sensitive "hard-copy" files and documents.

**Participate in Training**

OPM offers online telework training for employees and managers, which can be accessed via the joint OPM/GSA Website http://telework.gov/tools_and_resources/training/index.aspx. In addition, many agencies offer telework training, and telework coordinators are available to consult with managers.

Information technology security training, administered at the agency level, is mandatory (see **Security**), and managers must ensure teleworkers complete this training and understand their responsibilities in safeguarding work-related information.

# How To Be an Effective Telework Manager

To comply with the legislation, managers must be committed to using telework to the fullest extent possible. Beyond the basic requirements outlined above, managerial skill, participation, and support can make telework a real asset to an organization. To effectively implement a telework program, managers should accomplish the following:

**Determine Employee Eligibility**

Generally, agencies have discretion to determine telework eligibility criteria for their employees. These criteria should be detailed in agency policy. Individual managers should assess who is and who is not eligible in their workgroup based on these eligibility guidelines and any applicable collective bargaining agreements. Some agencies may provide managers additional discretion in deciding whether to grant or deny a request to telework from an eligible employee, based on additional factors such as staffing or budget.

All employees are considered eligible for telework except the following:

- Employees whose positions require, on a daily basis (i.e., every work day), **direct handling of secure materials** or **on-site activity** that cannot be handled remotely or at an alternative worksite, such as face-to-face personal contact in some medical, counseling, or similar services; hands-on contact with machinery, equipment, vehicles, etc.; or other physical presence/site dependent activity, such as forest ranger or guard duty tasks; and

- Employees whose last performance rating of record (or its equivalent) is below *fully successful* (or the agency's equivalent) or whose conduct has resulted in disciplinary action within the last year. (NOTE: Agencies may require a rating of record higher than *fully successful* for eligibility, but must still report as eligible all employees rated *fully successful* or higher.)

**Understand and Assess the Needs of the Workgroup**

Telework is often implemented piecemeal, rather than strategically, as individuals request arrangements. This reactive approach carries the risk of raising fairness issues, with decisions about telework arrangements being made on a first-come, first-served basis. Telework should be implemented strategically, taking into account the needs and work of the group, rather than granting or denying telework requests one by one. Employees should participate in the process and may be asked to help formulate possible solutions to issues that may arise.

## Create Signed Agreements

The teleworker and his or her manager should enter into a written agreement for every type of telework, whether the employee teleworks regularly or not. The parameters of this agreement are most often laid out by the agency policy and/or collective bargaining agreement, but should include certain key elements (see **How To Be an Effective Teleworker**). Most importantly, the agreement should be signed and dated by the manager. Managers should keep copies of all telework agreements on file.

Telework agreements are living documents and should be revisited by the manager and teleworker and re-signed regularly, preferably at least once a year. At a minimum, new telework agreements should be executed when a new employee/manager relationship is established.

OPM strongly recommends any individuals asked to telework in the case of a Continuity of Operations (COOP) event or a pandemic health crisis have a telework agreement in place that provides for such an occurrence. Such individuals also should practice teleworking on a regular basis as much as possible.

## Base Denials on Business Reasons

Telework requests may be denied and telework agreements may be terminated. Telework is not an employee right, even if the employee is considered "eligible" by OPM standards and/or the individual agency standards.

Denial and termination decisions must be based on business needs or performance, not personal reasons. For example, a manager may deny a telework agreement if, due to staffing issues, an employee who otherwise has portable duties must provide on-site office coverage. In this case, and whenever applicable, the denial or termination should include information about when the employee might reapply, and also if applicable, what actions the employee should take to improve his or her chance of approval. Denials should be provided in a timely manner. Managers should also review the agency's negotiated agreement(s) and telework policy to ensure they meet any applicable requirements.

Managers should provide affected employees (and keep copies of) signed written denials or terminations of telework agreements. These should include information about why the arrangement was denied or terminated. OPM tracks the numbers of agreements denied and/or terminated, as well as the reasons for such an action; therefore, copies should be given to the agency telework coordinator as well.

Bargaining unit employees may file a grievance about the denial or cancellation of a telework agreement through the negotiated grievance procedure.

