# EXHIBIT X

# Office of Inspector General
# Corporation for National and
# Community Service

**Special Report to Congress
From
The Office of Inspector
General
Of
The Corporation for
National and Community**



*Corporation for*
# NATIONAL &
# COMMUNITY
# SERVICE ★★★

**1201 New York Avenue, NW, Suite 830
Washington, DC 20525
Telephone (202) 606-9390
Facsimile (202) 606-9397
Hotline (800) 452-8210**

Special Report to Congress
From
The Office of Inspector General
Of
The Corporation for National and Community Service

This special report is issued to Congress in performance of the Congressional mandate to this Office of Inspector General for the Corporation for National and Community Service ("Corporation"), that we keep Congress "fully and currently informed . . . concerning . . . serious problems, abuses and deficiencies relating to the administration of programs and operations administered or financed by" the Corporation. 5 U.S.C. ¶ App. §§ 3, 4(a)(5).

Summary

Following a thorough investigation by Special Agents of this Office of Inspector General ("OIG"), on August 7, 2008, we sent a referral for criminal and/or civil prosecution to the United States Attorney for the Eastern District of California, concerning St. HOPE Academy ("St. HOPE"), a grantee from the Corporation, and its two principals, Kevin Johnson and Dana Gonzalez. Earlier, on May 21, 2008, OIG sent to the Corporation's Debarment and Suspension Official a referral requesting prompt suspension of St. HOPE, Johnson and Gonzalez from being able to receive or participate in future grants of Federal funds. Based on the detailed facts establishing misuse of the grant funds provided to St. HOPE, the Debarment and Suspension Official, on September 24, 2008, specified six acts of diverting grant funds to non-grant purposes, found that "immediate action is necessary to protect the public interest," and suspended all three respondents "from participating in Federal procurement and nonprocurement programs and activities." Although the notice of suspension afforded each respondent the opportunity to lift the suspension by submitting "specific facts that contradict" the findings contained in the Suspension notice, none of the respondents exercised that right.

Even so, on April 9, 2009, the Corporation, by the Debarment and Suspension Official and the Corporation's General Counsel, joining the United States Attorney for the Eastern District of California, but excluding the OIG (which had been the sole moving force in both proceedings), executed a settlement agreement of questionable value, but which vacated the

suspensions and precluded the debarment of any of the respondents -- all without any facts to contradict the previous findings which, the Debarment and Suspension Official had found, required holding that these respondents were each not responsible, and therefore should not receive further Federal funds.

This 180-degree turnaround was based on the change of circumstances of Respondent Johnson, who had, after directing St. HOPE's misuse of the grant funds provided to it and receiving the suspension notice, become Mayor of Sacramento. The suspension was lifted because, as one Corporation official put it, the Corporation could not "stand in the way of Sacramento" -- thereby effectively stating that, while Respondent Johnson was not sufficiently responsible to receive further Federal funds in his management position as a grantee, he suddenly became sufficiently responsible when elected Mayor of a city receiving substantially more Federal funds -- akin to deciding that, while one should not put a fox in a small chicken coop, it is fine to do so in a large chicken coop!

The settlement accepted by the Corporation leaves the unmistakable impression that relief from a suspension can be bought. In addition, media pressures and political considerations both appear to have impacted the Corporation's decision here.

The Corporation -- in a departure from talking to and working with OIG on any matter in which OIG has an interest and/or involvement -- refused to discuss this "settlement" with OIG and obtain OIG's views on the terms, and merely informed OIG of the "done deal" after it had been signed. The Corporation not only improperly "sold" a suspension away as part of a monetary settlement, but, due to its rush to conclude the "settlement" without any OIG input, entered into a settlement that does not even protect the Corporation's ability to receive the amount promised by St. HOPE in it. Further, the Corporation's action represented an unnecessary insult to the OIG staff, which had worked unselfishly long and hard to uncover the facts which substantiated the charges.

## A. The Grant

After submitting a proposal to the California Service Corps (the California State Commission), St. HOPE was awarded a three-year grant under which it received AmeriCorps grant funds (totaling $847,673 in direct grants and in education awards for AmeriCorps members assigned to St. HOPE) that originated with the Corporation. In its proposal, St. HOPE itself wrote the requirement that the grant funds must be used for the purpose of:

"(1) providing one-on-one tutoring to [Sacramento] elementary and high school students;

"(2) managing the redevelopment of one building a year in the Oak Park [the Sacramento neighborhood in which St. HOPE operates]; and

"(3) coordinating logistics, public relations, and marketing for the Guild Theater and Art Gallery events, as well as hands-on workshops, guest artist lectures, and art exhibitions for Sacramento High School for the Arts and PS7 Elementary School [in Sacramento]."

Ex. 1.

Those specified activities were to accomplish the following purposes:

"(1) to improve the reading and math achievement of 100 elementary and high school students . . . as part of the after school program; (2) to stimulate economic growth in Oak Park by managing the redevelopment of the Walton Pediatrics building, an investment of $1.6 million into the community; (3) to increase arts programming in Oak Park; and (4) to recruit and train 500 volunteers to complete 10,000 hours of service in Oak Park."

Ex. 2.[1]

Significantly, the grant documents restricted St. HOPE's ability to change its plan and grant obligations. The grant application that St. HOPE filed through the California State Commission (which is named "California Service Corps") provided, in part, "[sub]grantee may not revise the [described] 'Scope of Work,'" for which the grant funds were to be used, "without written approval" of the California Service Corps. Ex. 3. St. HOPE never sought or obtained that required written approval. Further, any "changes in the scope, objectives or goals of the Program" could not be made without "prior written approval of the [Corporation's] AmeriCorps

---

[1] The grant paperwork for the 3-year grant and for the second and third years contains the same language as in the first quotation above. The second quotation is substantially identical, with only the identity of the building to be redeveloped being changed and the numbers of volunteers recruited and trained being reduced.

Program Office." Ex. 4. Again, no such prior written approval was sought or obtained by St. HOPE.

Finally, the "Agreement Summary" portion of the grant, which the California State Commission provided to St. HOPE with the Notice of Grant Award, expressly reiterated that, when St. HOPE spent grant funds, its spending had to be in compliance "with all provisions of the grant [and] . . . in accordance with . . . [the] representations made in support of the approved Grant Application." Ex. 5.

The requirement that grant funds be used only for the community service purposes specified in the grant precluded St. HOPE from using the grant funds to pay for any of the expenses it had or would have had without the grant. Thus, unless expressly provided for in the grant, St. HOPE could not use grant funds to pay all or part of the salaries of its employees or the costs associated with its administrative or management structure. Further, the controlling statute, 42 U.S.C. § 12637, prohibits grant funds or service-providers financed with grant funds from being used to fill positions that have been or reasonably could be filled by someone in the community. See also 45 C.F.R. § 2540.100(f).

In the context of St. HOPE, these restrictions meant that, among other things, St. HOPE's AmeriCorps members, who were supposed to be tutoring, could not be put to work washing Johnson's car, running personal errands for him, helping him to land a new school contract across the country from Sacramento, or engaging in partisan political activities;[2] likewise, St. HOPE could not take its employees and, without changing their job duties, make them AmeriCorps members and pay them, in full or part, with grant funds -- all of which, as discussed below, the evidence establishes was done with AmeriCorps members.

## B. OIG Becomes Involved

It is, in retrospect, ironic that it was the Corporation (through its Office of Grants Management), together with the California State Commission, which, on April 17, 2008, advised

---

[2] 45 C.F.R. § 2520.65(a)(5) specifically prohibits use of AmeriCorps members for "partisan political activities, or other activities designed to influence the outcome of an election to any public office."

this Office of the irregularities at St. HOPE, thereby sparking this OIG investigation. Promptly, on April 23, 2008, two OIG Special Agents, Supervisory Special Agent Jeffrey Morales and Special Agent Wendy Wingers, from this Office traveled from Washington, DC, to Sacramento to investigate that information. When those Agents deployed, neither they nor this Office had reached any conclusions whether the allegations were true, much less had any predetermined outcome in mind. Rather, they were as interested in disproving as in proving the allegations.

While those Agents were in Sacramento, on April 25, 2008, the Sacramento Bee (the local newspaper) related that, after a teacher at Sacramento High School reported that Kevin Johnson had inappropriately touched a female student who told the teacher about the incident, Johnson's personal attorney and business partner investigated the complaint for the school. The Sacramento Bee reported that the student later recanted, and that Sacramento police investigators found no merit to her complaint. It also reported that the teacher resigned and, in his resignation letter, asserted, "St. HOPE sought to intimidate the student through an illegal interrogation and even had the audacity to ask me to change my story." Ex. 6.

We immediately recognized what appeared to be improper handling of this allegation by St. HOPE and unethical conduct by Mr. Johnson's attorney in investigating, supposedly on behalf of St. HOPE, a serious allegation of misconduct by that attorney's business partner and client. *See, e.g.*, California Rules of Professional Conduct Rule 3-310 "Avoiding the Representation of Adverse Interests."[3]

St. HOPE said that it had handled the allegations properly, but the Sacramento Bee reported that California law required that law enforcement authorities be notified immediately when school officials learn of such an allegation, and that, despite that requirement, the female

---

[3] (B) "A [lawyer] shall not accept or continue representation of a client without providing written disclosure to the client where…the [lawyer] has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter,…
(C) A [lawyer] shall not, without the informed written consent of each client…accept representation of more than one client in a matter in which the interests of the clients potentially conflict…"

Of course, Mr. Johnson, an interested party, could not provide that consent on behalf of St. HOPE. Only the Board of Directors could do so after full written disclosure. While in these circumstances, it would have been a breach of the Board's fiduciary duty to have consented, there is no evidence of either full disclosure to the Board or its consent.

student was questioned as part of the school's investigation -- by Johnson's business partner and attorney -- before the police were called.

Between April 23 and June 28, 2008, those OIG Special Agents made five trips related to the investigation, conducted 26 interviews and reviewed a substantial quantity of documents. Significantly, when our Agents twice asked to interview Mr. Johnson, the response was, first, that Mr. Johnson did not have time for an interview, and, when the second request was made to his attorney, the Agents were told that they must first brief Mr. Johnson's attorney on the facts known to the Agents after which Mr. Johnson's attorney would decide if Mr. Johnson would be interviewed. The Agents then briefed Mr. Jacobs with the relevant facts but, despite the Agents' repeated requests for an interview with Mr. Johnson, Mr. Jacobs responded that Mr. Johnson's schedule would not permit time for that purpose -- i.e., Mr. Johnson effectively declined to be interviewed.

Although this office was not the source, OIG's involvement did not pass without press notice. As early as April 26, 2008, the Politicker.com website reported that "a governor's office staff attorney confirmed that federal officials began [an] inquiry after seeing the newspaper's [i.e., the Sacramento Bee's] coverage." Ex. 7. Subsequently, on June 30, 2008, the Sacramento Bee reported that OIG agents made "a second visit to Sacramento in late May, after extending their initial stay in April by several weeks."[4] Ex. 8. While "[f]ederal officials" would not comment on the investigation, some of those interviewed talked with the Bee's reporter. Id.

On Friday, September 5, 2008, the Sacramento Bee reported, "Federal agents investigating the use of taxpayer dollars by Kevin Johnson's St. HOPE have turned the case over to the U.S. Attorney's Office in Sacramento, officials confirmed yesterday." The Sacramento Bee quoted, among others, the spokesman for this Office and then-United States Attorney McGregor Scott. What the Sacramento Bee does not say is that the spokesman for this Office did not confirm or deny the existence of a referral.[5]  The Sacramento Bee does state, "U.S.

---

[4] OIG Agents were in California from April 23 to May 9, 2008, and again from May 27 to May 30, 2008. In addition, an OIG Agent traveled to West Point, NY, on May 13, 2008.

[5] The spokesman for this office was called by a reporter for the Sacramento Bee and asked, among other things, whether this OIG presented a referral for prosecution to the United States Attorney; the OIG spokesperson told the

Attorney McGregor Scott confirmed Thursday evening that 'we are in receipt of the Inspector General's report and we are . . . reviewing it.'" Ex. 9.

## D. The Suspension

The Federal government has created a Debarment and Suspension procedure, covering all Federal agencies, to protect all Federal agencies from giving Federal funds to a person or entity which, in prior dealings with any single agency, has shown a lack of responsibility to use in a proper manner Federal funds entrusted to that person or entity. Under the controlling regulations, a person or entity may be suspended when there "exists . . . adequate evidence to suspect . . . commission of fraud, . . . making false claims, . . . or commission of any other offense indicating a lack of business integrity or honesty that seriously and directly affects [the person's or entity's] present responsibility . . . or violation of the terms of a public agreement or transaction so serious as to affect the integrity of an agency program, such as willful failure to perform in accordance with the terms of one or more public agreements or transactions." 2 C.F.R. §§ 180.700(b), 180.800 (a)(4), (b).

On May 21, 2008, this office forwarded to the Debarment and Suspension Official a 13-page recommendation, signed by the Inspector General and the Supervisory Special Agent on this investigation, that St. HOPE, Johnson and Gonzalez be suspended, detailing the evidence substantiating their violations, and thereafter provided to that official the voluminous evidence relied upon. After studying all the evidence provided, and obtaining the legal advice and assistance of the Corporation's General Counsel, the official issued his decision: By letters dated September 24, 2008, the Corporation suspended St. HOPE, Johnson, and Gonzalez "from participation in Federal procurement and nonprocurement programs and activities." Exs. 10, 11, 12.[6]

---

reporter that he could neither confirm nor deny the existence of a referral. At that point, the reporter learned that the United States Attorney had confirmed its existence, and rang off, telling our spokesman that there was no further need to talk with him.

[6] That the official issued his decision without notice to the respondents is consistent with prescribed procedure. A leading Government Contracts treatise points out, "an agency is not required to provide notice that it is contemplating the suspension of a contractor. Usually, once a contractor receives notice that it has been proposed for debarment or suspension, it is already included on the GSA's List of Parties excluded from Federal Procurement and Nonprocurement Programs.". Cibinic & Nash, Formation of Government Contracts, 3d (1998), 487. The treatise states further, "No notice of contemplated proceedings is required." *Id.* at 488.

In the Notice of Suspension, the Corporation's Debarment and Suspension Official stated that the information that he received "is adequate to allow me to suspect that there has been on your part a willful failure to perform in accordance with the terms of a public agreement, and other causes of so serious or compelling a nature that it affects your present responsibility." Exs. 10, 11, 12 at 2 (internal citations omitted). And, "[t]he evidence is adequate to suspect that you have committed irregularities which seriously reflect on the propriety of further Federal Government dealings with you." *Id.* He then provided respondents with notice of the specific instances of the diversion and misuse of Corporation grant funds that, in his judgment, warranted suspension (and followed each by the textual explanation providing additional specification):

1.   Using AmeriCorps members to "recruit[ ] students for St. HOPE Academy;"

2.   Using AmeriCorps members for political activities in connection with the "Sacramento Board of Education election;"

3.   Taking grant-funded AmeriCorps members "to New York to promote the expansion of St. HOPE operations in Harlem;"

4.   Assigning grant-funded AmeriCorps members to perform services "personally benefiting . . . Johnson," such as "driving [him] to personal appointments, washing [his] car, and running personal errands;"

5.   "Supplementing staff salaries by converting grant funds designated for AmeriCorps members," by enrolling two St. HOPE Academy employees "into the AmeriCorps program for the 2004/2005 grant year" without changing their duties, thereby improperly using grant funds so that one St. HOPE employee's "salary was then paid through the AmeriCorps program," plus she "received an [AmeriCorps] living allowance and an education award," and the other employee's salary, which was not paid from the grant, "was supplemented by both an AmeriCorps living allowance and an education award;" and

6.   Improperly using AmeriCorps "members to perform non-AmeriCorps clerical and other services" that "were outside the scope of the grant and therefore were impermissible" for "the benefit of St. HOPE."

*Id.* at 2-3.

The Suspension notice then advised each respondent:

"In accordance with 2 C.F.R. 180.720-745, within 30 calendar days of your receipt of this notice, you may submit, in person, in writing, or through your representative information and argument in opposition to this suspension, including specific facts that contradict the statements contained in this notice."

*Id.* at 3.

Notwithstanding the fact that their responses were due within 30 days after their receipt of the letters, we have been informed that no respondent made any submission to seek rescission of the suspension, and instead all requested multiple extensions of time, which the Corporation granted.[7]

On September 25, 2008, the suspension was reported by the media. On September 26, 2008, Mr. Johnson issued a statement (Ex. 13), calling the suspension "politically motivated," and proclaiming that he had "cooperated with the Federal government from day one," and that he "instructed attorneys to formally fight these crazy meritless allegations." There were many untruthful assertions in his statement: *E.g.*, (1) Clearly no one from OIG in Washington, DC, had any interest in the Sacramento Mayoral election, and therefore could have no political motivation for an investigation into St. HOPE, **commenced** in April 2008, **at the request of the Corporation**, but we did have our sworn obligation to investigate and pursue credible allegations of fraud and misuse of Corporation grant funds; (2) Mr. Johnson had in fact refused to cooperate with the OIG investigation -- he had, as described above, effectively declined to make himself available for an interview; and (3) He had clearly not instructed his attorneys to fight the suspension by following available procedures to seek to lift the suspension by providing facts which contradicted the findings made by the Suspension Official which warranted the suspension.

After the primary election and before the November run-off, on October 27, 2008, a weblog entry posted by a Sacramento Bee writer reported that, following referral of the OIG report to the U.S. Attorney's Office, the writer talked to the U. S. Attorney. The entry continued, "When I asked him about the report last month, U.S. Attorney McGregor Scott told me that he was 'sensitive to the bigger picture,' and promised to move 'as expeditiously as we can in a

---

[7] We believe that any records relating to the suspension process are held by the Corporation's Debarment and Suspension Official, its Office of General Counsel, or both.

professional manner to make the decisions required of us in a timely manner.' By timely, I hoped Scott meant before the election. That's just nine days away." Ex. 14.

In the November run-off election, Johnson defeated the incumbent mayor. Shortly after the election, on Thursday, November 6, 2008, the Sacramento Bee reported that the United States Attorney had announced a decision not to file any criminal charges (Ex. 15). As OIG had received no such notice from that office, the IG spoke to the United States Attorney who informed the IG that he had been misquoted. On the following day, the Sacramento Bee reported that the correct statement was that the United States Attorney "has asked for additional information and is awaiting an answer from Federal investigators," and made clear that "[n]o final decision has been made about whether there is any basis to proceed on either a civil or criminal front." Ex.16. The Sacramento Bee also wrote, "He [*i.e.,* McGregor Scott] also said the Inspector General's office is conducting a 'line-by-line audit' of [St. HOPE's] Hood Corps." *Id.*[8]

### E. Post-Election Events

Those November elections also resulted in the election of Barack Obama as President, who was sworn in on January 20, 2009. One of President Obama's first initiatives resulted in the enactment of ARRA, the stimulus legislation. With the prospect that stimulus funds might make their way to Sacramento, Johnson and the City each began looking at the effect of the suspension on the City's ability to receive and spend new Federal money from procurement and non-procurement programs.

In early March or before, both the media and Johnson directed their attention to the potential effects of the suspension of now-Mayor Johnson and Gonzalez, who was reported by the Sacramento Bee on January 29, 2009, to be an unpaid volunteer to his administration (Ex. 17).

The Sacramento Bee reported that "[s]hortly after Johnson's election last November, City Attorney Eileen Teichart hired Frederick M. Levy [a Washington, D.C. attorney] - regarded as an

---

[8] The Sacramento Bee wrote, "William Hillburg, a spokesman for the inspector general, said Thursday he could not confirm his office was doing an audit and could not comment on the investigation." Ex. 16.

expert on government contracting and compliance - to determine whether Johnson's inclusion on that [suspension] list posed an issue when it sought Federal funding." The Sacramento Bee continued that Levy, in his opinion provided to the City on March 13, 2009, had concluded that the "City of Sacramento likely is barred from getting Federal money -- including tens of millions the City is expecting from the new stimulus package -- because Mayor Kevin Johnson is on a list of individuals forbidden from receiving Federal funds." Ex. 18.

At this point, Johnson still did not exercise his right to seek to have the suspension lifted by submitting to the Debarment and Suspension Official "specific facts that contradict the statements contained in" the suspension notice -- the requirement, as he had been informed, to seek lifting of the suspension.

Instead, Johnson's lawyer, Matthew G. Jacobs, wrote three letters. In the first (Ex. 19), dated March 16, 2009, to Assistant United States Attorney Kendall Newman,[9] Mr. Jacobs wrote that the purpose of his letter was "(1) to establish that at least a large portion of the moneys provided to St. HOPE Academy . . . pursuant to the Grants was utilized to perform services within the scope of work of those Grants, (2) to establish St. HOPE's poor current financial condition, and (3) to demonstrate through accounting records the specifics of how St. HOPE spent the grant monies." Ex. 19. Mr. Jacobs quickly acknowledged that "[w]e have not yet been able to fully accomplish the third objective, although we are willing to continue trying . . . ." -- despite the express requirement that St. HOPE was required to maintain such records (e.g., Section V E of the AmeriCorps Grant Provisions) and thus an admission that St. HOPE had failed to perform in that regard as required by the grant provisions. While Mr. Jacobs asserted that the principal of PS7 Elementary School and several former St. HOPE AmeriCorps members could confirm that those members "did indeed spend many, many hours engaged in direct, one-on-one tutoring," he ignored the mandate, in the grant application (Narrative pp. 25-26) (Ex. 20), that all tutoring done must be documented in Tutoring Logs, which St. HOPE never was able to produce. Mr. Jacobs offered "to continue to work toward a more robust determination that grant monies were used in furtherance of the Grants" -- a "more robust determination" that, of

---

[9] Newman sent a copy of that letter to OIG, which was received on March 26th, although not all exhibits were provided to us.

necessity, could only mean documentation as required by the Grant provisions; but, this offer was, as will be shown, ignored by the Corporation in what quickly became an express train to lift the suspension.

Significantly, Mr. Jacob's 14-page, single-spaced letter did not address any of the six specifications (quoted pp 10-11 above) which were the basis for the suspension.

Mr. Jacobs, in his second letter, also addressed to AUSA Newman, dated March 18, 2009, confirmed the settlement offer he had telephonically communicated to AUSA Newman, of a cash payment of $50,000 plus a stipulated judgment in the amount of $250,000, both to be paid by St. HOPE (Ex. 21).

Mr. Jacobs wrote a third letter, dated March 31, 2009, to the Corporation's Debarment and Suspension Official (Ex. 22). Again, Mr. Jacobs did not address any of the six specifications in the Suspension Notice. Instead, he complained about the fairness of the suspension process. He said that the suspension was not challenged because, among other reasons, none of those suspended had applied for or were applying for Federal funds. He explained, "[h]owever, now that there appears to be an issue regarding whether federal agencies will permit an entirely separate entity altogether -- the City of Sacramento -- to participate in federal programs because of the Corporation's placement of our clients (and particularly, Mayor Johnson) on the Excluded Parties List, this matter has become extremely urgent, and must be resolved immediately." He ended by claiming that the suspension violated respondents' constitutional rights and threatened that, unless the Corporation "immediately withdraw[s] or rescind[s] its suspension," he would "seek legal redress with the courts."

### F.  U.S. Attorney's Consultation With OIG

From the first involvement of the United States Attorney's office, when OIG sent its referral, the United States Attorney's office had dealt solely, as is customary, with the OIG as the investigatory agency which had done the investigation and made the referral. The United States Attorney's office had not contacted the Corporation.

AUSA Newman early on recognized that he needed, and requested, OIG's help to obtain critical documents, books and records from St. HOPE which, under the grants, it was required to maintain, but had never produced for examination. For example, the General Ledger, a required financial document, which essentially records all receipts and all disbursements, with source and recipient identification, was never fully produced, despite repeated requests by OIG agents. On September 11, 2008, AUSA Newman asked OIG auditors to prepare a report on St. HOPE's financial records to determine the extent of St. HOPE's liability to return any or all of the grant funds it received. OIG auditors advised that an attempt should be made to obtain substantial amounts of St. HOPE's financial records which had not been produced. With AUSA Newman's concurrence, OIG then prepared and, on October 1, 2008, served on St. HOPE (with a copy provided to AUSA Newman) a subpoena requiring production of 16 specified types of documents (Ex. 23), including "General ledger and other accounting records detailing transaction-level support for Federal and match expenditures claimed on the financial status reports" filed by St. HOPE. The grant provisions and relevant regulations required St. HOPE to maintain most of the 16 specifications of documents (and good business practices would have called for the maintenance of the remainder), but St. HOPE had not produced them in response to OIG agents' earlier requests.

After repeated requests by St. HOPE for extensions of time, partial productions, notice to St. HOPE's attorney of St. HOPE's non-compliance -- on all of which AUSA Newman was kept informed -- on November 24, 2008, Special Agent Morales forwarded to AUSA Newman a list, prepared by OIG Auditors, of the St. HOPE documents needed to perform a fiscal review, and which should have been produced in response to the subpoena. On December 2, 2008, OIG asked AUSA Newman for assistance to enforce the subpoena to obtain full compliance. Two weeks later, AUSA Newman asked OIG to draft an affidavit in support of an enforcement proceeding he would commence. OIG proposed and then provided that affidavit on January 8, 2009, and, on January 22nd, AUSA Newman asked for certain alterations, which were done with a corrected affidavit e-mailed to AUSA Newman on January 23rd. AUSA Newman and OIG agreed that St. HOPE's failure to produce documents it was required to maintain provided us no comfort that we could rely on St. HOPE for financial transparency.

On February 4th, AUSA Newman informed OIG Supervisory Special Agent Morales that St. HOPE's attorney was furnishing additional documents and that OIG auditors should provide their report based on the documents St. HOPE provided. OIG auditors did so, providing their report on March 18th (Ex. 24). The report noted that St. HOPE had failed to provide the following documentation: "Source documentation for costs charged to the grant; complete general ledger (only a partial ledger was produced); reconciliation of costs charged on the Financial Status Report to the general ledger, including match funds; explanation of the methodology for allocating costs between match and Federal share; [and] identification of the accounting system used." The report's conclusion was straight forward:

> "None of the costs charged to the grant are allowable, primarily because the AmeriCorps members' service activities were not consistent with the grant requirements.
>
> " * * *
>
> "Contrary to . . . grant requirements and prohibitions, we found that St. HOPE AmeriCorps members performed little, if any, of the service agreed to and stipulated under the grant. Instead, they were used for non-authorized and prohibited activities, including service that displaced St. HOPE employees, a violation of 42 U.S.C. § 12637 *Non duplication and Non displacement*. We also found instances where AmeriCorps living allowances and benefits were unlawfully used to supplement the salaries of St. HOPE employees.
>
> "Another grant requirement is that all allowable cost must be adequately documented . . . . We found an almost total lack of documentation to support St. HOPE's performance of the grant, despite our repeated requests to St. HOPE for grant-related documents."

As noted above, AUSA Newman forwarded to OIG Mr. Jacobs' letter of March 16, 2009, which was received by OIG on March 26th. On Friday, March 27th, when the IG first saw the letter, he asked Agents Morales and Wingers to provide him with their comments by Monday, March 30th. The IG analyzed both Mr. Jacobs' letter and the Agents' memorandum, and on March 31st requested the Agents' assistance in drafting a response which we prepared and sent to AUSA Newman on April 6, 2009.

On April 1, 2009, the United States Attorney's Office appeared to continue working with OIG, as the investigative agency with which it would work, by asking this Office for OIG's views regarding a potential settlement, conveying terms that respondents had proposed (we later learned, on March 18th), which were $50,000 immediately and $250,000 over five years. AUSA Newman asked that we provide a proposed counter-offer and the minimum amount we believed would be acceptable. Although the IG stated that it was important for the United States Attorney's office to have OIG's response to Mr. Jacobs' March 16, 2009, letter to be able to analyze OIG's settlement views, AUSA Newman stated that he would like to have our views on the dollar amount of a settlement and thereafter receive our response to Mr. Jacobs' letter. He also demurred to the IG's suggestion that he wait until we had been able to obtain the Corporation's views, which we had sought to take into account in providing our views. He insisted that we provide our views on April 2nd. (His reason for such a rushed schedule later became apparent, as discussed below.)

Therefore, on April 2, 2009, the IG provided the following to AUSA Newman in a telephone conversation: (i) an opening counter-offer of $170,000 immediately (covering the amount paid for education awards from the National Service Trust funds) and $400,000 over five years; (ii) the minimum of $100,000 immediately, an additional $70,000 in one year, and $300,000 over the following four years; (iii) sufficient guaranties of payment; (iv) any settlement being pushed on the basis of factual assertions made in Mr. Jacobs letter could not be properly evaluated by the U.S. Attorney's office without OIG's reply, to be shortly provided, to Mr. Jacobs' letter, and OIG's interviews of the witnesses on whom Mr. Jacobs relied, which, the IG said, we would expeditiously do; and (v) that it would be improper to include the suspension in any settlement because that issue must be decided on whether the respondents are responsible for future grants, not whether they have paid for prior misuse of grant funds. In one of our March conversations with Acting U.S. Attorney Larry Brown, he had referred to the suspensions as "the 800-pound gorilla" in any settlement negotiation.

OIG had kept the Corporation's General Counsel, Frank Trinity, informed of both the settlement proposal made by respondents' attorney and OIG's position, including that it would be improper to negotiate the suspension as part of any monetary settlement. Mr. Trinity stated

that he agreed that it would be improper. As to the monetary terms of the settlement, on April 1, 2009, the IG informed the Corporation's Director of Grants Management, Margaret Rosenberry, of St. HOPE's settlement proposal terms and asked her to provide OIG with the Corporation's analysis for OIG to consider. The IG left a voicemail message to the same effect for Mr. Trinity. We did not obtain that Corporation input on the monetary amount in time to meet AUSA Newman's schedule for OIG to take that into consideration.

In the afternoon of April 2, 2009, after the IG had spoken with AUSA Newman, Ms. Rosenberry, together with a member of Mr. Trinity's staff, Irshad Abdal-Haqq, met with members of OIG staff to review the facts and seek the Corporation's view on the monetary amount of any settlement. Special Agents Morales and Wingers set forth the relevant facts -- including highlights of Mr. Jacobs' March 16, 2009, letter -- provided them documents as requested, and told them that, if they wanted any other documents, they had only to ask. At no time did either request a copy of Mr. Jacobs's March 16th letter.[10]

After the IG's April 2, 2009, telephone conversation with AUSA Newman, he and his office suddenly ceased talking with OIG personnel about this case. He apparently did not like (i) our opposition to any settlement that voided the suspension without allowing the Debarment and Suspension Official to determine, based on evidence, including any contradictory evidence respondents would furnish, whether Johnson and the other respondents were sufficiently responsible to be trusted with more Federal funds, and (ii) our view that Mr. Jacobs' summary of what his witnesses said should not be the basis of triggering a settlement, without giving OIG Special Agents an opportunity to interview those witnesses (although, during their investigation, the OIG Agents asked St. HOPE's Attorney for the current addresses, the response had been that they were not known to St. HOPE). Instead, as we were informed late in the evening of April 2,

---

[10] The Corporation's General Counsel, who was not present at that meeting, subsequently accused OIG of withholding the letter and declined to reconsider when OIG pointed out to him that the letter was the subject of discussion at that meeting. Indeed, OIG agents present stated at the meeting that they thought it necessary to re-interview the Principal of PS7, who Mr. Jacobs wrote in his letter had told him that the AmeriCorps members had in fact performed tutoring -- contrary to what the Principal had previously told the Agents. In addition, they reported that, of the nine interviews on which Mr. Jacobs relied in his letter, the agents had interviewed only two (one member and the PS7 Principal) and they had provided information contradictory to Mr. Jacobs' interviews. The Agents also informed Ms. Rosenberry and Mr. Abdal-Haqq that they had told AUSA Newman that, if any weight was being given to those interviews, the Agents wanted to reinterview two of them and interview the others, but AUSA Newman had stated that he put no weight in those interviews by Mr. Jacobs.

2009, by e-mail from Mr. Trinity, AUSA Newman "reached out to [Mr. Trinity]," immediately following my advice to him of OIG's position on settlement, and AUSA Newman and Mr. Trinity agreed that AUSA Newman's "office will deal with [Mr. Trinity] as the point of contact." (Ex. 25). From that date, the United States Attorney's office started dealing solely with Mr. Trinity. [11]

On Monday, April 6, 2009, as OIG had promised AUSA Newman, OIG e-mailed him our seven page analysis of and response to Mr. Jacobs' March 16, 2009, letter (Ex. 26). We provided a copy of this letter to Corporation General Counsel, Mr. Trinity. Noting that "Mr. Jacobs concedes that St. HOPE cannot 'demonstrate through accounting records the specifics of how St. HOPE spent the grant monies'," OIG showed AUSA Newman why the explanations that Mr. Jacobs offered for that failure were without merit. First, as to AUSA Newman's assertion that it was normal for grantees not to have documentation, our letter pointed out that it was absurd to suggest that a Federal agency would overlook the absence of required financial documentation. Contrary to Mr. Jacobs' assertion that OIG, not St. HOPE, had the St. HOPE invoice documentation, OIG noted that OIG did not have the "contemporaneous invoices St. HOPE provided to" the California State Commission. Moreover, Mr. Jacobs' general assertions that St. HOPE generally did what it was supposed to do with the Federal funds failed for lack of support. Our letter pointed out that the grants did not set out general obligations, "but rather fix[ed] more specific objectives and methods to document the use" of the Federal funds.

Likewise, our letter pointed out that Mr. Jacobs failed to provide documentary support for his assertion that some tutoring had been done. The grant program required that a "Tutoring Log" be kept, but none was ever produced in response to OIG requests. OIG noted that Mr. Jacobs' reliance on "interviews" was misplaced because, while OIG obtained 26 interviews -- almost all of people in the Sacramento area -- Mr. Jacobs primarily relied on conversations with individuals from remote areas whom OIG could not interview because, as already noted, when OIG had asked for the current addresses of those individuals, St. HOPE's attorney said that that the information was not available. In addition, for all but two individuals, Mr. Jacobs did not

---

[11] While Mr. Trinity wrote in that e-mail that the U.S. Attorney would also continue to seek OIG's input, in fact the U.S. Attorney's office, once it had received Mr. Trinity's agreement to by-pass OIG, never again communicated with OIG and dealt solely with Mr. Trinity.

provide interviews of people OIG had talked to, and the interviews of those two individuals by OIG and by Jacobs were contradictory.    Finally, Mr. Jacobs' reliance on a telephone conversation that he put into the text of an e-mail is hardly a procedure most conducive to obtaining the facts.

Later that day, Tuesday, April 6, 2009, the Corporation informed OIG of its evaluation of the claims against St. HOPE to OIG.   In an e-mail to Supervisory Special Agent Morales, the Corporation's Office of Grants Management gave a value of $250,000 - $335,000, exclusive of penalties.  Remarkably, the low figure is lower than the offer that St. HOPE had made.

### G. The Settlement

Without informing OIG -- and without seeking OIG's input on the terms and provisions of the settlement agreement -- on April 9, 2009, the United States Attorney announced the settlement of the Government's claims against St. HOPE, Johnson and Gonzalez. Ex. 27. The Settlement Agreement was signed on behalf of the Government by AUSA Newman, William Anderson "Acting Chief Financial Officer and Debarment and Suspension Official on behalf of the Corporation for National and Community Service," and Frank R. Trinity "General Counsel on behalf of the Corporation for National and Community Service."

### 1. The Settlement Agreement Terms

The Settlement Agreement (Ex. 28) provided:

(i) St. HOPE would make an immediate payment of $73,836.50, and execute a stipulated judgment for an additional $350,000, to be paid $35,000 annually for ten years, plus 5% annual interest.

(ii) "to assist St. HOPE in paying" the initial $73,836.50 amount, Johnson agreed to pay St. HOPE $72,836.50 and Gonzalez agreed to pay St. HOPE $1,000.00 "in time for St. HOPE to make the Initial Payment . . . pursuant to the terms of this Settlement Agreement."  Further, it provides that "Johnson and St. HOPE may enter into an agreement whereby St. HOPE agrees to repay Johnson when St. HOPE has the financial ability to do so while still meeting all of its other financial obligations."

(iii) "Johnson and Gonzalez shall register to take an on-line course offered by Management Concepts titled 'Cost Principles'" and "complete the course within 120 days . . . , and shall provide written verification under oath of having completed the course."

(iv) "The Corporation shall terminate the suspension of St. HOPE, Johnson and Gonzalez . . . " and "agrees not to institute debarment proceedings against" them "so long as they comply with their obligations under this Settlement Agreement."

(v) St. HOPE, but not Johnson and Gonzalez, "agrees that it may be considered a high-risk grantee by the Corporation for a period of two years."

(vi) "St. HOPE warrants that it has reviewed its financial situation and that it is currently solvent within the meaning of 11 U.S.C §§ 547 (b)(3) and 548 (a)(1)(B)(ii)(I), and will remain solvent following payment to the United States of the $73,836.50."[12]

## 2.  Analysis of the Settlement Agreement

Analysis of the Settlement Agreement makes clear that it was a rush job to paper a settlement, while failing to contain provisions to protect the Government's ability to receive even what, on the surface, it was supposed to receive:

(i) Johnson and Gonzalez were, as the Settlement Agreement recites, the President and Chief Executive Officer, and Executive Director, respectively of St. HOPE. Thus, they directed and were responsible for the misuse of Grant funds which led to the Settlement Agreement. Johnson is reported to be more than financially able to pay the full judgment due the Government. On the other hand, St. HOPE is, as discussed below, in poor current financial condition, to say the least. Moreover, as a not-for-profit entity, whatever assets it has and will have in the future are from grant funds and charitable contributions. Yet, except for the advance to St. HOPE of funds for St. HOPE's initial payment -- under a provision which allows Johnson to get it back from St. HOPE -- Johnson assumes no liability for the amount the Government

---

[12] The cited sections do not, in fact, define solvency, but instead deal with preferences. As the $73,836.50 was essentially an exchange transaction, which could have been accomplished as well by Johnson's and Gonzalez's payment directly to the Government on St. HOPE's behalf, it is questionable that this reference has any relevance, other than further wallpapering.

should be repaid. The effect is to penalize the charitable entity, not the people who misused it. If that charitable entity were not burdened by a 10-year obligation to repay, it could put those funds to use serving a community purpose. Penalizing the CEO would have properly penalized the person responsible for the misdirection of the charitable entity, without detracting from funds being directed for community purposes.