## Use Good Performance Management Practices

Managers often ask, "How do I know what my employees are doing when I can't see them?" Performance standards for off-site employees are the same as performance standards for on-site employees. Management expectations of a teleworker's performance should be clearly addressed in the telework agreement. As with on-site employees, teleworkers must, and can, be held accountable for the results they produce. Good performance management techniques practiced by a manager will mean a smooth, easy transition to a telework environment. Resources for performance management are available from OPM at www.opm.gov/perform.

**Communicate Expectations**

The telework agreement (see **How To Be an Effective Teleworker** for key elements) provides a framework for the discussion that needs to take place between the manager and the employee about expectations. For both routine and emergency telework, this discussion is important to ensure the manager and the employee understand each other's expectations around basic issues such as the following:

- How will the manager know the employee is present? (Signing in, signing off procedures may be needed.)
- How will the manager know the work is being accomplished?
- What technologies will be used to maintain contact?
- What equipment is the agency providing? What equipment is the teleworker providing?
- Who provides technical assistance in the event of equipment disruption?
- What will the weekly/monthly telework schedule be? How will the manager and co-workers be kept updated about the schedule? Do changes need to be pre-approved?
- What will the daily telework schedule be? Will the hours be the same as in the main office, or will they be different?
- What are the physical attributes of the telework office, and do they conform to basic safety standards? (Use a safety checklist.)
- What are the expectations for availability (phone, e-mail, etc.)?
- What is the expectation regarding the amount of notice (if any) given for reporting to the official worksite, and how will such notice be provided?
- How is a telework agreement terminated by management or an employee?

**Facilitate Communication With All Members of the Workgroup**

Teleworking and non-teleworking employees must understand expectations regarding telework arrangements, including coverage, communication, and responsibilities. Although individual teleworkers must take responsibility for their own availability and information sharing, managers should ensure methods are in place to maintain open communication across the members of a workgroup.

**Remain Equitable in Assigning Work and Rewarding Performance**

Managers should avoid distributing work based on "availability" as measured by physical presence, and avoid the pitfall of assuming someone who is present and looks busy is actually accomplishing more work than someone who is not on-site. Good performance management practices are essential for telework to work effectively and equitably.

**Make Good Decisions About Equipment**

In Federal Management Regulation (FMR) Bulletin 2006-B3, Guidelines for Alternative Workplace Arrangements (a link is available at www.telework.gov ), GSA provides guidelines for the equipment and support an agency may provide teleworkers. Generally, decisions are made by the agency or by individual managers regarding the ways in which teleworkers should be equipped. Managers should familiarize themselves with these guidelines and also with their agency's policy on equipment. Within those constraints, the challenge for managers is finding the right balance of budget, security, and effectiveness. Factors to consider include technology needs based on the work of the employee, agency security requirements, and budget constraints.

**Practice, Practice, Practice**

The success of an organization's telework program depends on regular, routine use. Experience is the only way to enable managers, employees, IT support, and other stakeholders to work through any technology, equipment, communications, workflow, and associated issues that may inhibit the transparency of remote work. Individuals expected to telework in an emergency situation should, with some frequency, telework under non-emergency circumstances as well.

## The Bottom Line

**Managers MUST—**
- Implement routine telework in their organization to the fullest extent possible
- Treat employees equitably and fairly in implementing telework in their organization
- Identify eligible and ineligible employees using established agency criteria
- Include telework in COOP and other emergency response planning

**Managers MAY NOT—**
- Under normal circumstances, require that an employee work from home
- Terminate a telework agreement for reasons other than business or performance reasons

**Managers MAY—**
- Require an employee to work at an alternative worksite (e.g., a telework center) within the employee's commuting area
- Terminate a telework agreement for business reasons, e.g., an employee's poor performance or a change in the nature of the work

### Sustaining a Successful Telework Arrangement – An Employee's Perspective

## What's in it for me?

### Work/life Balance

Telework gives employees more flexibility in meeting personal and professional responsibilities.

### Stress Reduction

Telework can help make life less stressful overall by reducing commuting time and adding to discretionary time, thus reducing commuting stress.

### Freedom From Office Distractions

Offices can be busy places, especially in environments where employees work in cubicles. Distractions are plentiful. Many employees find they are able to focus and be more productive when they telework.