(ii) The Government received no guaranty of, or security for, the ten annual payments of $35,000 plus interest which was the only payment promised to the Government, in addition to the initial $73,836.50 payment. As discussed below, the facts known to the Corporation, when it signed the Settlement Agreement, make obvious that St. HOPE's financial condition permits no assurance that these amounts will be paid.

(iii) While Johnson and Gonzalez provided St. HOPE with respectively $72,836.50 and $1,000.00 so that St. HOPE could make its initial payment of $73,836.50, the Settlement Agreement permits Johnson and St. HOPE to "enter into an agreement whereby St. HOPE agrees to repay Johnson when St. HOPE has the financial ability to do so while still meeting all of its other financial obligations." Significantly, no time period is specified before St. HOPE may so agree, and no standards are set forth objectively to determine that condition; thus, there is no protection against St. HOPE's immediately paying it back to Johnson. That is particularly true given that the Agreement contains St. HOPE's warranty that it is currently solvent. And if St. HOPE repays Johnson and is thereafter unable to make any or all of the ten annual payments, the Government has no recourse against Johnson even to disgorge that repayment of $72,836.50.

(iv) St. HOPE agreed "that it may be considered a high-risk grantee by the Corporation for a period of two years" -- presumably burdening St. HOPE's ability freely to obtain grant funds. But St. HOPE, as an entity, does not act by itself as a robot; for it to have acted improperly, it had to have been directed by Johnson and Gonzalez, its CEO and Executive Director. Yet, those who directed the wrongdoing are authorized to seek and receive control over new Federal grant funds without any high-risk label.

(v) Johnson's and Gonzalez's agreement to "register to take an on-line course offered by Management Concepts titled 'Cost Principles'" is pure wallpapering. One of our leading Certified Public Accountants has advised that this course is designed primarily for accountants and those performing accounting and bookkeeping functions, not to train someone in ethical issues involving the misuse of funds for a purpose other than for which it was provided. A review of the course book (Ex. 29) requires that conclusion in the listing of the following "Learning Objectives:"

"'discuss factors affecting allowability of costs;

"'classify costs as typically direct or indirect;

"'determine the allowability of selected items of cost;

"'review grant application budgets to determine cost allowability;

"'analyze spending decisions to determine whether they are allowable;

"'gain insight into grant cost disallowances by exploring agency and court decisions."

As already noted, the misuse here did not involve accounting "cost principles," but the ethical misuse of Federal grant funds for personal use and benefit of the CEO, contrary to the specified purpose for which the grant funds had been provided.

(vi) The Corporation's acceptance of St. HOPE's warranty that "it is currently solvent . . . and will remain solvent following payment to the United States of the" $73,836.50 underlines the wallpaper nature of this Settlement Agreement.

First, the warranty that the payment of the $73,836.50 will not cause St. HOPE to become insolvent is meaningless. That payment could cause St. HOPE to become insolvent only if the payment came from St. HOPE's assets or, conceivably, if St. HOPE accepted a liability to repay that amount. The Settlement Agreement was written carefully to avoid either condition, and to allow St. HOPE to agree to repay Johnson only at an unspecified time in the future, *i.e.*, after St. HOPE's payment of the $73,836.50, thus making axiomatic that the payment could not make St. HOPE insolvent, if it were solvent before that payment. The Agreement, however, allows such repayment by St. HOPE to Johnson the following day or anytime thereafter.

Second, significantly, Johnson was not required to warrant St. HOPE's solvency or guarantee St. HOPE's payment of the full amount to be given to the Government.

Third, and most significant, the information provided by St. HOPE itself, known to the Corporation, casts overwhelming doubt on St. HOPE's solvency, its ability to continue as a "going concern" (the customary audit term), and establishes that St. HOPE is in such a precarious financial condition that it is highly unlikely that St. HOPE will ever pay the remaining $350,000 to the Corporation.

As the Settlement Agreement recited, St. HOPE's cash flow and current assets did not allow it to pay the $73,836.50 initial installment. Johnson and Gonzalez had to provide those funds.

Also, Mr. Johnson's attorney, in his March 16, 2009, letter, himself described St. HOPE's financial condition as "precarious." He recited that, as of January 31, 2009, St. HOPE had net assets of $2,943,700 and total debt of $1,876.620, with $1,502,762 of the total assets being "accounts receivable, which St. HOPE will likely not realize." Excluding that amount from the realizable assets results in more debt than assets, or insolvency. Even all the assets as listed are not available to St. HOPE to pay its debts: Johnson's attorney disclosed that "'the investments' category reflects a $1,122,642 endowment from a separate 501(c)(3) organization, the St. HOPE Foundation, in an account at Merrill Lynch" which "are controlled by the Foundation, not St. HOPE."

Further, Johnson's lawyer disclosed that, for the single month of January 2009, St. HOPE sustained a net loss of $57,750 and for the eight months ending January 31, 2009, St. HOPE sustained a new loss of $725,103, and described St. HOPE as "hemorrhaging cash at an alarming rate."

Clearly, continuation of this "hemorrhaging cash at [that] alarming return" in the future would make the Corporation's collection from St. HOPE even more dubious. And Johnson's attorney disclosed that St. HOPE's "projection shows that for each month between February and

June 2009, except for April, St. HOPE will sustain a net cash loss of between $50,808 and $91,739." Johnson's attorney therefore concluded that "it is readily apparent that St. HOPE will soon be completely out of cash, with little or no revenue to supplant the loss." He concluded that "for current purposes, the 'ending cash' accessible funds total for April 2009 is $38,139; May 2009 is -$12,669; and June 2009 is -$74,477" with "next fiscal year's projections look[ing] even worse" -- which, he then represents, project "ending cash' as really -$136,285 in July 2009 and -$632,171 in June 2010."

That reality makes the Corporation's release of Johnson and Gonzalez from their joint liability in return for this worthless judgment against St. HOPE a waste of a Corporation cause of action asset and, frankly, a farce.

(vii)    As discussed below, the stated motivation for both the Corporation and the U.S. Attorney to rush into this settlement was to rescind the suspension of Johnson which precluded the City of Sacramento from receiving Federal grant funds. As already noted, the suspension procedure exists to protect Federal funds so that they are not entrusted into the control of someone who has, by his previous record with Federal funds, been shown not to be trustworthy. Thus, if the Corporation and the U.S. Attorney wanted to reconcile both the protections of the suspension procedure and the desire to allow the flow of Federal funds to Sacramento, they could have insisted that an independently appointed "Federal Funds Guardian" be appointed to review and safeguard the City's use of Federal funds, in place of the Mayor, until (and if) the Debarment and Suspension Official made a determination that the factual record presented to him warranted no suspension or debarment. While such provision might have been politically distasteful to Johnson, the responsibility of both the Corporation and the U.S. Attorney's Office was to protect Federal funds without regard to any impact -- favorable or unfavorable -- on Johnson's popularity. But, no such provision was even suggested by either the Corporation or the U.S. Attorney's Office.

* * *

If OIG had been allowed to provide our analysis of the Settlement Agreement before the Corporation rushed to sign it, our office would have provided the above objections. In fact, any

attorney, interested in protecting his/her client's interests, would have seen these same objections. But the Corporation rushed to execute the Settlement, rather than taking the time needed to obtain OIG's comments and thereby protect the interests of the Corporation and Federal taxpayers.

### H. Media and Political Pressure for Settlement

Shortly after the Sacramento Bee endorsed Mr. Johnson for Mayor on October 19, 2008 (Ex. 30), the Sacramento Bee's weblog first suggested, on October 27, 2008 (Ex. 14), that the "U.S. Attorney should resolve St. HOPE and Johnson questions." That did not cause any material expedition of the U.S. Attorney's progress.

Suddenly, with the enactment of stimulus legislation, a well-orchestrated push to force a settlement, which would include the lifting of the suspension -- without Johnson's need to provide facts to contradict the grounds for the suspension -- commenced. On March 16, and 18, 2009, as noted, Mr. Johnson's attorney wrote two letters to AUSA Newman requesting such settlement and lifting of the suspension. On Sunday, March 21st, the Sacramento Bee headlined an article "Mayor's status may imperil Sacramento's Federal stimulus funds, lawyer says," and reported that, in a statement, Johnson "said he is confident the issue can be resolved quickly" (Ex. 18). On Tuesday, March 24, 2009, the Sacramento Bee published an editorial "AmeriCorps case needs resolution" and opined that "[t]his is a case where everybody would be better off if the nonprofit and the IG reach a repayment settlement for the errors and move on" (Ex. 31).[13] On April 1, 2009, the Sacramento Bee reported that "Sacramento Mayor threatens to sue over his suspension from receiving U.S. funds" (Ex. 33), quoting Johnson's attorney's letter of March 31, 2009, to the Debarment and Suspension Official, a copy of which had apparently been provided to the Sacramento Bee by Johnson's attorney's simultaneously with forwarding it to the Corporation. Finally, on April 3rd, the Sacramento Bee published another editorial that a "repayment settlement" should be reached (Ex. 34).

---

[13] Misstatements in this editorial prompted the IG to respond to defend the OIG. Ex. 32.

## I. Serious Adverse Effects of this Rushed Settlement

Between August 7, 2008, when OIG made its referral to the United States Attorney's Office, through at least February 2009, there was no communication to the OIG that the U.S. Attorney's Office sought to expedite the review and conclusion. Indeed, our Agents' requests to expedite subpoena enforcement to obtain documents from St. HOPE were, to put it mildly, not handled in an expedited manner.

The only circumstance that changed was the sudden media and political pressure to settle the matter monetarily and lift the suspension. These pressures had the desired effect. OIG, which has the responsibility to ensure the non-fraudulent and non-wasteful use of Federal grant funds, and to protect Federal funds in the future from those who have shown lack of responsibility, was not diverted from its responsibility. But the U.S. Attorney's Office and the Corporation -- both of which also are duty-bound to protect Federal funds -- were detoured from that obligation.

The first hint was when the Acting U.S. Attorney described the suspensions as the "800 pound gorilla" obstacle to reaching a conclusion of OIG's referral to his office. Then, after it was made clear that OIG would not agree to any settlement that rescinded the suspensions without an evidentiary showing that convinced the Debarment and Suspension Official that his previous findings were not correct, the U.S. Attorney's Office stopped dealing with OIG and found a more pliant and sympathetic partner in Corporation management. As Nicola Goren, the Corporation's Acting CEO, said to the IG, in the presence of Mr. Trinity -- in response to the IG's comment that no facts have been presented to alter the findings made by the Debarment and Suspension Official (with the advice of Mr. Trinity) -- Mr. Johnson's lack of responsibility, as demonstrated in the findings, had to be ignored because the Corporation could not "stand in the way of Sacramento getting stimulus money." A similar statement was made by Acting U.S. Attorney Brown; "The lifting of the suspension against all parties, including Mayor Johnson, removes any cloud whether the City of Sacramento will be prevented from receiving much-needed federal stimulus funds" (Ex. 27). Significantly, neither the Corporation's Acting CEO nor the Acting U.S. Attorney ever suggested that the suspension was lifted because the evidence did not support the suspension decision made more than six months before on the basis of

specific findings of wrongdoing. They could not make such representation because the factual record before the Debarment and Suspension Official remained unaltered.

The decision by the Corporation and the U.S. Attorney to cut out OIG and agree to this Settlement Agreement was injurious to the Federal government as a whole and specifically to the Corporation and the hard-working and dedicated staff of the Office of Inspector General.

First, the settlement sends the signal that acceptance of a grantee or its principal as "responsible" can be purchased in a monetary settlement, overriding all evidence of wrongdoing previously found to warrant a suspension, without the presentation of any contradicting evidence. Settlement Agreements are supposed to settle the liability of the grantee and its principals for past wrongdoing. The Federal government created the suspension process to insulate all parts of the Federal government from providing Federal funds to those whose past conduct, with respect to any one agency, demonstrates that they are not sufficiently responsible to be awarded Federal funds from that agency or any other in the future. Reimbursing the Federal government for past irresponsible conduct, when caught, does not by itself provide evidence of responsibility in the future to handle Federal funds in a proper manner.

Second, as discussed above, the Settlement Agreement, poorly drafted (except as it was drafted to favor Johnson), provides no protection of the Corporation's interests. While papering it to appear, as the Sacramento Bee reported (Ex. 35), on April 9, 2009, that "Johnson and his nonprofit St. HOPE Academy have agreed to give back half of the $847,673 in federal grants it received," in fact that is false. Johnson is paying nothing; while he advanced $72,836.50 to St. HOPE for St. HOPE to pay its obligation under the Settlement Agreement, Johnson has no obligation to pay one cent of the grant-half touted to be paid back to the Corporation, and he can very promptly even obtain reimbursement from St. HOPE of the amount he advanced to St. HOPE.

Moreover, as discussed above, St. HOPE's financial condition is so precarious that it is unreasonable to count on St. HOPE to be able to make the ten years of payments provided by the Settlement Agreement.

In these circumstances -- and assuming *arguendo* that repayment of one-half of the Federal funds provided to St. HOPE (but not used as required by the grant terms) is an appropriate monetary settlement -- no attorney representing the interests of the Corporation should agree to that settlement without security or guaranties. It is obvious that leverage was on the side of the Corporation's attorneys, as Johnson badly wanted the settlement. Yet, the Corporation's attorneys accepted a settlement with no security or guaranties. In these circumstances, the touting of this settlement as monetarily in the Corporation's interests in that it will receive back one-half of what it provided to St. HOPE is an attempt to pull the wool over the public's eyes.

Likewise, as discussed above, Johnson's agreement to take a course for accountants and bookkeepers -- but not an ethics course -- is more wallpapering to fool the public.

If OIG had been consulted on this Settlement Agreement instead of being excluded, OIG would have pointed out these and the other obvious deficiencies discussed above in the Settlement Agreement. All of them make a mockery of the time, energy and money that OIG expended in performing its duty -- to investigate and bring to justice anyone who engages in fraud, waste and abuse of Federal funds.

That raises the third adverse impact of this Settlement Agreement. When the IG assumed the position of Inspector General, he told Corporation management and his staff that he believed the OIG existed to help the Corporation ensure that Congressional funds provided to it are in fact used for the Corporation's specified (and good) purposes, and are not wasted or fraudulently taken. To accomplish that end, the IG believed, and has so acted since then, in having frequent direct communication with Corporation management, and, absent some unique circumstance (which has not occurred), keep Corporation management informed of OIG activities, findings and recommendations. Until this episode, Corporation management has done the same.

While OIG and the Corporation have not agreed on all issues, we have openly discussed them and neither has shut the other out in full disclosure of what is intended to be done and in seeking the other's views before finalization.

What the Corporation did here in shutting OIG out of the finalization of an investigation and our audit section's review which OIG had, as normal procedure, totally controlled, unnecessarily tore asunder the trust OIG had in Corporate management.

But even worse, it has, understandably, adversely affected the morale, and attitude towards the Corporation, of the hard-working dedicated OIG staff. These men and women -- investigators and auditors -- have spent long hours investigating, reviewing, analyzing, and acting on the voluminous evidentiary record they created, and which caused the Corporation Debarment and Suspension Official to find that it created a sufficient record warranting suspension of St. HOPE, Johnson and Gonzalez. Also, they provided an evidentiary record to support criminal charges and/or full civil recovery against them. As detailed in the IG's April 6, 2009, letter to AUSA Newman, there could be no doubt that Gonzalez, whom Johnson delegated to sign required representations to the Government to obtain grant funds, made misrepresentations to obtain those funds; indeed, in interviews conducted by OIG agents, she admitted sufficient facts to support a criminal charge. These agents also provided more than sufficient evidence to establish that the grant terms were violated as to the full amount of grant funds St. HOPE received, and evidence that Johnson personally directed all of St. HOPE's activities, including particularly the use of AmeriCorps members. Such evidence would readily support the imposition of civil penalties to be paid directly to the U.S. Treasury of two to three times the amount of established damages under the Federal False Claims Act -- an amount that neither the Corporation nor the U.S. Attorney's Office even bothered to ask for or leverage in its so-called settlement negotiations with Johnson, Gonzalez, and the St. HOPE's lawyers.

The OIG staff rightfully feel that no good reason existed to sell their time and effort for a worthless settlement that "cleanses" the respondents' wrongdoing. And even more distasteful to them is that, after all they did on this matter, the U.S. Attorney and the Corporation shut them out from any input on, or knowledge of, the settlement until it was executed and publicly announced.

This was an exercise of, at least, terribly poor judgment by the Corporation and the United States Attorney's Office which, apparently, had another agenda -- not that of protecting Corporation grant funds.

### Conclusion

As we indicated at the beginning of this report, we believe it is OIG's obligation under statute to report these matters to you. In addition, it is the IG's position that he does so because, as long as he is in this position, he will stand by OIG's hard working staff whenever they are improperly treated for doing their job, and doing it well.

The IG and members of OIG staff are available to discuss this with you or your staff, at your request. Please call the IG directly at (202) 606-9390.

Respectfully submitted,

Gerald Walpin
Inspector General

Robert J. Walters
Assistant IG for Investigations

Stuart Axenfeld
Assistant IG for Audit

**Exhibit List**

<u>Description</u>

Excerpts, St. HOPE Grant Agreement No.

    03AFHCA002Y11-F102, Exhibit D,

    Narratives (page 3 of 34)

Excerpts, St. HOPE Grant Agreement No.

    03AFHCA002Y11-F102, Exhibit D,

    Narratives (page 2 of 34)

Excerpts, St. HOPE Grant Agreement No.

    03AFCHA002Y11-F102, Exhibit A, ¶ III

Excerpts, St. HOPE Grant Agreement No.

    03AFCHA002Y11-F102, Exhibit F, ¶ 15.a

Excerpts, St. HOPE Grant Agreement No.

    O3AFCHA002Y11-F102, Agreement Summary

"Investigation of girl's allegations against Kevin Johnson raises

    questions," The Sacramento Bee (April 25, 2008)

David Finnegan, "Sacramento mayoral candidate's non-profit now

    being examined by federal officials," www.politicker.com

    (April 26, 2008)

"Hood Corps probe expands," The Sacramento Bee (June 30,

    2008)

"Investigators turn St. HOPE report over to U.S. attorney," The

    Sacramento Bee (September 5, 2008)

Letter, September 24, 2008, from William Anderson, Debarment

and Suspension Official, Corporation for National and

Community Service, to Kevin Johnson, President, St.

HOPE Academy

Letter, September 24, 2008, from William Anderson, Debarment

and Suspension Official, Corporation for National and

Community Service, to Dana Gonzalez

Letter, September 24, 2008, from William Anderson, Debarment

and Suspension Official, Corporation for National and

Community Service, to Jules C. Alcouffe, Registered Agent

for St. HOPE Academy and St. HOPE Academy

"I Will Fight the Allegations Tooth and Nail,"

www.kevinjohnsonformayor.com (September 26, 2008)

Ginger Rutland, "US Attorney should resolve St. Hope and

Johnson questions," The Sacramento Bee, The Swarm

(October 27, 2008)

"No criminal charges for Johnson's Hood Corps," The Sacramento

Bee (November 6, 2008)

"U.S. attorney: No criminal case now against Johnson, Hood

Corps," The Sacramento Bee (November 7, 2008)

"Johnson builds volunteer team, wants more staff," The

Sacramento Bee (January 27, 2009)

Mayor's status may imperil Sacramento's federal stimulus funds, lawyer says," The Sacramento Bee (March 21, 2009)

Letter, March 16, 2009, from Matthew G. Jacobs to Kendall J. Newman

Excerpts, St. HOPE Grant Agreement No. 03AFHCA002Y11-F102, Exhibit D, Narratives (pages 25-26 of 34)

Letter, March 18, 2009, from Matthew G. Jacobs to Kendall Newman, Assistant United States Attorney

Letter, March 31, 2009, from Matthew G. Jacobs, Counsel for Mayor Kevin Johnson, Malcolm S. Segal, Counsel for St. HOPE Academy, and Richard Pachter, Counsel for Dana Gonzalez to William Anderson, Deputy CFO for Financial Management

OIG Subpoena No. 08-027-84 to Custodian of Records, St. HOPE Academy (October 1, 2008)

Letter, March 18, 2009, from Stuart Axenfeld, Assistant Inspector General for Audit, to Kendall Newman

E-mail, April 2, 2009, from Frank Trinity to Gerald Walpin

Letter, April 6, 2009, from Gerald Walpin, Inspector General, to Kendall J. Newman, Chief of the Civil Affirmative Section

Press Release, "United States Settles Claims Arising Out Of St. HOPE Academy's Spending Of AmeriCorps Grants And

Education Awards," from Acting United States Attorney

Lawrence G. Brown, Eastern District (April 9, 2009)

Settlement Agreement

"Learning Objectives" for Management Concepts, Inc., course on

Cost Principles

"Editorial: Johnson for mayor: time for a change," The

Sacramento Bee (October 19, 2008)

"Editorial: AmeriCorps case needs resolution," The Sacramento

Bee (March 24, 2009)

Gerald Walpin, "My View: The federal aid ball is in Johnson's

court," The Sacramento Bee (March 31, 2009)

"Sacramento mayor threatens to sue over his suspension from

receiving U.S. funds," The Sacramento Bee (April 1, 2009)

"Editorial: The case of the suspended mayor," The Sacramento

Bee (April 3, 2009)

"Sacramento Mayor Johnson reinstated to receive federal funds,"

The Sacramento Bee (April 9, 2009)

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD. 213 ( NEW 02/98 )

| | AGREEMENT NUMBER |
|---|---|
| | 03AFHCA002Y11-F102 |

| Registration NUMBER | Federal EIN |
|---|---|
| 06500105617241 | 68-0193050 |

This Agreement is entered into between the State Agency and the Contractor named below

STATE AGENCY'S NAME
DPR/California Service Corps (CSC)

CONTRACTOR'S NAME
St. Hope Academy

2. The term of this
   Agreement is:     July 1, 2004 - December 31, 2005

3. The maximum amount
   of this Agreement is:     $271,009.00

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made
   a part of the Agreement:

   Exhibit A, entitled "CSC Policy & Requirements"

   Exhibit B, entitled "Terms and Conditions"

   Exhibit C, entitled "Cost Per Member Policy dated July 1, 2004"

   Exhibit D, entitled "AmeriCorps Title Page/Program Narrative/Performance Measures"

   Exhibit E, entitled "Budget Form and Budget Narrative"

   Exhibit F, entitled "AmeriCorps Provisions Dated February 2004"

   Exhibit G, entitled "Travel Reimbursement Rates/Conditions"

   Exhibit H, entitled "Certification and Assurances"

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | CALIFORNIA Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (If other than an individual, state whether a corporation, partnership, etc.) | |
| St. Hope Academy | |
| BY (Authorized Signature)  >  [signature]  DATE SIGNED  11/10/04 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING  Lori Mills , Executive Director | |
| ADDRESS  P.O. Box 5447 , Sacramento , CA  95817 | |
| **STATE OF CALIFORNIA** | |
| AGENCY NAME  DPR/California Service Corps | |
| (Authorized Signature)  [signature] Marie Moretto  DATE SIGNED  1. 5. 05 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING  Moretti,   Executive Director, CSC | |
| 10 K Street, Suite 210, Sacramento, CA 95814 | [X] Exempt per AG Opinion No. 80-11 |

## PART I - FACE SHEET

| PLICATION FOR FEDERAL ASSISTANCE | 1. TYPE OF SUBMISSION:<br><br>Non-Construction |
|---|---|

| 2a. DATE SUBMITTED TO CORPORATION FOR NATIONAL AND COMMUNITY SERVICE (CNCS): | 3. DATE RECEIVED BY STATE:<br><br>15-JUL-04 | STATE APPLICATION IDENTIFIER: |
|---|---|---|
| 2b. APPLICATION ID:<br><br>04AC046031 | 4. DATE RECEIVED: | GRANT NUMBER: |

**5. APPLICATION INFORMATION**

| LEGAL NAME: St. HOPE Academy<br><br>ADDRESS (give street address, city, state and zip code):<br><br>P.O. Box 5447<br>Sacramento CA 95817 | NAME AND CONTACT INFORMATION FOR PROJECT DIRECTOR OR OTHER PERSON TO BE CONTACTED ON MATTERS INVOLVING THIS APPLICATION (give area codes):<br><br>NAME: Nicole West<br><br>TELEPHONE NUMBER: (916) 732-4673<br><br>FAX NUMBER: (916) 452-7177<br><br>INTERNET E-MAIL ADDRESS: nwest@sthope.org |
|---|---|

| 6. EMPLOYER IDENTIFICATION NUMBER (EIN):<br><br>680193050 | 7. TYPE OF APPLICANT:<br><br>7a. Non-Profit<br><br>7b. Community-Based Organization<br>Faith-based organization<br>Service/Civic Organization |
|---|---|

| 8. TYPE OF APPLICATION:<br><br>[X] NEW    [ ] CONTINUATION<br><br>[ ] REVISION<br><br>If Revision, enter appropriate letter(s) in box(es): [ ] [ ]<br><br>A. Increase Award    B. Decrease Award    C. Increase Duration<br><br>D. Decrease Duration | |
|---|---|
| | 9. NAME OF FEDERAL AGENCY:<br><br>**Corporation for National and Community Service** |
| 0a. CATALOG OF FEDERAL DOMESTIC ASSISTANCE NUMBER: 94.006<br>0b. TITLE: AmeriCorps*State | 11. DESCRIPTIVE TITLE OF APPLICANTS PROJECT:<br><br>Neighborhood Corps |
| 2. AREAS AFFECTED BY PROJECT (List Cities, Counties, States, etc):<br><br>Sacramento, California | |

| I. PROPOSED PROJECT: START DATE: 09/07/04    END DATE: 08/22/07 | 14. PERFORMANCE PERIOD: START DATE:    END DATE: |
|---|---|

| I. ESTIMATED FUNDING: | | 16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS? |
|---|---|---|
| a. FEDERAL | $ 273,745.00 | [ ] YES, THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON: |
| b. APPLICANT | $ 170,961.00 | DATE: |
| c. STATE | $ 0.00 | |
| d. LOCAL | $ 0.00 | |
| e. OTHER | $ 0.00 | |
| f. PROGRAM INCOME | $ 0.00 | 17. IS THE APPLICANT DELINQUENT ON ANY FEDERAL DEBT? |
| g. TOTAL | $ 444,706.00 | [ ] YES  if "Yes," attach an explanation.  [X] NO |

TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT, THE DOCUMENT HAS BEEN .Y AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES IF THE ASSISTANCE AWARDED.

| YPED NAME OF AUTHORIZED REPRESENTATIVE:<br><br>on Mills | b. TITLE:<br><br>Acting Executive Director | c. TELEPHONE NUMBER:<br><br>(916) 732-4673 |
|---|---|---|
| | | d. DATE: |

*1 of 34*

# Narratives

## Summary of Program Design

Hood Corps is an experiential leadership development and community service program based on five tenets: (1) Practical Theology; (2) Simple Living; (3) Physical Training; (4) Professional Development; and (5) Civic Leadership. Hood Corps offers a variety of volunteer opportunities ranging from one-hour projects to two-year fellowships. These opportunities are organized into four levels based on the intensity and duration of service: (1) Fellowships; (2) Internships; (3) Apprenticeships; and (4) Volunteers.

Hood Corps assignments include: (1) providing one-on-one tutoring to elementary and high school students; (2) managing the redevelopment of one building per year in Oak Park; and (3) coordinating logistics, public relations, and marketing for the Guild Theater and Art Gallery events, as well as hands-on workshops, guest artist lectures, and art exhibitions for Sacramento High School of the Arts and PS7 Elementary School. Fellows, Interns and Apprentices are responsible for general volunteer recruitment and training and participate in a variety of character building, physical training and growth activities beyond the workday.

A Program Director and Program Coordinator staff the program. A Mentor and a Work Supervisor are assigned to each Fellow, Intern and Apprentice to provide professional and personal support. St. HOPE Academy provides financial administration services.

## Summary of Accomplishments

St. HOPE has achieved significant success to date. Over the last 15 years, St. HOPE has dramatically improved education in Oak Park. Through the after school program, hundreds of youth have demonstrated major gains in academic achievement, most notably in reading and math. In 2003, St.

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD. 213 (NEW 02/985

| | |
|---|---|
| **AGREEMENT NUMBER** | 03AFHCA002Y11-F102 |
| Registration NUMBER 0650018561724 | Federal EIN 68-0193050 |

This Agreement is entered into between the State Agency and the Contractor named below

STATE AGENCY'S NAME
JPR/California Service Corps (CSC)

CONTRACTOR'S NAME
St. Hope Academy

2. The term of this Agreement is:    July 1, 2004 - December 31, 2005

3. The maximum amount of this Agreement is:    $271,009.00

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the Agreement:

> Exhibit A, entitled "CSC Policy & Requirements"
>
> Exhibit B, entitled "Terms and Conditions"
>
> Exhibit C, entitled "Cost Per Member Policy dated July 1,2004"
>
> Exhibit D, entitled "AmeriCorps Title Page/Program Narrative/Performance Measures"
>
> Exhibit E, entitled "Budget Form and Budget Narrative"
>
> Exhibit F, entitled "AmeriCorps Provisions Dated February 2004"
>
> Exhibit G, entitled "Travel Reimbursement Rates/Conditions"
>
> Exhibit H, entitled "Certification and Assurances"

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | CALIFORNIA Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (if other than an individual, state whether a corporation, partnership, etc.) St. Hope Academy | |
| BY (Authorized Signature) > | DATE SIGNED 11/10/04 |
| PRINTED NAME AND TITLE OF PERSON SIGNING Lori Mills , Executive Director | |
| ADDRESS P.O. Box 5447 , Sacramento, CA  95817 | |

| STATE OF CALIFORNIA | |
|---|---|
| AGENCY NAME JPR/California Service Corps | |
| (Authorized Signature) Marie Moretto | DATE SIGNED 1·5·05 |
| PRINTED NAME AND TITLE OF PERSON SIGNING Moretti,  Executive Director, CSC | |
| 110 K Street, Suite 210, Sacramento, CA 95814 | [X] Exempt per AG Opinion No. 80-11 |

# PART I - FACE SHEET

## PLICATION FOR FEDERAL ASSISTANCE

| | |
|---|---|
| | **1. TYPE OF SUBMISSION:**<br>Non-Construction |
| **2a. DATE SUBMITTED TO CORPORATION FOR NATIONAL AND COMMUNITY SERVICE (CNCS):** | **3. DATE RECEIVED BY STATE:** 15-JUL-04 |  **STATE APPLICATION IDENTIFIER:** |
| **2b. APPLICATION ID:** 04AC046031 | **4. DATE RECEIVED:** | **GRANT NUMBER:** |

**5. APPLICATION INFORMATION**

LEGAL NAME: St. HOPE Academy

ADDRESS (give street address, city, state and zip code):

P.O. Box 5447
Sacramento CA 95817

**NAME AND CONTACT INFORMATION FOR PROJECT DIRECTOR OR OTHER PERSON TO BE CONTACTED ON MATTERS INVOLVING THIS APPLICATION (give area codes):**

NAME: Nicole West

TELEPHONE NUMBER: (916) 732-4673

FAX NUMBER: (916) 452-7177

INTERNET E-MAIL ADDRESS: nwest@sthope.org

**6. EMPLOYER IDENTIFICATION NUMBER (EIN):**

680193050

**8. TYPE OF APPLICATION:**

[X] NEW    [ ] CONTINUATION

[ ] REVISION

If Revision, enter appropriate letter(s) in box(es): [ ] [ ]

A. Increase Award    B. Decrease Award    C. Increase Duration

D. Decrease Duration

**7. TYPE OF APPLICANT:**

7a. Non-Profit

7b. Community-Based Organization
Faith-based organization
Service/Civic Organization

**9. NAME OF FEDERAL AGENCY:**

## Corporation for National and Community Service

**0a. CATALOG OF FEDERAL DOMESTIC ASSISTANCE NUMBER: 94.006**
**0b. TITLE: AmeriCorps*State**

**11. DESCRIPTIVE TITLE OF APPLICANT'S PROJECT:**

Neighborhood Corps

**2. AREAS AFFECTED BY PROJECT (List Cities, Counties, States, etc):**

Sacramento, California

**3. PROPOSED PROJECT: START DATE: 09/07/04    END DATE: 08/22/07**

**14. PERFORMANCE PERIOD: START DATE:    END DATE:**

**5. ESTIMATED FUNDING:**

| | |
|---|---|
| a. FEDERAL | $ 273,745.00 |
| b. APPLICANT | $ 170,961.00 |
| c. STATE | $ 0.00 |
| d. LOCAL | $ 0.00 |
| e. OTHER | $ 0.00 |
| f. PROGRAM INCOME | $ 0.00 |
| g. TOTAL | $ 444,706.00 |

**16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS?**

[ ] YES, THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON:
DATE:

**17. IS THE APPLICANT DELINQUENT ON ANY FEDERAL DEBT?**
[ ] YES  If "Yes," attach an explanation.    [X] NO

TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT, THE DOCUMENT HAS BEEN LY AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES IF THE ASSISTANCE AWARDED.

| TYPED NAME OF AUTHORIZED REPRESENTATIVE:<br>Lori Mills | b. TITLE:<br>Acting Executive Director | c. TELEPHONE NUMBER:<br>(916) 732-4673 |
|---|---|---|
| | | d. DATE: |

1 of 34

# Narratives

**Executive Summary**

### Statement of Need

Oak Park was founded in 1889 as the first suburb of Sacramento, California. In its early years, schools, businesses and the arts thrived. Today, Oak Park is a densely populated annexed inner-city community fighting the effects of urban blight. On a daily basis, residents are faced with widespread poverty and homelessness, high crime rates, extensive drug activity, truancy, under resourced schools, and a lack of jobs and services. As an area targeted for redevelopment, the Oak Park community is in transition and positioned for revitalization. However, community revitalization cannot be fully realized without coordinated education and economic development efforts, and dedicated volunteers to fuel these efforts.

### Mission

Neighborhood Corps ('Hood Corps') is an inner-city service program that educates, trains and empowers individuals to become civic leaders in order to further educational and economic development efforts in the Oak Park community. Hood Corps is part of St. HOPE Academy, a faith-based, nonprofit community development corporation dedicated to revitalizing inner-city communities through public education, civic leadership, economic development, and the arts.

### Expected Impact

By the end of the program year, Hood Corps expects to: (1) to improve the reading and math achievement of 100 elementary and high school students by as part of the after school program; (2) to stimulate economic growth in Oak Park by managing the redevelopment of the Walton Pediatrics building, an investment of $1.6 million dollars into the community; (3) to increase arts programming in Oak Park, and (4) to recruit and train 500 volunteers to complete 10,000 hours of service in Oak Park.

California Service Corps - 2004 AmeriCorps Grant Award

**Exhibit A**

**Consideration**

The total amount payable to the Contractor under this Agreement shall not exceed $271,009.00. This amount reflects a cost per member of $15,208.06. The consideration paid to Contractor shall be in compensation for all of the Contractor's expenses, as approved in the budget, attached as Exhibit E.

**II. Program Year**

The Program Year, defined as the 12 month period in which Members will perform service, will be from 9/1/2004 to 8/5/2005.

**III. Scope of Work**

For the purposes of this agreement, the Scope of Work shall be deemed to be the objectives, deliverables, and commitments contained in Exhibit D, "AmeriCorps Title Page/Program Narrative/Performance Measures". The grantee may not revise the "Scope of Work" without written approval from the California Service Corps. Extensive changes to the "Scope of Work" require an amendment to this agreement.

**IV. California Service Corps Compliance Requirements**

The Grantee has set the following date(s) as the Final Enrollment Date(s) for enrolling new members into the Program. This date(s) is also the date(s) that the CSC may adjust the Program's budget, based on the number of members enrolled.

Final Enrollment date for Full-time (1700 hours) Members: 9/30/04
Final Enrollment date for Part-time (900 hours) members: 1/31/2005
Final Enrollment date for Part-time (600 hours) members:
Final Enrollment date for Part-time (450 hours) members: 5/31/05

The CSC may adjust the Program's budget based on the number of members enrolled in the Program at two points in time. The first time the budget may be adjusted is at the latest date members can be brought on by the Program and still complete their term of service within the program year (Final Enrollment Date). The second time is on the last date the Program has members serving (Program End Date). For further clarification, please see Exhibit C entitled "Cost Per Member Policy".

California Service Corps - 2004 AmeriCorps Grant Award

The Grantee will establish Memorandums of Understanding (MOU) with any party providing the program with cash match, Education Award only (unstipended by the Corporation for National and Community Service (CNCS)) members and/or any costs associated with Education Award only members. These MOUs should establish the roles and responsibilities of each party. Education Award Only positions must be filled **prior** to any Corporation-sponsored stipended member slots.

Prior to the processing of the contract, Contractor must complete the CNCS Financial Management Survey. The completed form and related attachments should be submitted to the CSC's Fiscal Unit at the address provided in Item 29.