**Engagement**

When employees feel they have greater control over their work, they tend to feel more committed to their organizations.

## The Basics

**Know Your Telework Coordinator**

All agencies must designate a telework coordinator who acts as the key contact for policy and program questions. Employees should maintain contact with their telework coordinator for support and assistance as well as to ensure they follow the agency's policy and procedures.

**Know Your Agency's Policy and Procedures**

As required by Public Law 106-346, § 359, all agencies must have a telework policy. Employees should familiarize themselves with this policy to ensure they are in compliance with its requirements. Most agency policies will include procedures to be followed for establishing telework arrangements, obtaining equipment, etc.

In addition, employees need to work with their managers and information technology (IT) support to ensure their equipment choices and telework agreements comply with their agency's policy on information systems and technology security (see **Security**). This includes the protection of sensitive files and documents needed for work.

**Participate in Training**

OPM offers online teleworker training, which can be accessed via the joint OPM/GSA Website at http://telework.gov/tools_and_resources/training/index.aspx. In addition, many agencies offer various types of training. Some training may be required for participation in a telework program.

Information technology security training, administered at the agency level, is mandatory (see **Security**). Teleworkers must complete this training and understand their responsibilities in safeguarding work-related information.

## How To Be an Effective Teleworker

**Conduct an Honest Self-Assessment**

A successful telework arrangement starts with a good self-assessment. Employees should consider the following factors in making an honest determination about their telework capabilities:

- Sufficient portable work for the amount of telework being proposed
- Ability to work independently, without close supervision
- Comfort with the technologies, if any, needed to telework
- Good communication with manager, co-workers, and customers that will enable a relatively seamless transition from on-site to off-site
- Telework office space conducive to getting the work done
- Dependent care (i.e., child care, elder care, or care of any other dependent adults) arrangements in place

- Ability to be flexible about the telework arrangement to respond to the needs of the manager, the workgroup, and the workload

## Create a Good Telework Agreement

A successful telework arrangement also requires a strong foundation. No matter how frequently or infrequently an employee intends to telework, a written agreement should be executed between the employee and manager. Elements of this agreement should include the following:

- Location of the telework office (e.g., home, telework center, other)
- Equipment inventory – what the employee is supplying, what the agency is providing, and if applicable, what the telework center is providing
- In general, the job tasks to be performed while teleworking
- Telework schedule
- Telework contact information (e.g., the phone number to use on the telework day)
- Safety checklist – certifying the home office meets certain standards (see **Safety**)
- Expectations for emergency telework (specify whether the employee is expected to telework in the case of a COOP event, pandemic health crisis, shutdown of agency operations, etc.)

Telework agreements need to be updated as circumstances change (e.g., if the telework schedule changes). The manager and teleworker should work together to evaluate the arrangement periodically, make changes in the agreement as necessary, and re-sign the document. In the first year this may happen within a few months; thereafter, perhaps annually.

## Safeguard Information and Data

Employees must take responsibility for the security of the data and other information they handle while teleworking, as described in **Security.** Employees should—

- Be familiar with, understand, and comply with their agency's information security policies;
- Participate in agency information security training; and
- Maintain security of any relevant materials, including files, correspondence, and equipment, in addition to following security protocols for remote connectivity. Depending on the sensitivity of the information being handled, the home office may need to include security measures such as locked file cabinets, similar to what may be used in the worksite

## Plan the Work

Employees who telework should assess the portability of their work and the level of technology available at the remote site as they prepare to telework. Employees will need to plan their telework days to be as productive as possible by considering the following questions:

- What files or other documents will I need to take with me when I leave my regular workplace the day before teleworking?
- What equipment will I need to take?
- Who needs to be notified that I will be teleworking?
- What other steps should I take before I leave my office? (e.g., forwarding the phone)
- In the case of emergency telework, what should I have available at all times at my home office or, if applicable, a telework center, to enable me to be functional without coming on-site to retrieve materials?