### Record Keeping and Document Verification

The Grantee must obtain and maintain documentation demonstrating member eligibility to serve and the successful completion of a specified term of service. The 2004 AmeriCorps Provisions detail member eligibility requirements. Section 14 - Member Records and Confidentiality outlines the need to obtain and maintain documentation of the review process used to verify eligibility to serve in AmeriCorps. CSC requires that copies of all documents used to confirm age or eligibility be maintained in the member files.

### Web Based Reporting

The Grantee may delegate authority to an individual(s) to sign as "certifying officials" for the web based reporting system (WBRS). These individuals are responsible for certifying member forms, completion of members' terms of service, and programmatic and fiscal reports. The Grantee shall follow the formalized WBRS procedures when setting up access accounts to ensure data security, including establishing individual users and assigning their level of access to information in WBRS. The Grantee is responsible for maintaining staff access levels, communicating staff access information to CSC, and, ultimately, maintaining the overall integrity of the information reported through WBRS.

**Page 2 of 2**

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD. 213 (NEW 02/98)

| | |
|---|---|
| AGREEMENT NUMBER | 03AFHCA002Y11-F102 |
| Registration NUMBER | Federal EIN |
| 0650018561724 | 68-0193050 |

This Agreement is entered into between the State Agency and the Contractor named below

STATE AGENCY'S NAME
OPR/California Service Corps (CSC)

CONTRACTOR'S NAME
St. Hope Academy

2. The term of this
   Agreement is:     July 1, 2004 - December 31, 2005

3. The maximum amount
   of this Agreement is:     $271,009.00

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made
   a part of the Agreement:

    Exhibit A, entitled "CSC Policy & Requirements"

    Exhibit B, entitled "Terms and Conditions"

    Exhibit C, entitled "Cost Per Member Policy dated July 1,2004"

    Exhibit D, entitled "AmeriCorps Title Page/Program Narrative/Performance Measures"

    Exhibit E, entitled "Budget Form and Budget Narrative"

    Exhibit F, entitled "AmeriCorps Provisions Dated February 2004"

    Exhibit G, entitled "Travel Reimbursement Rates/Conditions"

    Exhibit H, entitled "Certification and Assurances"

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | CALIFORNIA Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (if other than an individual, state whether a corporation, partnership, etc.) St. Hope Academy | |
| BY (Authorized Signature) | DATE SIGNED 11/10/04 |
| PRINTED NAME AND TITLE OF PERSON SIGNING Lori Mills , Executive Director | |
| ADDRESS P.O. Box 5447 , Sacramento , CA   95817 | |

| STATE OF CALIFORNIA | |
|---|---|
| AGENCY NAME OPR/California Service Corps | |
| BY (Authorized Signature) | DATE SIGNED 1-5-05 |
| PRINTED NAME AND TITLE OF PERSON SIGNING Moretti, Executive Director, CSC | |
| 110 K Street, Suite 210, Sacramento, CA 95814 | [X] Exempt per AG Opinion No. 80-11 |

g. **Cost Share.** The Corporation encourages private sector support over-and-above the matching fund requirement. As a general rule, the Corporation will treat cash or in-kind matching contribution that exceeds the required minimum as cost-share. Grantees must comply with the requirements of CFR 2543.23 in documenting cash and in-kind contributions.

## 14. MEMBER RECORDS AND CONFIDENTIALITY.

a. **Record-Keeping.** The Grantee must maintain records specified in (b) below that document each member's eligibility to serve pursuant to the member eligibility requirements in the definitions section of these provisions. The records must be sufficient to establish that the individual was eligible to participate in the program and that the member successfully completed the program requirements.

b. **Verification.** To verify U.S. citizenship, U.S. national status or, U.S. lawful permanent resident alien status, the Grantee must obtain and maintain documentation as required by 45 C.F.R. 2522.200(b) and (c). The Corporation does not require programs to make and retain copies of the actual documents used to confirm age or citizenship eligibility requirements, such as a driver's license, or birth certificate, as long as the Grantee has a consistent practice of identifying the documents that were reviewed and maintaining a record of the review. To verify whether the member meets the requirements relating to high-school education, the Grantee must obtain from the member, and maintain in the member's file, a written declaration under penalty of law that the member meets the requirements of these provisions relating to high school education. If the member has been determined to be incapable of obtaining a high school diploma or its equivalent, the Grantee must retain a copy of the supporting independent evaluation

c. **Confidential Member Information.** The Grantee must maintain the confidentiality of information regarding individual members. The Grantee must obtain the prior written consent of all members before using their names, photographs and other identifying information for publicity, promotional or other purposes. Parental or legal guardian consent must be obtained for members under 18 years of age. Grantees may include an informed consent form as part of the member contract materials that are signed at the time the member enrolls. Grantees may release aggregate and other non-identifying information, and are required to release member information to the Corporation and its designated contractors. The Grantee must permit a member who submits a written request for access to review records that pertain to the member and were created pursuant to this Grant.

## 15. BUDGET AND PROGRAMMATIC CHANGES.

a. **Programmatic Changes.** The State Commission or Parent Organization must obtain the prior written approval of the AmeriCorps Program Office before making the following changes in the approved Program:

i.     Changes in the scope, objectives or goals of the Program, whether or not they involve budgetary changes;

ii.    Substantial changes in the level of participant supervision;

iii.   Entering into additional sub-Grants or contracts for AmeriCorps activities funded by the Grant but not identified or included in the approved application and grant budget.

**b. Program Changes for Formula Programs**

i.     State Commissions are responsible for approving the above changes for state formula programs.

**c. Budgetary Changes.** The Grantee must obtain the prior written approval of the Corporation's Office of Grants Management before deviating from the approved budget in any of the following ways:

i.     **Reallocation of Funds from the "Member Support Cost" category** to other categories of the approved budget. However, the Grantee may reallocate funds within the line items in this category, except for increases in health care cost per member, which must be approved. The specific line items covered by this subclause are:

     a.  Living allowance,

     b.  FICA, worker's compensation, and unemployment insurance and

     c.  Health care (or alternative health care).

ii.    **Specific Costs Requiring Prior Approval before Incurrence** under OMB Circulars A-21, A-87 or A-122. For certain cost items, the cost circulars require approval of the awarding agency for the cost to be allowable. Examples of these costs are overtime pay, rearrangement and alteration costs, and pre-award costs.

iii.   **Purchases of Equipment over $5,000** using Grant funds, unless specified in the approved application and budget.

iv.   **Unless the Corporation share of the award is $100,000 or less, changes** to cumulative budget line items that amount to 10 per cent or more of the total program budget must be approved in writing in advance by the Corporation. The total program budget includes both the Corporation and Grantee shares. Grantees may transfer funds among approved direct cost categories when the cumulative amount of such transfers does not exceed 10 per cent of the total program budget.

**d. Approvals of Programmatic and Budget Changes.** The Corporation's Grants Officers are the only officials who have the authority to change the requirements of the Grant. The Grants Officers will execute written amendments, and Grantees should not assume approvals have been granted unless documentation from the Grants Office has been received.

000489

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD. 213 (•nEW.02/98•)

| | AGREEMENT NUMBER |
|---|---|
| | 03AFHCA002Y11-F102 |

Registration NUMBER
06000056l724

Federal EIN
68-0193050

This Agreement is entered into between the State Agency and the Contractor named below

STATE AGENCY'S NAME
JPR/California Service Corps (CSC)

CONTRACTOR'S NAME
St. Hope Academy

2. The term of this
Agreement is:   July 1, 2004 - December 31, 2005

3. The maximum amount
of this Agreement is:   $271,009.00

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made
a part of the Agreement:

Exhibit A, entitled "CSC Policy & Requirements"

Exhibit B, entitled "Terms and Conditions"

Exhibit C, entitled "Cost Per Member Policy dated July 1, 2004"

Exhibit D, entitled "AmeriCorps Title Page/Program Narrative/Performance Measures"

Exhibit E, entitled "Budget Form and Budget Narrative"

Exhibit F, entitled "AmeriCorps Provisions Dated February 2004"

Exhibit G, entitled "Travel Reimbursement Rates/Conditions"

Exhibit H, entitled "Certification and Assurances"

N WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | CALIFORNIA Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (If other than an individual, state whether a corporation, partnership, etc.) | |
| St. Hope Academy | |
| Y (Authorized Signature) | DATE SIGNED: 11/10/04 |
| INTED NAME AND TITLE OF PERSON SIGNING: Lon Mills, Executive Director | |
| DDRESS: P.O. Box 5447, Sacramento, CA 95817 | |

| STATE OF CALIFORNIA | |
|---|---|
| GENCY NAME | |
| JPR/California Service Corps | |
| (Authorized Signature) | DATE SIGNED: 1.5.05 |
| INTED NAME AND TITLE OF PERSON SIGNING: Moretti, Executive Director, CSC | |
| 110 K Street, Suite 210, Sacramento, CA 95814 | [X] Exempt per AG Opinion No. 80-11 |

**AGREEMENT SUMMARY**
(TD. 2 (rev. 2002))

☐ **CHECK HERE IF ADDITIONAL PAGES ARE ATTACHED** _____ Pages

| | AGREEMENT NUMBER | AMENDMENT NUMBER |
|---|---|---|
| | 03AFHCAC-Y14-F102- | - |

**1. CONTRACTOR'S NAME**

St. Hope Academy

**2. FEDERAL I.D. NUMBER**

68-0193050

**3. AGENCY TRANSMITTING AGREEMENT**

Office of Planning and Research (OPR)

**4. DIVISION, BUREAU or OTHER UNIT**

California Service Corps (CSC)

**5. AGENCY BILLING CODE**

031100

**6. NAME & TELEPHONE NUMBER OF CONTRACT ANALYST FOR QUESTIONS REGARDING THIS AGREEMENT**

Mimi Morris  916-324-4786

**7. HAS YOUR AGENCY CONTRACTED FOR THESE SERVICES BEFORE**

◯ Yes  ⦿ No  (If YES, enter prior contractor name and Agreement Number)

**8. BRIEF DESCRIPTION OF SERVICES - LIMIT 72 CHARACTERS INCLUDING PUNCTUATION AND SPACES**

Neighborhood Corps (Hood Corps) will have approximately 6 FT, 18 PT, and 12 QT members. FT members will serve 40 hours per week for a one-

**9. AGREEMENT OUTLINE** (include reason for Agreement. Identify specific problem, administrative requirement, program need or other circumstances making the Agreement necessary; or special or unusual terms and conditions.)

The contractor competed successfully for grant funding by submitting a proposal to administer an AmeriCorps program in California. AmeriCorps programs strengthen communities through projects that address education, public safety, the environment, and other unmet human needs. The grantee agrees to comply with all provisions of the grant as well as to administer the grant in accordance with approved Grant Application and budget, supporting documents, and other representations made in support of the approved Grant Application.

**10. PAYMENT TERMS** (More than one may apply.)

Itemized Invoice

| 1. PROJECTED EXPENDITURES FUND TITLE | ITEM | F.Y. | CHAPTER | STATUTE | PROJECTED EXPENDITURES |
|---|---|---|---|---|---|
| Federal Trust | 0650-101-0890 | 2004-2005 | 208 | 04 | $271,009.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| OBJECT CODE | | AGREEMENT TOTAL | $271,009.00 |
|---|---|---|---|
| | | AMOUNT ENCUMBERED BY THIS DOCUMENT | $271,009.00 |
| OPTIONAL USE | | PRIOR AMOUNT ENCUMBERED FOR THIS AGREEMENT | |

I CERTIFY upon my own personal knowledge that budgeted funds for the current budget year are available for the period and purpose of the expenditure stated above.

| ACCOUNTING OFFICER'S SIGNATURE | DATED SIGNED | TOTAL AMOUNT ENCUMBERED TO DATE |
|---|---|---|
| *[signature]* | 1-18-05 | $271,009.00 |

| AGREEMENT | TERM From | Through | TOTAL COST THIS TRANSACTION | BID, SOLE SOURCE, EXEMPT |
|---|---|---|---|---|
| Original | 7/1/2004 | 12/31/05 | $271,009.00 | EXEMPT |
| Amendment 1 | | | | |
| Amendment 2 | | | | |
| Amendment 3 | | | | |
| Amendment 4 | | | | |
| | TOTAL | | $271,009.00 | |

AGREEMENT SUMMARY
STD. 215 (Rev 4/2002)

STATE OF CALIFORNIA
**AGREEMENT SUMMARY**
STD 215 (Rev 04/02)

| | AGREEMENT NUMBER | AMENDMENT NUMBER |
|---|---|---|
| | 03AFHCA002Y11-F102 | |

**BIDDING METHOD USED:**

☐ REQUEST FOR PROPOSAL (RFP)
*(Attach justification if secondary method is used.)*

☐ INVITATION FOR BID (IFB)

☐ USE OF MASTER SERVICE AGREEMENT

☐ SOLE SOURCE CONTRACT
*Attach STD. 821.*

☒ EXEMPT FROM BIDDING
*(Give authority for exempt status)*

☐ OTHER (Explain)

*NOTE: Proof of publication in the State Contracts Register or an approved form STD. 821, Contract Advertising Exemption Request, must be attached.* Exempt from bidding per Section 3.18c of the State Contracting Manual

**14. SUMMARY OF BIDS** (List bidders, bid amount and small business status.) *(If an amendment, sole source, or exempt, leave blank)*

N/A

**15. IF AWARD OF AGREEMENT IS TO OTHER THAN THE LOWER BIDDER, PLEASE EXPLAIN REASON(S)** *(If an amendment, sole source, or exempt, leave blank.)*

N/A

**16. WHAT IS THE BASIS FOR DETERMINING THAT THE PRICE OR RATE IS REASONABLE?**

**17. JUSTIFICATION FOR CONTRACT** *(Check one)*

☐ Contracting out is based on cost savings per Government Code §19130(a). The State Personnel Board has been so notified.

☐ Contracting out is justified based on Government Code §19130(b). Justification for the agreement is described below.

*Justification:*
As a unit of the Governor's Office, the California Service Corps is exempt from this requirement. All staff of CSC are staff of the Governor's Office. All functions of the Governor's Office are exempt from civil service, pursuant to Section 4 of Article VI of the California Constitution.

| 18. FOR AGREEMENTS IN EXCESS OF $5,000, HAS THE LETTING OF THE AGREEMENT BEEN REPORTED TO THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING? | 19. HAVE CONFLICT OF INTEREST ISSUES BEEN IDENTIFIED AND RESOLVED AS REQUIRED BY THE STATE CONTRACT MANUAL SECTION 7.10? | 20. FOR CONSULTING AGREEMENTS, DID YOU REVIEW ANY CONTRACTOR EVALUATIONS ON FILE WITH THE DGS LEGAL OFFICE? |
|---|---|---|
| No | Yes | N/A |

| 21. IS A SIGNED COPY OF THE FOLLOWING ON FILE AT YOUR AGENCY FOR THIS CONTRACTOR? | | 22. REQUIRED RESOLUTIONS ARE ATTACHED |
|---|---|---|
| A. CONTRACTOR CERTIFICATION CLAUSES | B. STD. 204, VENDOR DATA RECORD | |
| N/A | Yes | N/A |

**23. ARE DISABLED VETERANS BUSINESS ENTERPRISE GOALS REQUIRED?** *(If an amendment, explain changes, if any.)*

DISABLED VETERAN BUSINESS ENTERPRISES:        % OF CONTRACT        Good Faith effort documentation attached if 3% goal is not reached.

We have determined that the contractor has made sincere Good Faith effort to meet the goals.

EXPLAIN:
N/A

IS THIS A SMALL BUSINESS CERTIFIED BY OSMB?        SMALL BUSINESS REFERENCE NUMBER

No        *(Indicate Industry Group)*

IS THIS CONTRACT (WITH AMENDMENTS) FOR A PERIOD OF TIME LONGER THAN ONE YEAR?

If YES, please provide justification.

*I certify that all copies of the referenced Agreement will conform to the original Agreement sent to the Department of General Services*

| SIGNATURE/TITLE | DATE SIGNED |
|---|---|
| Chief Financial Officer | 1/10/2005 |

THE SACRAMENTO BEE   sacbee.com

This story is taken from Sacbee / Our Region

# Investigation of girl's allegations against Kevin Johnson raises questions

**thardy@sacbee.com**

**Published Friday, Apr. 25, 2008**

After a Sacramento High School teacher's report last year that a 17-year-old student told him she was inappropriately touched by Kevin Johnson, Johnson's personal attorney and business partner investigated the complaint for the campus.

State law requires that authorities be notified immediately when school officials learn of such an allegation. But – before police were called in by the teacher – Johnson's attorney, Kevin Hiestand, questioned the girl during an internal investigation, according to interviews and e-mails obtained by The Bee.

Following the school's internal investigation, the student recanted. (The Bee is not naming her because of her age and the nature of the allegation.) Sacramento police investigators, who never interviewed Johnson, later found "no merit" to the allegation and declined to pursue the case in part because the girl recanted.

At the time of the April 2007 allegation, former NBA star Johnson served as a teacher, interim principal and head of St. HOPE Public Schools, which oversees the Sac High charter school. Currently, he is challenging Sacramento Mayor Heather Fargo in the June election.

Erik Jones, the teacher who made the report to police, resigned over the way the matter was handled by the school.

"St. HOPE sought to intimidate the student through an illegal interrogation and even had the audacity to ask me to change my story," Jones wrote in his May 15 resignation letter.

In response to a detailed summary of issues raised by this article, the Johnson campaign released a one-paragraph statement late Wednesday:

"St. HOPE takes any claim of harassment seriously, particularly in the case of a minor. In this case, St. HOPE acted swiftly to follow its federally mandated requirement to investigate. An impartial three-person panel found that the allegation was unfounded, a finding that was later confirmed by law enforcement. We consider the matter closed given the findings of law enforcement and out of respect for the minor involved."

When a Bee reporter asked about the matter at a Sacramento Press Club lunch Thursday, Johnson responded briefly.

"I think the allegations at the school were handled in the way that you would want them handled," he said. "Immediately they followed all the normal protocols that they were

supposed to follow ... . I think it was pretty clear there was nothing there."

Pressed for more information, Hiestand e-mailed answers to some questions late Thursday. He said the three-person impartial panel included him, the school's principal and a St. HOPE staff member and that they proceeded "in accordance with the law." He said he did not recall whether the investigation began before police were notified.

Police Chief Rick Braziel said that the police report confirms that the attorney had contacted the girl before they got involved.

"We knew there was an internal investigation done before the date we were notified," Braziel said. "We did ask the young lady whether anyone had influenced her – her answer was no."

## Classmate questioned

Jones, who heard the girl's original account, and a classmate who also was there, told The Bee that Hiestand suggested they alter their versions of what they heard. Both said they refused.

The classmate, Dora Bromme, said Hiestand pulled her out of class and told her the girl making the allegation had recanted. In an interview, Bromme told The Bee that Hiestand said he was from "human resources" but did not identify himself as a lawyer.

She said Hiestand told her that the student "told us that (Johnson) just kissed her on the forehead and gave her a pat on the shoulder and left."

"I said to him 'I can tell you for a fact that's not what she said,'" Bromme said. "He was changing around the story."

St. HOPE classifies the incident as "harassment," and Hiestand said he participated as the school's federal Title IX officer. Police, however, investigated it as a child sexual abuse case because the minor alleged Johnson had touched her breasts.

"Our investigation found the allegations were rumor and innuendo, and not based on any evidence," Hiestand wrote in his Thursday e-mail response.

All school teachers and administrators are "mandated reporters" – meaning they are required to report suspected child abuse. Under the California Education Code, teachers who fail to report can lose their credentials. And the state penal code says any supervisor or administrator who "impedes or inhibits" the reporting can be punished with a fine or jail time or both.

"Your duty is to report, not investigate," the California attorney general's office advises educators in a written explanation of legal requirements for reporting child abuse.

Also at issue is Hiestand's possible conflict of interest, legal experts say, because he represented both the school and Johnson, the target of the complaint.

Diane Karpman, a Los Angeles-based expert in legal ethics, said cases like the Sac High situation raise several questions, including the importance for lawyers to disclose dual roles and receive a formal waiver from the school board.

St. HOPE board minutes for the past year show no request for a waiver. The board is appointed by Johnson and he served as its chairman until January.

Hiestand said he disclosed that he was Johnson's private attorney and had been retained to represent St. HOPE to "every party involved in the investigation, including the student and her guardian."

## Lawyer and friend

Hiestand is a vice president of Johnson's private development company, Kynship, according to state incorporation papers. His relationship to Johnson is "personal and legal counsel," a federal document states. And he receives a monthly retainer of $2,800 from St. HOPE Public Schools for his legal services.

Hiestand, Johnson's friend since childhood, has filled a number of roles in the organization. He was part of the team in January that presented St. HOPE's application to open a new charter school in New York City's Harlem.

When Johnson played point guard for the Phoenix Suns, Hiestand was his spokesman. In 1995, Hiestand also got involved in a Phoenix police investigation into a 16-year-old's allegation that Johnson molested her. In a conversation taped by police, Hiestand called the girl's therapist and questioned her about her client's story.

Phoenix police referred that case to the District Attorney's Office, but no charges were filed.

In the Sac High case, Jones and a counselor who heard the girl's remarks about Johnson both said Hiestand told them not to report the incident until the internal investigation was complete.

According to Jones: "Hiestand told me he had met with her and that she had told a different story and that I should change my story to fit the one they had been told."

Jones maintains that Hiestand later told him the girl had recanted during the internal investigation.

Hiestand described a different chain of events, saying that "when Jones informed me about his suspicion and asked whether he should file a report, I promptly told him to do so with the police and CPS."

On April 30 – a week after the girl made her allegations – Jones sent Hiestand an e-mail asking: "Do (I) not also need to submit a form to (Child Protective Services) as I am a mandatory reporter in my role as a teacher?"

Hiestand responded: "Yes, if you suspect it."

By then, however, Jones had already begun trying to contact outside authorities.

## Teacher recounts events

In a recent interview, Jones gave a detailed account of events he said led up to his resignation. He said the girl's initial comments came during a senior class retreat in Yosemite.

As the group prepared breakfast on April 23, Jones said, the girl confided to him, counselor Jill Tabachnick and two classmates that Johnson had touched her inappropriately on several occasions.

The classmates, Dora Bromme and Lisa Wood, corroborated Jones' account. When contacted by The Bee, Tabachnick – who was laid off from Sacramento High at the end of the school year – confirmed she heard the girl's allegations and she confirmed Jones' account of the school's handling of the situation.

Jones said the girl demonstrated to the Yosemite group how Johnson massaged her shoulders from behind as she sat at a computer at the school, and how his hands dipped down to her breasts.

"The situation grossed me out and that was not the first time," Jones quoted her as saying in his report to police.

"(Johnson) has also done this to other girls in the class," Jones' child-abuse report quoted her as adding. "And with one of the Hood Corps students he tried to crawl into her bed. And that

is why she quit Hood Corps."

Hood Corps, another arm of St. HOPE, is a nonprofit organization based on an urban Peace Corps model that enlists high school students and recent graduates. The girl who spoke up in Yosemite also was a part-time Hood Corps volunteer.

Under federal AmeriCorps provisions, St. HOPE was required to report both allegations immediately, according to Marta Bortner, a spokeswoman for California Volunteers, the state office that channeled AmeriCorps grants to Johnson's Hood Corps. That never happened, she said.

After being shown Jones' child abuse report, California Volunteers on Tuesday turned the matter over to the inspector general for one of its umbrella organizations, the Corporation for National and Community Service.

Jones said the Sac High student was worried about telling people about Johnson because "he is a family friend, but I feel creeped out when he does this."

The girl's mother, asked to comment last week, said only "nothing happened" and hung up. The girl didn't respond to requests for comment.

## Investigation progresses

When the group returned to Sacramento from Yosemite, Jones said he knew he was legally bound to make a child abuse report so he asked Tabachnick to talk to administrators.

He said the school's response came from Hiestand, telling him to delay filing the report: "Hiestand told me, 'Before you fill anything out, we will conduct our own internal investigation.'"

Jones said he learned that the girl who made the allegation was summoned to a meeting, along with her mother, and questioned by Hiestand, Sac High Principal Lara Knight, and Lori Mills, a longtime friend of Johnson's and a top St. HOPE administrator. Jones' account of that meeting was confirmed by Tabachnick.

Neither Knight nor Mills responded to requests for comment.

As the internal investigation progressed, Jones said he grew increasingly concerned about his responsibility as a mandated reporter. He conferred with two friends, both of them now principals at other schools.

One, Allen Young, clearly recalled the conversation. Young, formerly Jones' principal at Sac High, is now principal at Met Sacramento Charter High School.

"Erik called me and told me this girl was groped and that St. HOPE was going to deal with it internally," Young said. "I said: 'You are a mandated reporter. This needs to get past anecdotal discussion.' I told him to call the Department of Justice.

"I watched Erik, pretty much in tears, calling in the report. He knew what it meant: He was finished at Sac High."

## Parent protests

When Lisa Wood's mother heard that Hiestand was questioning students, she told The Bee she sent an e-mail to Knight, the principal, saying that her daughter was not to be questioned without a parent present.

"I am shocked that parents have not been notified before students are questioned," Linda Hogg-Wood wrote on May 3.

Knight replied on May 7, "We did meet with a student last week regarding information she may know about an investigation we are conducting regarding allegations brought to our attention by a teacher."

Following that exchange with her mother, Lisa Wood said she was never questioned after all.

In a May 6 e-mail to Jones, Hiestand wrote: "We have concluded our investigation and management will take appropriate action based on our findings."

Meanwhile, on May 3 the Sacramento County District Attorney's Office notified the Police Department of Jones' child abuse complaint, according to police spokesman Sgt. Matt Young. The same day, Jones gave police a written version of his complaint.

The case was handled by Sgt. Don Buno, a sex crimes investigator. Jones gave Buno information about the other witnesses from Yosemite and passed along the name of the Hood Corps volunteer mentioned in his child-abuse report. He also said he told Buno of his concerns about Hiestand's internal investigation.

The Sacramento Police Department declined to release the actual police report. In an e-mail response to Bee questions, Young wrote that detectives interviewed "several people" but would not reveal their names because most were juveniles. Of the four Yosemite witnesses, only Jones said he was interviewed by police – the others said they were not contacted by police.

Johnson was another person left off the detectives' interview list. Asked why, Young responded: "There was no evidence indicative of criminal conduct on the part of Mr. Johnson."

Detectives also said they did not pursue the information Jones passed on about the young woman who left Hood Corps. They gave two reasons: She was not a juvenile and the allegation that Johnson tried to get into her bed "doesn't indicate conduct of a criminal nature."

   ShareThis

*Call The Bee's Terri Hardy, (916) 321-1073, or Dorothy Korber, (916) 321-1061. The Bee's Mary Lynne Vellinga contributed to this report.*

Sacramento mayoral candidate's non-profit now being examined by ...    http://www.politicker.com/california/2641/sacramento-mayoral-cand...

RSS Feeds

Send suggestions to:
editor@politicker.com

NEWS: CALIFORNIA                                April 20, 2009 - 02:30

## Sacramento mayoral candidate's non-profit now being examined by federal officials

By DAVID FINNIGAN

Federal officials on Friday began investigating Sacramento mayoral candidate and ex-NBA star Kevin Johnson's urban nonprofit Hood Corps following a Sacramento Bee story about sexual misconduct concerns surrounding two Hood Corps-connected teenagers.

The Bee reported Friday that a governor's office staff attorney confirmed that federal officials began their inquiry after seeing the newspaper's coverage. Federal officials will check out Hood Corps for possibly failing to report sexual misconduct allegations involving a teenage volunteer and a student.

Hood Corps receives AmeriCorps funding which is covered through the federal Corporation for National and Community Service, the agency handling the inspector general inquiry of Johnson's non-profit. Though Hood Corps received AmeriCorps funding from 2004 through 2007, the Bee said it currently does not get that funding.

The Bee's Friday story raised questions about the handling of a 17-year-old female student's claim, later recanted, that Johnson allegedly touched her inappropriately in 2007.

Johnson wants to unseat incumbent Sacramento Mayor Heather Fargo. On April 15, mayoral candidate Steve Padilla released a Phoenix police report about a 1995 investigation of alleged sexual misconduct involving Johnson and a minor in Arizona. No criminal charges were filed.

*David Finnigan can be reached via email at noreply@politicker.com.*

RELATED TOPICS: KEVIN JOHNSON, HEATHER FARGO

If you liked this article, subscribe to The Wake-Up Call. It's FREE!

## Comments

## Post new comment

Subject:

Comment: *

• Web page addresses and e-mail addresses turn into links automatically.
• Allowed HTML tags: <a> <p> <em> <strong> <cite> <code> <ul> <ol> <li> <dl> <dt> <dd> <p>
• Lines and paragraphs break automatically.

**More information about formatting options**

CAPTCHA

This question is for testing whether you are a human visitor and to prevent automated spam submissions.

Math Question: *
2 + 3 =
Solve this simple math problem and enter the result. E.g. for 1+3, enter 4.

Preview

**WOMEN GRANTS**

Free Government Grants for Women Only! GET YOUR FREE KIT TODAY!

Women Have the Largest Opportunity of Any Group to Benefit from Free Government Grants. Yet, Less than 15% of Women Ever Consider Applying for Free Government Grant Money!

www.TopGrantReporter.com                Ads by Google

WAKE UP CALL 

We read the papers
so you don't have to...

Sign up for the Wake-Up Call today.

California

[enter your email address]

Most Active Stories

1. (Maryland) It's quiz time again!
2. (Pennsylvania) From Conspiracy Theories To Cable News
3. (Alaska) The Ross letter: "I don't talk like that! I don't believe in that!"
4. (Texas) When Chinese Drywall attacks Texas home buyers
5. (Texas) 90% of Texans support Betty Brown's racist remarks
6. (Kentucky) Condoleezza
7. (Kentucky) Mongiardo already touting his "values"
8. (Alaska) Palin on judicial appointment process: "There may be reasonable steps that could be taken to improve it."
9. (Pennsylvania) Lil Ricky, Again. (Part I)
10. (Maryland) UPDATED: Del. Myers' son killed in accident



FUNDRAISING

EARN UP TO 50% PROFIT!

REQUEST MORE INFO

THE SACRAMENTO BEE  sacbee.com

This story is taken from Sacbee / Our Region

# Hood Corps probe expands

**dkorber@sacbee.com**

**Published Monday, Jun. 30, 2008**

The continuing federal investigation into St. HOPE's Hood Corps has expanded to more deeply scrutinize the volunteer program's use of public dollars, say those familiar with the probe.

Agents Jeffrey Morales and Wendy Wingers made a second visit to Sacramento in late May, after extending their initial stay in April by several weeks. They interviewed teen volunteers, parents, teachers and administrators affiliated with St. HOPE, the nonprofit that operates Hood Corps. They traveled to Humboldt County and West Point.

Initially, the agents were dispatched to Sacramento on April 24 to examine allegations of sexual misconduct, Hood Corps' mandatory church attendance and compulsory physical training – activities prohibited on the federal dime.

Federal officials would not talk about the Hood Corps investigation but said their rules are clear.

"No church on our time, and it cannot be required," said William O. Hillburg, a spokesman for the inspector general's office conducting the investigation. "No political activity at all on our time, and it can't be required. No residential requirement at all."

At issue is $807,000 in federal AmeriCorps money that Hood Corps collected from 2004 to 2007. Though funding for the program was not renewed last year, if theft of public funds is found, fines could be assessed and other federal funding withheld from every program administered by St. HOPE, according to Hillburg.

Kevin Johnson, former NBA star and current mayoral candidate, is St. HOPE's founder and served as CEO until this month. Johnson has built his political campaign on his efforts to improve Oak Park, from redevelopment to charter schools to the Hood Corps, which he has compared to an urban Peace Corps.

Neither St. HOPE nor Johnson responded to questions from The Bee about the investigation. Instead, they issued one-paragraph statements saying they were cooperating with the agents but could not comment on specifics until the probe is complete.

At a televised candidate forum in early May, Johnson was asked about the investigation. "I feel very confident in what St. HOPE has done," he said. "If St. HOPE did not do something as well as it should have, we would certainly rectify that immediately, but we'd have to hear back from them."

The federal investigation was sparked by a report of alleged sexual misconduct last year involving Johnson and two teen volunteers. That report, filed by a teacher at Sacramento

High School, was found to be without merit by police – but still became the catalyst for the investigation because it was not reported to AmeriCorps.

AmeriCorps currently has 75,000 volunteers – called "members" – serving in 4,100 nonprofits nationwide. Members are paid a small living allowance and, if they put in a specified number of hours, earn an education award for college: $4,725 for 1,700 hours over the course of a year.

About 100 programs currently are under investigation, according to Hillburg. His office is part of the federal Corporation for National and Community Service, one of AmeriCorps' umbrella organizations.

Agents are checking whether St. HOPE's Sacramento High School used Hood Corps funds to augment employee salaries, sources close to the investigation told The Bee.

Among those interviewed by the federal agents was Sheila Coleman, a dance teacher at Sac High and a Hood Corps member in 2005.

That year, Coleman received a salary of $20,225 from St. HOPE public schools plus a $13,000 living stipend for her Hood Corps work, according to documents obtained by The Bee through a public information act request.

Coleman did not return calls for comment.

Allen Young, Coleman's former principal, said the teacher worked full time in 2005 and her salary would have been approximately $35,000.

Young said he learned about St. HOPE's decision to tap into funds for Hood Corps volunteers during a budget meeting when an employee from St. HOPE Human Resources told him of the plan.

"She said we had 'X' amount of money to hire staff. She said some of Sheila Coleman's salary would be paid for from some other tab – Hood Corps," said Young, who also has been in contact with agent Morales. "I didn't give it a second thought. I thought it must be OK to do that."

Allison Alair, a former St. HOPE teacher and administrator, said she met with agent Morales in May and has exchanged e-mails with him since then.

Alair said Morales questioned her about her allegation that Johnson and Dana Gonzalez, a top St. HOPE executive, directed Hood Corps members to help her sell school uniform shirts. "From Day One, Kevin and Dana told me to use Hood Corps students if I needed anything done," she said.

Alair said Morales also asked questions about Johnson's role in Hood Corps.

"He wanted information on Kevin, on his position, on his power," Alair said. "He wanted me to tell him the chain of command and specific examples about how Kevin himself directed certain activities."

Such questions – aimed at nailing down who is responsible – are crucial in every investigation, according to Hillburg.

Hood Corps – short for "Neighborhood Corps – was founded in 1998 by Johnson as a cornerstone of his St. HOPE organization. He continued in an active role in the program during the AmeriCorps years, according to Hood Corps participants and St. HOPE documents.

In its original contract with AmeriCorps, Hood Corps said its volunteers would perform a range of community service including tutoring, public relations for the Guild Theater and art gallery, and managing "redevelopment of one building per year in Oak Park."

Some volunteers said those things were among their duties. But Jonathan Beacham, a full-time Hood Corps fellow in 2004, told The Bee that his main duty was to be assistant manager for Uncle Jed's Cut Hut, a barbershop operated by St. HOPE.

Others told investigators that their tasks differed greatly from the contract, including chauffeuring Johnson, washing a St. HOPE van and scrubbing the toilets at the nonprofit's Guild Theater, according to four former members who spoke to The Bee after talking to the agents.

Changing duties in that way is prohibited, according to Hillburg, because it can undermine the very aspects of a program that won it funding. "You must abide by the contract," he said.

In addition to conducting interviews, Morales and Wingers also are reportedly combing through documents – including timecards – gathered under federal subpoena.

Agents always look hard at volunteers' timecards, Hillburg said, considering them the only true measure of work done.

"They have to be signed by the member and by a supervisor," he said. "If you sign a wrong time sheet, that's fraud and a federal charge.

Tamara Shelton, a full-time 2005 member, said she told the agents she never filled out a time sheet.

"We never kept track – they did that for us," according to Shelton, who dropped out of the program after struggling with the physical training.

Depending on the agents' findings, AmeriCorps investigations can have heavy consequences.

If warranted, Hillburg said, the agency can place a nonprofit or individual employees under a temporary federal suspension, cutting off all federal funding until the probe is completed. After the conclusion of the case, federal officials also can yank federal funding for up to three years – a punishment known as "debarment."

Under debarment, Hood Corps and other St. HOPE programs – including Sacramento Charter High School and PS 7, which last year received $1.3 million in federal funds – could be placed on a national list barring them from receiving any type of federal money, including student lunch funding, student loans – even federally backed mortgages.

"I call it the 'pariah list,' " Hillburg said.

   ShareThis

*Call The Bee's Dorothy Korber, (916) 321-1061 or Terri Hardy at (916) 321-1073.*



The Web Site of The Sacramento Bee

This story is taken from Sacbee / News.

# Investigators turn St. HOPE report over to U.S. attorney

**By Dorothy Korber and Terri Hardy - dkorber@sacbee.com**
**Published 12:00 am PDT Friday, September 5, 2008**

Federal agents investigating the use of taxpayer dollars by Kevin Johnson's St. HOPE have turned the case over to the U.S. Attorney's Office in Sacramento, officials confirmed Thursday.

A spokesman for the agency conducting the probe said he could not comment specifically on the case. But, any " referral means that it's our opinion that there is some truth to the initial allegations, backed up by our investigation of the matter," said William O. Hillburg, spokesman for office of inspector general for the Corporation for National and Community Service.

Since the inspector general's office does not have prosecutorial authority, Hillburg said it depends on federal prosecutors to "decide whether it's a criminal or civil matter – essentially whether they want to put someone in jail or decide to get the money back. They might also say they can't handle it, because it doesn't meet their threshold for prosecution."