**Manage Expectations and Communication**

Managers are ultimately responsible for the effective functioning of the workgroup. Nevertheless, teleworkers should help manage the group's expectations and their own communication in order to avoid any negative impact from their arrangement. Issues that should be addressed include the following:

- Backup:  Even with very portable work there are inevitably instances where physical presence is required and a co-worker may need to step in.  Co-worker backup should be planned, it should not be onerous, and it should be reciprocal.  Cross-training of staff has broad organizational benefits and should be a management priority.
- On-the-spot assistance:  Teleworkers may occasionally need someone who is physically in the main office to assist them (e.g., to fax a document or look up information).  Again, these arrangements should not be unduly burdensome; a "buddy system" between teleworkers may be the least disruptive solution.
- Communication with manager:  The manager must be kept apprised of the teleworker's schedule, how to make contact with the teleworker, and the status of all pending work.
- Communication with co-workers:  Co-workers must be informed about the appropriate handling of telephone calls or other communications that are the teleworker's responsibility.

# The Bottom Line

**Teleworkers MUST—**

- Comply with the security and telework policies of their agency
- Take responsibility for ensuring the success of their arrangement
- Notify the manager of any changes in their situation that may affect the arrangement

**Teleworkers MAY NOT—**

- Assume a telework arrangement is permanent
- Use telework as a substitute for child or other dependent care

**Teleworkers MAY—**

- Use appropriate grievance procedures if they believe their telework request or agreement was wrongfully denied or terminated.  Telework requests or agreements may be denied or terminated only for business reasons, and managers must provide written justification to the affected employee.

## Safety

Teleworkers must address issues of their own personal safety to be effective while teleworking from a home office.  This is not an issue in telework centers, where appropriate workstations are provided.

Government employees causing or suffering work-related injuries and/or damages at the alternative worksite (home, telework center, or other location) are covered by the Military Personnel and Civilian Employees Claims Act, the Federal Tort Claims Act, or the Federal Employees' Compensation Act (workers' compensation), as appropriate.

## Manager Safety Responsibilities

- Review safety checklist with teleworker.
- Depending on agency policy, managers may have the authority to visit home offices, with advance notice to the teleworker.

## Teleworker Safety Responsibilities (for home-based telework)

- Provide appropriate telework space, with ergonomically correct chair, desk, and computer equipment.
- Complete safety checklist certifying the space is free from hazards. This checklist is not legally binding, but details management expectations and, if signed, assumes compliance.
- Immediately report any work-related accident occurring at the telework site and provide the supervisor with all medical documentation related to the accident. It may be necessary for an agency representative to access the home office to investigate the report.

# Security

(Note: This guidance is subject to change to incorporate pertinent information from the June 23, 2006, Office of Management and Budget (OMB) memo, "Protection of Sensitive Agency Information" http://www.whitehouse.gov/omb/memoranda/fy2006/m06-16.pdf.)

Federal employees and their managers are responsible for the security of Federal Government property and information, regardless of their work location. Agency security policies do not change and should be enforced at the same rigorous level when employees telework as when they are in the office.

The Federal Information Security Management Act of 2002 (FISMA) defines information security as protecting information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction in order to provide—

(A) integrity, which means guarding against improper information modification or destruction and includes ensuring information nonrepudiation and authenticity;
(B) confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information; and
(C) availability, which means ensuring timely and reliable access to and use of information.

As in the main office, security measures should cover not only information systems and technology, but all aspects of the information systems used by the employee, including paper files, other media, storage devices, and telecommunications equipment (e.g., laptops, PDAs, and cell phones). Employees who telework from home need to keep Government property and information safe, secure, and separated from their personal property and information.

Agencies managing or operating records systems are required by the Privacy Act of 1974 and other relevant laws and regulations to issue rules for maintaining the security of information contained in those records, whether the information is maintained in electronic or paper form. Managers and employees must follow these rules whenever they are accessing this information,

whether they are working from home, at another remote location, or at their regular duty station. For example, OPM regulates access and use of Government personnel records as follows:

> Section 293.106(a) of title 5, Code of Federal Regulations, mandates that "[a]ll persons whose official duties require access to and use of personnel records be responsible and accountable for safeguarding those records and for ensuring that the records are secured whenever they are not in use or under the direct control of authorized persons. Generally, personnel records should be held, processed, or stored only where facilities and conditions are adequate to prevent unauthorized access."