Federal agents were dispatched to Sacramento in April to examine Johnson's volunteer program, Hood Corps. They investigated whether the nonprofit misused federal funds, required volunteers to attend church and train for a marathon on the federal dime or mishandled allegations of sexual misconduct.

U.S. Attorney McGregor Scott confirmed Thursday evening that "we are in receipt of the Inspector General's report and we are... reviewing it."

Johnson, facing Sacramento's Mayor Heather Fargo in a November runoff, said in a statement released by his campaign: "Although we have not seen the report, we are confident that it will show only administrative mistakes that St. HOPE already has acknowledged. We look forward to the U.S. Attorney's review and will continue to cooperate fully."

Timothy Zindel, a local assistant federal defender, said it's unlikely that the inspector general's office would turn over the case if it was a "simple non-compliance matter."

"The U.S. Attorney wouldn't handle something like that, unless it's an issue of recovery of funds on the civil side," he said.

A decision on whether to file charges could take from days to months, Zindel said, but he added that because of public interest in the case the process might move faster.

Go to: Sacbee / Back to story

This article is protected by copyright and should not be printed or distributed for anything except personal use.
The Sacramento Bee, 2100 Q St., P.O. Box 15779, Sacramento, CA 95852
Phone: (916) 321-1000

Copyright © The Sacramento Bee



*Corporation for*
# NATIONAL &
# COMMUNITY
# SERVICE ★★★★

### VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED

September 24, 2008

Kevin Johnson, President
St. HOPE Academy
3400 Third Avenue.
Sacramento, CA   95817

Re:     **Grantee:**          **St. HOPE Academy**
        **Individual:**        **Kevin Johnson**
                               **President and former Chief Executive Officer**

**AmeriCorps Awards: State of California Grants**

| Number | Period of Funding | Federal Share |
|---|---|---|
| 03AFHCA002Y11-F102 | July 1, 2004-Dec. 31, 2005 | $271,009 |
| 03AFHY12-F102 | July 1, 2005-Dec. 31, 2006 | $277,651 |
| 06AFHY13-F102 | July 1, 2006-Dec. 31, 2007 | $258,674 |

### NOTICE OF SUSPENSION

Dear Mr. Johnson:

Under the Federal regulations on Suspension and Debarment, 2 CFR Parts 180 and 2200, the Corporation for National and Community Service (Corporation), an agency of the United States Government, hereby notifies you, as required under 2 CFR 180.615 and 180.715, of its decision to suspend you from participation in Federal procurement and nonprocurement programs and activities.[1] Your name will be entered into the Excluded Parties List System, thereby giving governmentwide effect to your suspension. This suspension is for a temporary period pending the completion of an investigation, or the conclusion of any legal or debarment proceedings resulting from the investigation. (See 2 CFR 180.760 for other details regarding the time limits for suspension.)

---

[1] For your information. by separate mailing to Mr. Jules Alcouffe. St. HOPE Academy, St. HOPE Academy also is suspended from Federal procurement and nonprocurement activities for the same reasons set out in this Notice.

       1201 New York Avenue, NW  ★  Washington, DC 20525
                202-606-5000  ★  www.nationalservice.org
        Senior Corps ★ AmeriCorps ★ Learn and Serve America



I have determined that there exists adequate evidence to suspect a cause for debarment listed under 2 CFR 180.800(b) through (d), and that immediate action is necessary to protect the public interest. This suspension is based upon information that I have received from the Corporation's Office of Inspector General (OIG) relating to the use of Corporation grant funds awarded to St. HOPE by the State of California, as listed above, as part of AmeriCorps grant funding for the period from September, 2004, through August, 2007. Although the OIG investigation is ongoing, thus far the information I have received is adequate to allow me to suspect that there has been on your part a willful failure to perform in accordance with the terms of a public agreement (2 CFR 180.800(b) (1)), and other causes of so serious or compelling a nature that it affects your present responsibility (2 CFR 180.800(d)). The evidence is adequate to suspect that you have committed irregularities which seriously reflect on the propriety of further Federal Government dealings with you.

St. HOPE's AmeriCorps application requested grant funds to support AmeriCorps members to tutor elementary and high school students, help redevelop one building a year in Oak Park, and coordinate logistics, public relations and marketing for the Guild Theatre and Art Gallery in Sacramento, CA.

Specifically, however, the evidence reveals that in your capacity as president and chief executive officer of St. HOPE Academy during the period of the referenced grants, you engaged in a pattern of conduct in which Corporation grant funds were diverted for uses outside the scope of the grant. This improper conduct is indicative of either a fundamental lack of understanding of how to administer Federal grant funds and policy, or the inability to do so. This conduct also may indicate a disregard for the terms of the grant agreement and the applicable cost principles, administrative, and prohibited activity regulations (2 CFR 230 (A-122); 45 CFR 2543; and 45 CFR 2520.65, respectively). The diversion of grant funds is so serious a violation of the terms of a grant agreement that immediate action via suspension is required to protect the public interest and restrict the offending parties' involvement with other Federally-funded programs and activities.

The evidence reveals that Corporation grant funds were diverted and used in the following manner:

*1. Recruiting students for St. HOPE Academy*
Evidence provided by OIG demonstrates that grant-funded AmeriCorps members were directed to actively recruit students for enrollment into St. HOPE Academy, which was outside the scope of the grant and therefore an impermissible activity.

*2. Political Activities relating to the Sacramento Board of Education Election*
Evidence provided by OIG demonstrates that St. HOPE improperly engaged grant-funded AmeriCorps members to participate in political activities relating to the election of candidates to the Sacramento Board of Education, in violation of the Corporation's AmeriCorps regulation prohibiting political activities. (45 CFR 2520.65 (a) (5) and (6)).

2

### 3. Traveling to New York to promote the expansion of St. Hope operations in Harlem

OIG evidence demonstrates that grant-funded AmeriCorps members were assigned to and participated in a trip to New York City from June 26 to July 16, 2006, to recruit students for a new charter school St. HOPE was planning to open in Harlem, and that the trip was not within the scope of the grant agreement. Therefore, it was an impermissible activity.

### 4. Personally Benefitting President and then-CEO Kevin Johnson

OIG investigators obtained evidence demonstrating that grant-funded AmeriCorps members were assigned to perform personal services for your personal benefit, including driving you to personal appointments, washing your car, and running personal errands which were outside the scope of the grant agreement and therefore impermissible.

### 5. Supplementing staff salaries by converting grant funds designated for AmeriCorps members

According to evidence provided by OIG, St. HOPE Academy enrolled two employees, Ms. Sheila Coleman and Mr. Diego Carillo, into the AmeriCorps program for the 2004/2005 grant year. Ms. Coleman's salary was then paid through the AmeriCorps program. In addition, she received a living allowance and an education award. Although St. HOPE continued to pay Mr. Carillo's salary, it was supplemented by both an AmeriCorps living allowance and an education award. Under Corporation-funded programs, only individuals serving in approved AmeriCorps positions are eligible for financial benefits, including living allowances and education awards, described in the regulations. (45 CFR 2522.240) Therefore living allowance costs and education award certifications associated with Ms. Coleman and Mr. Carillo employment were improper diversions of federal funds.

### 6. Performing Clerical and Front Office Duties

St. HOPE Academy improperly used members to perform non-AmeriCorps clerical and other services for the benefit of St. HOPE. OIG evidence demonstrates that grant-funded AmeriCorps members were diverted to serve as receptionists, perform clerical work, staff the school store and perform other routine clerical and cleaning duties to the benefit of the school, which were activities outside the scope of the grant and therefore were impermissible.

Based upon my review of the evidence discussed in this notice, I conclude that the evidence is adequate to suspect the existence of one or more causes for debarment and that immediate action is necessary to protect the public interest. Therefore, you are hereby suspended from participation in Federal procurement and nonprocurement programs and activities.

In accordance with 2 CFR 180.720-745, within 30 calendar days of your receipt of this notice, you may submit, in person, in writing, or through your representative, information and argument in opposition to this suspension, including specific facts that contradict the statements contained in this notice. The Corporation has been advised by the U.S. Attorney's Office that substantial interests of the government in pending or contemplated proceedings based on the same facts as the suspension would be prejudiced by conducting fact-finding. Therefore, as provided under 2 CFR 180.735(a)(4), no additional opportunity to challenge the facts will be permitted.

Please send all written correspondence to me at the following address:

> William Anderson
> Deputy CFO for Financial Management
> Corporation for National and Community Service
> 1201 New York Avenue, 8th Floor
> Washington, DC 20525

Please be aware that the Corporation's receipt of regular mail is slow due to the irradiation procedures that continue to be conducted by the U.S. Postal Service; to facilitate our receipt of any written correspondence you wish to send, you are encouraged to send correspondence via an alternative means—e.g. overnight mail or fax at 202-606-3467. Also, if you have any questions, or wish to arrange for an in-person presentation, please contact me at 202-606-6980.

Sincerely,

William Anderson
Debarment and Suspension Official
Corporation for National and Community Service

4



*Corporation for*
**NATIONAL &**
**COMMUNITY**
**SERVICE** ★★★

## *VI A CERTIFIED MAIL RETURN RECEIPT REQUESTED*

September 24, 2008

Dana Gonzalez,
Director of New Site and School Development
St. HOPE
3400 Third Avenue,
Sacramento, CA   95817

Re:    **Individual:    Dana Gonzalez**
**St. HOPE Director of New Site and School Development;**
**former Executive Director of**
**St. HOPE Academy**

**AmeriCorps Awards:  State of California Grants**

| Number | Period of Funding | Federal Share |
|---|---|---|
| 03AFHCA002Y11-F102 | July 1, 2004-Dec. 31, 2005 | $271,009 |
| 03AFHY12-F102 | July 1, 2005-Dec. 31, 2006 | $277,651 |
| 06AFHY13-F102 | July 1, 2006-Dec. 31, 2007 | $258,674 |

### NOTICE OF SUSPENSION

Dear Ms. Gonzalez:

Under the Federal regulations on Suspension and Debarment, 2 CFR Parts 180 and 2200, the Corporation for National and Community Service (Corporation), an agency of the United States Government, hereby notifies you, as required under 2 CFR 180.615 and 180.715, of its decision to suspend you from participation in Federal procurement and nonprocurement programs and activities.[1] Your name will be entered into the Excluded Parties List System, thereby giving governmentwide effect to your suspension. This suspension is for a temporary period pending the completion of an investigation, or the conclusion of any legal or debarment proceedings resulting from of the investigation. (See 2 CFR 180.760 for other details regarding the time limits for suspension.)

---

[1] For your information, by separate mailing to Mr. Jules Mccuffe, St. HOPE Academy also is suspended from Federal procurement and nonprocurement activities for the same reasons set out in this Notice.

   

I have determined that there exists adequate evidence to suspect a cause for debarment listed under 2 CFR 180.800(b) through (d), and that immediate action is necessary to protect the public interest. This suspension is based upon information that I have received from the Corporation's Office of Inspector General (OIG) relating to the use of Corporation grant funds awarded to St. HOPE by the State of California, as listed above, as part of AmeriCorps grant funding for the period from September, 2004, through August, 2007. Although the OIG investigation is ongoing, thus far the information I have received is adequate to allow me to suspect that there has been on your part a willful failure to perform in accordance with the terms of a public agreement (2 CFR 180.800((b) (1)), and other causes of so serious or compelling a nature that it affects your present responsibility (2 CFR 180.800(d)). The evidence is adequate to suspect that you, acting through St. HOPE's officers and employees, have committed irregularities which seriously reflect on the propriety of further Federal Government dealings with you.

St. HOPE's AmeriCorps application requested grant funds to support AmeriCorps members to tutor elementary and high school students, help redevelop one building a year in Oak Park, and coordinate logistics, public relations and marketing for the Guild Theatre and Art Gallery in Sacramento, CA.

Specifically, however, the evidence reveals that in your capacity as executive director of St. HOPE Academy during the period of the referenced grants, you engaged in a pattern of conduct in which Corporation grant funds were diverted for uses outside the scope of the grant. This improper conduct is indicative of either a fundamental lack of understanding of how to administer Federal grant funds and policy, or the inability to do so. This conduct also may indicate a disregard for the terms of the grant agreement and the applicable cost principles, administrative, and prohibited activity regulations (2 CFR 230 (A-122); 45 CFR 2543; and 45 CFR 2520.65, respectively). The diversion of grant funds is so serious a violation of the terms of a grant agreement that immediate action via suspension is required to protect the public interest and restrict the offending parties' involvement with other Federally-funded programs and activities.

The evidence reveals that Corporation grant funds were diverted and used in the following manner:

*1. Recruiting students for St. HOPE Academy*
Evidence provided by OIG demonstrates that grant-funded AmeriCorps members were directed to actively recruit students for enrollment into St. HOPE Academy, which was outside the scope of the grant and therefore an impermissible activity.

*2. Political Activities relating to the Sacramento Board of Education Election*
Evidence provided by OIG demonstrates that St. HOPE improperly engaged grant-funded AmeriCorps members to participate in political activities relating to the election of candidates to the Sacramento Board of Education, in violation of the Corporation's AmeriCorps regulation prohibiting political activities. (45 CFR 2520.65 (a) (5) and (6)).

*3. Traveling to New York to promote the expansion of St. Hope operations in Harlem*
OIG evidence demonstrates that grant-funded AmeriCorps members were assigned to and participated in a trip to New York City from June 26 to July 16, 2006, to recruit students for a new charter school St. HOPE was planning to open in Harlem, and that the trip was not within the scope of the grant agreement. Therefore, it was an impermissible activity.

*4. Personally Benefitting President and then-CEO Kevin Johnson*
OIG investigators obtained evidence demonstrating that grant-funded AmeriCorps members were assigned to perform personal services for Mr. Kevin Johnson's personal benefit, including driving him to personal appointments, washing his car, and running personal errands which were outside the scope of the grant agreement and therefore impermissible.

*5. Supplementing staff salaries by converting grant funds designated for AmeriCorps members*
According to evidence provided by OIG, St. HOPE Academy enrolled two employees, Ms. Sheila Coleman and Mr. Diego Carillo, into the AmeriCorps program for the 2004/2005 grant year. Ms. Coleman's salary was then paid through the AmeriCorps program. In addition, she received a living allowance and an education award. Although St. HOPE continued to pay Mr. Carillo's salary, it was supplemented by both an AmeriCorps living allowance and an education award. Under Corporation-funded programs, only individuals serving in approved AmeriCorps positions are eligible for financial benefits, including living allowances and education awards, described in the regulations. (45 CFR 2522.240) Therefore living allowance costs and education award certifications associated with Ms. Coleman and Mr. Carillo employment were improper diversions of federal funds.

*6. Performing Clerical and Front Office Duties*
St. HOPE Academy improperly used members to perform non-AmeriCorps clerical and other services for the benefit of St. HOPE. OIG evidence demonstrates that grant-funded AmeriCorps members were diverted to serve as receptionists, perform clerical work, staff the school store and perform other routine clerical and cleaning duties to the benefit of the school, which were activities outside the scope of the grant and therefore were impermissible.

Based upon my review of the evidence discussed in this notice, I conclude that the evidence is adequate to suspect the existence of one or more causes for debarment and that immediate action is necessary to protect the public interest. Therefore, you are hereby suspended from participation in Federal procurement and nonprocurement programs and activities.

In accordance with 2 CFR 180.720-745, within 30 calendar days of your receipt of this notice, you may submit, in person, in writing, or through your representative, information and argument in opposition to this suspension, including specific facts that contradict the statements contained in this notice. The Corporation has been advised by the U.S. Attorney's Office that substantial interests of the government in pending or contemplated proceedings based on the same facts as the suspension would be prejudiced by conducting fact-finding. Therefore, as provided under 2 CFR 180.735(a)(4), no additional opportunity to challenge the facts will be permitted.

Please send all written correspondence to me at the following address:

> William Anderson
> Deputy CFO for Financial Management
> Corporation for National and Community Service
> 1201 New York Avenue, 8th Floor
> Washington, DC 20525

Please be aware that the Corporation's receipt of regular mail is slow due to the irradiation procedures that continue to be conducted by the U.S. Postal Service; to facilitate our receipt of any written correspondence you wish to send, you are encouraged to send correspondence via an alternative means—e.g. overnight mail or fax at 202-606-3467. Also, if you have any questions, or wish to arrange for an in-person presentation, please contact me at 202-606-6980.

Sincerely,

William Anderson
Debarment and Suspension Official
Corporation for National and Community Service



*Corporation for*
**NATIONAL &**
**COMMUNITY**
**SERVICE** ★★★★

*VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED*

September 24, 2008

Jules C. Alcouffe
Registered Agent
St. HOPE Academy
1659 Greenbrier Road
West Sacramento, CA  95691

St. HOPE Academy
3400 Third Avenue,
Sacramento, CA · 95817

Re:    **Grantee:**          **St. HOPE Academy**

**AmeriCorps Awards:  State of California Grants**

| <u>Number</u> | <u>Period of Funding</u> | <u>Federal Share</u> |
|---|---|---|
| 03AFHCA002Y11-F102 | July 1, 2004-Dec. 31, 2005 | $271,009 |
| 03AFHY12-F102 | July 1, 2005-Dec. 31, 2006 | $277,651 |
| 06AFHY13-F102 | July 1, 2006-Dec. 31, 2007 | $258,674 |

### NOTICE OF SUSPENSION

Dear Mr. Alcouffe:

Under the Federal regulations on Suspension and Debarment, 2 CFR Parts 180 and 2200, the Corporation for National and Community Service (Corporation), an agency of the United States Government, hereby notifies you, as required under 2 CFR 180.615 and 180.715, of its decision to suspend St. HOPE Academy from participation in Federal procurement and nonprocurement programs and activities. This Notice is served upon St. HOPE Academy through you in your capacity as its Registered Agent. The name of St. HOPE Academy will be entered into the Excluded Parties List System, thereby giving governmentwide effect to your suspension. This suspension is for a temporary period pending the completion of an investigation, or the conclusion of any legal or debarment proceedings resulting from the investigation. (See 2 CFR 180.760 for other details regarding the time limits for suspension.)

  


I have determined that there exists adequate evidence to suspect a cause for debarment listed under 2 CFR 180.800(b) through (d), and that immediate action is necessary to protect the public interest. This suspension is based upon information that I have received from the Corporation's Office of Inspector General (OIG) relating to the use of Corporation grant funds awarded to St. HOPE by the State of California, as listed above, as part of AmeriCorps grant funding for the period from September, 2004, through August, 2007. Although the OIG investigation is ongoing, thus far the information I have received is adequate to allow me to suspect that there has been on St. HOPE's part a willful failure to perform in accordance with the terms of a public agreement (2 CFR 180.800(b)(1)), and other causes of so serious or compelling a nature that it affects your present responsibility (2 CFR 180.800(d)). The evidence is adequate to suspect that St. HOPE Academy, acting through its officers and employees, have committed irregularities which seriously reflect on the propriety of further Federal Government dealings with your institution.

St. HOPE's AmeriCorps application requested grant funds to support AmeriCorps members to tutor elementary and high school students, help redevelop one building a year in Oak Park, and coordinate logistics, public relations and marketing for the Guild Theatre and Art Gallery in Sacramento, CA.

Specifically, however, the evidence reveals that St. HOPE engaged in a pattern of conduct in which Corporation grant funds were diverted for uses outside the scope of the grant. This improper conduct is indicative of either a fundamental lack of understanding of how to administer Federal grant funds and policy, or the inability to do so. This conduct also may indicate a disregard for the terms of the grant agreement and the applicable cost principles, administrative, and prohibited activity regulations (2 CFR 230 (A-122); 45 CFR 2543; and 45 CFR 2520.65, respectively). The diversion of grant funds is so serious a violation of the terms of a grant agreement that immediate action via suspension is required to protect the public interest and restrict the offending parties' involvement with other Federally-funded programs and activities.

The evidence reveals that Corporation grant funds were diverted and used in the following manner:

*1. Recruiting students for St. HOPE Academy*
Evidence provided by OIG demonstrates that grant-funded AmeriCorps members were directed to actively recruit students for enrollment into St. HOPE Academy, which was outside the scope of the grant and therefore an impermissible activity.

*2. Political Activities relating to the Sacramento Board of Education Election*
Evidence provided by OIG demonstrates that St. HOPE improperly engaged grant-funded AmeriCorps members to participate in political activities relating to the election of candidates to the Sacramento Board of Education, in violation of the Corporation's AmeriCorps regulation prohibiting political activities. (45 CFR 2520.65 (a) (5) and (6)).

*3. Traveling to New York to promote the expansion of St. Hope operations in Harlem*
OIG evidence demonstrates that grant-funded AmeriCorps members were assigned to and participated in a trip to New York City from June 26 to July 16, 2006, to recruit students for a new charter school St. HOPE was planning to open in Harlem, and that the trip was not within the scope of the grant agreement. Therefore, it was an impermissible activity.

*4. Personally Benefitting President and then-CEO Kevin Johnson*
OIG investigators obtained evidence demonstrating that grant-funded AmeriCorps members were assigned to perform personal services for Mr. Johnson's personal benefit, including driving him to personal appointments, washing his car, and running personal errands which were outside the scope of the grant agreement and therefore impermissible..

*5. Supplementing staff salaries by converting grant funds designated for AmeriCorps members*
According to evidence provided by OIG, St. HOPE Academy enrolled two employees, Ms. Sheila Coleman and Mr. Diego Carillo, into the AmeriCorps program for the 2004/2005 grant year. Ms. Coleman's salary was then paid through the AmeriCorps program. In addition, she received a living allowance and an education award. Although St. HOPE continued to pay Mr. Carillo's salary, it was supplemented by both an AmeriCorps living allowance and an education award. Under Corporation-funded programs, only individuals serving in approved AmeriCorps positions are eligible for financial benefits, including living allowances and education awards, described in the regulations. (45 CFR 2522.240) Therefore living allowance costs and education award certifications associated with Ms. Coleman and Mr. Carillo employment were improper diversions of federal funds.

*6. Performing Clerical and Front Office Duties*
St. HOPE Academy improperly used members to perform non-AmeriCorps clerical and other services for the benefit of St. HOPE. OIG evidence demonstrates that grant-funded AmeriCorps members were diverted to serve as receptionists, perform clerical work, staff the school store and perform other routine clerical and cleaning duties to the benefit of the school, which were activities outside the scope of the grant and therefore were impermissible.

Based upon my review of the evidence discussed in this notice, I conclude that the evidence is adequate to suspect the existence of one or more causes for debarment and that immediate action is necessary to protect the public interest. Therefore, St. HOPE Academy is hereby suspended from participation in Federal procurement and nonprocurement programs and activities.

In accordance with 2 CFR 180.720-745, within 30 calendar days of your receipt of this notice, you may submit, in person, in writing, or through your representative, information and argument in opposition to this suspension, including specific facts that contradict the statements contained in this notice. The Corporation has been advised by the U.S. Attorney's Office that substantial interests of the government in pending or contemplated proceedings based on the same facts as the suspension would be prejudiced by conducting fact-finding. Therefore, as provided under 2 CFR 180.735(a)(4), no additional opportunity to challenge the facts will be permitted.

3

Please send all written correspondence to me at the following address:

> William Anderson
> Deputy CFO for Financial Management
> Corporation for National and Community Service
> 1201 New York Avenue, 8th Floor
> Washington, DC 20525

Please be aware that the Corporation's receipt of regular mail is slow due to the irradiation procedures that continue to be conducted by the U.S. Postal Service; to facilitate our receipt of any written correspondence you wish to send, you are encouraged to send correspondence via an alternative means--e.g. overnight mail or fax at 202-606-3467. Also, if you have any questions. or wish to arrange for an in-person presentation, please contact me at 202-606-6980.

Sincerely,

William Anderson
Debarment and Suspension Official
Corporation for National and Community Service



- <u>HOME</u>
- <u>KEVIN</u>
- <u>ISSUES</u>
- <u>THE FACTS</u>
- <u>ACTION</u>
- <u>TOWN HALL FORUM</u>
- <u>KJFM BLOG</u>

- <u>BIO</u>
- <u>VISION</u>
- <u>FAQs</u>
- <u>ENDORSEMENTS</u>
- <u>MEDIA</u>
- <u>CONTACT</u>

- <u>Reducing Crime</u>
- <u>Public Schools</u>
- <u>Finances & Leadership</u>
- <u>Economic Development</u>
- <u>GLBT Issues</u>
- <u>Kings Arena</u>
- <u>Quality of Life</u>

Search

- <u>April 2009</u>
- <u>March 2009</u>

February 2009
January 2009
December 2008
November 2008
October 2008
September 2008
August 2008
July 2008
June 2008
May 2008
April 2008
March 2008



# Checking in at Sac State

Tags: debate, kcra, kevin johnson, kxjz, sac state — kevin @ 4:46 pm

I'm a big fan of thinking outside of the box. That's why I'm excited about next Monday's debate at Sac State, which will focus on the issues of education, public safety, and jobs. This won't be a traditional debate. The sponsors, CSUS, KXJZ radio, and KCRA-TV, wanted to make it more lively, and have introduced a new format that's similar to the town meetings I've been holding across the city. The audience, compromised almost entire of Sac State students, will be quizzing the candidates.

Just to get a taste of what I might be in for at the debate, I stopped by the class taught by my campaign manager at Sac State last night and tackled some questions. Students asked me about the economy, the Wall St. bailout, racial profiling, and a variety of other issues. They didn't go easy on me, and we had a good exchange about the campus and the city's relationship to it.

I expect more of that next week. I hope you tune in to KCRA and KXJZ @ 630 p.m. next Monday to watch.

Comments (0)

# I Will Fight the Allegations Tooth and Nail

Tags: boys and girls club, corporation for national service, kevin johnson, mayor, sacramento — kevin @ 12:36 am

At the Sacramento Boys and Girls Club today, I had the chance to set the record straight on the politically-motivated allegations made by the Inspector General of the Corporation

for National Service, and made it clear I will fight them tooth and nail. Please take a minute to read my prepared remarks at the end of this message.

In addition, here's what Sacramento City Attorney Eileen Teichert told the Sacramento Bee today: "'We do not see anything that would preclude (the city) from having the ability to receive federal funds' with Johnson as mayor."

I began my campaign to become Mayor because I believe in the people of Sacramento and the greatest of our city.

From the calls coming into our headquarters today, there's little doubt that they will see what these allegations for what they are: titillating but untrue.

I have vowed to run a positive campaign and stick to the issues. I will continue to do that, and I am thankful for your support.

Text of Prepared Remarks:

Let me make a few things clear from the start:

I have cooperated with the federal government on this review from day one.

I have said all along that there may have been administrative errors.

As a small nonprofit working with a federal bureaucracy for the first time, we may have not dotted all the i's and crossed all the t's – just like the hundreds of other nonprofits that have been investigated by the Inspector General of the Corporation for National Service.

That's why I remain confident that the U.S. Attorney will decide not to proceed when it conducts a non-political review of the allegations.

The U.S. Attorney's Office does not have a website with "NEWSFLASH" across the top that's more fitting for the National Enquirer website than that of a federal government agency.

The U.S. Attorney's Office respects the law and only proceeds when it is purposely violated, not just to get headlines.

The U.S. Attorney's Office does not have a political agenda, and has a policy, in fact, of not making announcements on the eve of an election.

So rest assured: I will fight this suspension tooth and nail.

Today I've instructed attorneys to formally fight these crazy, meritless allegations.

And I am optimistic about the outcome.  Very optimistic.

Let me also say this: Despite some media reports and the opinions of some, I have been advised by experts in government contracting law that this will have no bearing on my role as Mayor.

None.

Under our system of city government, it's the city manager, not the Mayor, that engages with the federal government on contracts.

So you can rest assured that I will shake every tree in Washington for federal grants to help our city, and this will have no impact whatsoever.

I am no longer the CEO of St. HOPE.

Nonetheless, let me make it clear that St. HOPE Academy does not currently rely on any federal funding for any of its programs and has not sought or applied for federal funding for any of its programs in 2008.

Whatever the conclusion of the federal inquiry is, it should not impact St. HOPE Academy programs nor its ability to fundraise.

St. HOPE Academy and St. HOPE Public Schools are two separate and distinct legal entities with different boards of directors and different employees, with minimal overlap. Any findings found against St. HOPE Academy will not affect St. HOPE Public Schools.

To clarify, Sacramento High School and PS7 Elementary School will be not affected by any finding made against St. HOPE Academy or any of its former representatives. Therefore, the schools' federal funding will continue as it always has.

St. HOPE Academy will continue to revitalize inner city neighborhoods and impact the lives of young people by promoting public education, economic development, leadership training and arts enrichment.

And you know, that's the unfortunate thing here.

We've had several front page stories about allegations that have not been proven true – but none about the true stories about the lives of young people that have benefited from the AmeriCorps grants.

Young people like our St. HOPE graduate now at West Point, preparing to serve her nation.

And those at Stanford, UCLA, and UC Berkeley.

I came back to this city to do good, to give something back. That's why I started St. HOPE. And that's why I'm running for Mayor.

# THE SACRAMENTO BEE  sacbee.com
# The Swarm



**Mix it up with The Bee's editorial board.**

**October 27, 2008**

## US Attorney should resolve St. Hope and Johnson questions

Some labor unions that want to re-elect Sacramento Mayor Heather Fargo and defeat challenger Kevin Johnson are airing a bunch of misleading ads that say federal funds for school lunch and reading programs have been cut off at two charter schools run by Johnson's St. Hope organization . The ads appear to be flat out lies. According to the principal of St. Hope's Public Schools, federal funds continue to flow to both schools. A spokesperson for the Sacramento Unified School District says the district has received no confirmation of any cut off of federal funds to either.

Rumors of a cutoff began flying after Inspector General Gerald Walpin sent out a press release last month announcing the government was suspending all federal grants to Johnson's St. Hope organization because Johnson may have committed "potential criminal violations," But that investigation targeted only St. Hope Academy's Hood Corps (a domestic urban Peace Corps-type program), not its charter schools. The folks who put out the false ad must know that.

Walpin's report was refered to the U.S. Attorney's office for possible federal prosecution. When I asked him about the report last month, U.S. Attorney McGregor Scott told me that "he was"sensitive to the bigger picture," and promised to move "as expeditiously as we can in a professional manner to make the decisions required of us in a timely manner. " By timely, I had hoped Scott meant before the election. That's just nine days away now. It's been almost a month since IG Walpin made his highly sensational allegations public. Johnson says the charges are bogus. Nonetheless, Fargo supporters are exaggerating them to try to defeat Johnson. Parents and students are being alarmed needlessly

The U.S. Attorney could resolve this issue once and for all. In fairness to Johnson, Fargo, and the voters he should.

**Categories:** Ginger Rutland

**Tags:** Heather Fargo, Kevin Johnson, Sacramento mayor



Posted by **Ginger Rutland**
4:17 PM | Comments (6) |  SHARE
Recommend this story at Yahoo Buzz:

**THE SACRAMENTO BEE** sacbee.com

This story is taken from Sacbee / Our Region / Top Stories

# No criminal charges for Johnson's Hood Corps

**dwalsh@sacbee.com**

**Published Thursday, Nov. 06, 2008**

The results of an investigation of Mayor-elect Kevin Johnson and his nonprofit Hood Corps program lacked enough information to support criminal charges, according to U.S. Attorney McGregor Scott.

Scott, who announced his resignation last week effective Jan. 4, said he did not want to speak out before Tuesday's election to avoid any perception he was trying to influence voters.

He said a decision about whether to file civil charges, far more common in similar investigations of programs funded by the federal AmeriCorps volunteer program, awaits a results of an audit being conducted by the Office of the Inspector General.

The inspector general for the Corporation for National and Community Service investigated Hood Corps, an urban Peace Corps-style offshoot of Johnson's St. HOPE organization. Hood Corps received $807,000 in grant money from AmeriCorps.

In September, the Inspector General's Office said it had turned the results of its investigation over to the U. S. Attorney's Office. Then, later in the month, Inspector General Gerald Walpin released a broad outline of his findings.

Scott, however, said that the material submitted by Walpin's office fell short of proving criminal conduct on anyone's part.

"We have asked the investigating agency for information that would enable us to make an informed decision," Scott said. "We are still waiting for an answer."

He said the Inspector General's Office is conducting a "line-by-line audit" of Hood Corps.

"Hopefully, the results of that audit will tell us whether there is justification for a civil lawsuit to recoup misspent grant funds," Scott said.

William Hillburg, a spokesman for the inspector general, asked Wednesday about the status of Scott's request for more information, said, "We don't have any comment about this case as of now."

A summary of the inspector general's findings was released Sept. 25 in conjunction with an announcement that St. HOPE Academy, operator of Hood Corps; Johnson, St. HOPE's

No criminal charges for Johnson's Hood Corps - Sacramento News - ...                    http://www.sacbee.com/749/v-print/story/1376501.html

founder and former president; and Dana Gonzalez, former executive director of Hood Corps, had been suspended from access to all federal grants and contracts for up to a year or until the completion of the investigation.

In its written suspension, the corporation cited a number of alleged AmeriCorps grant violations, including diversion of federal funds.

The suspension said: "The diversion of grant funds is so serious a violation of the terms of the grant agreement that immediate action via suspension is required to protect the public interest and restrict the offending parties' involvement with other federal programs and activities."

Johnson's attorney, Matthew Jacobs, a former federal prosecutor, said Scott's reaction to the results of the investigation thus far "confirms what we have believed all along. That is, professionals who have the expertise to evaluate evidence would quickly conclude there is no criminal conduct here."

*Call The Bee's Denny Walsh, (916) 321-1189*

.S. attorney: No criminal case now against Johnson, Hood Corps - Sa...        http://www.sacbee.com/government/v-print/story/1378264.html

**THE SACRAMENTO BEE**  sacbee.com

This story is taken from Sacbee / Capitol and California / Government/Politics

# U.S. attorney: No criminal case now against Johnson, Hood Corps

**dwalsh@sacbee.com**

**Published Friday, Nov. 07, 2008**

The findings submitted to the U.S. attorney's office thus far from an investigation of Mayor-elect Kevin Johnson and his nonprofit Hood Corps do not warrant criminal charges, U.S. Attorney McGregor Scott said Thursday.

Scott said his office has asked for additional information and is awaiting an answer from federal investigators.

"No final decision has been made about whether there is any basis to proceed on either a criminal or civil front," Scott said.

He said a decision on a possible civil lawsuit – a more common outcome of investigations on the use of funds from the federal AmeriCorps program – awaits the results of an audit being conducted by the Office of the Inspector General for the Corporation for National and Community Service.

Inspector General Gerald Walpin last April began an investigation of Hood Corps, an urban Peace Corps-style offshoot of Johnson's St. HOPE organization.

In September, Walpin's office released the findings of that investigation, alleging Johnson and other St. HOPE officials had improperly diverted some of the $807,000 in federal grant money Hood Corps received between 2004 and 2007.

Citing the seriousness of the allegations, federal officials also announced St. Hope Academy, operator of Hood Corps; Johnson, St. Hope's founder and former president; and Dana Gonzalez, former executive director of Hood Corps, had been suspended from access to all federal grants and contracts for up to a year or until the completion of the investigation.

Walpin turned over the findings to the U.S. attorney's office for a decision on whether the violations cited by agents warranted criminal charges or financial penalties.

But Scott said this week the material submitted by Walpin's office fell short of proving criminal conduct on anyone's part.

"We have asked the investigating agency for information that would enable us to make an informed decision," Scott said. "We are still waiting for an answer."

He also said the inspector general's office is conducting a "line-by-line audit" of Hood Corps.

"Hopefully, the results of that audit will tell us whether there are grounds for a civil lawsuit to recoup misspent grant funds," Scott said.

William Hillburg, a spokesman for the inspector general, said Thursday he could not confirm his office was doing an audit and could not comment on the investigation.

Johnson's attorney, Matthew Jacobs, a former federal prosecutor, said Scott's reaction "confirms what we have believed all along. That is, professionals who have the expertise to evaluate evidence would quickly conclude there is no criminal conduct here."

If Scott's office decides there have been only administrative infractions, the matter would be passed back to the Corporation for National and Community Service, which could seek reimbursement of all or part of the grant money, and could claim damages up to three times the amount alleged to have been misused.

Johnson was not available Thursday to comment. His spokesman, Steve Maviglio, said, "The case is essentially meritless from the criminal point of view. We thought there might be some administrative fines, and we're prepared for that."

Frederic Levy, a Washington, D.C., attorney and expert in government contracting and compliance, said prosecutors "look to whether violations were knowing and intentional. The fine print in these grants is sometimes so arcane that inadvertence comes into play."

In its written suspension barring Johnson from receiving federal funds, the corporation cited a number of alleged grant violations, including diversion of funds.

"The diversion of grant funds is so serious a violation of the terms of the grant agreement that immediate action via suspension is required to protect the public interest and restrict the offending parties' involvement with other federal programs and activities," the suspension said.

Hillburg said Scott's preliminary analysis of the investigation does not affect the suspension. "It remains in effect," he said.

Among the specific violations cited in the inspector general's September release:

• Misusing AmeriCorps members, financed by federal grant funds, to personally benefit Johnson, including driving him to personal appointments, washing his car and running personal errands.

• Unlawfully supplementing St. HOPE school staff salaries with federal grant funds by enrolling two employees in the AmeriCorps program and giving them federally funded living allowances and education awards.

• Improperly using members for banned political activities, namely canvassing for school board candidates.

• Misusing AmeriCorps members to recruit students for St. HOPE's charter schools.