> Under 5 CFR 293.108, "Office and agency employees whose official duties involve personnel records shall be sensitive to individual rights to personal privacy and shall not disclose information from any personnel record unless disclosure is part of their official duties or required by executive order, regulation, or statute (e.g., required by the Freedom of Information Act, 5 U.S.C. 552)." Also, "[a]ny Office or agency employee who makes a disclosure of personnel records knowing that such disclosure is unauthorized, or otherwise knowingly violates these regulations, shall be subject to disciplinary action and may also be subject to criminal penalties where the records are subject to the Privacy Act (5 U.S.C. 552a)."

Each Executive agency must develop a Federal information systems security awareness and training plan and provide role-specific security training to employees as required by 5 CFR 930.301. The regulations advise agencies to follow the guidance published by the National Institute of Standards and Technology (NIST).

NIST publications include Special Publication 800-50, "Building an Information Technology Security Awareness and Training Program," which provides a blueprint for developing agency-specific security awareness and training materials. NIST advises agencies that users of information systems must—

- Understand and comply with agency security policies and procedures;
- Be appropriately trained in the rules of behavior for the systems and applications to which they have access;
- Work with management to meet training needs;
- Keep software/applications updated with security patches; and
- Be aware of actions they can take to better protect their agency's information. These actions include, but are not limited to, proper password usage, data backup, proper antivirus protection, reporting any suspected incidents or violations of security policy, and following rules established to avoid social engineering attacks and rules to deter the spread of spam or viruses and worms.

Special Publication 800-50 recommends addressing these topics in agency security awareness campaigns. Other topics may include accessing unknown email and attachments, dealing with spam, protecting against "shoulder surfing (i.e., someone reading a document or a computer screen from behind the user)," physical protection of data (e.g., from water, fire, dust or dirt, physical access), inventory and property transfer, personal use of systems at work and home, use of encryption, transmission of sensitive/confidential information, laptop security, and personally-owned systems and software.

In Special Publication 800-46, "Security for Telecommuting and Broadband Communications," NIST helps Federal agencies address security issues by providing recommendations on

securing a variety of applications, protocols, and networking architectures to be used by teleworkers. NIST recommendations encompass the following five security principles:

- All home networks connected to the Internet via a broadband connection should have some firewall device installed.
- Web browsers should be configured to limit vulnerability to intrusion.
- Operating system configuration options should be selected to increase security.
- Selection of wireless and other home networking technologies should be in accordance with security goals.
- Federal agencies should provide teleworking users with guidance on selecting appropriate technologies, software, and tools consistent with the agency network and with agency security policies.

Complete texts of these and other NIST publications are available at http://csrc.nist.gov/publications/nistpubs/.

## Manager Security Responsibilities

- Thoroughly review all telework agreements to ensure they are in compliance with agency information security policies.
- Ensure employees receive agency information systems security training.
- Work with employees to ensure they fully understand and have the technical expertise to comply with agency requirements.
- Invest in technology and equipment that can support success.
- Work with employees to develop secure systems for potentially sensitive documents and other materials.
- Track removal and return of potentially sensitive materials, such as personnel records.
- Enforce personal privacy requirements for records.

## Teleworker Security Responsibilities

- Participate in agency information systems security training.
- Achieve sufficient technical proficiency to implement the required measures.
- Provide a high level of security to any personal or private information accessed at the telework site or transported between locations.
- Remain sensitive to individual rights to personal privacy.
- Comply with agency policies and with any additional requirements spelled out in the telework agreement.

## Emergency Response Telework: Continuity of Operations (COOP)

Telework should be part of all agency emergency planning. Management must be committed to implementing remote work arrangements as broadly as possible to take full advantage of the potential of telework for this purpose and ensure that—

- Equipment, technology, and technical support have been tested
- Employees are comfortable with technology and communications methods
- Managers are comfortable managing a distributed workgroup

In addition, agencies and management should consider investing in and using—

- Teleconferencing, videoconferencing, and other technologies that enable multi-channel communication
- Paperless systems

## Continuity of Operations (COOP)

The Federal Emergency Management Agency's Federal Continuity Directive (FDC) 1 defines COOP planning as "an effort within individual agencies to ensure they can continue to perform their Mission Essential Functions (MEFs) and Primary Mission Essential Functions (PMEFs) during a wide range of emergencies, including localized acts of nature, accidents, and technological or attack-related emergencies.