*Call The Bee's Denny Walsh, (916) 321-1189.*

**THE SACRAMENTO BEE** sacbee.com

This story is taken from Sacbee / Our Region / Sacramento Mayor

# Johnson builds volunteer team, wants more staff

**rlillis@sacbee.com**

**Published Tuesday, Jan. 27, 2009**

Sacramento Mayor Kevin Johnson is exploring whether he can raise money to beef up his full-time staff. In the meantime, he's already amassed a team of volunteers that dwarfs the staffs of any of his recent predecessors.

In addition to his four full-time paid staffers, Johnson has 12 volunteers working closely with him on issues including the city's finances, education and media relations.

Six of the volunteers have a connection to Johnson's pre-City Hall life: They either attended Sacramento Charter High School or worked with St. HOPE, the education and development organization that Johnson founded.

The mayor says the team of volunteers is part of his "gung ho" plan to add "capacity for the city to get things done."

"If we think about effective government and you look around the country at what other cities are doing, they're able to bring additional resources in, people who are volunteering," Johnson said last week in a meeting with The Bee's editorial board.

Beyond his volunteer team, the mayor said he is exploring whether he can raise money to pay for additional full-time staff members within his office.

That proposal would require City Council approval, said City Attorney Eileen Teichert. So far, it has not been brought to the council.

Still, Johnson said the idea is being met with enthusiasm outside City Hall.

"People want to take a year off and work for the city if I could raise the dollars because they want to give back to their city for a year or two," he said. "And these are neat things for our city to experience, especially when you have a down economy."

There are regulations in place for using donations to pay for city staffers.

According to the California Fair Political Practices Commission, the mayor's office would have to identify those who donate more than $5,000 a year toward the cause and staff members would be required to fill out economic interest statements.

Those same rules do not apply to city volunteers.

Each of the city's 2,800 volunteers – including the dozen working for the mayor – has filled

Johnson builds volunteer team, wants more staff - Sacramento News ...          http://www.sacbee.com/734/v-print/story/1575536.html

out a "volunteer interest and agreement form," according to city spokeswoman Amy Williams. The form asks for volunteers' professional background, education and whether they have been convicted of a crime.

City officials said Monday they are working to provide The Bee with copies of the forms signed by the mayor's volunteers.

Neither a conflict of interest form nor statement of economic purpose is part of the volunteer process. Councilwoman Sandy Sheedy said she planned to ask Teichert at today's council meeting to examine the city's volunteer policy and consider whether conflict of interest forms should be included.

"Volunteers also have conflicts of interests," Sheedy said.

The mayor's volunteers do not have unfettered access to City Hall. They must check in at the building's security desk and wear visitor's passes.

Many on the mayor's volunteer team spend much of their time working in a third-floor work space. The office is two floors beneath the offices of the mayor and council and is one of the few in City Hall not separated from the rest of the building by a locked door.

The mayor said he has worked with City Manager Ray Kerridge and Teichert "to provide full transparency and disclosure for all our volunteers."

"I also welcome citizens who care so much for their community that they will volunteer their time to join the four staff members I have with the huge task of helping move our city forward – particularly when we have a $58 million deficit and greater demands on city government," the mayor said in a statement.

One of the mayor's volunteers is Dana Gonzalez, a former St. HOPE official who, along with Johnson, was banned last year from accessing federal funding while an investigation takes place into St. HOPE's use of federal grant money.

Gonzalez is one of the more visible faces of the mayor's volunteer team, attending many meetings and volunteering on nearly a full-time basis.

Steve Maviglio, the mayor's spokesman during the campaign, is also a volunteer and has continued handling media responsibilities since Johnson was sworn in nearly two months ago. He is also the spokesman for the campaign trying to get a strong-mayor measure on a future ballot.

Other volunteers include Denise Merano, a board member of St. HOPE Academy; Michelle Smira, who runs her own political affairs firm; Tracy Stigler, the vice chair of the St. HOPE Public Schools board and a former project manager at Buzz Oates Realty; Ting Sun, founder of the Natomas Charter School; Becky Warren, a media specialist with Mercury Public Affairs; and Nicole West, a former program director at St. HOPE who also worked on the mayor's campaign.

ShareThis

*Call The Bee's Ryan Lillis, (916) 321-1085.*

THE SACRAMENTO BEE

This story is taken from Sacbee / Our Region / Top Stories

# Mayor's status may imperil Sacramento's federal stimulus funds, lawyer says

**rlillis@sacbee.com**

**Published Saturday, Mar. 21, 2009**

The city of Sacramento likely is barred from getting federal money – including tens of millions the city is expecting from the new stimulus package – because Mayor Kevin Johnson is on a list of individuals forbidden from receiving federal funds, according to a leading attorney the city commissioned to look into the issue.

Federal authorities placed Johnson and the nonprofit Hood Corps organization he founded on the federal list last year – before he was elected mayor – following a preliminary investigation into allegations that the urban Peace Corps-style program had misused federal funds. Federal officials said the allegations were so serious the funding suspension was warranted.

Shortly after Johnson's election last November, City Attorney Eileen Teichert hired Frederic M. Levy – regarded as an expert on government contracting and compliance – to determine whether Johnson's inclusion on that list posed an issue for the city when it sought federal funding. Teichert had said before the election she thought Johnson's inclusion on the list would not threaten the city's access to federal aid.

Levy's response is laid out in a confidential memo, obtained by The Bee, that was distributed this week to City Council members.

The question, he said, is whether federal agencies consider the mayor a "principal" in city financial decisions; if the answer is yes, he wrote, it would "prevent the City from obtaining ... federal grants, subsidies, or cooperative agreements."

Levy concludes that Johnson, in his role as mayor, likely would be found to be a principal, meaning he is "in a position to influence the use of federal funds."

So far, federal agencies have continued to grant funding to the city. But Levy's memo suggests the $44.2 million in aid the city has received or been allocated since Johnson took office in December could be at risk.

"Obviously, I'm concerned about the federal funds that we have received to this point," City Manager Ray Kerridge told The Bee.

Teichert wrote in a separate memo that "it may be appropriate for the mayor to abstain from ... any decisions involving City projects for which federal funding may or will be sought."

Johnson declined an interview request Friday. In an e-mailed statement, he said he is

confident the issue can be resolved quickly.

"I believe, as the City Attorney did in September, that there will ultimately be zero impact on the city's eligibility to receive the federal funds that Congresswoman Matsui, Governor Schwarzenegger, our U.S. Senators, and I are working hard to deliver to our city," he wrote. "I am optimistic this will be resolved positively in short order."

Top city officials will meet Wednesday to discuss the issue.

Levy, a Washington, D.C., attorney, provided his opinion March 13 and a copy of his memo was forwarded to Johnson and members of the City Council this week.

Johnson and officials with Hood Corps improperly used some of the $807,000 in federal grant money the organization received between 2004 and 2007, according to allegations released in September following an investigation by the Office of the Inspector General for the Corporation for National and Community Service. The corporation oversees AmeriCorps, the program that helped fund Hood Corps.

In response, federal officials placed St. HOPE Academy, operator of Hood Corps; Johnson, who was St. HOPE's founder and former president; and Dana Gonzalez, Hood Corps' former executive director and now a mayoral volunteer, on an Excluded Parties List, meaning they were suspended from access to federal grants and contracts for up to one year or until the case is resolved.

The federal audit of Hood Corps' use of funds is ongoing. A spokesman for the Office of the Inspector General declined to say when the review would be finished.

"We can't comment on any ongoing case," spokesman William Hillburg said.

Last year, the U.S. attorney's office in Sacramento determined the findings turned over by the Inspector general did not warrant criminal charges. The U.S. attorney requested additional information, and held out the possibility of filing a civil action, pending the results of the audit.

"There continues to be ongoing and considerable negotiations between this office and representatives of St. HOPE Academy and Mayor Johnson to resolve allegations of improperly expended federal grant funds," acting U.S. Attorney Lawrence Brown said Friday.

Matt Jacobs, the attorney representing Johnson, said he would expect any settlement to include Johnson's removal from the suspension list.

"That would certainly be something that we would try to obtain," he said.

Malcolm Segal, an attorney for St. HOPE also considered an expert on government contracts, said he would be surprised if the city was ruled ineligible to obtain federal funding, arguing the mayor has a limited role in policy direction.

"The city manager is responsible for the reporting and auditing of the uses of federal funds," he said. "Hopefully, this dispute with the AmeriCorps program will be resolved shortly to the satisfaction of all parties and the suspension lifted."

According to Levy's memo, the city must notify all federal agencies of Johnson's inclusion on the Excluded Parties List or it could face "severe sanctions."

Levy also said the city faces potential risk by allowing Gonzalez – the former Hood Corps executive director also on the excluded list – to work as a mayoral volunteer.

City officials said Friday they have not yet notified federal agencies of Johnson's suspension.

3/21/2009 6:11 PM

http://www.sacbee.com/topstories/v-print/story/1717767.htm

On Thursday, the Sacramento Area Council of Governments voted to seek $20 million in federal economic stimulus funds for the city of Sacramento this year to help kick-start redevelopment of the downtown railyard. Johnson heralded that as a huge step forward.

SACOG officials said Friday they would use the money for another project if the city doesn't qualify under federal rules.

Sacramento Rep. Doris Matsui issued a statement Friday saying she was trying to get clarification from city officials on the extent of the potential problem.

"I have been working tirelessly to get Sacramento funding," she e-mailed The Bee. "I'm concerned if federal funding for our community is in jeopardy."

Councilman Kevin McCarty said Levy's conclusions "could have major impacts on the city."

"We're counting on those dollars," he said. "We're counting on those to put people back to work and invest in our city. Everything that could jeopardize receiving those dollars is something we should take very seriously."

According to Levy, the city has several options.

City officials can attempt to have Johnson's suspension lifted, which he said would require the mayor to convince authorities that the allegations are not true. The city also may be able to appease the Corporation for National and Community Service by offering to train the mayor and council on the rules governing the use of federal grant funds.

The city also could seek written exceptions from federal agencies on a case-by-case basis.

In doing so, the city likely would need to convince federal agencies that the mayor's role in administering federal funding is minimal by pointing out that he is one vote of nine on the City Council.

A third would be for the city to redefine the mayor's role under the city charter to indicate the mayor has no influence or control over federal funds.

Johnson has proposed going the opposite direction, calling for changes in the city charter that would increase the mayor's powers over hiring and budgeting.

The proposal ran into political opposition in some quarters, and a council-appointed commission is reviewing alternatives.

Levy directly addressed the strong-mayor initiative in his memo, saying the city's chances of receiving case-by-case waivers would be harmed if the proposal were approved.

Levy, who testified last month before a House committee about the federal suspension list as it pertains to federal aid, did not return a phone call seeking comment.

Teichert also declined to comment.

   ShareThis

---

*Call The Bee's Ryan Lillis, (916) 321-1085.*

STEVENS, O'CONNELL & JACOBS LLP

ATTORNEYS

400 CAPITOL MALL, SUITE 1400
SACRAMENTO, CALIFORNIA 95814-4498

www.sojllp.com

TELEPHONE: (916) 329-9111
FACSIMILE: (916) 329-9110

MATTHEW G. JACOBS
mgj@sojllp.com

March 16, 2009

*By Hand Delivery*

*Privileged Settlement Communication*

Kendall J. Newman
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814

Re:    St. HOPE Academy

Dear Ken:

On behalf of St. HOPE Academy and Mayor Kevin Johnson,[1] thank you for giving us the opportunity to present information regarding the good works performed by the Neighborhood Corps, known colloquially as "Hood Corps," in carrying out the 2004-2007 AmeriCorps awards (the "Grants").[2]

As you and I have discussed, the purpose of this submission is threefold: (1) to establish that at least a large portion of the monies provided to St. HOPE Academy ("St. HOPE") pursuant to the Grants was utilized to perform services within the scope of work of those Grants; (2) to establish St. HOPE's poor current financial condition; and (3) to demonstrate through accounting records the specifics of how St. HOPE spent the grant monies. This submission accomplishes the first two objectives. We have not yet been able to fully accomplish the third objective, although we are willing to continue trying, and are happy to cooperate with your Office in doing so. However, we hope that the extent to

---

[1] As you know, I represent Mayor Johnson. The letter is written under my signature only because other counsel have been engaged in other cases and are unable to participate in the short time we have had to respond to your request for information since you and I first spoke.

[2] The Grants consist of State of California Grant numbers 03AFHCA002Y11-F102 (July 1, 2004-Dec. 31, 2005) (attached as Exhibit A); 03AFHY12-F102 (July 1, 2005-Dec. 31, 2006) (attached as Exhibit B); and 06AFHY13-F102 (July 1, 2006-Dec. 31, 2007) (attached as Exhibit C).

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 2

which we have accomplished the first two tasks will eliminate or at least lessen the government's need to have us complete the third task, since the real issue is (or should be) whether St. HOPE did, indeed, pursue the Grants' objectives (it did), not whether we can now go back and trace every grant dollar to each of its ultimate recipients.[3]

I.    Most, if Not All, of Hood Corps' Work Was Within the Scope of the Grants.

When we first spoke last month, you expressed concern that you had no evidence that any Hood Corps members had done any work that was within the scope of the Grants. I can now assure you, based on our own investigation, that all or virtually all of the work performed by Hood Corps members was indeed within that scope. More specifically, our research and investigation has shown that Hood Corps members performed extensive work during the life of the Grants that directly and substantially benefited many at-risk students at PS7 and Sacramento High School, the Oak Park community as a whole, and the Hood Corps members themselves, and that as described below, Hood Corps activities fell squarely within the scope of the Grants and touched many lives in the process.

Scope of the Grants Generally

The Grants themselves establish the scope of work that Hood Corps members were to perform. The third numbered paragraph of the California Service Corps Policies and Requirements attached to the Grants, titled "Scope of Work," states, "For the purposes of this agreement, the Scope shall be deemed to be the objectives, deliverables, and commitments contained in Exhibit D, 'AmeriCorps Title Page/Program Narrative/Performance Measures.'"[4] In turn, the AmeriCorps Title/Page/Program Narrative/Performance Measures (the "Narratives") define the scope of work broadly, but focus on four main categories: (1) tutoring and academic assistance at PS7 Elementary School and Sacramento High; (2) increasing arts and cultural programming in Oak Park; (3) engaging in economic development activity in Oak Park; and (4) training Hood Corps members in civic leadership. (See Exs. A-C, Narratives).

---

[3]In that regard, it is not unusual for non-profit agencies, and even public agencies, not to be able to re-create exactly how they spent grant funds. See, e.g., Editorial, "The 20 % Coercion; A Gift from one Agency to Another," San Diego Union-Tribune (Feb. 28, 2009) (copy attached as Ex. D). I am sure that the agency charged with administering the AmeriCorps grants would so attest.

[4]Since most material provisions of the Narratives are identical, we reference them collectively. We note any relevant material differences.

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 3

The Narratives, and thus the scope of work, define Hood Corps' mission:

> [Hood Corps] is an inner-city service program that educates,
> trains and empowers individuals to become civic leaders in
> order to further educational and economic development efforts
> in the Oak Park community. Hood Corps is part of St. HOPE
> Academy, a faith-based, nonprofit community development
> corporation dedicated to revitalizing inner-city communities
> through public education, civic leadership, economic
> development, and the arts.

(Exs. A-C, Narratives, Mission). As set forth below, the Narratives further define the scope of work in each category listed in the mission statement, but allow significant breadth with respect to permissible activity under the Grants.

Given the flexibility and breadth of the scope of work defined in the Narratives and approved by the government, the Corporation for National and Community Service's Notice of Suspension ("Suspension Notice" attached as Exhibit E) defines the scope of work too narrowly. It states, "St. HOPE's AmeriCorps application requested grant funds to support AmeriCorps members to tutor elementary and high school students, help redevelop one building a year in Oak Park, and coordinate logistics, public relations and marketing for the Guild Theater and Art Gallery in Sacramento, CA." While this statement is true as far as it goes, it does not accurately encompass the extent of the permissible scope of work. Rather, the Narratives provide Hood Corps with flexibility to achieve the goals pertaining to public education, arts enrichment, economic development, and civic leadership. I now discuss each of these categories in turn, along with the evidence establishing that Hood Corps members did indeed fulfill these goals.

### Public Education

The scope of work with respect to the general category of public education is scattered throughout the Narratives, and is articulated in several different ways. However, everyone would probably agree that tutoring was an essential ingredient of the Grants' public education component.[5] For example, the Narratives provide that Hood Corps

---

[5] But tutoring is not the only public education activity within the scope of work. For example, pages 13-15 of the 2006-2007 Narratives provide, "Students will participate in tutoring and academic support interventions." (Ex. C). Moreover, they explain that Hood Corps members will act as Teaching Assistants: "[f]ive members will support designated classroom teachers who are working with struggling students by providing individual and small group instruction, designing and teaching lessons, administering assessments, monitoring attendance, and grading, for up to 5 hours per day." (*Id.*) Thus, the permissible scope of work goes beyond tutoring.

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 4

members will provide "one-on-one tutoring to elementary and high school students." (Exs. A-C, Narratives, Summary of Program Design). Our conversations with the principal of PS7 Elementary School ("PS7") and several former Hood Corps members confirm that Hood Corps members did indeed spend many, many hours engaged in direct, one-on-one, tutoring.

For example, Herinder Pegany, Principal of PS7 explained the tutoring process for Hood Corps members during the period of the Grants. (March 9, 2009 E-mail from Herinder Pegany, Ex. F ("Pegany E-mail")). Principal Pegany directly supervised the Hood Corps tutors at PS7. (Id.) Indeed, before any tutoring began, Principal Pegany personally trained the Hood Corps tutors, drawing on his knowledge as an education consultant and teacher. (Id.) Teachers were also directly involved in tutoring logistics; they often created and disseminated to Hood Corps members individually tailored tutoring plans for struggling PS7 students. (Id.) Principal Pegany ensured consistency and structure by matching up students with individual Hood Corps tutors who would tutor the same students for extended periods of time. (Id.)

This tutoring occurred after school, and each student in the program received Hood Corps tutoring four days a week. (Id.) Page 15 of the 2006-2007 Narratives shows that Hood Corps members and volunteers (e.g., Hood Corps Interns) tutored 147 students in 2004-2005 and 222 in 2005-2006. (Ex. C). Further, Principal Pegany recalled that there were typically between six and ten Hood Corps members present and tutoring on any given day during the school year. (Pegany E-mail). He also informed us that the Hood Corps members were focused and on task the vast majority of time while tutoring at PS7, and they knew that getting off track or failing to show up would only hurt the students who relied on them. (Id.) "The whole Hood Corps program emphasized responsibility and being a leader." He explained that the Hood Corps members were a constant presence on campus and that they worked hard and showed serious commitment. (Id.)

Principal Pegany found that the Hood Corps tutoring efforts were significantly beneficial on two main fronts. First, the tutored students' academic performance improved as a result of the tutoring. (Id.) For example, California requires that all schools reach an API[6] level of 800 on a 1000 point scale by 2014. (Id.) Oak Park schools scored an average API Base Score of 625 for the 2002-2003 school year. (Exs. A-C, Narratives, Needs and Services Activities). During the Hood Corps' tutoring efforts, however, PS7's API score consistently improved, to 638 in 2004, 737 in 2005, 744 in 2006, and to 749 in 2007. (Ex. G). Notably, PS7 recently achieved an 802 on the API scale – a full five years before the California deadline. (Pegany E-mail). Principal Pegany stated that the Hood Corps tutors

---

[6]"API" is short for Academic Performance Index, and is measured though standardized tests in California. See http://www.cde.ca.gov/ta/ac/ap/glossary08b.asp#ga3.

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 5

deserve a significant amount of credit in helping to achieve these results, among others.[7] (*Id.*) He particularly noted improvement in the students' reading and language skills, which he attributes in part to the Hood Corps' tutoring efforts. (*Id.*) Second, the students themselves cherished the presence of the Hood Corps members and looked up to them as role models. Principal Pegany stated that it was helpful to have such positive role models for his underserved students to emulate and interact with. He explained that the Hood Corps members could often communicate ideas to the students more effectively than teachers given their closer proximity in age. (*Id.*) In all, Mr. Pegany believes that the Hood Corps' tutoring efforts greatly benefited his students. (*Id.*)

Over the last two weeks, we also spoke with several former Hood Corps members. They universally and unequivocally stated that Hood Corps members not only participated in tutoring on a daily basis, but that they did so with enthusiasm and focus. (*See* March 4, 2009 E-mail from William DuBose, Ex. H ("DuBose E-mail"); March 16, 2009 E-mail from Jimmy Haynie, Ex. I ("Haynie E-mail"); March 6, 2009 E-mail from Charles Hudson, Ex. J ("Hudson E-mail"); March 6, 2009 E-mail from Dominique Donette, Ex. K ("Donette E-mail"); March 10 E-mail from Jeremy Hagstrom, Ex. L ("Hagstrom E-mail"); March 12, 2009 oral confirmation from Brandi Sanders, Ex. M ("Sanders E-mail"). The majority of Hood Corps tutoring took place at PS7, with some tutoring taking place at Sacramento High. (*See* DuBose E-mail and Donette E-mail). The former Hood Corps members confirmed that tutoring occurred every day after school, and that they engaged in one-on-one tutoring as well as group tutoring where appropriate. (*Id.*)

As an example, we spoke with 2004-2005 Hood Corps Intern William DuBose, and our conversation with him confirmed that Hood Corps met the tutoring goals outlined in the Narratives. (DuBose E-mail). He explained that he tutored at PS7 nearly every day during the 2004-2005 school year from the time school got out until five or six o'clock in the evening. (*Id.*) While present at PS7, DuBose and the other Hood Corps members were focused and on task, and spent virtually all of their time actually tutoring students. (*Id.*) Mr. DuBose also believes the students he tutored benefited directly from the experience, and he recalls a once-shy student approaching him excitedly to proudly proclaim that he had received an "A" on a test in a subject matter in which Mr. DuBose had tutored him. (*Id.*) He often reminded and encouraged the students to study hard because "grades represent smiles." (*Id.*)

We also spoke with 2005-2006 and 2006-2007 Hood Corps member Charles Hudson. (Hudson E-mail). Mr. Hudson confirmed that he took tutoring very seriously and spoke very highly of other Hood Corps members' commitment and focus. (*Id.*) Specifically, Mr. Hudson tutored at PS7 nearly every day of the week from about three o'clock to five-thirty in the afternoon. (*Id.*) At least ninety percent of Mr. Hudson's time at PS7 was spent

---

[7] For example, in 2005-2006, students with a documented truancy record in 2004-2005 increased their rates of attendance by 80 percent. (Ex. C, Narratives, p. 15).

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 6

actively tutoring students. (*Id.*)  Moreover, he confirmed that almost all of the other Hood
Corps members with whom he tutored spent their time on task and actively tutoring PS7
students.  (*Id.*)  Each Hood Corps member told the same story regarding tutoring at PS7;
that is, that the Hood Corps members were dedicated and on task, and that the students
benefited significantly from the experience. (*See* Exs. H-M).

In sum, Principal Pegany's recollection is consistent with the experience described by
every former Hood Corps member with whom we spoke.  It is unfortunate that the evidence
in your possession does not disclose the undeniable truth that Hood Corps maintained a
constant presence at PS7 on a regular and consistent basis.  In
addition, the students' academic performances improved as a result of Hood Corps tutoring
efforts.  In sum, Hood Corps not only complied with the educational objective in the
Grants, it did so with enthusiasm, focus, and ultimately, with success.

<u>Arts Enrichment</u>

The Grants also set forth the scope of work with respect to arts enrichment.  The
Narratives state broadly that Hood Corps expects "to increase arts programming in Oak
Park." (Exs. A-C, Narratives, Expected Impact).  Further, as the Suspension Notice notes,
Hood Corps members were supposed to "coordinate logistics, public relations and
marketing for the Guild Theater and Art Gallery in Sacramento, CA." (Suspension Notice,
at 2).  However, as it does with respect to the public education component of the Grants, the
Suspension Notice neglects to mention other clearly permissible work under the scope of
work, including coordinating "hands-on workshops, guest artist lectures, and art exhibitions
for Sacramento High School of the Arts and PS7 Elementary School." (Exs. A-C,
Narratives, Summary of Program Design).  Our investigation shows that Hood Corps fully
complied with these provisions of the Grants.

Kim Curry-Evans, Director of the 40 Acres Art Gallery in Oak Park (the "Gallery"),
supervised the Hood Corps members in connection with their work at the Gallery during
the 2004-2007 period. (March 5, 2009 E-mail from Kim Curry-Evans, Ex. N ("Curry E-
mail")).  (The Gallery is a non-profit St. HOPE program devoted to benefiting the
community by making art more accessible.)  As a general proposition, she stated that the
Hood Corps members were her "arms and legs," and that they worked hard at the Gallery
without exception.  (*Id.*)  Hood Corps members coordinated much of the logistics work for
the Gallery during this period, including day-to-day operational activities, setting up and
taking down exhibits, helping with workshops, and marketing.  (*Id.*)  Hood Corps members
spent the vast majority of their time on track and focused on their duties. (*Id.*)  She never
found them wasting more than a few minutes of time, and on the rare occasion when she
noticed a member losing focus, she would get him or her back on track immediately.  (*Id.*)
She "runs a tight ship" and has been told as much on several occasions.  (*Id.*)

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 7

In terms of marketing, Ms. Curry-Evans considered the Hood Corps members the "face" of the Gallery. (*Id.*) They engaged in a broad range of marketing activities such as maintaining the contact database and crafting and disseminating press releases for Gallery exhibits and events. (*Id.*) Hood Corps members also engaged in "hands on" marketing in the Oak Park community, including creating post cards and posters and distributing them to local businesses to advertise the Gallery and its events. (*Id.*) Ms. Curry-Evans strongly believes that the Hood Corps' marketing efforts helped make the Gallery successful, which in turn fulfilled the Grants' directive to increase arts programming in Oak Park. (*Id.*)

Hood Corps members also contributed mightily to Gallery workshops. (*Id.*) These workshops typically included a local or national "resident" artist who would stay for a period of time and teach PS7 and Sacramento High students about art. (*Id.*) The Hood Corps helped in all logistical matters pertaining to workshops, from set up to clean up. (*Id.*)

The Hood Corps members who served at the Gallery universally echo Ms. Curry-Evans' assessment. For example, Dominique Donette, a 2004-2005 Hood Corps Fellow who now attends U.C. Berkeley, served as the Hood Corps Arts Outreach Coordinator. (Donette E-mail). In that capacity, she often led tours and workshops for local schools, and was the contact person for such events. (*Id.*) Moreover, she was the main gallery assistant and essentially ran day-to-day operations, such as taking questions from and helping customers, setting up and taking down exhibits, and opening and closing the Gallery. (*Id.*) She explained that the Gallery would garner very high attendance during "Second Saturday" art events. (*Id.*) Moreover, she spoke highly of an exhibition she helped put on entitled, "The Best of Sac High," in which the Gallery showcased and awarded art created by Sacramento High School students. (*Id.*) Ms. Donette reiterated that Hood Corps members did not "goof off or screw around." (*Id.*) She explained that Ms. Curry-Evans kept members on track and their schedules full. (*Id.*) Several other Hood Corps members substantiated the work the Hood Corps members performed at the Gallery and their high level of focus and attention. (*See* Haynie E-mail; DuBose E-mail; Hudson E-mail; and Sanders E-mail).

Ms. Curry-Evans also explained that Hood Corps members participated in coordinating logistics for Guild Theater productions, lectures, and events with the same zeal and commitment. (Curry E-mail). (The Guild Theater is also a non-profit St. HOPE program that exists for the benefit of the community.) Of course, the Guild Theater activities were commensurate with productions, lectures, and events and did not require daily attention as the Gallery did. We spoke with several participants in Guild Theater activities who corroborate the Hood Corps' participation in such events. In particular, Megan Caldwell-Meeks, a 2004-2005 Hood Corps member, informed us that she worked at the Guild Theater regularly before and after events, including live theatrical performances, live music, movies, and lectures. (March 11, 2009 E-mail from Megan Caldwell-Meeks, Ex. O ("Meeks E-mail")). Ms. Meeks confirmed that Hood Corps members' duties at theater events were similar to duties at the Gallery; that is, they handled much of the logistics and

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 8

contributed to marketing. (*Id.*) Al Williamson, former Project Manager for St. HOPE
Development Company, explained that Hood Corps members would clean up the theater
before an event and then change into their best clothes and greet people. (March 9, 2009 E-
mail from Al Williamson, Ex. P ("Williamson E-mail")). These efforts resulted not only in
an increase in arts programming but also in the Oak Park community's increased patronage
of the Guild Theater – plainly activities covered within the scope of the Grants. (Meeks E-
mail; Williamson E-mail).

In sum, all Hood Corps members and supervisors with whom we spoke confirmed
the long, productive, and focused hours the Hood Corps members worked for the Gallery
and the Guild Theater. Ms. Curry-Evans believes that they were a "huge help" to her and
the Gallery. (Curry E-mail). Ms. Meeks and Mr. Williamson informed us that groups from
outside the Oak Park community began attending and still attend events at the Guild
Theater, such as live jazz, which did not occur before Hood Corps' involvement. (Meeks E-
mail; Williamson E-mail). Lastly, all of the Hood Corps members with whom we spoke
who had worked at the Gallery and Guild Theater believe that their efforts had tremendous
positive impacts on arts programming and appreciation in Oak Park. (*See* Donette E-mail;
Hudson E-mail; DuBose E-mail; Meeks E-mail). It is thus apparent that Hood Corps
fulfilled the objective under the Grants with respect to arts enrichment.

### Economic Development

As with the public education and arts enrichment objectives, the Narratives define
the Hood Corps' scope of work with respect to the economic development objective. The
Suspension Notice suggests that economic development activity under the Grants was
limited to "help[ing] redevelop one building a year in Oak Park." (Suspension Notice, at 2).
While the Narratives do reference this type of work, the scope of work under the Grants is
much broader. The Narratives provide, "As an area targeted for redevelopment, the Oak
Park community is in transition and positioned for revitalization. However, community
revitalization cannot be fully realized without coordinated education and economic
development efforts, and dedicated volunteers to fuel these efforts." (Narratives, Executive
Summary). The 2004-2005 and 2005-2006 Narratives also state more specifically, "Fellows
and Interns may also provide direct services to the community through organizing and
participating on [sic] development projects such as playground builds and *property upkeep and
rehabilitation*." (Exs. A-B, Work Experience) (emphasis added). Although Hood Corps'
relationship with the Sacramento Housing and Redevelopment Agency[2] did not materialize
as anticipated between 2004 and 2007, which would have allowed for significant renovation
management opportunities, Hood Corps members nonetheless engaged in economic
development activities that fall well within the scope of the Grants.

_____

[2]SHRA is a public agency that acts as one of the primary funding sources in inner-
city development zones, such as Oak Park.

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 9

Al Williamson, a civil engineer, was Project Manager for St. HOPE Development Company from October 2005 through May 2008. (Williamson E-mail). He supervised Hood Corps members' activities concerning economic development during that period. Mr. Williamson joined St. HOPE for the purpose of renovating dilapidated buildings in Oak Park, but quickly discovered that economic conditions there were so bad that no one would rent the finished buildings. (*Id.*) Mr. Williamson believes in a form of the "broken windows" theory of economic development, which essentially provides that if the community removes graffiti, cleans up the neighborhood, and gets trash off the streets, economic conditions will improve. (*Id.*) That is, a clean Oak Park is more likely to develop economically (thereby making it easier to rent out buildings) than a dirty one. (*Id.*) According to Mr. Williamson, this is a proven theory in blighted urban areas of New York and other cities. (*Id.*)

With that theory in mind and with properties in hand that no one would rent, Mr. Williamson and the Hood Corps began implementing the broken windows theory in Oak Park, which included property upkeep and rehabilitation as expressly permitted in the 2004-2005 and 2005-2006 Narratives. (*Id.*)

An important element of Hood Corps' economic development activity included its Second Saturday Cleanup Program which took place, not surprisingly, on the second Saturday of each month. (*Id.*) This program consisted of Hood Corps members, St. HOPE affiliates, volunteers from the community and Sacramento High, and the local business association. (*Id.*) Typical attendance ranged from 60 to 120 people who would gather and dispose of the trash on the streets of Oak Park and generally clean up the community. (*Id.*) Each Hood Corps member was in charge of a small group of Sacramento High volunteers, and each carried a walkie-talkie that was monitored by local police. (*Id.*) Hood Corps members would manage the cleanup process, and then facilitate a question-and-answer and reflection period after the cleanup. (*Id.*) The purpose of this reflection period was to allow the Hood Corps members and other volunteers to reflect on the positive impact they were having on the Oak Park community. (*Id.*) Mr. Williamson explained that the Hood Corps members were effective leaders of these groups and that they were on task and focused on their duties. (*Id.*) In addition to the duties described above, the Hood Corps members would assist in setting up, signing in volunteers, distributing materials, and other logistics. (*Id.*) Several of the Hood Corps members with whom we spoke confirmed their participation in these events. (*See* Donette E-mail; Cooper-Sanders E-mail; Haynie E-mail).

Aside from the Second Saturday cleanup efforts, Hood Corps members applied the broken windows theory to the 40-Acres Complex in Oak Park.[9] (Williamson E-mail). For example, they were required to pick up trash when they saw it on the ground around the premises. (*Id.*) And they were required to generally keep the premises clean. (*Id.*) This is

---

[9]This complex is a plot of land in Oak Park containing, among other buildings, the Gallery, the Guild Theater, a bookstore, and a Starbuck's coffee shop.

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 10

important because "people need to be surprised at the cleanliness of Oak Park" when they visit; it needs to be cleaner than other parts of town to promote economic growth. (*Id.*) Ms. Donette confirms that Hood Corps members would engage in day projects with an eye towards stimulating the local economy, such as cleaning out a dilapidated day care building so that it could be renovated for productive use. (Donette E-mail) These activities have contributed to the economic growth in the area. It is also worth noting that the Guild Theater began bringing in patrons from outside Oak Park for events and shows only after the Hood Corps engaged in their revitalization efforts. (Williamson E-mail; Meeks E-mail). An honest assessment of Hood Corps' efforts in the realm of economic development requires recognition of these activities, which were directed toward making Oak Park an area worth investing in.

As with their duties in public education and arts enrichment, Hood Corps members performed with focus and pride in their economic development activities. They have made a substantial impact on Oak Park for the better. (Williamson E-mail). Perhaps most importantly for current purposes, these activities were within the scope of the Grants.

### Civic Leadership Development

We would be remiss if we did not point out that the Hood Corps program was ultimately designed to be one that "educates, trains and empowers individuals to become civic leaders . . . ." (Exs. A-C, Narratives, Mission). In other words, the Narratives are replete with references to goals and opportunities to foster youth leadership amongst the Hood Corps members. Moreover, Exhibit B to the 2006-2007 Grant, Section D, Paragraph 4 titled "Service-Learning" provides, "The grantee agrees to use service experiences to help members achieve the skills and education needed for productive, active citizenship . . . ." (Ex. C). We have no doubt that the Hood Corps experience succeeded in enhancing the leadership and citizenship skills of each and every member.

Our discussions with Hood Corps supervisors and members show that the Hood Corps program had a concrete and lasting effect on its members' leadership skills. As an example, one former 2004-2005 Hood Corps member, Megan Caldwell-Meeks, currently attends the United States Military Academy at West Point. (Meeks E-mail). She believes that the Hood Corps experience "most definitely" enhanced her civic leadership skills. (*Id.*) It taught her a kind of discipline she was not used to; she dubbed it "selfless service." (*Id.*) She further noted that at West Point, all cadets seek to be leaders, but her experience at Hood Corps allowed her to be an effective leader from the start. (*Id.*) Ms. Caldwell-Meeks informed us that she will graduate as a Second Lieutenant in the United States Army and will be in charge of a platoon. However, she is ready for the challenge, thanks in part to "selfless service" leadership skills she learned from her experience as a member of Hood Corps. (*Id.*)

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 11

The list goes on. Dominique Donette explained that she would not have even applied to U.C. Berkeley, where she is now a student, but for her experience in the Hood Corps, and that Hood Corps enhanced her discipline, personal accountability, and leadership skills. (Donette E-mail). Jimmy Haynie now attends Arizona State University, where he is the president of his fraternity and a member of an African-American businessperson's group. (Haynie E-mail). Charles Hudson stated that he was "lost" before Hood Corps, and that it gave him direction and improved his leadership skills. (Hudson E-mail). By design, Hood Corps members were at the forefront of a great number of community activities, and they had the opportunity to experience many positive things that they otherwise would not have. (Williamson E-mail). We could go on for pages with anecdotal evidence of Hood Corps' success in training leaders and successful young citizens. As Principal Pegany explained, "The whole Hood Corps program emphasized responsibility and being a leader." (Pegany E-mail). In this regard, the investment of the Grants not only benefited Oak Park at large, but it enhanced the futures of many deserving people and with them, all of our futures.

In sum, the evidence we have garnered plainly establishes that Hood Corps performed substantial and specific work that was expressly authorized in the Grants. More generally, Exhibit F to the 2004-2005 Grant, Section B, Paragraph 1 titled "Purposes Of The Grant" states that "The general purposes of this Grant are 'Getting Things Done' in communities, strengthening the ties that bind communities together, and developing the citizenship and skills of AmeriCorps members." There can be little doubt that Hood Corps accomplished these goals as well.

II.    St. HOPE's Financial Condition is Precarious.

The second purpose of this submission is to establish St. HOPE's precarious financial condition. Toward that end, we have attached four schedules reflecting that dismal condition.

The first schedule, entitled "St. Hope Academy Statement of Activities for the month & 7 months ending January 31, 2009 (Unaudited)" (attached as Exhibit Q), establishes two relevant data points. First, for January 2009, St. HOPE sustained a net loss of $57,750. This is due to the simple fact that it brought in $25,528, while its expenses totaled $83,278.