Telework can play a vital role in helping agencies preserve their essential functionality in this environment.

### Manager COOP Responsibilities

- Understand the agency COOP plan and management roles in executing the plan.
- Notify employees designated as essential personnel for COOP.
- Communicate expectations both to COOP and non-COOP employees regarding what steps they need to take in case of an emergency.
- Establish communication processes to notify COOP and non-COOP employees of COOP status in the event of an emergency.
- Integrate COOP expectations into telework agreements as appropriate.
- Allow essential personnel who might telework in case of an emergency to telework regularly to ensure functionality.

### Teleworker COOP Responsibilities

- Maintain a current telework agreement detailing any COOP responsibilities, as appropriate.
- Practice telework regularly to ensure effectiveness.
- Be familiar with agency and workgroup COOP plans and individual expectations during COOP events.

## Pandemic

The National Strategy for Pandemic Influenza Implementation Plan references the benefits of using telework to slow the spread of disease by keeping face-to-face contact to a minimum (often referred to as "social distancing") while maintaining operations as close to normal as possible. Telework can also help agencies retain functionality as infrastructure issues and other challenges make the main worksite difficult to access.

The key to successful use of telework in the event of a pandemic health crisis is an effective routine telework program. As many employees as possible should have telework capability (i.e., current telework arrangements, connectivity, and equipment commensurate with their work needs and frequent enough opportunities to telework to ensure all systems have been tested and are known to be functional). This may entail creative thinking beyond current implementation of telework, drawing in employees who otherwise might not engage in remote access and ensuring their effectiveness as a distributed workforce.

**Manager Pandemic Responsibilities**

- Implement telework to the greatest extent possible in the workgroup so systems are in place to support successful remote work in an emergency.
- Communicate expectations to all employees regarding their roles and responsibilities in relation to remote work in the event of a pandemic health crisis.
- Establish communication processes to notify employees of activation of this plan.
- Integrate pandemic health crisis response expectations into telework agreements.
- With the employee, assess requirements for working at home (supplies and equipment needed for an extended telework period).
- Determine how all employees who may telework will communicate with one another and with management to accomplish work.
- Identify how time and attendance will be maintained.

**Teleworker Pandemic Responsibilities**

- Maintain current telework agreement specifying pandemic health crisis telework responsibilities, as appropriate.
- Perform all duties assigned by management, even if they are outside usual or customary duties.
- Practice telework regularly to ensure effectiveness.
- Be familiar with agency and workgroup pandemic health crisis plans and individual expectations for telework during a pandemic health crisis.

# References

Federal Employee's Emergency Guide
Office of Personnel Management
http://www.opm.gov/emergency/PDF/EmployeesGuide.pdf

Federal Information Security Management Act (FISMA)
http://csrc.nist.gov/groups/SMA/fisma/index.html

Federal Management Regulation (FMR) Bulletin 2006-B3
Guidelines for Alternative Workplace Arrangements
Link to FMR Bulletin No. 2006-B3

Federal Manager's/Decision Maker's Emergency Guide
Office of Personnel Management
http://www.opm.gov/emergency/PDF/ManagersGuide.pdf

Federal Continuity Directive (FDC) 1
http://www.fema.gov/pdf/about/offices/fcd1.pdf

GAO-03-679, July 2003
Report to the Chairman, Committee on Government Reform, House of Representatives
Human Capital: *Further Guidance, Assistance, and Coordination Can Improve Federal Telework Efforts*
http://www.gao.gov/new.items/d03679.pdf

GAO-06-713, May 2006
Report to the Chairman, Committee on Government Reform, House of Representatives
Continuity of Operations: *Selected Agencies Could Improve Planning for Use of Alternate Facilities and Telework during Disruptions*
http://www.gao.gov/new.items/d06713.pdf

National Strategy for Pandemic Influenza Implementation Plan
http://www.whitehouse.gov/homeland/pandemic-influenza.html

NIST Special Publication 800-46
Security for Telecommuting and Broadband Communications
http://csrc.nist.gov/publications/nistpubs/800-46/sp800-46.pdf