This schedule also includes St. HOPE's year-to-date net loss. For the seven months ending January 31, 2009, St. HOPE received $725,664 in total revenue. During that same period, it incurred $1,450,768 in expenses, for a net loss of $725,103. As is evident, St. HOPE is hemorrhaging cash at an alarming rate.

The second schedule, entitled "St. Hope Academy Statement of Financial Position as of January 31, 2009 (Unaudited)" (attached as Exhibit R) shows that St. HOPE had a total debt of $1,876,620 and net assets of $2,943,700 as of January 31, 2009. However,

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 12

these numbers are easily misconstrued. As the schedule reflects, the vast majority of these assets consist of heavily leveraged property and equipment. Moreover, the "investments" category reflects a $1,122,642 endowment from a separate 501(c)(3) organization, the St. HOPE Foundation, in an account at Merrill Lynch. These funds are controlled by the Foundation, not St. HOPE, and are distributed pursuant to an investment policy on a strict quarterly basis schedule. Also, $1,502,762 of the "total assets" on this schedule is accounts receivable, which St. HOPE likely will not realize. When this schedule is coupled with the cash flow projection schedules described below, St. HOPE's financial condition looks grim indeed.

St. HOPE's cash flow projection for the rest of the 2008-2009 fiscal year (attached as Ex. S) shows little hope that its condition will improve anytime soon.[10]  To briefly summarize that schedule, the projection shows that for each month between February and June 2009, except for April, St. HOPE will sustain a net cash loss of between $50,808 and $91,739. (*Id.*) The schedule also shows extremely limited sources of revenue. As a matter of simple arithmetic, it is readily apparent that St. HOPE will soon be completely out of cash, with little to no revenue to supplant the loss.

You will note that the projection for April 2009 does not appear to result in a loss for that month. This is because of the $250,000 Kellogg grant listed under the "Large Grants and Donations" category for that month. This grant is 100 percent restricted to Hood Corps purposes as that program now exists. In other words, these funds are not accessible to St. HOPE. Therefore, to ascertain accessible funds, $250,000 must be subtracted from each "ending cash" total for April 2009-June 2009 at the bottom of the schedule. Thus for current purposes, the "ending cash" accessible funds total for April 2009 is $38,139; May 2009 is -$12,669; and June 2009 is -$74,477. (*See* Ex. U). The next fiscal year's projections look even worse.

With respect to the 2009-2010 cash flow projections schedule (attached as Ex. V), the "ending cash" totals begin at $113,715 in July 2009, and end at -$382,171 in June 2010. Notably, these figures *include* the $250,000 restricted Kellogg grant. In terms of accessible funds, because the $250,000 Kellogg grant is completely restricted,[11] the "ending cash" totals

---

[10]We created two simple graphs reflecting the two cash flow projection spreadsheets for your convenience. One shows St. HOPE's financial projections including a large restricted grant. (Ex. T). The other shows St. HOPE's financial condition excluding the large restricted grant. (Ex. U).

[11]Note that the 2009-2010 cash flow projection sheet contains grants from the Sacramento Kings/Maloof ($50,000); the Phoenix Suns ($50,000); and Sacramento Metropolitan Arts Council ($20,000). Unlike the "Kellogg" grant noted on the 2008-2009 sheet, these funds are unrestricted and therefore are properly included in this analysis.

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 13

are properly reduced by $250,000. Thus, accessible "ending cash" is really -$136,285 in July 2009 and -$632,171 in June 2010. (*See* Ex. U).

In short, these schedules demonstrate what I told you when we spoke and what Malcolm Segal has been telling you: St. HOPE's financial condition is precarious, at best.[12]

III.   The Showing in Part I, Above, Also Establishes That St. HOPE Spent Most, If Not All, of the Grant Funds To Carry Out the Grants' Objectives.

When you and I spoke last month, we also talked about the possibility that St. HOPE would demonstrate through its accounting records the specific recipients of the AmeriCorps grant monies it received. Our response is twofold: (1) the current state of St. HOPE's records and the departures of key St. HOPE financial personnel have prevented us from completing this analysis; but (2) the exercise seems superfluous in light of the showing made in Part I, above, that Hood Corps did indeed pursue the Grants' objectives.

Expanding upon the second point first, I believe your desire to trace all the Grant funds to specific recipients was based at least in part on the absence of evidence in your possession that Hood Corps had done anything at all to advance the Grants' objectives. We hope we have now dispelled that notion, and established that Hood Corps did indeed vigorously pursue those objectives. In doing so, it necessarily spent at least most of the grant monies to pay the stipends for Hood Corps members, the salaries of personnel who devoted all or a portion of their time to carrying out the Grants' objectives, and for the use of facilities and other expenses associated with accomplishing those objectives. This showing would seem to alleviate the need to trace each grant dollar to its ultimate recipient.

Nonetheless, to the extent you would still desire to "follow the money," St. HOPE is willing to fully cooperate and assist in that effort, though it will take some additional time. We may need to request copies of all checks from the banks, review the payroll records St. HOPE previously produced to you, and confer with the most knowledgeable remaining St. HOPE employees.[13] Perhaps this could be a joint endeavor between St. HOPE and your office; indeed, you may have better and more expeditious means of obtaining records than

---

[12]I was not aware until late last week that St. HOPE had actually already repaid $51,871.92 of its grant monies in 2007 to California Volunteers, the State agency charged with administering the Grants. This repayment must be taken into account in any resolution of this matter.

[13]One set of documents we think would be helpful in this regard are the contemporaneous invoices St. HOPE provided to California Volunteers. However, an attorney for that agency told me just last Friday that OIG had collected all of that agency's Hood Corps files some months ago, and that California Volunteers no longer had access to them; hence St. HOPE does not currently have access to them either.

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 16, 2009
Page 14

St. HOPE does. Whatever way we choose to proceed or not to proceed in this regard, however, you have St. HOPE's and Mayor Johnson's unequivocal pledge to fully cooperate; neither has anything to hide.

<u>Conclusion</u>

Once again, I thank you for the opportunity to present this information.

The first part of our submission should dispel any suspicion that St. HOPE took the grant money and ignored what is was supposed to be doing in return; in fact, St. HOPE ran a very successful AmeriCorps program that absolutely fit within the scope of the Grants' objectives. The second part of our submission shows that St. HOPE simply does not have, and is not going to obtain (at least any time soon), any funds with which it could repay the Grants, even were that otherwise appropriate (which we don't believe it is). And while we are happy to continue to work toward a more robust demonstration that grant monies were used in furtherance of the Grants, we believe that the first part of this submission establishes that most, if not all, of those monies were indeed used in the pursuit of the Grants' objectives.

Please do not hesitate to call me with questions or concerns. We look forward to your response and to continuing this dialogue. Our hope is that we can resolve this matter in a way that allows St. HOPE to continue to serve the community, assuming it can otherwise find a way to survive.

Sincerely,

Matthew G. Jacobs

Enclosures

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD. 213 (*NEW 02/98*)

| | AGREEMENT NUMBER |
|---|---|
| | **03AFHCA002Y11-F102** |

| Registration NUMBER | Federal EIN |
|---|---|
| 060001056724 | **68-0193050** |

This Agreement is entered into between the State Agency and the Contractor named below

STATE AGENCY'S NAME
DPR/California Service Corps (CSC)

CONTRACTOR'S NAME
St. Hope Academy

2. The term of this
   Agreement is:        July 1, 2004 - December 31, 2005

3. The maximum amount
   of this Agreement is:   $271,009.00

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made
   a part of the Agreement:

Exhibit A, entitled "CSC Policy & Requirements"

Exhibit B, entitled "Terms and Conditions"

Exhibit C, entitled "Cost Per Member Policy dated July 1,2004"

Exhibit D, entitled "AmeriCorps Title Page/Program Narrative/Performance Measures"

Exhibit E, entitled "Budget Form and Budget Narrative"

Exhibit F, entitled "AmeriCorps Provisions Dated February 2004"

Exhibit G, entitled "Travel Reimbursement Rates/Conditions"

Exhibit H, entitled "Certification and Assurances"

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | CALIFORNIA Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (*if other than an individual, state whether a corporation, partnership, etc.*) St. Hope Academy | |
| BY (Authorized Signature)  [signature] | DATE SIGNED 11/10/04 |
| PRINTED NAME AND TITLE OF PERSON SIGNING  Lori Mills , Executive Director | |
| ADDRESS  P.O. Box 5447 , Sacramento, CA  95817 | |
| STATE OF CALIFORNIA | |
| AGENCY NAME  DPR/California Service Corps | |
| BY (Authorized Signature)  [signature] Marie Moretto | DATE SIGNED 1.5.05 |
| PRINTED NAME AND TITLE OF PERSON SIGNING  Moretti,   Executive Director, CSC | |
| 110 K Street, Suite 210, Sacramento, CA 95814 | [X] Exempt per AG Opinion No. 80-11 |

## PART I - FACE SHEET

### PLICATION FOR FEDERAL ASSISTANCE

| | |
|---|---|
| | **1. TYPE OF SUBMISSION:**<br>Non-Construction |

| | | |
|---|---|---|
| **2a. DATE SUBMITTED TO CORPORATION FOR NATIONAL AND COMMUNITY SERVICE (CNCS):** | **3. DATE RECEIVED BY STATE:**<br><br>15-JUL-04 | **STATE APPLICATION IDENTIFIER:** |
| **2b. APPLICATION ID:**<br>04AC046031 | **4. DATE RECEIVED:** | **GRANT NUMBER:** |

**5. APPLICATION INFORMATION**

**LEGAL NAME:** St.HOPE Academy

**ADDRESS (give street address, city, state and zip code):**
P.O.Box 5447
Sacramento CA 95817

**NAME AND CONTACT INFORMATION FOR PROJECT DIRECTOR OR OTHER PERSON TO BE CONTACTED ON MATTERS INVOLVING THIS APPLICATION (give area codes):**
**NAME:** Nicole West
**TELEPHONE NUMBER:** (916) 732-4673
**FAX NUMBER:** (916) 452-7177
**INTERNET E-MAIL ADDRESS:** nwest@sthope.org

**6. EMPLOYER IDENTIFICATION NUMBER (EIN):**
680193050

**7. TYPE OF APPLICANT:**
7a. Non-Profit
7b. Community-Based Organization
    Faith-based organization
    Service/Civic Organization

**8. TYPE OF APPLICATION:**

[X] NEW    [ ] CONTINUATION

[ ] REVISION

If Revision, enter appropriate letter(s) in box(es): [ ] [ ]

A. Increase Award    B. Decrease Award    C. Increase Duration

D. Decrease Duration

**9. NAME OF FEDERAL AGENCY:**
### Corporation for National and Community Service

**0a. CATALOG OF FEDERAL DOMESTIC ASSISTANCE NUMBER: 94.006**
**0b. TITLE:** AmeriCorps*State

**2. AREAS AFFECTED BY PROJECT (List Cities, Counties, States, etc):**
Sacramento, California

**11. DESCRIPTIVE TITLE OF APPLICANT'S PROJECT:**
Neighborhood Corps

**3. PROPOSED PROJECT: START DATE: 09/07/04    END DATE: 08/22/07**

**14. PERFORMANCE PERIOD: START DATE:        END DATE:**

**5. ESTIMATED FUNDING:**

| | |
|---|---|
| a. FEDERAL | $ 273,745.00 |
| b. APPLICANT | $ 170,961.00 |
| c. STATE | $ 0.00 |
| d. LOCAL | $ 0.00 |
| e. OTHER | $ 0.00 |
| f. PROGRAM INCOME | $ 0.00 |
| g. TOTAL | $ 444,706.00 |

**16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS?**
[ ] YES, THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON:
DATE:

**17. IS THE APPLICANT DELINQUENT ON ANY FEDERAL DEBT?**
[ ] YES  If "Yes," attach an explanation.    [X] NO

. TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT, THE DOCUMENT HAS BEEN LY AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES IF THE ASSISTANCE AWARDED.

| **TYPED NAME OF AUTHORIZED REPRESENTATIVE:**<br>Lori Mills | **b. TITLE:**<br>Acting Executive Director | **c. TELEPHONE NUMBER:**<br>(916) 732-4673 |
|---|---|---|
| | | **d. DATE:** |

1 of 34

## Performance Measures

Service Category

Afterschool Programs

Community-Based Volunteer Programs

Training and Technical Assistance

1   **Measure Type:**   Needs and Service Activities

1. **Identify the result. Label as output, int-outcome or end outcome.**

OUTPUT: Elementary and high school students will be tutored.

INTERMEDIATE OUTCOME:  Students who are tutored improve attendance and increase positive behavior.

END OUTCOME:  Students tutored improve academic skills.

2. **Describe how you will achieve this result.**

Each school year, 100 PS7 Elementary students Sacramento High School students performing at one to three years below grade level in reading and/or math will be selected by their school staff and principal to receive one-on-one tutoring.  Student placement will be determined based on a diagnostic test (HOSTS) and progress will be measured at minimum mid-year and end-of-year.  An Individualized Education Plan will be developed for each student that will guide the tutoring curriculum.  Students will receive 2-4 hours of one-on-one tutoring per week in reading and/or math for 40 weeks per year or until they reach grade level.  Hood Corps Fellows, Interns and Apprentices will receive HOSTS training and provide tutor students for 1-hour (half an hour per subject) 2-4 days a week for one during the school day and/or after school.  Hood Corps members will work with the same students throughout the school year.

3. **What data and instruments will you use to measure the results?**

OUTPUT:

3. What data and instruments will you use to measure the results?

Tutoring Log (contained in the Individualized Educational Plan)

INTERMEDIATE OUTCOME:

Student attendance records

Referral records

Suspension records

END OUTCOME

Diagnostic Tests (Elementary'HOSTS, High School'TBD)

Ongoing Assessment (Elementary'HOSTS, High School'TBD)

CAT-6 (Math and Language Arts scores)

4. What targets do you expect to meet during the 3 year grant period?

Year 1:  100 PS7 Elementary School students and Sacramento High School students will receive a

total of 16,000 hours of one-on-one tutoring by the end of the school year

Year 2:  110 PS7 Elementary School students and Sacramento High School students will receive a

total of 17,600 hours of one-on-one tutoring by the end of the school year

Year 3:  120 PS7 Elementary School students and Sacramento High School students will each

receive a total of 19,200 hours of one-on-one tutoring by the end of the school year

Year 1: 60% of students who receive one-on-one tutoring in reading and math that have truancy

and/or behavior issues at the onset of the program will increase attendance and positive behavior by

40%.

Year 2: 70% of students who receive one-on-one tutoring in reading and math that have truancy

and/or behavior issues at the onset of the program will increase attendance and positive behavior by

STEVENS, O'CONNELL & JACOBS LLP

ATTORNEYS

400 CAPITOL MALL, SUITE 1400
SACRAMENTO, CALIFORNIA 95814-4498

www.sojllp.com

TELEPHONE:  (916) 329-9111
FACSIMILE:   (916) 329-9110

MATTHEW G. JACOBS
mgj@sojllp.com

March 18, 2009

*By E-Mail Only*
*Privileged Settlement Communication*

Kendall J. Newman
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814

Re:     St. HOPE Academy

Dear Ken:

This confirms our conversation in which I offered, on behalf of St. HOPE Academy (which is not my client, but which has authorized me to convey this offer), to resolve your investigation and all related matters for a $50,000 cash payment and a $250,000 stipulated judgment, the terms of which would be subject to negotiation. This would fully resolve all of the United States' civil and administrative claims against St. HOPE Academy, Mayor Kevin Johnson, and Dana Gonzales arising out of the AmeriCorps grants to St. HOPE Academy, including all administrative claims for suspension or debarment. (This offer also assumes informal confirmation from your Office's criminal division that it is declining to pursue criminal charges in connection with this matter.)

When we spoke today, I related that I had only very recently learned that St. HOPE had already repaid approximately $52,000 of the grant monies pursuant to an audit by California Volunteers, the State agency charged with administering the grants. In light of this new information, the decision-makers at St. HOPE seriously considered reducing the offer conveyed in our conversation and in this letter. However, it ultimately decided against doing so in an effort to demonstrate its good faith, and in furtherance of its desire to resolve these matters once and for all.

STEVENS, O'CONNELL & JACOBS LLP

Kendall J. Newman
March 18, 2009
Page 2

If you have any questions, please call.  Thank you.

Sincerely,

Matthew G. Jacobs

MGJ:db

STEVENS, O'CONNELL & JACOBS LLP

ATTORNEYS

400 CAPITOL MALL, SUITE 1400

SACRAMENTO, CALIFORNIA  95814-4498

www.sojllp.com

TELEPHONE:  (916) 329-9111

FACSIMILE:  (916) 329-9110

MATTHEW G. JACOBS
mgj@sojllp.com

March 31, 2009

*By E-mail and U.S. Mail*

Mr. William Anderson
Deputy CFO for Financial Management
Suspension and Debarment Official
Corporation for National and Community Service
1201 New York Avenue, 8th Floor
Washington, DC 20525

Re:    Suspensions of Kevin Johnson; St. HOPE Academy; and Dana Gonzalez

Dear Mr. Anderson:

The undersigned counsel represent Kevin Johnson, the mayor of Sacramento, California; St. HOPE Academy ("St. HOPE"); and Dana Gonzalez, respectively.

On September 24, 2008, the Corporation for National and Community Service (the "Corporation") sent Notices of Suspension under your signature to our clients. We write to request that the Corporation immediately withdraw or rescind these notices and remove our clients from the Excluded Parties List unless and until they have been granted the "name-clearing hearing" that is an absolute prerequisite to suspension or debarment. *See Cox v. Roskelley*, 359 F.3d 1105, 1106 (9th Cir. 2004) ("the law [is] clearly established that publication of stigmatizing information without a name-clearing hearing violates due process."). Moreover, before any such hearing could proceed, the Corporation must provide the evidence upon which it would base any decision to suspend our client, which it has so far refused to provide.

We have not previously challenged the suspensions for three important reasons: (1) none of our clients had applied for or were contemplating applying for federal funds; (2) the Corporation refused to provide us with the evidence upon which it based its decision to suspend, so we did not (and still do not) know what we are refuting; and (3) the Corporation told us that it would not process any appeal of the suspension until its Inspector General and the United States Attorney had completed their ongoing investigation. However, now that there appears to be an issue regarding whether federal agencies will permit an entirely separate entity altogether – the City of Sacramento – to participate in federal programs

STEVENS, O'CONNELL & JACOBS LLP

Mr. William Anderson
March 31, 2009
Page 2

because of the Corporation's placement of our clients (and particularly, Mayor Johnson) on the Excluded Parties List, this matter has become extremely urgent, and must be resolved immediately.

<u>By Suspending Our Clients Without a Hearing, the Corporation Has Violated Their Constitutional Rights</u>

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). When a government agency suspends a person or entity from participating in government programs or funding and publicly discloses stigmatizing information in the process, the suspended party's liberty interests are implicated if the charge affects one's reputation for honesty or morality. *Erickson v. U.S. ex rel. Dep't of Health & Human Servs.*, 67 F.3d 858, 860 (9th Cir. 1995); *Cleanmaster Industries, Inc. v. Shewry*, 491 F. Supp. 2d 937, 943 (C.D. Cal. 2007). Once a liberty interest is implicated, procedural due process protections apply, and stigmatizing information cannot be publicized without a pre-suspension name-clearing hearing.[1] *Cox v. Roskelley*, 359 F.3d 1105, 1106 (9th Cir. 2004); *Cleanmaster, supra.*

As a threshold matter, the Corporation has levied extremely stigmatizing accusations concerning misuse of federal funds against our clients, and has widely disseminated them through (1) a press release and (2) statements on a web site.[2] As the *Sacramento Bee* reported

---

[1] While "exceptional circumstances" may warrant a delayed hearing to protect the public from immediate and continuing harm (*Cleanmaster*, 491 F. Supp. 2d at 946), no such circumstances existed when the Corporation suspended our clients. In fact, the grants at issue had been completely paid out and none of our clients had applied for or contemplated applying for additional funding. In addition, and as the *Sacramento Bee* noted in its recent editorial, "The original reason for suspension was to protect the public from 'potential repetition of this conduct' while the investigation was ongoing. Johnson and Gonzalez have stepped down from their positions at St. HOPE and Hood Corps, so that should no longer be a concern." "Editorial: AmeriCorps Case Needs Resolution," *Sacramento Bee*, March 24, 2009.

In any event, there is no conceivable reason why Mayor Johnson's previous affiliation with a small non-profit organization should have any affect on a major metropolitan area's ability to participate in federal programs. Under the circumstances, there is no risk to the public fisc that would warrant suspension, and it is certainly not in the public interest to deny the citizens of the Sacramento region the benefits of federal programs based on what Mayor Johnson did or did not do when he was affiliated with St. HOPE.

[2] *See, e.g.*, D. Korber, *et al.*, "Investigators Turn St. HOPE Report Over to U.S. Attorney," *Sacramento Bee*, Sept. 5, 2008; T. Hardy, *et al.*, "Federal probe accuses Johnson of improper use of St. HOPE funding, *Sacramento Bee*, Sept. 26, 2008; J. Gerstein, "St. Hope Board Member Steps Down," *The New York Sun*, Sept. 30, 2008.

STEVENS, O'CONNELL & JACOBS LLP

Mr. William Anderson
March 31, 2009
Page 3

last fall, "The suspension of Johnson and St. Hope was trumpeted in huge red headlines ... on the web site of Gerald Walpin, inspector general of the Corporation for National & Community Service." M. Vellinga, *et al.*, "Kevin Johnson: Probe Concerns 'Absurd,'" sacbee.com, Sept. 27, 2008, www.sacbee.com/city/story/1269986.html. More recently, Mr. Walpin wrote an open letter to the *Sacramento Bee*, published this morning, repeating these accusations. G. Walpin, "My View: The federal aid ball is in Johnson's court," sacbee.com, March 31, 2009, www.sacbee.com/opinion/story/1741193.html.

The Supreme Court has recognized that impairment of one's reputation for honesty or morality, and thus implication of a liberty interest, occurs when the government makes a "charge against him that might seriously damage his standing and associations in his community." *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972). Accusations, such as those the Corporation has made against our clients, irrefutably "damage [their] standing and associations in [their] community." Our clients' Constitutional liberty interests are therefore implicated by the Corporation's suspension of them and its dissemination of information about those suspensions.

Once a person's liberty interests are implicated, courts apply a specific due process analysis. "The procedural protections of due process apply if the accuracy of the charge is contested, there is some public disclosure of the charge, and it is made in connection with the termination of employment or the alteration of some right or status recognized by law." *Vanelli v. Reynolds School Dist. No. 7*, 667 F.2d 773, 777 (9th Cir. 1982); *Orloff v. Cleland*, 708 F.2d 372, 378 (9th Cir. 1983). All the elements of this test are satisfied here: (1) our clients strongly contest the charges against them; (2) the Corporation has made the charges public; and (3) our clients' recognized rights have been altered. Accordingly, the Corporation could not legally suspend our clients without a pre-suspension, name-clearing hearing. Its failure to provide such a hearing violated our clients' Constitutional rights and made the Corporation and its agents potentially liable for damages under 42 U.S.C. section 1983. To begin to rectify these violations, the Corporation must immediately withdraw or rescind its suspensions, at least until our clients are afforded their due process rights to be heard and confront the evidence against them.

The *Cleanmaster* case is particularly instructive. In that case, a pharmacy challenged its exclusion from California's federally funded Medi-Care program because, among other things, it did not receive a pre-suspension, name-clearing hearing. 491 F. Supp. 2d at 941. After determining that the plaintiff had properly alleged a claim under 42 U.S.C. section 1983, the court held that "the due process clause of the Fourteenth Amendment requires the Department to conduct a hearing at which [plaintiff] has a meaningful opportunity to contest the charges against it before the [government] may debar or suspend the plaintiff . . . ." *Id.* at 946. It held that the agency's failure to do so violated due process.

STEVENS, O'CONNELL & JACOBS LLP

Mr. William Anderson
March 31, 2009
Page 4

*Cleanmaster* is directly on point with the facts here. The Corporation should therefore immediately withdraw or rescind its suspensions of our clients until the requisite hearing can be held.[3]  If it does not, we will have no choice but to seek legal redress with the courts.

We look forward to your immediate response.  Thank you.

Very truly yours,

Matthew G. Jacobs
Counsel for Mayor Kevin Johnson

Malcolm S. Segal
Counsel for St. HOPE Academy

Richard Pachter
Counsel for Dana Gonzalez

cc:    Chairman Alan Solomont
       CEO Nicola Goren
       General Counsel Frank Trinity
       Inspector General Gerald Walpin
       U.S. Attorney Lawrence G. Brown
       Assistant U.S. Attorney Kendall J. Newman
       Sacramento City Attorney Eileen M. Teichert

---

[3]The Corporation has also violated our clients' due process rights by refusing to provide them with the evidence upon which any suspension would be based.  As the Supreme Court has held, "[a]t minimum, due process requires notice and a hearing where the individual has *a meaningful opportunity to confront the evidence against him.*" *Matthews*, 424 U.S. at 335 (emphasis added).  The Corporation's September 24, 2008 Notices of Suspension state only that they are based on evidence provided by the Corporation's Inspector General, but do not disclose that evidence, and our subsequent requests for that evidence have been denied.  Due process requires more.  Without seeing the evidence against them, our clients cannot meaningfully participate in the requisite pre-suspension, name-clearing hearing.

October 1, 2008

Custodian of Records
St. HOPE Academy
3400 Third Avenue
Sacramento, CA 95817

Re:  Subpoena Number 08-027-S4

Dear Custodian of Records,

Accompanying this letter is a subpoena addressed to you, returnable in Washington, DC, on October 20, 2008, at 11:00 am, before either of my designees, Special Agents Jeffrey Morales and Wendy Wingers at 1201 New York Avenue NW, Suite 830, Washington, DC.  You should appear in response to the subpoena as the person who is primarily responsible for keeping and maintaining the documents requested.  The subpoena has been issued pursuant to the authority provided by section 6(a)(4) of the Inspector General Act of 1978, as amended.

All documents (as described in the subpoena) must be produced.  All documents submitted in response to the ·bpoena must be organized and identified by each specific description of documents stated in the subpoena. .nally, a signed sworn statement verifying the accuracy and completeness of the materials produced must accompany each submission in response to this subpoena. .

Failure to appear at the time, place, and manner set forth above will be taken as a failure to comply with the subpoena.  However, as a convenience, you may forward your responses to the subpoena, as described above, together with your signed sworn statement, by registered or certified mail or other type of accountable means (i.e. Federal Express) no earlier than October 20, 2008, to Special Agent Jeffrey Morales, Office of Inspector General, Corporation. for National and Community Service, Suite 830, 1201 New York Avenue, NW, Washington, D.C. 20525.  If you wish to respond to the subpoena in this manner, please notify our office.  If you have any questions, please contact Mr. Vincent Mulloy, Counsel to the Office of the Inspector General, at (202) 606-9365.

Very truly yours,

Gerald Walpin
Inspector General

Enclosure
Subpoena with attachment

ATTACHMENT

Documents Requested by the Corporation's Office of Inspector General
St. HOPE Academy

All of the following original documents (or copies where original are not available) in the custody and control of St HOPE Academy related to the AmeriCorps grant program for grant years 2004 through 2007:

    1.  General ledger and other accounting records detailing transaction-level support for federal and match expenditures claimed on the Financial Status Reports;

    2.  Financial Status Reports, Periodic Expense Reports and Grantee Progress Reports;

    3.  Reconciliation between accounting detail reports provided and amounts of Federal cost claimed on the Financial Status Report;

    4.  Reconciliation between accounting detail reports provided and amounts of match/cost sharing claimed on the Financial Status Report;

    5.  AmeriCorps member files, inclusive member contracts and evaluations.

    6.  Personnel files of all employees charged to the grant;

    7.  Any internal audit or other audit reports by Federal and/or State agencies.

    8.  OMB Circular A-133 reports and management letter;

    9.  Programmatic, accounting and personnel written policies and procedures related to the AmeriCorps program;

    10.  Organization charts for each year;

    11.  Charts of account for each year;

    12.  Record retention and travel policies.

    13.  All amendments, grant applications and budget (with narrative) for each grant year;

    14.  Pertinent correspondence and/or other communication with the Corporation for National and Community Services and the California Commission.

    15.  Bank statements; and

    16.  W-2's for all AmeriCorps members.

**All documents submitted in response to this request should be organized and identified by each specific description of documents above.**

**Each submission in response to this request should be accompanied by a signed sworn statement verifying the accuracy and completeness of the materials provided.**

The term "document' or "documents" used in this attachment means:

a. All written, printed, typed, recorded, or graphic matter of every type and description, however and by whomever prepared, produced, reproduced, disseminated or made, in your actual or constructive possession, custody or control (including but not limited to, all reports, answers, records, accounts, papers, writings, letters, minutes, bulletins, correspondence, telegrams, memoranda, notes, instructions, literature, work assignments, notebooks, agreements, contracts, notations of telephone or personal conversations or conferences, interoffice communications, microfilm, circulars, pamphlets, advertisements, catalogues, studies, notices, summaries, invoices, graphs, photographs, drafts, data sheets, data compilations, computer data sheets, computer data compilations, work sheets, statistics, speeches or other writings, tape recordings, transcript of tape recordings, phonograph records, or data compilations including on any computer equipment from which information can be obtained or can be translated through detection devices into reasonable usable form);

b. Originals (or copies where originals are not available) and all copies not absolutely identical to the original; and

c. All drafts and notes (whether typed, handwritten, or otherwise) made or prepared in connection with such documents, whether used or not.



*Corporation for*
**NATIONAL &**
**COMMUNITY**
**SERVICE**

### OFFICE OF INSPECTOR GENERAL

March 18, 2009

Kendall Newman, Esq.
Office of Assistant U.S. Attorney
U.S. Department of Justice
For the Eastern District of California
501 I Street
Suite 10-100
Sacramento, CA 95814

Subject:  Corporation for National and Community Service ("Corporation") Grant No.
03AFHCA002, awarded to California Volunteers, and Subgrant No.
03AFHCA0020032 awarded to St. HOPE Academy ("St. HOPE")

Dear Mr Newman:

At your request, we reviewed the investigator files and data subpoenaed from Saint
HOPE Academy to determine the amount of Corporation funds that were allowable, allocable
and in compliance with the subgrant terms. We believe that none of the costs charged to the
grant are allowable, primarily because the AmeriCorps members' service activities were not
consistent with the grant requirements. The following chart shows the grant cost paid to St.
HOPE and the Education Awards paid to AmeriCorp members. All of the costs should be
disallowed:

| Costs for the grant period (8/31/04 through 9/30/07) | Costs |
|---|---|
| Member Living Allowance | $447,009 |
| Member Fringe Benefits | 61,486 |
| Staff Personnel Expenses | 104,479 |
| Staff Personnel Fringe Benefits | 13,667 |
| Other Cost | 50,669 |
| Total Federal Share Claimed | 677,310 |
| Education Awards | 170,363 |
| Total | $847,673 |

Grant applications by St. HOPE were approved by California Volunteers, the California
State Commission, for each of the three grant periods and all three applications were nearly
identical.

  

1201 New York Avenue, NW ★ Suite 830, Washington, DC 20525
202-606-9390 ★ Hotline: 800-452-8210 ★ www.cncsoig.gov

Senior Corps ★ AmeriCorps ★ Learn and Serve America



St. HOPE, in its grant applications, which are part of the grant provisions, agreed that the grant funds were to be used for the following purposes:

- "providing one-on-one tutoring to elementary and high school students;"

- "managing the redevelopment of one building per year in Oak Park [the Sacramento neighborhood in which St. HOPE operates];"

- "coordinating logistics, public relations, and marketing for the Guild Theater and Art Gallery events, as well as hands-on workshops, guest artist lectures, and art exhibitions for Sacramento High School of the Arts and PS7 Elementary School;" and

- "recruit and train 500 volunteers to complete 10,000 hours of service in Oak Park."

Additionally, the applications, which are part of the grant terms, authorize training for members in tutoring, leadership, first aid, newsletter production, recruiting volunteers, St. HOPE history and the AmeriCorps program.

AmeriCorps members, funded by grant funds, are assigned to a grantee to provide services as specified in the grant applications. Members are not permitted to be used by grantees to subsidize themselves, reduce the administrative costs of the grantee, or displace or pay part of the cost of grantee employees.

Contrary to those grant requirements and prohibitions, we found that St. HOPE AmeriCorps members performed little, if any, of the service agreed to and stipulated under the grant. Instead, they were used for non-authorized and prohibited activities, including service that displaced St. HOPE employees, a violation of 42 U.S.C. § 12637 *Nonduplication and nondisplacement*. We also found instances where AmeriCorps living allowances and benefits were unlawfully used to supplement the salaries of St. HOPE employees.

Another grant requirement is that all allowable cost must "be adequately documented" see OMB Circular A-122 *Cost Principles for Non-Profit Organizations*, Attachment A., *General Principals*, Section 2.g. Factors affecting allowability of costs. We found an almost total lack of documentation to support St. HOPE's performance of the grant, despite our repeated requests to St. HOPE for grant-related documents.

Specific grant issues, based on the Office of Inspector General's ("OIG") investigation and audit review, are as follows:

Member living allowances and fringe benefits.

We reviewed the 21 interviews conducted by OIG investigators. The total included 9 former AmeriCorps members, 7 Sacramento High School personnel, 4 St. HOPE personnel and 1 official of California Volunteers. The interviews of the members and staff reported that members were performing clerical work at the high school and recruiting students to attend the high school. Recruiting students is different from recruitment of volunteers described in the grant applications. The purpose of recruiting volunteers is to increase the impact of the AmeriCorps programs, while student recruitment is to increase student enrollment, which assists the financial position of the subgrantee's chartered high school. The redevelopment of one building a year in Oak Park, an objective specified in the grant, was not mentioned by any of the interviewees as a service performed.

Regarding service in support of the arts, the only indication of such activity involved a St. HOPE dance teacher. She was a school employee whose salary was illegally supplemented by an AmeriCorps living allowance.

Only three members interviewed mentioned tutoring as part of their service, with one member stating that they performed limited tutoring, but not everyday. Another member said tutoring was rarely a part of service while a third said tutoring consisted of helping students with homework during study hall, which did not meet the grant requirement of one-on-one tutoring. Interviews with four teachers and two principals at the high school reported no knowledge of the members tutoring students.

Based on St. HOPE's approved applications, which are included in and are part of the grant terms, we conclude that the member activities were inconsistent with the program descriptions in those applications.

<u>Staff Personnel Expenses and Fringe Benefits</u>

The budgets approved by California Volunteers included two staff positions to support the grant effort: a Program Director, at 100 percent of salary for each of the three years; and a Program Coordinator, at 50 percent of salary the first year and 100 percent for the remaining two grant years. Two employees of St. HOPE occupied these positions the first two years. Other individuals held these positions the third year. The only timesheets we could locate to support their roles covered four and a half months for the Program Director in 2004 and one month for the Program Coordinator, also in 2004. Timesheets are necessary to support labor costs and are required by OMB Circular A-122 *Cost Principles for Non-Profit Organizations*, Attachment B., *Selected Items of Cost*, Section 8. *Compensation for personal services*.

The Program Director for the first two years of St. HOPE's AmeriCorps program was concurrently employed full time as a teacher at Sacramento High School. The only timesheets that existed for the Program Director were four and a half months of work and included a high of 58 hours a week, but usually 40 hours a week. The absence of timesheets for most of the months of the grant (all but four and a half months) itself requires rejection of the expense for the Program Director for the non-documented period. But even the four and a half months with timesheets must realistically be rejected. The Program Director was budgeted at 100% to the grant and was thus required to work full time on the grant. As a full time teacher at the subgrantee's high school, the Program Director must have worked significant hours each day at the high school. As the AmeriCorps members' work primarily was required to involve tutoring of students in school, most of the work that the Program Director was required to direct would have been performed during the same hours he was working full time as a teacher. Even assuming -- contrary to reality -- his work as Program Director could have been performed only outside of school hours, and considering the 40 hours per week low listing in the time sheets, it would mean that the Program Director would have performed those duties before or after school, each day, occurring when school was out and beyond the normal hours for any AmeriCorps service work. Thus, we cannot find any basis to conclude that the Program Director was giving 100 percent of his effort to the grant-funded position while concurrently teaching at the high school. Instead, we conclude that the Program Director was illegally charging his teaching time to the grant.

Overall, we conclude that all salaries charged to the grant by St. HOPE's program staff should be reimbursed to the Corporation. These individuals were responsible for managing the AmeriCorps members and the program. By directing member service that was not in compliance with grant terms, and directing the enrollment of St. HOPE employees to

3

supplement salaries with Federal grant funds, subgrantee management violated the grant provisions.

### Other Costs

We were not able to locate any support for the other costs charged to the grant. We questioned these costs based on OMB Circular A-122 *Cost Principles for Non-Profit Organizations*, Attachment A., *General Principals*, Section 2.g. Factors affecting allowability of costs, requires that to be allowable under an award, costs must "be adequately documented."

### Education Awards

St. HOPE AmeriCorps members received more than $170,000 in education awards, based on eligibility information submitted to the Corporation by St. HOPE program officials. The awards, given to members upon the successful completion of service, are not funded by the grant, but by the taxpayer-supported National Service Trust that is administered by the Corporation. The members should not have been given the awards because their service was not consistent with the grant. However, the responsibility for this unallowable service lies with the St. HOPE officials who managed the grant, directed the members to perform non-grant services and who despite these facts, attested to the members' award eligibility to the Corporation. St. HOPE should therefore reimburse the Corporation for all education awards.

On October 1, 2008 a subpoena was issued to St. HOPE, requiring production of all documentation relevant to use of AmeriCorps Federal funds to the OIG. Despite repeated follow-up requests, the following documentation was never furnished to OIG.

- Source documentation for costs charged to the grant.
- Complete general ledger (only partial was produced).
- Reconciliation of costs charged on the Financial Status Report to the general ledger, including match funds.
- Explanation of the methodology for allocating costs between match and Federal share.
- Identification of the accounting system used.

We also reviewed the St. HOPE Academy Independent Auditor's Report and Consolidated Financial Statements for the years ended June 30, 2005, 2006 and 2007. These audits expressed an opinion that the financial statements were presented fairly. However, these audits were conducted to assess conformity with generally accepted accounting principals and did not test for compliance with grant terms. The applicable criteria for Corporation grant funds to St. HOPE Academy, which generated our conclusions in this letter, are:

- OMB A-122 *Cost Principles for Non-Profit Organizations*, and the Corporations A-122 *Compliance supplement,*
- 45 C.F.R. §§ 2520-2543,
- *AmeriCorps Provisions,*
- *Notice of Grant Award* and
- the approved grant applications and budgets.

### Conclusion

Our review of documentation and witnesses established that St. HOPE's use of grant funds did not comply with the word or the intent of the grant. We conclude all of the Federal funds should be returned to the Corporation.

<div align="center">4</div>

Nothing came to our attention while reviewing the St. HOPE data available to us that indicates further evaluation is necessary.

If you have any questions or need additional information please contact me.

Very Truly Yours,

Stuart Axenfeld
Assistant Inspector General for Audit

Attachment:  Accumulation of the Periodic Expense Reports

5

EXHIBIT

St. Hope Academy
Subgrant No. 03AFHCA0020032
Grant Cost 2004-2007

**St. Hope Academy**
**Subgrant no. 03AFHCA0020032**
**Accumulation of the Periodic Expense Reports**

| | 08/31/2004 Through 09/30/2007 | | |
|---|---|---|---|
| SECTION 1 Program Operating Cost | CNCS | Grantee | Total |
| A. Personnel Expenses | $104,479 | $38,026 | $142,504 |
| B. Personnel Fringe Benefits | 13,667 | 3,974 | 17,641 |
| C. Travel | 0 | 0 | 0 |
| Staff Travel | 15 | 1,565 | 1,580 |
| Member Travel | 5,713 | 6,969 | 12,681 |
| C. Travel Subtotal: | 5,728 | 8,534 | 14,261 |
| D. Equipment | 234 | 159 | 393 |
| E. Supplies | 3,363 | 7,568 | 10,931 |
| F. Contractural And Consultant Services | 0 | 0 | 0 |
| G. Training | 0 | 0 | 0 |
| Staff Training | 70 | 35 | 105 |
| Member Training | 909 | 2,502 | 3,411 |
| G. Training Subtotal: | 979 | 2,537 | 3,516 |
| H. Evaluation | 0 | 553 | 553 |
| I. Other Program Operating Costs | 11,167 | 22,761 | 33,928 |
| Travel to CNCS Sponsored Mtgs | 2,000 | 0 | 2,000 |
| I. Other Subtotal: | 13,167 | 22,761 | 35,928 |
| SECTION I. Subtotal | 141,617 | 84,111 | 225,728 |
| | | | |
| SECTION II. Member Costs | | | |
| A. Living Allowance | 447,009 | 255,952 | 702,961 |
| B. Member Support Costs | 0 | 0 | 0 |
| FICA for Members | 34,032 | 19,806 | 53,838 |
| Workers Compensation | 9,485 | 4,743 | 14,228 |
| Health Care | 17,969 | 9,350 | 27,319 |
| B. Member Support Subtotal: | 61,486 | 33,899 | 95,385 |
| SECTION II Subtotal | 508,495 | 289,851 | 798,346 |
| | | | |
| SECTION III Administrative Costs | | | |
| A. Corporation Fixed Percentage | 0 | 0 | 0 |
| Corporation Fixed Amount | 27,198 | 49,262 | 76,460 |
| Commission Fixed Amount | 0 | 0 | 0 |
| SECTION III Subtotal | 27,198 | 49,262 | 76,460 |
| | | | |
| Total | $677,310 | $423,224 | $1,100,534 |

Note: The $677,310 reconciled with the Financial Status Report and the drawdown
    schedule provided by the California State Commission.

**·rald Walpin**

| | |
|---|---|
| **From:** | Trinity, Frank [FTRINITY@cns.gov] |
| **Sent:** | Thursday, April 02, 2009 7:02 PM |
| **To:** | Gerald Walpin |
| **Subject:** | St. Hope Academy |

Thank you for the case cites.

I also wanted to let you know that since AUSA Ken Newman has reached out to me today we have agreed that in seeking management's view on possible settlement of civil claims his office will deal with me as the point of contact. This would, of course, be in addition to his seeking OIG's view directly from you.

I am out tomorrow but let's plan to discuss on Monday when I return.

Frank R. Trinity
General Counsel
Corporation for National and Community Service
202-606-6677 (direct)



*Corporation for*
# NATIONAL &
# COMMUNITY
# SERVICE ★★★★

## OFFICE OF INSPECTOR GENERAL

April 6, 2009

Kendall J. Newman, Esq.
Chief of the Civil Affirmative Section
Office of the United States Attorney
  for the Eastern District of California
501 I Street
Suite 10-100
Sacramento, CA 95814

Re: Kevin Johnson and Dana Gonzalez                     Via E-mail and USPS

Dear Ken:

When we spoke last week, I summarized for you some, but not all, of the grounds supporting our office's position that St. Hope Academy, Kevin Johnson, and Dana Gonzalez are each liable, jointly and severally, to be required to return to the Corporation for National and Community Service ("Corporation") the full amounts of the grants totaling $807,334. Those facts also responded to Mr. Jacobs' letter to you dated March 16, 2009 (to the extent I had had time to review it). I stated that I would put in writing various facts supporting our position so that you would be able to have it conveniently available.

We also discussed, and each expressed respective views on, the legal requirements in order to hold Mr. Johnson personally liable and on procedures available to the Government. I am sending you this letter to provide you with our views for consideration by you and your office.

### I. Grand Jury Procedure

I recognize your office's reticence -- to put it mildly -- to use grand jury procedure in this matter to obtain all relevant facts. I must note my lack of understanding of the reason for your office's position, although I respect that decision is properly made by your office. There can be no doubt that we have presented to your office more than sufficient evidence of a false claims criminal violation to warrant a grand jury proceeding in which all relevant facts, including as to each individual's knowledge and guilty conduct, could be elicited. Dana Gonzalez signed and submitted claims and made representations to obtain Federal funds, which were paid to St. Hope on representations, made by her, that the funds had been used in accordance with the grant terms. Indeed, Ms. Gonzalez admitted to OIG investigators that AmeriCorps members were misused and given assignments to benefit St. Hope and Mr. Johnson by work outside of the grant

  

1201 New York Avenue, NW ★ Suite 830, Washington, DC 20525
202-606-9390 ★ Hotline: 800-452-8210 ★ www.cncsoig.gov



Senior Corps ★ AmeriCorps ★ Learn and Serve America



requirements.  Her admission was corroborated by interviews of several former AmeriCorps members.

Given this evidence -- as close to conclusive as one can ask before an actual grand jury proceeding -- what is the reason to give a free pass to her?

Moreover, while I recognize that Mr. Johnson appears to have been very careful not to sign the paperwork submitted to claim Federal funds, there is clearly substantial basis to investigate his involvement with the use of a grand jury.  Just two examples suffice for this letter: (1) The evidence we presented conclusively showed that Mr. Johnson personally took members from Sacramento to Harlem, New York, from June 26 to July 16, 2006, to help lobby for Mr. Johnson's application for a new charter school in New York and recruit students for it.  There can be no dispute that St. Hope obtained Federal funds to finance AmeriCorps members for the purpose of having them perform services in Sacramento, California, not Harlem, NY.  Thus, to hold that Mr. Johnson was innocent of thus misusing members contrary to the grant terms, one would have to conclude that Mr. Johnson, the CEO of the grantee -- who, various witnesses affirmed, knew everything occurring at St. Hope -- did not know that the members have been assigned for service in Sacramento, California.  (2) Mr. Johnson personally signed the "Offer of Employment Letter" to Diego Carrillo to be Student Recruiter for St. Hope Academy.  Mr. Carillo stated that Mr. Johnson personally hired him and told him that Mr. Carillo would be placed in the AmeriCorps program so that AmeriCorps would pay part of his salary.

In any event, given the clear ground for a grand jury proceeding as to St. Hope and Ms. Gonzalez, that proceeding would be the most efficient means to meet the need, which we both agreed existed, to obtain all facts concerning Mr. Johnson's personal knowledge and involvement.

Moreover, I suggest that a grand jury proceeding would provide your office with a likely opportunity to open discussions with Ms. Gonzalez's independent counsel on the possibility of her cooperation in truthfully furnishing facts that she knows.

I therefore ask your office to reconsider our suggestion for a grand jury proceeding.

II.  Response to Mr. Jacobs' Letter

Mr. Jacobs' purpose in writing his letter was to convince you that "all or virtually all of the work performed by Hood Corps members was indeed within the scope of" the grants (Jacobs p. 2).  Mr. Jacobs understandably attempts to focus you on the "Scope of the Grants **generally**" (*id.*), and the general purpose of the grants, rather than the specific requirements of the grants, to which St. Hope bound itself, and the controlling statutory and regulatory provisions.

Mr. Jacobs concedes that St. Hope cannot "demonstrate through accounting records the specifics of how St. Hope spent the grant monies."  He offers two reasons to excuse this inability: (i) he asserts, citing only a newspaper editorial, that "it is not unusual for non-profit agencies not to be able to re-create exactly how they spend grant funds" (p. 2 n.3); and (ii) "the narratives provide Hood Corps with flexibility to achieve the goals" (p. 3).

There is no legal or practical support for Mr. Jacobs' first assertion.[1]   Although Mr. Jacobs states that the "agency charged with administering the AmeriCorps grants would so assert" (p.2 n.3), that is simply false in suggesting that excuses or mitigates liability. My office, which has responsibility for auditing grantees and questioning costs, regularly recommends the disallowance of costs for which the necessary supporting accounting records do not exist, and the Corporation regularly follows that recommendation when supporting documentation does not exist.

This requirement of source documentation to support allowable costs is so important that it is repeated several times in different documents governing each grant. For example, Exhibit B to each grant award to St. Hope provides:

> "Contractor agrees that the awarding department . . . or their designated representative shall have the right to review and to copy any records and supporting documentation pertaining to the performance of this Agreement. Contractor agrees to maintain such records for possible audit . . . ."

Likewise, the AmeriCorps Grant Provisions V B, mandates:

> "The grantee must maintain financial management systems that include standard accounting practices. . . . a clear audit trail . . . . "

And in Section V E of the AmeriCorps Grant Provisions, it mandates:

> "The grantee must retain and make available all financial records, supporting documentation . . . "

> "The Grantee must maintain adequate supporting documents for its expenditures . . . . Costs must be shown in books or records [e.g., a disbursement ledger or journal], and must be supported by a source document, such as a receipt, travel voucher, invoice, bill, in-kind voucher, or similar document" (bracket in original).[2]

The Code of Federal Regulations, which governs grants and how the Federal agency expends funds, in § 2543.21, mandates:

> "(b) Recipients' financial management systems shall provide for the following:
> ". . .

---

[1] Even the editorial does not support Mr. Jacobs' representation. The editorial in fact reported that, on the San Diego grant involved, "HUD found almost $13 million spent improperly or without documentation and asked for it back" and that HUD has warned that "continued inadequate documentation" "will 'negatively impact' on the city's share" of future grants -- exactly what OIG is stating here.

[2] The AmeriCorps Grant provisions state that "All applicable provisions of the grant . . . shall apply to any . . . subgrantee."

"(2) Records that identify adequately the source and application of funds for federally-sponsored activities. These records shall contain information pertaining to . . . outlays . . . .

" . . .

"(7) Accounting records including cost accounting records that are supported by source documentation."

Section 2543.53 mandates that:

(b) Financial records, supporting documents . . . and all other records pertinent to an award shall be retained.

Mr. Jacobs erroneously asserts (p. 13 n.13) that my office has possession of the "contemporaneous invoices St. Hope provided to" the California Commission. OIG does not have any such invoices. Significantly, Mr. Jacobs does not state when St. Hope supposedly provided them to the California Commission. On February 23, 2007, Tom Bratkovich, CFO of St. Hope, was able to reference invoices by invoice number, invoice amount, establishing St. Hope's possession of the invoices at that time (see e-mail attached as Exhibit 1) -- with no explanation of what happened to them and, if St. Hope no longer has them, the reason it failed to comply with its record retention obligations quoted above.

Beyond even the grant and regulatory provisions, practicality requires that each grantee have source documentation for the Federal funds it claims as payment for its expenditures. Without such source documentation, there is no way to confirm allowable costs and proper use of Federal funds. If documentation were not required, audits become meaningless and grantees would be provided Federal funds with no meaningful overseeing of the use of these funds.

Mr. Jacobs, in asserting generally that St. Hope used "a large portion of the monies" to perform the general purpose of the grants, again ignores the specific provisions of the grants which governed what St. Hope agreed to do with the funds and he ignores the 26 interviews OIG obtained of Members and Staff, each of whom negated, close to totally, the use of Members for the grant purposes.[3]

It is to avoid issues as to proper use of grant funds that grants do not provide Federal funds for the general use of bettering the community, but rather fix more specific objectives **and** methods to document the use.

As Mr. Jacobs concedes, "tutoring was an essential ingredient of the Grants' public education component," requiring "one-on-one tutoring to elementary and high school students" (pp. 3-4). Mr. Jacobs relies on anecdotal reports of such "tutoring occurr[ing] after school" (p.

---

[3] Circumstances relating to the telephone interviews provided by Mr. Jacobs are revealing: (i) although almost all of the persons interviewed by OIG were from the local Sacramento area, Mr. Jacobs' interviewees were almost all from remote areas; (ii) when OIG sought the address or telephone numbers so that OIG could interview them, St. Hope stated it did not have the information; (iii) Mr. Jacobs, with two exceptions, did not provide interviews of the persons OIG had interviewed; and (iv) the method that Mr. Jacobs used -- by telephone and then sending a text by e-mail to the interviewees -- is hardly the procedure most conducive to obtain the facts. In addition, those interviews provided by Mr. Jacobs of the two persons interviewed by OIG contradicted what they said in the OIG interviews.

4).   That, by itself, even if it were true to any substantial extent, ignores that the grant application, in the narrative (p. 4) written by St. Hope as the basis for the grant, specified that the tutoring program was to "occur during the school day as well as after school."  The narrative continues to specify that "100 PS and Elementary Students [and] Sacramento High School students . . . will be selected . . . to receive one-on-one tutoring."  In order to document this program, a "Tutoring Log" is required (Narrative pp. 25-26), as well as an "Individualized Learning Plan [f]or each of the 240 students" receiving the tutoring that identifies the academic support in which the student will participate (*i.e.* one-on-one and small group tutoring . . . )" (Calif. AmeriCorps Application p. 93).  Although OIG asked to see such Tutoring Logs, none was ever produced.

Similarly with economic development (Jacobs pp. 8 - 9), the Narrative (p. 15) specifies "fellows will manage the redevelopment of the Walton Pediatrics Building, the 1885 Victorian, and the Made Rite Site in Oak Park."  Mr. Jacobs does not even suggest that Members worked on any of these sites.  Instead, Mr. Jacobs relies almost entirely on observations by Al Williamson, Project Manager for St. Hope Development Co.  Yet, both Ms. Gonzalez, the St. Hope Executive Director, and Mr. Tom Bratkovich, the St. Hope Chief Financial Officer, informed OIG that Mr. Williamson had no involvement with Hood Corps Members aside from managing the apartments in which the members resided.

Data on other authorized usage of AmeriCorps members similarly was required.  *E.g.* volunteer recruitment by Members (narrative pp. 28-29), which required retention by St. Hope of "Volunteer Applicants," "Training Sign In Sheets," and "Volunteer Database (tracks volunteers, placements, hours, etc.)."  While, for example, St. Hope provided adequate numbers in its quarterly progress report for 2004-05, when OIG reviewed the sign-in sheets, it was clear that, as compared to the 138 volunteers inserted in the progress report, only 14 names appeared on the sign-in sheets.  Similar findings were made for each of the grant years.

It is easy to assert conclusorily that members did some of these tasks.  But Federal funds are not properly shoveled out on the basis that some -- particularly a non-quantified amount -- of the money was used for grant purposes.  Just as a cost-plus Government contract with a for-profit contractor requires the Government to disburse taxpayer funds only on documentation establishing the cost involved, so too a non-profit grantee may not receive grant funds to pay for costs that are not properly documented.

In sum, Mr. Jacobs has presented no competent evidence to counter the conclusion that St. Hope took the grant money and ignored what it was supposed to be doing in return (Jacobs p. 14).  Generalities and selected anecdotes (but ignoring most witnesses' reported experience), do not counter St. Hope's admitted failure to be able to document its performance, as it was required to do, and the vast amount of evidence OIG presented of misuse of members and Federal funds.  These various specifications of misuse were disclosed to Mr. Jacobs' client in the Notice of Suspension; Mr. Jacobs' failure even to attempt to rebut those specifications must be taken as an inability to do so.

III.  Elements of Mr. Johnson's Liability

We recognize that Mr. Johnson, although CEO of St. Hope, carefully avoided signing any of the representations made and claims filed to obtain disbursement to St. Hope of Federal funds. Evidence already obtained establishes, however, his personal involvement in the misuse of AmeriCorps members contrary to grant requirements, *e.g.* personally taking Members to Harlem, New York for activity benefiting St. Hope and Mr. Johnson; personally using Members as his personal chauffeur.  Statements have also been obtained that Mr. Johnson made decisions at St. Hope.

Controlling authority does not require that an individual has personally signed the false representation or claim which caused disbursement of Federal funds.  31 U.S.C. § 3729 imposes liability when a person "causes to be presented" or "conspires" to present a false claim.  Thus, the issue is whether the evidence will establish either (i) that Ms. Gonzalez acted without the knowledge, instruction, or approval of Mr. Johnson, or (ii) that Mr. Johnson was aware, at a minimum, that the grant was to be used to have Members perform service in Sacramento -- for community benefit, not Mr. Johnson's own benefit and certainly not in New York.  I suggest to you that a jury would conclude that Mr. Johnson knew or should have known that there were limits to his and St. Hope's use of members, rather than concluding that Mr. Johnson would believe that he was free to use Members for whatever personal benefit he chose.  This is particularly true because the statute holds that a person has the requisite knowledge for liability with proof establishing actual knowledge if he "acts in deliberate ignorance" or "in reckless disregard."

But a decision on the sufficiency of evidence need not be made now, whether it be relevant to proceeding civilly or criminally.  The evidence now provided is more than sufficient to support a good faith decision to proceed on either track into the available procedures for further fact-finding -- whether grand jury proceeding or discovery and depositions in a civil litigation.  Either of those avenues would provide the full fact-finding to determine the ultimate decisions by your office.

The identical issue now presented to your office of the sufficiency of a complaint against individual non-signing officers of an entity which submitted false claims was decided in *United States v Cherokee Implement Co.,* 216 F. Supp. 374 (N.D. Iowa 1963).  After noting that "the statute was intended to reach any person who knowingly assisted in causing the Government to pay claims grounded in fraud," which can be established by proof that the individual was "part of the cause which resulted in the false claim" (*id.* at 376), the court held a motion to dismiss the complaint against the individuals must be denied, with their liability to be determined at a trial. And in *Henry v United States,* 424 F.2d 677 (5th Cir. 1970), the Court affirmed a verdict against the individual who "directed the business," despite no assertion of evidence of his personal involvement or knowledge.  Other examples of upholding liability of the person actually in charge, even though others signed the false claims are *United States v Mackby,* 261 F. 3d 821 (9th Cir. 2001), and *United States v Klein,* 230 F. Supp 426 (W.D. Pa. 1964).

This discussion does not purport to be an exhaustive recitation of the precedents on this issue. But, we submit, it warrants a decision to utilize available procedures to press further through grand jury or civil proceedings, either of which would ensure full fact-finding.

<u>Conclusion</u>

We remain available to discuss this matter with you and/or any one else in your office, and to provide you with any further assistance you might request.

Sincerely,

Gerald Walpin
Inspector General

cc:    Frank Trinity
       CNCS, General Counsel

**Wendy S. Wingers**

| | |
|---|---|
| **From:** | Circe Olander [Circe.Olander@CaliforniaVolunteers.CA.GOV] |
| **Sent:** | Tuesday, March 24, 2009 1:10 PM |
| **To:** | Wendy S. Wingers; Jeffrey Morales |
| **Subject:** | FW: St. Hope Academy's Unallowable Costs |
| **Attachments:** | F102 0607 Net Payment 3.29.07.pdf; St. HOPE 2005-2006 Americorps Internal Audit 2005-2006 1 8.xls; F102 Final Invoice with the required adjustments.pdf; F102 YTD with proposed adjustments.pdf; F102 with the allowed changes.pdf; F102 Y13 3.29.07 draw justification.pdf |

Circe Olander
CaliforniaVolunteers
1110 K Street, Suite 210
Sacramento, CA  95814
Phone: (916) 323-4504 Fax (916) 323-3227
Circe.Olander@CaliforniaVolunteers.ca.gov

**From:** Circe Olander
**Sent:** Tuesday, March 24, 2009 8:53 AM
**To:** Sarah Mangum
**Subject:** FW: St. Hope Academy's Unallowable Costs

Circe Olander
CaliforniaVolunteers
1110 K Street, Suite 210
Sacramento, CA  95814
Phone: (916) 323-4504 Fax (916) 323-3227
Circe.Olander@CaliforniaVolunteers.ca.gov

**From:** Mimi Morris
**Sent:** Thursday, March 29, 2007 10:34 AM
**To:** Debbie Johnson
**Cc:** Eddie Aguero; Ia Moua; Circe Olander; Pamela Freeman; Jesse Delis
**Subject:** St. Hope Academy's Unallowable Costs

Hi Debbie –

I'm inserting below the full details on this issue of unallowable costs that need to be repaid by our subgrantee, St. Hope Academy, F102, along with the original attachments on my response.

We've got an unusual situation on our hands.  This subgrantee owes us $51,871.92 for unallowable 05-06 (03AFH Grant Award) expenses and is reluctant or unable to pay us back and we owe him $75,748.04 for 06-07 (06AFH Grant Award) expenses.  I'm not willing to process the payments for 06-07 until we are repaid the roughly $52K for the unallowable 05-06 costs.  The 03AFH Grant Award expired on 12/31/06 and our access to these funds is limited to 90 days after the expiration date, or 3/31/07, so we don't have the luxury of time to help resolve this situation.

I'm sending over the last of the 03AFH (05-06) invoices today (totalling $1,352,090.08) along with St.

4/6/2009

EXHIBIT J

Hope Academy's 06-07 invoices. I'd like to have you reduce today's 03AFH draw by the amount owed to us by St. Hope Academy ($51,871.92) and have you draw the funds instead from the 06AFH award.

I am attaching two pdfs of the Transmittal Sheet for the 06-07 payments to St. Hope Academy showing in one the full $75,748.04 to substantiate the draw and in the other the $243,876.12 due them after subtracting the unallowable costs from 05-06.

All future 06-07 invoices will be paid in full and the 05-06 obligation to us will be considered piad in full.

Please let me know if you see any problems with this plan.

Thank you for your assistance in this regard.

Mimi

-----Original Message-----
**From:** Mimi Morris
**Sent:** Friday, March 23, 2007 6:48 PM
**To:** 'Tom Bratkovich'
**Cc:** Jules Alcouffe; Dana Gonzalez; Eddie Aguero; Ia Moua; Circe Olander; Jesse Delis; Pamela Freeman
**Subject:** RE: St. HOPE Internal Americorps Audit 2005-2006

Hi Tom –

First off, I must apologize for taking so long to respond to your information submission. I have been updating our database and was in the middle of a prolonged data validation when your email arrived.

I've now had the opportunity to review all of your documentation and can speak to what needs to occur.

I greatly appreciate all your efforts to document the unallowable expenditures that were already submitted. I'm encouraged by your commitment to clean up the situation and correct the billings to reflect only those costs which can be charged to this federal grant.

I am attaching three pdf files for your consideration (and I'm attaching your originals for the benefit of our staff who weren't included on the original email). The first pdf shows the Year To Date impact of your requested adjustments, the second pdf shows the allowable adjustment (shown as a December expense report), and the third pdf shows the Year to Date Data given the allowable adjustment.

There are two issues with your requested adjustments that we cannot overcome:

1)    You are limited in your Section I expenses to available funds in Section I. You do not have the authority to move funds from Section II into Section I. Accordingly, you will need to find an alternate source for $980 worth of Personnel Expenses.
2)    Your budget of $11K in Indirect Costs is based on direct costs of a higher level than you achieved. Accordingly, you are limited to just over $8K in Indirect. The Allowable Adjustment reflects this change.

These two changes bring the amount due up to over $51, 871.92.

While I appreciate your interest in getting this amount reduced, I have no ability to allow these unallowable expenditures. The full amount must be repaid, as I indicated in our conversation in

EXHIBIT 1

January, by March 31, 2007. We are facing the end of this grant term and do not have the ability to grant you an extension or a payment plan.

We will not be able to process any 06-07 contract payments until this obligation is fulfilled.

I have four invoices that were submitted by Chris Orr in late January for the months of September, October, November and December 2006. These invoices total almost $70,000 and are identified as 05-06 invoices. Please let me know how these new invoices relate to your explanation of the situation below and/or if these are erroneously identified as being 05-06 expenses.

I regret that we can't offer you greater flexibility, but this grant is a federal award and is subject to both specific grant provisions and OMB rules regarding allowability of costs.

Please feel free to contact me or your Program Associate if you have any questions.

Sincerely,


Mimi Morris
Chief Financial Officer
California Volunteers
1110 K Street, Suite 210
Sacramento, CA 95814
(916) 324-4786
(916) 323-3227 fax
www.CaliforniaVolunteers.org
mimi.morris@CaliforniaVolunteers.ca.gov


-----Original Message-----
**From:** Tom Bratkovich [mailto:tbratkovich@sthope.org]
**Sent:** Monday, March 19, 2007 6:27 PM
**To:** mimi.morris@csc.ca.gov
**Cc:** Jules Alcouffe; Dana Gonzalez; Tom Bratkovich
**Subject:** RE: St. HOPE Internal Americorps Audit 2005-2006

Hi Mimi, just checking in again to see if you have had a chance to review the information in the last couple of weeks since we last talked. Thanks and I hope that all is well,

Tom


**From:** Tom Bratkovich
**Sent:** Friday, February 23, 2007 6:21 PM
**To:** Mimi Morris (mimi.morris@csc.ca.gov)
**Cc:** Tom Bratkovich; Jules Alcouffe; Dana Gonzalez
**Subject:** St. HOPE Internal Americorps Audit 2005-2006


Dear Mimi,

Please find attached our internal audit of our Americorps Contract # 03AFHY12-F102 financials for the 2005-2006 timeframe. The attached spreadsheets provide many details, however, to summarize our efforts:

- In Tab 1 you will find the amount budgeted, the amount invoiced/funds received as cash

4/6/2009

EXHIBIT 1

by St. HOPE, the difference between budget and actuals invoiced/received, proposed audit adjustments, and final budget balance.

- In Tab 2 you will find details on the Personnel adjustments proposed for Section I.
    - The only adjustment in this section is that Nicole West was incorrectly coded as a Member instead of her true role as administrative staff for Hood Corps.
- In Tab 3 you will find details on the Personnel adjustments for Section II.
    - In the first rows you will find 27 personnel that were Americorps Members that we invoiced correctly.
    - In the next section you will find 8 personnel that were Americorps Members that we paid more stipend than our timesheet records indicate.
    - In the next section you will find 1 person that had a 450 hour contract but was paid for 900 hours.
    - In the next section you will find 1 person (Nicole West) that was incorrectly invoiced as a Hood Corps member but instead was administrative, as detailed above.
    - In the next section you will find 14 personnel that were not Americorps Members that we invoiced incorrectly in WBRS.
    - In the next section you will find 2 personnel that were invoiced as Americorps Members, but are not eligible for Americorps, and therefore are not allowable.
- In Tab 4 you will find details on additional chargeable expenses to Americorps for August 2006 that surfaced in our A/P system in September 2006 and were not entered into WBRS, but that we are claiming now.

We would ask that you review our results and provide the maximum amount of flexibility that you can in this manner. While we are proposing that our *maximum* penalty from all items should be $48,554, we highlight the following mitigating factors:

- If those dollars are repaid by us, we would end up *under budget* for the amount invoiced to you by $60,144 for this year, which is a substantial amount under your expectations under the terms of the contract.
- Even with the acknowledged mis-coding of numerous personnel, we did not utilize all of our Member slots. For example, we used only 5 out of 6 of our Full Time Member slots.

Please call next week if you have any questions after you have reviewed the spreadsheets and these notes. We appreciate your support.

Thanks,

Tom, Jules, Dana

**Tom Bratkovich**
St. Hope
916 649 7921
tbratkovich@sthope.org


**Mimi Morris**
**Chief Financial Officer**
**California Volunteers**
**1110 K Street, Suite 210**
**Sacramento, CA 95814**
**(916) 324-4786**
**(916) 323-3227 fax**

4/6/2009

www.CaliforniaVolunteers.org
mimi.morris@CaliforniaVolunteers.ca.gov



# Department of Justice

### Acting United States Attorney Lawrence G. Brown
### Eastern District of California

FOR IMMEDIATE RELEASE
Thursday, April 9, 2009
*www.usdoj.gov/usao/cae*

CONTACT: Lauren Horwood
PHONE: 916-554-2706
*usacae.edcapress@usdoj.gov*

### UNITED STATES SETTLES CLAIMS ARISING OUT OF ST. HOPE ACADEMY'S SPENDING OF AMERICORPS GRANTS AND EDUCATION AWARDS
### *Federal Suspension of St. HOPE Academy, Kevin Johnson & Dana Gonzalez Will Be Terminated*

SACRAMENTO, Calif. – Acting United States Attorney Lawrence G. Brown announced today that St. HOPE Academy has agreed to pay $423,836.50 to settle allegations that St. HOPE did not appropriately spend AmeriCorps grant awards and education awards in accordance with the terms of grant requirements and did not adequately document its expenditures of grant awards. The amount of the civil settlement represents one-half of the $847,673 in AmeriCorps grant funds received by St. HOPE Academy. During the relevant time period, Sacramento Mayor Kevin Johnson was Chief Executive Officer of St. HOPE and Dana Gonzalez was the Executive Director of St. HOPE. Under the terms of the agreement, which includes mandatory grant administration training for Mayor Johnson and Ms. Gonzalez, suspension from federal programs will be terminated.

"The agreement reached strikes a proper balance between accountability and finality. St. HOPE Academy must pay a significant amount for its improper handling of AmeriCorps funds. The lifting of the suspension against all parties, including Mayor Johnson, removes any cloud whether the City of Sacramento will be prevented from receiving much-needed federal stimulus funds," said Acting U.S. Attorney Brown.

According to Assistant United States Attorney Kendall J. Newman, the lead government attorney in the case against St. HOPE, AmeriCorps grant funds were awarded by the State of California to St. HOPE and administered by St. HOPE during 2004 through 2007. Additionally, AmeriCorps members were entitled to Education Awards if they fulfilled their service requirements for St. HOPE according to the terms of the grant requirements. The United States contends that St. HOPE did not appropriately spend the grant awards according to the terms of the grant requirements and did not adequately document its expenditures of the grant funds.

On September 28, 2008, the Debarment and Suspension Official for the Corporation for National and Community Service (the "Corporation"), notified St. HOPE, Johnson, and Gonzalez that they were suspended from participation in federal procurement and non-procurement programs for a temporary period of time pending completion of an investigation by the United States Attorney's Office, or conclusion of any legal or debarment proceedings resulting from the investigation of the alleged misuse of federal funds provided in support of the AmeriCorps grants.

In settlement, St. HOPE acknowledged that it did not adequately document a portion of its

expenditures of the grant awards. The settlement terms are:

- St. HOPE will make an initial payment of $73,836.50 by electronic transfer within five business days from today;

- Kevin Johnson will pay $72,836.50 of the initial payment by St. HOPE, with possible repayment to Johnson by St. HOPE when it is financially able to do so; and

- Dana Gonzalez will pay $1,000.00 of the initial payment by St. HOPE.

- St. HOPE has entered into a stipulated judgment for $350,000.00, plus five percent annual interest, payable at $35,000 annually for 10 years, the final payment of which will include interest.

Within five business days from today:

- Johnson and Gonzalez shall each register to take an online course offered by Management Concepts titled "Cost Principles";

- Johnson and Gonzalez will provide written proof to the Corporation of having registered for the course.

Within 120 days from today:

- Johnson and Gonzalez will complete the course; and

- Johnson and Gonzalez will provide written verification under oath of having completed the course.

As part of the settlement, the Corporation will terminate the suspension of St. HOPE, Johnson, and Gonzalez from participation in federal procurement and non-procurement programs upon all of the following occurring:

- The settlement agreement having been signed by all parties;

- St. HOPE having made the Initial Payment of $73,836.50;

- St. HOPE having signed the Stipulated Judgment;

- Johnson and Gonzalez having made payments to St. HOPE; and

- Johnson and Gonzalez having provided verification of having registered for the "Cost Principles" course.

Additionally, the Corporation will not institute debarment proceedings against St. HOPE with respect to the AmeriCorps grants so long as it complies with the terms of the settlement agreement. The Corporation also will not institute debarment proceedings against Johnson and Gonzalez with respect to the AmeriCorps grants so long as they comply with their obligations under the settlement agreement, including certification of the course completion.

# # # #

## SETTLEMENT AGREEMENT

### I. PARTIES

This Settlement Agreement ("Settlement Agreement") is entered into by and between the United States of America ("United States"), acting through the United States Attorney's Office for the Eastern District of California, on behalf of the Corporation for National and Community Service, an agency of the United States Government (the "Corporation") (hereafter collectively referred to as the "United States"); and St. HOPE Academy ("St. HOPE"), through its authorized representatives, Kevin Johnson, individually ("Johnson"), and Dana Gonzalez, individually ("Gonzalez"), through their authorized representatives. Hereinafter, the United States, St. HOPE, Johnson and Gonzalez are jointly referred to as "the Parties."

### II. PREAMBLE

As a preamble to this Settlement Agreement, the Parties agree to the following:

A.    AmeriCorps grant funds were awarded by the State of California to and administered by St. HOPE under grant award numbers 03AFHCA002Y11-F102, 03AFHY12-F102, and 06AFHY13-F102 ("AmeriCorps Grants"). Additionally, AmeriCorps members were entitled to Education Awards if they fulfilled their service requirements for St. HOPE pursuant to the terms of the grant requirements. The Education Awards and grants awarded to St. HOPE (collectively the "Grant Awards") totaled $847,673.00.

B.    During the majority of the relevant time period herein, Johnson was the President and Chief Executive Officer of St. HOPE, and Gonzalez was the Executive Director of St. HOPE.

United States v. St. HOPE Academy
Settlement Agreement                          1

C.    The United States contends that St. HOPE did not appropriately spend the Grant

Awards pursuant to the terms of the grant requirements, and did not adequately document its

expenditures of the Grant Awards.

D.    By letters dated September 24, 2008, the Debarment and Suspension Official for

the Corporation, notified St. HOPE, Johnson and Gonzalez that they were suspended from

participation in Federal procurement and nonprocurement programs for a temporary period of

time pending the completion of an investigation by the United States Attorney's Office, or the

conclusion of any legal or debarment proceedings resulting from the investigation, of the alleged

misuse of Federal funds provided in support of the AmeriCorps Grants.

E.    This Settlement Agreement is not an admission of liability or fault by St. HOPE,

Johnson or Gonzalez, nor a concession by the United States that its claims are not well founded.

However, as acknowledged below and in the attached Stipulation for Judgment, St. HOPE

acknowledges that it did not adequately document a portion of its expenditures of the Grant

Awards.

F.    To avoid the delay, uncertainty, inconvenience, and expense of further litigation,

the Parties mutually desire to reach a full and final settlement of the Parties' claims with respect

to the AmeriCorps Grants and Grant Awards and the related claims and investigation, pursuant

to the Terms and Conditions set forth below.

G.    Although issues of suspension and possible debarment are ordinarily addressed by

the Corporation separately from resolution of any civil claims, at the request of St. HOPE,

Johnson and Gonzalez for a global resolution of all matters related to the AmeriCorps Grants and

Grant Awards, this Settlement Agreement also addresses the resolution of suspension issues and further proceedings, if any, related to debarment proceedings.

NOW, **THEREFORE**, in consideration of the mutual promises, covenants, conditions, terms, and obligations set forth in this Settlement Agreement, the Parties agree to settle this matter as follows:

## III. TERMS AND CONDITIONS

1.      In consideration of the obligations of the Parties set forth in this Settlement Agreement, St. HOPE agrees to pay the total sum of Four Hundred Twenty-Three Thousand Eight Hundred Thirty-Six Dollars and Fifty Cents ($423,836.50) (the "Settlement Amount"). St. HOPE shall pay the Settlement Amount to the United States as follows:

a.      An initial payment of Seventy-Three Thousand Eight Hundred Thirty-Six Dollars and Fifty Cents ($73,836.50) (the "Initial Payment") by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the Eastern District of California. St. HOPE agrees to make this electronic funds transfer within 5 business days of this Settlement Agreement being signed by all parties.

b.      Johnson believes that St. HOPE has played a significant role in the community and he believes that it will continue to do so. Johnson has decided to assist St. HOPE in paying the settlement amount and agrees to pay Seventy-Two Thousand Eight Hundred Thirty-Six Dollars and Fifty Cents ($72,836.50) of the Initial Payment by paying such amount to St. HOPE in time for St. HOPE to make the Initial Payment to the United States pursuant to the terms of this Settlement Agreement. Johnson and St. HOPE may enter into an agreement

United States v. St. HOPE Academy
Settlement Agreement                    3

whereby St. HOPE agrees to repay Johnson when St. HOPE has the financial ability to do so while still meeting all of its other financial obligations.

        c.    Gonzalez believes that St. HOPE has played a significant role in the community and she believes that it will continue to do so. Gonzalez has decided to assist St. HOPE in paying the settlement amount and agrees to pay One Thousand Dollars ($1,000.00) of the Initial Payment by paying such amount to St. HOPE in time for St. HOPE to make the Initial Payment to the United States pursuant to the terms of this Settlement Agreement.

        d.    St. HOPE shall enter into a stipulated judgment for the remainder of the Settlement Amount, Three Hundred and Fifty Thousand Dollars ($350,000.00), plus 5% annual interest. Such amount shall be paid by certified check payable to the United States Department of Justice in the amount of Thirty-Five Thousand Dollars ($35,000.00) annually for ten years, each payment being due on or before April 15th of each year. The first payment pursuant to the Stipulated Judgment is due on or before April 15, 2010. The final payment shall be in the amount of Thirty-Five Thousand Dollars ($35,000.00), plus the interest due and owing on the stipulated judgment, and shall be due on or before April 15, 2019.

    2.    Within 5 business days of this Settlement Agreement being signed by all parties, Johnson and Gonzalez shall register to take an on-line course offered by Management Concepts titled "Cost Principles", and shall provide written proof to the Corporation, through its counsel, of having registered for the course. Johnson and Gonzalez agree to complete the course within 120 days of this Settlement Agreement being signed by all parties, and shall provide written verification under oath of having completed the course.

3. The Corporation shall terminate the suspension of St. HOPE, Johnson and Gonzalez from participation in Federal procurement and nonprocurement programs upon all of the following:

    a. This Settlement Agreement having been signed by all parties;

    b. St. Hope having made the Initial Payment pursuant to the terms of Paragraph 1a-c above;

    c. St. HOPE having signed the Stipulated Judgment in accordance with Paragraph 1d above;

    d. Johnson and Gonzalez having made the payments in accordance with Paragraph 1b-c above; and

    e. Johnson and Gonzalez having provided verification of having registered for the course in accordance with Paragraph 2 above.

4. The Corporation agrees not to institute debarment proceedings against St. HOPE with respect to the AmeriCorps Grants and Grant Awards so long as it complies with the terms of this Settlement Agreement. The Corporation also agrees not to institute debarment proceedings against Johnson and Gonzalez with respect to the AmeriCorps Grants and Grant Awards so long as they comply with their obligations under this Settlement Agreement, including the certification of course completion pursuant to Paragraph 2 above.

5. Once the Corporation has terminated the suspension against St. HOPE, Johnson and Gonzalez, nothing herein is intended as a prohibition against their applying for federal grants. However, St. HOPE agrees that it may be considered a high-risk grantee by the Corporation for a period of two years, until April 15, 2011. After April 15, 2010, and upon the

request of St. HOPE and its submission of any supporting documents, the Corporation agrees to reconsider this high-risk designation to determine if it should be rescinded.

6.    Subject to the exceptions in Paragraph 7 below, in consideration of the obligations of St. HOPE, Johnson and Gonzalez in this Settlement Agreement, and conditioned upon the full payment by St. Hope of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) hereby releases St. HOPE and its current and former directors, officers, agents, shareholders, and employees (including Johnson and Gonzalez), from all liability for any civil claims, demands, obligations, actions, causes of action, damages, costs, losses, attorneys' fees, and expenses, which the United States has or may have relating to the application and handling of the AmeriCorps Grants and payment of the Grant Amounts, investigation and litigation of this matter (including public statements), and matters related to the suspension and possible debarment of St. HOPE, Johnson and Gonzalez, including under the False Claims Act, 31 U.S.C. §§ 3729-3733, or the Program Fraud Civil Remedies Act and its implementing regulations, 31 U.S.C. §§ 3801-3812, 45 CFR Part 2554.

7.    Notwithstanding any term of this Settlement Agreement, specifically reserved and excluded from the scope and terms of this Settlement Agreement as to any entity or person are the following claims of the United States:

a.    Any civil, criminal, or administrative liability arising under Title 26, United States Code (Internal Revenue Code);

b.    Any criminal liability; and

c.    Any liability to the United States (or its agencies) for any conduct other than that explicitly released in this Settlement Agreement.

United States v. St. HOPE Academy
Settlement Agreement                          6

8.     In consideration of the obligations of the United States set forth in this Settlement Agreement, St. HOPE and its current and former directors, officers, agents, shareholders, and employees (including Johnson and Gonzalez), hereby release the United States and its employees, former employees, agents, agencies, and departments from all liability for any civil claims, demands, obligations, actions, causes of action, damages, costs, losses, attorneys' fees, and expenses, which they have or may have as of the Effective Date of this Settlement Agreement relating to the application and handling of the AmeriCorps Grants, payment of the Grant Awards, investigation and litigation of this matter (including public statements), and matters related to the suspension and possible debarment of St. HOPE, Johnson and Gonzalez.

9.     The Parties to this Settlement Agreement shall bear their own costs, attorneys' fees, and expenses incurred in any manner in connection with the investigation, litigation, and resolution of this matter.

10.     This Settlement Agreement is binding upon St. HOPE's successors, transferees and assigns. Otherwise, this Settlement Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity not expressly released by this Settlement Agreement.

11.     The individual signing this Settlement Agreement on behalf of St. HOPE represents and warrants that he or she has the power, consent, and authorization of St. HOPE to execute this Settlement Agreement.

12.     The individuals signing on behalf of the United States represent that they are signing this Settlement Agreement in their official capacities and that they are authorized to execute this Settlement Agreement.

13.     Each Party represents and warrants that it has not transferred anything being released under this Settlement Agreement, and is not aware of any such transfer, and that the Party is not aware of any prohibition of any type that prevents the Party from performing the terms of this Settlement Agreement.

14.     St. HOPE warrants that it has reviewed its financial situation and that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and will remain solvent following payment to the United States of the Settlement Amount.

15.     The Parties warrant that, in evaluating whether to execute this Settlement Agreement, they (i) have intended that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to St. HOPE, Johnson and Gonzalez, within the meaning of 11 U.S.C. § 547(c)(1), and (ii) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended and do, in fact, represent a reasonably equivalent exchange of value which is not intended to hinder, delay, or defraud any entity to which St. HOPE, Johnson or Gonzalez was or became indebted on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

16.     Nothing in this Settlement Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of Title 26, United States Code (Internal Revenue Code).

17.     Each Party warrants that it has been represented by, and has sought and obtained the advice of, independent legal counsel with regard to the nature, purpose, and effect

of this Settlement Agreement. This Settlement Agreement was negotiated by the Parties and their respective counsel, each of whom had the opportunity to participate in the drafting thereof. The Parties hereby declare that the terms of this Settlement Agreement have been completely read, fully understood, and voluntarily accepted following opportunity for review by legal counsel of their choice.

18.    Each Defendant warrants and represents that it is freely and voluntarily entering into this Settlement Agreement without any degree of duress or compulsion whatsoever, after having been apprised of all relevant information and data by its legal counsel. Defendants further warrant and represent that no other party or its representative has made any promise, representation or warranty, express or implied, except as expressly set forth in this Settlement Agreement, and that the Defendants have not relied on any inducements, promises, or representations made by any Party to this Settlement Agreement, or its representatives, or any other person, except as expressly set forth herein.

19.    The Parties understand and acknowledge that if the facts relating to the application and handling of the subject grants and payment of the grant amounts are found hereafter to be different from facts now believed by any Party described herein to be true, each Party expressly accepts and assumes the risks of such possible difference in facts and agrees that this Settlement Agreement shall remain effective, notwithstanding any such differences.

20.    The Parties expressly recognize that the United States may publicly disclose this Settlement Agreement, and information about the case and this Settlement Agreement.

21.    This Settlement Agreement constitutes the complete agreement between the Parties, and supercedes and replaces all prior negotiations and agreements, whether written or

United States v. St. HOPE Academy
Settlement Agreement                                      9

oral, relating to the application and handling of the subject grants and payment of the grant amounts

22.     This Settlement Agreement may be executed in counterparts, and each of the counterparts taken together shall constitute one valid and binding Settlement Agreement between the Parties.

23.     This Settlement Agreement may not be altered, amended, or modified, except by a writing duly executed by authorized representatives of all of the Parties.

24.     This Settlement Agreement is governed by the laws of the United States.  The Parties agree that, should any judicial action be required to enforce or interpret this Settlement Agreement, or to resolve any dispute hereunder, the exclusive jurisdiction and venue for such action shall be in the United States District Court for the Eastern District of California.

25.     This Settlement Agreement is effective, final, and binding as of the date of signature of the last signatory to the Settlement Agreement ("Effective Date").  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Settlement Agreement.

## UNITED STATES OF AMERICA

Dated: April 9 2009

LAWRENCE G. BROWN
Acting United States Attorney

By:

KENDALL J. NEWMAN
Assistant United States Attorney
Chief, Civil Affirmative Section

Attorneys for
United States of America

Dated: April 9, 2009

WILLIAM ANDERSON
Acting Chief Financial Officer and
Debarment and Suspension Official
on behalf of the Corporation for National
and Community Service

Dated: April 9, 2009

FRANK R. TRINITY
General Counsel
on behalf of the Corporation for National
and Community Service

ST. HOPE ACADEMY

Dated: 4/9/09

By: _____
Name: Acting Executive Director
Title: Lori Mills

Approved as to form:

Dated: _____

SEGAL & KIRBY

_____
MALCOLM S. SEGAL, Esq.
Attorneys for St. HOPE Academy

KEVIN JOHNSON

Dated: 4/9/09

_____
KEVIN JOHNSON, in his individual capacity

Approved as to form:

Dated: _____

STEVENS, O'CONNELL & JACOBS LLP

_____
MATTHEW G. JACOBS, Esq.
Attorneys for Kevin Johnson

DANA GONZALEZ

Dated: 4/9/09

_____
DANA GONZALEZ, in her individual capacity

Approved as to form:

Dated: _____

THE LAW OFFICES OF RICHARD PACHTER

_____
RICHARD PACHTER, Esq.
Attorney for Dana Gonzalez

United States v. St. HOPE Academy
Settlement Agreement                    12

ST. HOPE ACADEMY

Dated: _____                     By: _____
                                             Name:
                                             Title:

Approved as to form:

Dated: **04·09·09**                          SEGAL & KIRBY

                                             _____
                                             MALCOLM S. SEGAL, Esq.
                                             Attorneys for St/HOPE Academy


KEVIN JOHNSON

Dated: _____                     _____
                                             KEVIN JOHNSON, in his individual capacity

Approved as to form:

Dated: _____                     STEVENS, O'CONNELL & JACOBS LLP

                                             _____
                                             MATTHEW G. JACOBS, Esq.
                                             Attorneys for Kevin Johnson

DANA GONZALEZ

Dated: _____                     _____
                                             DANA GONZALEZ, in her individual capacity

Approved as to form:

Dated: _____                     THE LAW OFFICES OF RICHARD PACHTER

                                             _____
                                             RICHARD PACHTER, Esq.
                                             Attorney for Dana Gonzalez

**ST. HOPE ACADEMY**

Dated: _____          By:_____
                                  Name:
                                  Title:

Approved as to form:

Dated: _____               SEGAL & KIRBY

                                  _____
                                  MALCOLM S. SEGAL, Esq.
                                  Attorneys for St. HOPE Academy


·KEVIN JOHNSON

Dated: _____           _____
                                  KEVIN JOHNSON, in his individual capacity

Approved as to form:

Dated: 4/9/09                      STEVENS, O'CONNELL & JACOBS LLP

                                  _____
                                  MATTHEW G. JACOBS, Esq.
                                  Attorneys for Kevin Johnson

DANA GONZALEZ

Dated: _____           _____
                                  DANA GONZALEZ, in her individual capacity

Approved as to form:

Dated: _____           THE LAW OFFICES OF RICHARD PACHTER


                                  _____
                                  RICHARD PACHTER, Esq.
                                  Attorney for Dana Gonzalez

United States v. St. HOPE Academy                12
Settlement Agreement

**ST. HOPE ACADEMY**

Dated: _____        By:_____
                                Name:
                                Title:

Approved as to form:

Dated: _____            SEGAL & KIRBY

                                _____
                                MALCOLM S. SEGAL, Esq.
                                Attorneys for St. HOPE Academy


**KEVIN JOHNSON**

Dated: _____        _____
                                KEVIN JOHNSON, in his individual capacity

Approved as to form:

Dated: _____        STEVENS, O'CONNELL & JACOBS LLP

                                _____
                                MATTHEW G. JACOBS, Esq.
                                Attorneys for Kevin Johnson


**DANA GONZALEZ**

Dated: _____        _____
                                DANA GONZALEZ, in her individual capacity

Approved as to form:

Dated:  April 8, 2009           THE LAW OFFICES OF RICHARD PACHTER

                                _____
                                RICHARD PACHTER, Esq.
                                Attorney for Dana Gonzalez

<u>United States v. St. HOPE Academy</u>
Settlement Agreement                12

# Cost Principles:  2 CFR 220 (A-21), 225 (A-87), and 230 (A-122), and FAR 31.2

## Management Concepts Incorporated
8230 Leesburg Pike, Suite 800
Vienna, Virginia 22182

Phone:  703.790.9595      E-Mail:    Info@managementconcepts.com
Fax:    703.790.1371      Web Site:  www.managementconcepts.com

*The Management Concepts logo and the name "Management Concepts" are registered trademarks belonging to Management Concepts, Inc. Reproduction of these materials, in whole or in part, is strictly prohibited.*

© 2007 - 1996 by Management Concepts Incorporated
No claim to previously copyrighted material or works in the public domain.
All rights reserved.
Printed in the United States of America.

*Cost Principles:  2 CFR 230 (A-21), 225 (A-87), and 230 (A-122), and FAR 31.2*
Course No.  2080
JD 33806

COST PRINCIPLES: 2 CFR 220 (A-21),
225 (A-87), AND 230 (A-122), AND FAR 31.2

# Syllabus

## Course Description

This two-day *Cost Principles: 2 CFR 220 (A-21), 225 (A-87), and 230 (A-122), and FAR 31.2* course (2080) provides a firm grounding in the basic premises underlying all of the sets of cost principles, as well as practical experience applying each set of cost principles to assistance agreement situations.

## Learning Objectives

Through lecture and individual and group exercises, students will:

- discuss factors affecting allowability of costs;

- classify costs as typically direct or indirect;

- determine the allowability of selected items of cost;

- review grant application budgets to determine cost allowability;

- analyze spending decisions to determine whether they are allowable;

- gain insight into grant cost disallowances by exploring agency and court decisions.

## Required Texts

The following required materials will be issued to each student on the first day of class and will be used throughout the course.

> Management Concepts®, *Cost Principles: 2 CFR 220 (A-21), 225 (A-87), and 230 (A-122), and FAR 31.2* ©2007. [Includes text, appendices, and handouts.]

*Cost Principles: 2 CFR 220 (A-21), 225 (A-87), and 230 (A-122), and FAR 31.2*

## Suggested Prerequisites

*Introduction to Grants and Cooperative Agreements for Federal Personnel (2040)* or *Managing Federal Grants and Cooperative Agreements for Recipients (2062)*

## Successful Completion

Full (100%) attendance is expected and required. Successful completion of the course depends on class attendance, active participation in individual and group exercises, and completion of the final exam with a grade of 70% or higher.

## Course Schedule

| Day One | |
|---|---|
| **morning** | Introductions and Course Administration |
| | Chapter 1: Applicability and Development of the Cost Principles |
| | Chapter 2: Basic Concepts |
| | Exercises 2-1 through 2-3 |
| **lunch** | |
| **afternoon** | Chapter 2, Continued |
| | Exercises 2-4 through 2-8 |

© Management Concepts Incorporated

*Syllabus*

| Day Two | |
|---|---|
| **morning** | Chapter 2, Continued<br>Exercise 2-9 through 2-10<br>Chapter 3: Using and Applying the Cost Principles on the Job<br>Exercises 3-1 through 3-4 |
| **lunch** | |
| **afternoon** | Chapter 3, Continued<br>Exercises 3-5 through 3-7<br><br>Exam |

# TABLE OF CONTENTS

# Cost Principles: 2 CFR 220 (A-21), 225 (A-87), and 230 (A-122), and FAR 31.2

**Chapter 1    Applicability and Development of the Cost Principles**

1.1    Cost Principles Applicability ................................................ 1-1
    1.1.1    The Five Sets of Cost Principles ........................... 1-1
    1.1.2    Flowthrough ....................................................... 1-2
1.2    Development of Governmentwide Cost Principles ............. 1-3
    1.2.1    Why Were the Cost Principles Developed? ........... 1-3
    1.2.2    Historical Development ....................................... 1-3
    1.2.3    Recent Changes to the Cost Principles ................. 1-4

**Chapter 2    Basic Concepts**

2.1    Allowability ..................................................................... 2-1
    Exercise 2-1:    Treatment of Allowability in the Cost Principles ...... 2-5
2.2    Allocability ...................................................................... 2-7
    Exercise 2-2:    Treatment of Allocability in the Cost Principles ...... 2-9
2.3    Reasonableness ................................................................ 2-10
    Exercise 2-3:    Treatment of Reasonableness in the Cost
        Principles ............................................................... 2-11
2.4    Direct and Indirect Costs ................................................. 2-12
    Exercise 2-4:    Classifying Costs as Direct or Indirect ................... 2-15
2.5    Selected Items of Cost ..................................................... 2-16
    2.5.1    Overview .............................................................. 2-16
    Exercise 2-5:    Selected Items of Cost under 2 CFR 230 ............... 2-27
    Exercise 2-6:    Selected Items of Cost under 2 CFR 225 ............... 2-31
    Exercise 2-7:    Selected Items of Cost under 2 CFR 220 ............... 2-35
    Exercise 2-8:    Selected Items of Cost under FAR 31.2 ................. 2-39
    2.5.2    Complex Questions Relating to Allowability ......... 2-42
    Exercise 2-9:    Case Study:  Inter-Tribal Council of California ...... 2-43
    Exercise 2-10: Reviewing Questioned Costs ............................. 2-45

## Chapter 3    Using and Applying the Cost Principles on the Job

3.1    Budget Development and Review ...................................................3-1
    Exercise 3-1:    Budget Review ...................................................3-5
    Exercise 3-2:    Budget Approval ...............................................3-9
3.2    Spending Decisions....................................................................3-10
    Exercise 3-3:    Analyzing Complex Spending Decision Issues.........3-11
3.3    Documenting Costs.....................................................................3-14
    3.3.1        Explicit Documentation Standards ...................................3-14
    3.3.2        Implicit Documentation Standards ...................................3-16
    Exercise 3-4:    Analyzing Documentation Issues ............................3-21
    3.3.3        Cost Disallowances and Appeals .....................................3-23
    Exercise 3-5:    Case Study:  Tennessee Protection and Advocacy ...3-25
3.4    Site Visits ................................................................................3-28
3.5    Audits and Audit Resolution.........................................................3-29
    Exercise 3-6:    Resolving Audit Findings .....................................3-33
    Exercise 3-7: - Case Study:  Greater Philadelphia Health
                  Action, Inc. ...................................................3-35

## Appendices

1    2 CFR 230, Cost Principles for Nonprofit Organizations (OMB
    Circular A-122)

2    2 CFR 225, Cost Principles for State, Local, and Indian Tribal
    Governments (OMB Circular A-87)

3    2 CFR 220, Cost Principles for Educational Institutions (OMB
    Circular A-21)

4    Federal Acquisition Regulation (FAR) Subpart 31.2, Contracts with
    Commercial Organizations

5    A-133 Compliance Supplement, Part 3 — Compliance Requirements,
    Section B, Allowable Costs/Cost Principles

*Cost Principles: 2 CFR 220 (A-21), 225 (A-87), and 230 (A-122), and FAR 31.2*

© Management Concepts Incorporated

THE SACRAMENTO BEE   sacbee.com

This story is taken from Sacbee / Opinion

# Editorial: Johnson for mayor: time for a change

**Published Sunday, Oct. 19, 2008**

Voters trying to decide who should be the next mayor of Sacramento face clear choices and a difficult decision.

Both the clarity and the difficulty derive from the records of the candidates for mayor. Heather Fargo, seeking an unprecedented third term, is for better or worse a proven quantity. Her opponent, Kevin Johnson, is for better or worse a mass of question marks and potential.

Both have strengths that appeal to voters. Fargo has deep experience thanks to her two terms as mayor and three terms on the City Council. Many voters are likely to be drawn to her as the candidate more likely to keep things running at City Hall.

Johnson, well known from his career as a basketball player but making his first race for public office, is a hometown success story with a deep commitment to Sacramento and to the Oak Park neighborhood where he grew up. Many voters will be drawn to him because of his energy and dynamic personality.

But while each of the candidates has distinct strengths, both candidates also have serious weaknesses.

In Fargo's case, the weakness is her leadership, or in some cases the absence of it. In two terms as mayor, she has worked hard on a vital public safety issue – flood control. While she can point to progress downtown and in midtown neighborhoods, that progress has been halting, and much of it took place without her involvement. Her efforts to lead on the development of a new arena for the Sacramento Kings were inept. She has seemed oblivious to the rise in crime in recent years and the needs of the city's public schools. This is not the kind of track record voters should expect from such an experienced officeholder.

Kevin Johnson, too, is flawed. His efforts to rebuild Oak Park through both the St. HOPE nonprofit and his development business have been admirable. But they are clouded by a federal investigation of St. HOPE's Hood Corps contract and Johnson's inclination to take on too many projects at once.

His conduct of this campaign has raised questions about his judgment. With the city facing a huge budget deficit next year, he has promised to increase spending on public safety and has signed a pledge to support a vague but expensive proposal by the powerful firefighters union. The most charitable interpretation of these actions is that he has a lot to learn.

So how, given the candidates' strengths and weaknesses, are voters to decide? Start by

naming your top priority for the city – developing the riverfront, combating gangs, diversifying the local economy, whatever – and then ask yourself this: Is that goal more likely to be accomplished through more of the same or through a new direction in the mayor's office?

The answer, it seems to us, is that it's time for new leadership and a new navigator. That makes Kevin Johnson the better choice.

Johnson, more than Fargo, has a vision for what Sacramento's next century could look like. He's spent time traveling to other cities, networking and learning about innovations that would help Sacramento mature.

More than Fargo, Johnson has an interest, and an awareness, in the city's more troubled neighborhoods. He'd be a champion of Del Paso Heights, Meadowview and Oak Park, along with newer neighborhoods, such as the Pocket area and North Natomas.

In voting for Kevin Johnson, Sacramentans will be opting for change, not writing a blank check. They will be saying they are willing to take a chance on him, because they believe he can grow into a mayor who can make Sacramento a better place to live.

The next mayor must guide the city through a period of financial challenges. That will require energy, to be sure, but it also will require toughness, flexibility and vision. In this race between two imperfect candidates, Kevin Johnson has the better chance to deliver what Sacramento needs.

**THE SACRAMENTO BEE**  sacbee.com

This story is taken from Sacbee / Opinion

# Editorial: AmeriCorps case needs resolution

**Published Tuesday, Mar. 24, 2009**

Since AmeriCorps began in September 1994, about 2,600 nonprofit and community groups a year have worked with volunteers to improve communities. For their service, volunteers get a $4,725 education award for college or graduate school and a living allowance.

Unfortunately, but not surprisingly, some nonprofit organizations working with AmeriCorps volunteers have run into problems that range from human error and ignorance of regulations to outright fraud.

In Sacramento, St. HOPE Academy's Neighborhood Corps ("Hood Corps" for short), received federal grants from 2004 to 2007. Under these grants, AmeriCorps volunteers were supposed to tutor students at St. HOPE's charter schools, redevelop one building a year in Oak Park and coordinate marketing and logistics for the Guild Theater and 40 Acres Art Gallery.

The AmeriCorps' office of the inspector general began looking at Hood Corps in April 2008; in preliminary findings last September, it found that two St. HOPE employees received AmeriCorps living allowances and education awards – duplicating their salaries.

The inspector general also found that AmeriCorps volunteers were engaged in activities beyond the scope of the grant – such as recruiting students for Sac High and for a new charter opening in Harlem and doing clerical tasks at Sac High. The IG found that AmeriCorps volunteers were driving St. HOPE founder Kevin Johnson around, washing his car and picking up his dry cleaning. They also handed out fliers recommending a slate of Sac City school board candidates.

Johnson has admitted "administrative errors." The usual remedy in these cases is repayment.

In some cases, there is also a fine. (That's what happened when the YMCA of New York was found to be padding AmeriCorps volunteer hours in a tutoring program).

In Sacramento, the IG's findings have not led to criminal charges. In November, the U.S. attorney said the material submitted by the IG fell short of proving criminal conduct and sent the case back for more information. The matter is dragging on.

Normally, such slowness wouldn't matter. But in this case, the IG took the unusual step of suspending St. HOPE Academy, Johnson (now Sacramento's mayor) and former Hood Corps director Dana Gonzalez (now a mayoral volunteer) from receiving federal funds for up to a year pending completion of the investigation.

Now, the city of Sacramento has received an opinion that Johnson's suspension may preclude the city from getting federal funds if he influences their use. And the IG's office has "declined to say when the review would be finished."

Given the potential consequences of a suspension, the IG's office should either expedite the case – getting repayment and/or fines under way – or lift the suspension if the case is expected to drag on indefinitely. The original reason for suspension was to protect the public from "potential repetition of this conduct" while the investigation was ongoing. Johnson and Gonzalez have stepped down from their positions at St. HOPE and Hood Corps, so that should no longer be a concern.

This situation cries out for resolution. This is a case where everybody would be better off if the nonprofit and the IG reach a repayment settlement for the errors and move on.

ShareThis

**THE SACRAMENTO BEE** sacbee.com

This story is taken from Sacbee / Opinion

# My View: The federal aid ball is in Johnson's court

### Special to The Bee

### Published Tuesday, Mar. 31, 2009

Your March 24 editorial, without basis, attacks my Inspector General office for "dragging on" with our investigation of St.-HOPE Academy and its principals so that the city of Sacramento may be precluded "from getting federal funds" due to the fact that on Sept. 24, 2008, Mr. Kevin Johnson was suspended "from receiving federal funds."

The relevant law – which I would have thought that you would have researched before writing your editorial – demonstrates that you are targeting the wrong entity for any delay of the determination of whether Johnson's suspension was appropriate.

Some background: As inspector general, I am duty-bound to take action to uncover and to prevent fraud and waste in the almost $1 billion of taxpayers' money that is disbursed by the Corporation for National and Community Service.

Under controlling regulations, suspension from receiving or controlling federal funds is one of the tools available, where there "exists ... adequate evidence to suspect ... commission of fraud ... making false claims ... or commission of any other offense indicating a lack of business integrity or business honesty that seriously and directly affects (the person's) present responsibility ... or violation of the terms of a public agreement or transaction so serious as to affect the integrity of an agency program, such as willful failure to perform in accordance with the terms of one or more public agreements or transactions."

For a suspension to occur, my office must recommend the suspension to the deciding official (who is not in my office) and provide adequate evidence to support the suspension to the deciding official. That was done here. The suspending official there- after notified Johnson of the suspension.

Most important is that the regulations give any person or entity suspended – including Johnson – the right "to contest a suspension" by "provid(ing) the suspending official with information in opposition to the suspension ... within 30 days after (receipt of) the Notice of Suspension." The opposition submission cannot rely on "a general denial"; instead, it must include "specific facts that contradict the statements made in the Notice of Suspension."

Thus, contrary to your editorial, the ball on the suspension has been in Johnson's court since the order of suspension was issued.

Apparently, he made the decision not to appeal the suspension by providing specific facts that would show to the neutral suspension official that the suspension was not warranted. If, as you charge (without basis), that suspension in these circumstances was an "unusual step,"

the procedures allowed Johnson to seek to lift the suspension. He decided not to do so.

Your editorial also refers to a criminal investigation or civil monetary recovery or settlement. I do not comment on such matters unless they are public.

But, in any event, those legal avenues are irrelevant here as they are in no way connected with the ability of the city of Sacramento to obtain federal funds – only the suspension order has that effect.

ShareThis

*Gerald P. Walpin is the inspector general of the Corporation for National and Community Service.*

**THE SACRAMENTO BEE**  sacbee.com

This story is taken from Sacbee / Capitol and California / Government/Politics

# Sacramento mayor threatens to sue over his suspension from receiving U.S. funds

**rlillis@sacbee.com**

**Published Wednesday, Apr. 01, 2009**

Sacramento Mayor Kevin Johnson threatened to sue the federal government Tuesday if he is not immediately taken off a list of individuals barred from receiving federal funds.

According to Johnson's attorney, the matter has become "extremely urgent" since a legal expert said earlier this month that Johnson's suspension would likely hinder the city's ability to receive federal aid – including millions of dollars in economic stimulus funding.

In a letter obtained by The Bee on Tuesday, the attorneys representing Johnson, St. HOPE Academy and former St. HOPE official Dana Gonzalez wrote that their clients' constitutional rights were violated because they were suspended by the federal Corporation for National and Community Service without a hearing.

The attorneys also wrote that their clients' names were tarnished when the federal agency "levied extremely stigmatizing accusations" against them through press releases and a Web site news advisory that included large red headlines.

Johnson's legal threat was included in a letter sent to William Anderson, a suspension and debarment official with the Corporation for National and Community Service. A corporation spokesman could not be reached for comment.

The mayor's spokesman, Steve Maviglio, said Johnson believes his suspension is "unnecessary and unfair."

"We have continued to work in good faith with the U.S. attorney's office and AmeriCorps, and will explore every avenue possible, including the courts, to make sure that this improper suspension does not affect the citizens of Sacramento," Maviglio said.

According to a probe by the Office of the Inspector General for the Corporation for National and Community Service, Johnson and officials with the nonprofit Hood Corps organization he founded improperly used some of the $807,000 in federal grant money the urban Peace Corps-style organization received between 2004 and 2007.

Authorities placed Johnson and Hood Corps on the federal Excluded Parties List last year – before Johnson was elected mayor – following the preliminary investigation.

Placement on the suspension list was warranted due to the serious nature of the allegations, federal authorities said.

A federal audit of Hood Corps is ongoing.

Soon after Johnson was elected mayor in November, City Attorney Eileen Teichert hired Washington, D.C., attorney Frederic M. Levy – an expert on government contracting and compliance – to determine whether Johnson's inclusion on the suspension list would hinder the city's ability to receive federal aid.

According to a confidential memo from Levy obtained exclusively by The Bee, the city was likely barred from receiving federal funds while Johnson was on the list.

Levy wrote that federal agencies would likely determine Johnson was a "principal" in city financial decisions, a determination that would "prevent the City from obtaining ... federal grants, subsidies, or cooperative agreements."

City officials have refused to make Levy's memo public – or release it to media – because they say it contains attorney-client privileged information.

The city has already received nearly $50 million in federal grants since Johnson took office in December. City officials had not been notifying federal agencies of Johnson's suspension but said last week they would begin doing so.

The U.S. attorney's office in Sacramento said last year that the findings turned over by the inspector general did not warrant criminal charges. The U.S. attorney requested additional information and held out the possibility of filing a civil action, pending the results of the audit.

Johnson's attorneys and federal authorities are working on a civil settlement on the case.

Matt Jacobs, Johnson's attorney, said earlier this month he expected any settlement would include the mayor's removal from the suspension list.

ShareThis

*Call The Bee's Ryan Lillis, (916) 321-1085.*

## THE SACRAMENTO BEE  sacbee.com

This story is taken from Sacbee / Opinion

# Editorial: The case of the suspended mayor

**Published Friday, Apr. 03, 2009**

If you're wondering how Sacramento Mayor Kevin Johnson got suspended from receiving federal funds, you're not alone. Johnson's situation seems unique.

In rare cases individuals and nonprofits that have received federal funds for AmeriCorps volunteer programs have later been "debarred" from participating in federal programs and grants. Usually these actions occur after a conviction for embezzlement, theft, forgery or deliberate false claims.

The case of St. HOPE Academy's Hood Corps, which led to Johnson's suspension, is different. In Johnson's case, Inspector General Gerald Walpin decided to act before any legal body determined whether irregularities in the administration of grants from 2004-2007 reflected inadvertent errors and ignorance of regulations or actual fraud.

Walpin recommended that during the investigation, St. HOPE Academy, Johnson and former Hood Corps director Dana Gonzalez be suspended from receiving federal funds for up to a year. A "debarment official" at the Corporation for National and Community Service followed Walpin's recommendation, issuing a suspension letter in September 2008.

We asked Walpin's office what other organizations and individuals he had recommended for such serious action of suspension since becoming inspector general in January 2007. His spokesman said, "We don't keep those kinds of records." Further inquiries revealed that since its beginning in 1994, the corporation has suspended only two other organizations and three other individuals.

The inspector general has found irregularities at Hood Corps similar to those found in investigations of other nonprofits (that were not suspended). Johnson has admitted "administrative errors." The U.S. attorney in Sacramento found no criminal conduct in November. The usual remedy in such cases is repayment and, rarely, a fine.

It's not helpful that Johnson's spokesman has attacked Walpin as a "controversial right-wing Republican" and that Johnson is threatening to sue. Everybody needs to calm down and work out a repayment settlement. The current impasse is not protecting the public interest, either in Washington or Sacramento.

ShareThis

The Sacramento Bee : Sacramento Mayor Johnson reinstated to recei...    http://m.sacbee.com/sacramento/db_11055/contentdetail.htm%3Bjse...

# THE SACRAMENTO BEE

## Top Stories

**Sacramento Mayor Johnson reinstated to receive federal funds**

rlillis@sacbee.com (Ryan Lillis)

Posted:04/09/2009 3:43 PM



‹‹ Back

By Denny Walsh and Ryan Lillis | rlillis@sacbee.com

Sacramento Mayor Kevin Johnson holds a news conference at City Hall after acting U.S. Attorney Lawrence G. Brown announced Johnson has been removed from a list of individuals barred from receiving federal aid.

Sacramento Mayor Kevin Johnson has been removed from a list of individuals barred from receiving federal aid and the city will not be hindered in receiving future federal aid, according to a settlement reached with the U.S. Attorney's Office announced today.

Because Johnson and his nonprofit St. HOPE Academy have agreed to give back half of $847,673 in federal grants it received, they will be removed from a list of those suspended from access to federal funds.

Those are the key elements in a civil settlement announced by U.S. Attorney Lawrence Brown concerning allegations leveled by the Corporation for National and Community Service, which funded the grants.

In a news conference today, Brown said the settlement removes any cloud over whether the city of Sacramento is eligible for federal funding, including millions it is expecting in economic stimulus money.

According to an investigation by the Office of the Inspector General for the Corporation for National and Community Service, Johnson and officials with St. HOPE Academy improperly used some of the federal money they received between 2004 and 2007.

In response, Johnson, St. HOPE Academy and former St. HOPE official Dana Gonzalez were placed on the federal Excluded Parties List, banning them from accepting federal aid. Johnson is a founder of St. HOPE, which operates St. HOPE public schools. St. HOPE also brought businesses and jobs to Oak Park.

An expert attorney hired by the city said last month that Sacramento likely would be banned

4/23/2009 3:25 PM

The Sacramento Bee : Sacramento Mayor Johnson reinstated to recei...    http://m.sacbee.com/sacramento/db_11055/contentdetail.htm%3Bjse...

from federal funding - including economic stimulus money - as long as Johnson was on the Excluded Parties List.

The civil settlement appears to resolve that situation.

"From the get-go, I said that federal funds to the city were never at risk, and that the suspension was unwarranted and unnecessary," Johnson said in a statement released by his office. "This settlement confirms that, and it closes the chapter on this distraction so I can continue to work with President Obama, our U.S. senators, and Congresswoman Matsui for Sacramento's fair share of federal dollars and stimulus funds."

As part of the settlement, St. HOPE Academy will repay about $423,000 of the allegedly misused funds, including an initial payment of $73,836, sources told The Bee.

Of that first payment, about $72,000 will come from a loan from Johnson. The other $1,000 will come from Gonzalez, who is now a volunteer at City Hall.

St. HOPE Academy will pay off the remaining $350,000 over the next 10 years with 5 percent interest.

Johnson and Gonzalez will also take a course on the principles of federal contracting.

Once the suspensions of St. HOPE, Johnson and Gonzalez are lifted they can apply for federal grants. St. HOPE will be considered a "high-risk grantee" for two years.

"The settlement agreement in not an admission of liability or fault by St. HOPE, Johnson or Gonzalez, nor a concession by the United States that its claims are not well founded," the agreement says. St. HOPE did acknowledge poor record keeping.

Johnson, Gonzalez and St. HOPE received an assurance — in the form of a letter from John Vincent, head of the U.S. attorney's office criminal division — that there will be no federal prosecution.

Brown said he doubts state authorities would second guess that decision.

Acting U.S. Attorney Lawrence G. Brown announces at a news conference today that Sacramento Mayor Kevin Johnson has been removed from a list of individuals barred from receiving federal aid.

Text-a-friend »
« Back



4/23/2009 3:25 PM