IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GERALD WALPIN,

        Plaintiff,

v.

THE CORPORATION FOR NATIONAL AND
COMMUNITY SERVICE, NICOLA O.
GOREN, as Acting Chief Executive Officer
thereof, RAYMOND LIMON, as Chief Human
Capital Officer thereof, and FRANK TRINITY,
as General Counsel thereof,

        Defendants.

Civil Action No.  1:09-cv-01343 (RWR)

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................ 1

II.   BACKGROUND ......................................................................................... 4

III.  STANDARD OF REVIEW ........................................................................ 9

IV.   ARGUMENT ............................................................................................ 10

  A.  Mr. Walpin Has Alleged Sufficient Facts To Establish A Clear Right to
      Mandamus Relief .................................................................................... 10

      1.  The IGA Vests Inspectors General With Independence ................... 10

      2.  The Removal and Transfer of Mr. Walpin Violated the 30-day Notice
          Requirement .................................................................................. 16

          a.  The President's Action Constituted a Prohibited Removal and Transfer ..... 16

          b.  The June 11, 2009 Letter to Congress Failed to State a Reason for
              Removal .................................................................................. 19

  B.  The IGA Imposes a Clear Ministerial Duty On Defendants to Permit Mr. Walpin
      to Perform His Duties By Reinstating Him to His Office. ............................ 22

  C.  Failure to Grant Relief Will Eliminate the Independence of Inspectors
      General .................................................................................................. 29

V.    CONCLUSION .......................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*13th Regional Corp. v. Dept. of Interior,*  654 F.2d 758. (D.C. Cir. 1980) ..................... 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................. 9

*Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ........................... 28

*Conley v. Gibson*, 355 U.S. 41 (1957) ............................................................... 10

*Corley v. United States*, 129 S. Ct. 1558 (2009) .................................................... 30

*Gagliano v. Reliance Standard Life. Ins. Co.*, 547 F.3d 230 (4th Cir. 2008) .................. 25

*Galluci v. Chao*, 374 F. Supp. 2d 121 (D.D.C. 2005) ............................................ 10

*Ghaly v. U.S. Dep't of Agriculture*, 228 F. Supp. 2d 283 (S.D.N.Y. 2002) .................... 17

*Guerrero v. Clinton,* 157 F.3d 1190 (9th Cir. 1998) ............................................... 21

*Hibbs v. Winn*, 542 U.S. 88 (2004) .................................................................. 30

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ................................. 27, 28

*Jackson v. Holder*, No. 09-1453, 2009 WL 2382949 (D.D.C. July 31, 2009) ................ 23

*LaMell v. Armed Forces Retirement Home*, 104 M.S.P.R. 413 (M.S.P.B. 2007) ............ 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................... 24

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803) ......................................... 24, 25

*McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178 (1936) ................... 10

*Myers v. United States*, 272 U.S. 52 (1925) ...................................................... 26

*Natural Resources Defense Council Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988)... 20, 21

*Oliver v. U.S. Postal Service*, 696 F.2d 1129 (5th Cir. 1983) ................................. 17

*Sinclair v. Kleindienst,* 711 F.2d 291 (D.C. Cir. 1983) ...................................... 10

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ......................................... 4, 10, 21

*Wiener v. United States*, 357 U.S. 349 (1958) ..................................................... 26, 27, 28

**Statutes**

§ 3(a) Pub. L. No. 110-409 ...................................................................................... 1

5 U.S.C. app. § 11(c)(11) ..................................................................................... 13

5 U.S.C. § app. 3(a) ............................................................................................... 11

5 U.S.C. app. 3 § 2 ................................................................................................ 13

Inspector General Act of 1978 ........................................................................ *passim*

Pub. L. No. 110-409 .............................................................................................. 12

**Rules**

Fed. R. Civ. P. 12(b)(1) ........................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 1, 9

Fed. R. Civ. P. 8 ...................................................................................................... 9

Local Rule 7(f) ........................................................................................................ 1

**Other Authorities**

154 Cong. Rec. H9881 .......................................................................................... 15

154 Cong. Rec. H9882 .......................................................................................... 15

154 Cong. Rec. S10054-55 .................................................................................... 15

H.R. Rep. No. 110-354 (2007) .............................................................................. 14

S. Rep. No. 110-262 (2008) .................................................................................. 14

S. Rep. No. 95-1071 (1978) .............................................................................. 11, 12

Pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Plaintiff Gerald Walpin, by and through undersigned counsel, hereby submits the following Opposition to Defendants' Motion to Dismiss. Plaintiff also requests, in accordance with Rule 7(f) of the Local Rules of Civil Procedure, that oral argument be taken on Defendants' Motion.

## I.    INTRODUCTION

Being the watchdog against fraud, waste, and abuse will not make one a lot friends, however, Mr. Walpin accepted the position as the Inspector General ("IG") for the Corporation for National and Community Service ("CNCS") at age 76 because he thought it was a meaningful way to serve, and give something back to the country that had been so good to him.[1]  By the end of 2008, he received reconfirmation of how much Congress valued the office when Congress provided clear statutory protections through the Inspector General Reform Act of 2008, including:  a) a 30-day Congressional notice requirement before an IG is "transferred" or "removed"; and b) a mandatory statement of the "reason" for his "transfer" or "removal" in the same congressional notice.  § 3(a), Pub. L. No. 110-409, 122 Stat. 4302.  The past months had included controversial matters and some clashes with the CNCS Board, but on June 10, 2009, Mr. Walpin had no suspicion that it would be his last day as the CNCS Inspector General.  He was wrong.

Notwithstanding the plain language of the Inspector General Act of 1978 ("the IGA"), as amended, 5 U.S.C. 3 app. § 3(b),  a White House Official, purporting to act on behalf of the President, informed Mr. Walpin that he was removed from his position as

---

[1] Mr. Walpin also spent the first ten years of his legal career in government service, including time in the U.S. Air Force and as an Assistant United States Attorney.

1

Inspector General, barred from his office, and transferred to so-called administrative leave status, thereby violating the IGA's mandate to notify both Houses of Congress at least 30 days before removing or transferring an Inspector General, i.e., Mr. Walpin, from his position. The President's "notice" to Congress, by letter dated June 11, 2009 — the day after the White House barred him from his IG position — concealed from Congress that Mr. Walpin had already been transferred to administrative leave status and barred from performing his IG duties, by informing Congress only that he was removing Mr. Walpin "effective 30 days from today." Yet in a brief moment of candor, the White House, in a June 16, 2009, letter, correctly described the reality of what it had done, stating "that Mr. Walpin was removed." (*See* Defs. Mem. Ex. E.)

Now, in their Motion to Dismiss, Defendants once again revert to semantics and argue that administrative leave status is a "personnel action otherwise authorized by law," which, they assert, is exempted from the IGA's requirement of 30 days' advance notice to Congress. But Defendants' position is contravened by express statutory language which excludes from that exemption any personnel action which effects a "removal or transfer." Both by definition and as applied, the action taken against Mr. Walpin, on June 10, 2009, constituted his immediate removal from his position as Inspector General — clearly in advance of any notice to Congress.

Defendants completely disregard the obvious importance that Congress attached to the Office of Inspector General ("Office" or "OIG") and its respective ability to function independent of undue pressure. Legislative history demonstrates that one purpose for the 30 days' advance notice requirement was to ensure that an Inspector General had at least 30 days to carry out and/or complete pending audits and

2

investigations.  Here, Mr. Walpin was in the midst of several important investigations when he was barred from his office, staff, and records.

Contrary to Defendants' mischaracterization of the Amended Complaint, Mr. Walpin is not asking the Court to intercede in Congress' relationship with the Administration by adjudicating the sufficiency of the President's reasons for removing Mr. Walpin.  The law requires the President to timely report to Congress his reasons for removal so that Congress may do just that.   Unless Defendants can demonstrate that this year June 11 came 30 days prior to June 10, it strains credulity for them to claim Mr. Walpin has failed to state a cause of action for violation of the IGA.  Moreover, when the President did report to both Houses of Congress, he failed to provide any "reason" for Mr. Walpin's removal, as distinguished from a mere conclusion that he wanted Mr. Walpin out.

The facts set forth in the Amended Complaint sufficiently support Plaintiff's claim for the issuance of an order of mandamus in the nature of an affirmative injunction.  The President improperly removed Mr. Walpin and in doing so he violated the limitations set forth in the IGA.  To retroactively justify its unlawful action, the Administration then engaged in character assassination and impugned Mr. Walpin's professional reputation and credibility in an attempt to avoid responsibility for its actions.  Mr. Walpin has a clear and indisputable right to continue in office, to have his employment record corrected, and to get his reputation back.

Defendants have the ministerial duty of maintaining the employment records of personnel in the Office of Inspector General, including Mr. Walpin's records, and can implement any order of this Court and correct Mr. Walpin's employment records to

reflect that he was not lawfully removed, and thus continue as CNCS Inspector General. Finally, there is no other adequate remedy available to Mr. Walpin to obtain the relief to which he is legally entitled — i.e., reinstatement until the statutory conditions precedent to removal are met and the correction of his employment records to reflect that his removal was unlawful and that he was, at all relevant times, the CNCS IG.

The requested writ of mandamus should be issued consistent with more than two hundred year's of jurisprudence beginning with *Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803), and recently reaffirmed by the Court of Appeals for this Circuit in *Swan v. Clinton,* 100 F.3d 973 (D.C. Cir. 1996). Chief Justice Marshall taught long ago when Secretary Madison sought to withhold Marbury's commission that federal officers are "bound to obey the laws" and, therefore, cannot implement the unlawful instructions of a President to bar a duly appointed official from his office. *Marbury,* 5 U.S. at 158. He also made clear that the courts have the authority to compel obedience to the law through a writ of mandamus when a president seeks to exercise removal power he does not posses. *See id.* at 157. Nothing has changed. Defendants, like all federal officers, must obey the law and disregard the unlawful commands of the President, and the federal courts must enforce it where they do not.

## II.    BACKGROUND[2]

On January 6, 2007, following his nomination by President George W. Bush and confirmation by the United States Senate, Mr. Walpin became the Inspector General of CNCS. (Am. Compl. ¶ 2.) During the next two years, he performed his duties with

---

[2] Unless otherwise supported by a citation to Plaintiffs' Exhibit A, which is attached only in response to Defendants' 12(b)(1) motion, the facts are taken from Plaintiffs' Amended Complaint and the documents incorporated therein by reference.

distinction, earning many commendations for his service.  (Am. Compl. ¶¶ 3, 20-23.) Unfortunately, Mr. Walpin performed his duties too well in the view of the White House and the heads of CNCS.  (Am. Compl. ¶¶ 4, 27.)

Beginning in April, and continuing through June of 2009, Mr. Walpin and OIG staff vigorously investigated and exposed, *inter alia*, two separate misuses of CNCS grant money that would eventually lead to his termination.  (Am. Compl. ¶ 24.)  First, following an audit by career personnel, Mr. Walpin reported that approximately $80,000,000 in grant funds, the largest ever of its type, was improperly provided to and accepted by City University of New York ("CUNY").  CNCS Management strenuously objected to the report, and the CNCS Board refused to independently evaluate its merits. (Am. Compl. ¶¶ 24-26.)

Second, Mr. Walpin filed a report with Congress critical of a settlement CNCS had reached in connection with the misuse by Kevin Johnson of an $850,000 grant, previously exposed by Mr. Walpin's office.  (Am. Compl. ¶ 24.)  Mr. Johnson reportedly is a supporter and friend of the President, and the current mayor of Sacramento, California.  *Id.*  Nevertheless, career OIG investigators determined that he misused grant money — the facts they relied upon were never disputed — and Mr. Walpin sought to have his case treated like any other.  *Id.*

Despite his efforts, CNCS settled the matter without Mr. Walpin's participation, and over his express objection.  *Id.*  Mr. Walpin notified CNCS and the Acting U.S. Attorney in Sacramento that he intended to report to Congress this waste of federal funds, and, in response, they generated a complaint with the Integrity Committee of the Council of the Inspectors General on Integrity and Efficiency, the body created by Congress to

receive and determine the merits of complaints against an Inspector General.  (*See* Defs.

Mem. Ex. E.)  It would eventually be summarily dismissed.  By letter dated October 19,

2009, the Integrity Committee advised Mr. Walpin:

> After carefully considering the allegations described in the
> complaint together with your response, the IC determined
> that the response sufficiently and satisfactorily addressed
> the matter and that further inquiry or an investigation
> regarding the matter was not warranted.

(Pl. Ex. A.)[3]

Not long after issuance of his Report to Congress, Mr. Walpin's Office discovered

evidence that Mr. Johnson had concealed subpoenaed documents and destroyed others.

(Am. Compl. ¶ 26.)  Mr. Walpin, therefore, announced that an investigation for

obstruction of justice should be opened.  (Defs. Mem. Ex. E.)

Shortly thereafter, on June 10, 2009, Mr. Walpin received a telephone call from

Norman L. Eisen, the president's Special Counsel, while driving to a judicial conference.

(Am. Compl. ¶ 29.)  Mr. Eisen informed Mr. Walpin that he had one hour to agree to

tender his resignation or be fired.  *Id.*  Mr. Walpin asked why the White House sought to

remove him; Mr. Eisen simply responded that it was "time to move on."  *Id.*

Mr. Eisen called Mr. Walpin less than an hour later and demanded to know

whether he would voluntarily resign.  *Id.*  He denied Mr. Walpin's request for more time

and informed Mr. Walpin that he was being immediately removed from his post as

Inspector General.  Later that evening CNCS terminated Mr. Walpin's access to his OIG

---

[3] While this is a motion to dismiss, Defendants are relying on documents which accept as true the allegations against Mr. Walpin made by the Acting U.S. Attorney in his complaint to the Integrity Committee.  (*See, e.g.*, Def. Mem. 7 "[P]laintiff had . . . exhibited a lack of candor in providing material information to decisionmakers. . . .").  Defendants' attempt to rely on the charge, although it has now been rejected by the body assigned by Congress with the duty to determine the merits of the charge, which exemplifies that a motion to dismiss does not lie here.

email account and office, and denied him access to his staff.  (Am. Compl. ¶ 41.)  Mr. Walpin was prevented from performing even the most rudimentary steps in order to ensure that his termination did not prevent OIG from performing its duties.  *Id.*

The day after Mr. Walpin was removed, June 11, 2009, President Barack Obama sent a letter to Vice-President Joseph R. Biden, in his capacity as the Presiding Officer of the United States Senate, and to Speaker Nancy Pelosi, in her capacity as Presiding Officer of the House of Representatives, informing them that he was "exercising [his] power as President to remove [Mr. Walpin] from office . . . effective 30 days from today."  (Am. Compl. ¶ 30.)  The President's letter did not inform Congress that Mr. Walpin had been removed from his duties and responsibilities and transferred to an administrative leave status the day before.  (*See* Defs. Mem. Ex. E.)  Nor did the President give any reason for his decision. *See id.* He only stated that which was implied by the termination:  that he "no longer" had "the fullest confidence in" Mr. Walpin.  See *id.* The President did not explain why that was so. *See id.*

Members of Congress immediately protested the President's failure to provide 30-days' notice prior to removing Mr. Walpin from his office. Indeed, Senator Charles Grassley wrote the President on June 11, 2009, before receiving the President's letter. (Am. Compl. ¶¶ 32, 34-35, 39.)   Senator Grassley reminded the President that he (the President) was a co-sponsor of the Inspector General Reform Act, and stated that he was "deeply troubled to learn of the ultimatum given Inspector General Walpin absent Congressional notification."  (Am. Compl. ¶ 32.)  He warned that the public "cannot afford to have Inspector General independence threatened," and urged the president "to follow the letter of the law should you have cause to remove any Inspector General." *Id.*

7

Senator Grassley concluded that since serving as Inspector General Mr. Walpin "has identified millions of dollars in AmeriCorps funds either wasted outright or spent in violation of established guidelines. In other words, it appears he has been doing his job." *Id.*

In response to Senator Grassley, Gregory B. Craig, Counsel to the President, repeated that the basis for the removal was the conclusory statement that "the President does not have full confidence in" Mr. Walpin. (*See* Defs. Mem. Ex. D.) He sought to justify ignoring the limitations on Presidential power by suggesting that Mr. Walpin had only been placed in the status of "suspended, with pay." *Id.* Formal removal would not occur for 30 days, the White House claimed, at which time Mr. Walpin would no longer receive pay. *Id.*

On June 16, 2009, Mr. Eisen sent a letter to Senators Lieberman and Collins (but not to both Houses of Congress), in response to their concerns with the legality of Mr. Walpin's removal. (*See* Defs. Mem. Ex. E.) He acknowledged therein that "Mr. Walpin was removed," and stated why Mr. Walpin "no longer" had the confidence of the president. For example, he wrote that "Mr. Walpin was removed after a review was unanimously requested by the bi-partisan Board of the Corporation . . . [and Mr. Walpin was] confused, disoriented, unable to answer questions and exhibited other behavior that led the Board to question his capacity to serve." *Id.* He also cited the complaint filed with the Integrity Committee by the Acting U.S. Attorney against Mr. Walpin. *Id.*

None of the *post hac* justifications was actually investigated by the White House before Mr. Walpin's removal. (Am. Compl. ¶ 40.) The White House made no attempt to interview Mr. Walpin or any members of the OIG staff. *Id.* Further, the White House

did not seek consideration of any issue relating to Mr. Walpin from the Integrity Committee, the body expressly created by Congress under the Inspector General Reform Act for the purpose of reviewing, and providing its conclusion on, allegations against Inspectors General.[4] *Id.*

### III.    STANDARD OF REVIEW

When ruling on a defendant's motion to dismiss, the court must accept as true all of the allegations contained in a complaint and "then determine whether they plausibly give rise to an entitlement of relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). As the Supreme Court recently held, to survive a Rule 12(b)(6) motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and have "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 547 (2007). Under *Twombly*'s construction of Rule 8 of the Federal Rules of Civil Procedure a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

Asking for plausible grounds does not impose a probability requirement at the pleading stage. It simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence in further substantiation of a plaintiff's claims. *Twombly*, 550 U.S. at 545. Thus, *Twombly* does not require a universal standard of heightened fact pleading, but is instead requiring "a flexible 'plausibility standard,' which obliges a

---

[4] The Integrity Committee, again, found the Acting U.S. Attorney's complaint to be without merit. (*See* Pls. Ex. A.)

pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal,* 129 S. Ct. at 1944.

In response to a 12(b)(1) motion to dismiss, the plaintiff must establish subject matter jurisdiction by a preponderance of the evidence. *Galluci v. Chao*, 374 F. Supp. 2d 121 (D.D.C. 2005) (citing *McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936)).   The Court may only dismiss if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"   *Id.* citing *Sinclair v. Kleindienst*, 711 F.2d 291, 293 (D.C. Cir. 1983) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).   When ruling on a motion to dismiss for lack of subject matter jurisdiction, the "court assumes the truth of the allegations made in the complaint and construes them favorably to the pleader," but it "may look to materials beyond the pleadings. *Id.* (citations omitted).

Under both standards, as is demonstrated below, Mr. Walpin has pled sufficient facts from which the Court can infer that he was improperly removed from office and that the Defendants can provide adequate relief from this wrong.

## IV.   ARGUMENT

### A.   Mr. Walpin Has Alleged Sufficient Facts To Establish A Clear Right to Mandamus Relief

#### 1.   The IGA Vests Inspectors General With Independence

To establish a right to mandamus, a plaintiff must show that:  "(1) [he] has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *Swan v. Clinton,* 100 F.3d 973, 976 n.1 (D.C. Cir. 1996).  A "ministerial duty" can exist even "where the interpretation of the controlling statute is in doubt," provided that "the statute, once interpreted, creates a peremptory

obligation for the officer to act." *13th Regional Corp. v. Dept. of Interior*, 654 F.2d 758, 760. (D.C. Cir. 1980). Accordingly, the D.C. Circuit has noted that even a statute that "nowhere expressly limits the President's removal power" can impose a "nonremoval duty of sufficient clarity to create a ministerial duty." *Swan*, 100 F.3d at 978.

Defendants would have this Court determine that mandamus is unavailable because the IGA, as amended, 5 U.S.C. app. 3 § 3(b), does not vest Inspectors General with a "clear right" to any protection from unlawful termination. Rather than protecting Inspectors General from political attacks by establishing preconditions to their termination, Defendants contend Congress' sole purpose in enacting the IGA was to "facilitate communication" between Congress and the president. Defendants purport to find this apparently exclusive purpose in its statutory text and the legislative history of the IGA.

Defendants' protestations aside, the text of the IGA establishes that Inspectors General are granted individualized protection from interference in the performance of their duties by balancing the Executive power of appointment with Inspectors' General independence. Section 3(a) of the IGA, expressly prohibits interference with said independence. *See* 5 U.S.C. app. § 3(a) ("Neither the head of the establishment nor the officer next in rank below such head shall prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation.").[5]   Similarly, Congress

--------

[5] The Senate Report accompanying the original IGA in 1978 made clear that its purpose was to "confer upon the Inspector General a unique status within the executive branch," S. REP. NO. 95-1071, at 2706 (1978), by guarantying Inspectors General "the requisite independence to do an effective job." S. REP. NO. 95-1071, 31, 7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676, 2706, 2682.   To implement that goal,

amended the very next subsection, § 3(b), in 2008 to provide minimal, yet absolute, safeguards against presidential interference by imposing a 30-day advance congressional-notice requirement on presidential removal power. The safeguards operate to both: (1) deter political or other illegitimate interference with the Inspectors' General duties; and (2) allow Inspectors General to serve an additional 30 days after being notified of pending removal or transfer to continue and perhaps conclude the work that may have improperly motivated their removal or transfer.

The intended use of dual enforcement mechanisms is evidenced by the history of the IGA. Initially, the IGA required only that a president "communicate the reason for any . . . removal to both Houses of Congress." Notice following removal was fine — it facilitated dialogue between the White House and Congress. In 2008, Congress concluded that IG independence could be better protected by requiring the notice in advance of removal, and that a transfer of an IG out of his position would result in the same effect on his ability to proceed with his work as an outright removal. Therefore, Congress amended the IGA (i) to require that the President provide Congress with a 30-

---

Inspectors General were to be freed from the possibility of being prevented "from undertaking and completing any audits and investigations which the Inspector . . . General deems necessary." *Id.*, at 2677. The Senate Report was prescient as to what occurred here to Mr. Walpin, where it is apparent that reports his Office issued were not happily received by the Executive Branch. The Senate Report recognized:

> There is a natural tendency for an agency administrator to be protective of the programs that he administers. ... Even if he is not personally implicated, revelations of wrongdoing or waste may reflect adversely on his programs and undercut public and congressional support for them. ... For that reason, the audit and investigative functions should be assigned to an individual whose independence is clear and whose responsibility runs . . . ultimately to the Congress, [i.e., an Inspector General.]

*Id.* at 2682. The Senate Report also explained its requirement of the content that the President must communicate to Congress in order to give his reasons for the removal: it must communicate "some justification — other than the desire to remove an Inspector . . . General who is performing his duties in a way which embarrasses the executive — to warrant the removal action." *Id.* at 2701.

day notice prior to removal, and (ii) added that the limitation on the President's right to remove an IG also applies to any "transfer[] to another position or location." *See* Pub. L. No. 110-409, § 3(a).

Defendants emphatically state that "[n]othing in the text of the IG Act suggests that Congress intended the 30-day notice requirement to vest any individual rights in Inspectors General." (Defs. Mem. 9.)  In fact, the IGA affirmatively declares its purpose is:

> to create *independent* and objective units . . . (1) to conduct and supervise audits and investigations relating to the programs and operations of [the relevant] establishment[] . . . and . . . (3) to provide a means for keeping . . . the Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations and the necessity for and progress of corrective action.

5 U.S.C. app. 3 § 2 (emphasis added).  In other words, Congress sought to make the Inspector General position to serve as its *independent* monitor of federal programs by vesting them with sufficient protections. And it intended that these protections would be vindicated by individual suit.  Thus, it instructed that nothing in the subsection of the IGA establishing the Integrity Committee should be construed as creating a right to a private cause of action, but did not impose the same limitation on the 30-day notice requirement.  *Compare* 5 U.S.C. app. § 11(c)(11) ("This subsection is not intended to create any right or benefit, substantive or procedural, enforceable at law by a person against the United States, its agencies, its officers, or any person."), *with* § 3.  The two provisions were enacted at the same time:  only one of them prohibited private enforcement.

13

Moreover, Defendants characterize the amendment requiring notice 30 days before removal or transfer as being designed merely to "facilitate communication," without explaining how the prior-existing requirement of notice to Congress (albeit not in advance of removal) did not already facilitate communication. Defendants' position is that the 2008 reforms effected no change: before the amendment, the President could order the immediate removal or transfer of an IG, and, after the amendment, he could continue to do the same with impunity.

Defendants, however, disregard statements in both the Senate and the House Reports addressing the notice requirement as being for the purpose of enhancing IG's independence. The House Report described its purpose as "to enhance the independence of the Inspectors General." H.R. REP. NO. 110-354, at 1 (2007). The Senate Report, S. REP. NO. 110-262 (2008), likewise repeatedly made that purpose clear. Defendants omit that the sentence they quote was excerpted from the section of the Report entitled "STRENGTHENING INDEPENDENCE" of IGs, and refers to this "advance notice provision" as giving IGs "a useful deterrent against improper intimidation or dismissal." S. REP. NO. 110-262, at 5. The introductory paragraph of the Report recites the purpose as "to enhance the Offices of the Inspector General." S. REP. NO. 110-262, at 1. The next paragraph, under the heading "Purpose and Summary," repeats the purpose as "to strengthen the Inspector General system," followed immediately in the next paragraph with the statement that "[i]t is essential that Inspectors General operate with sufficient independence to do their jobs well." *Id.* To effect that objective, the 2008 amendment was required because the then "current IG structure does not go far enough to safeguard [the IGs'] independence." S. REP. NO. 110-262, at 1-2. The Report continues, under the

14

heading, "Background and Need For The Legislation," to recite "Inspectors General must operate without fear of improper intervention or intimidation by management or political forces. . . .  It is critical that agency management respect the independence and not attempt to retaliate against a vigorous Inspector General by threatening his or her tenure . . . ."[6] S. REP. NO. 110-262, at 3.

The debates on the 2008 reforms likewise emphasized that its purpose was to protect Inspectors General.  Congressman Henry A. Waxman stated that this statute provided Inspectors General with "greater independence . . . and the President will have to inform Congress 30 days before any IG is removed."  154 CONG. REC. H9882 (daily ed. Sept. 25, 2008) (statement of Rep. Waxman).  Congressman Edolphus Towns also emphasized that the purpose of this condition precedent to removal was to prevent an Inspector General from being "fired" while "in the middle of an investigation," so that "it gives them the freedom to be able to move and get the things they need to get done."  154 CONG. REC. H9881 (daily ed. Sept. 25, 2008) (statement of Rep. Towns).

The Court should reject an interpretation that presumes Congress amends statutes for no reason and with no practical effect, especially where, as here, there is a substantial amount of legislative history indicating that the 30-day notice requirement was intended to strengthen the independence of the Inspectors General.  There is no basis to Defendants' contention that Congress added the 30-day notice requirement to ensure that dialogue occurred between Congress and the president.  That purpose was accomplished

---

[6] A similar analysis demonstrates that the only other quote Defendants rely upon — Senator Lieberman's statement that the 30-day notice requirement would "give [Congress] time to consider whether the Administration was improperly seeking to displace an Inspector General for political reasons because the IG was, in effect, doing his or her job too well," 154 CONG. REC. S10054-55 (daily ed. September 29, 2008) (statement of Sen. Lieberman). — supports Mr. Walpin's construction of the statute.  Senator Lieberman's full statement expressly affirmed that the amendment was intended "to ensure that [Inspectors General] have the independence they need to carry out this vital, but often unpopular work. . . ." *Id.*

by the original IGA which required notice to Congress after a removal, and thus it could not be the reason for amending the statute to require notice to Congress before removal or transfer.

### 2.   The Removal and Transfer of Mr. Walpin Violated The 30-day Notice Requirement

#### a.   The President's Action Constituted a Prohibited Removal and Transfer

Defendants argue that the physical removal of Mr. Walpin from his office, removal from his continued performance of his duties and responsibilities, removal from access to his emails and to his staff, and transfer from active status to administrative leave status was neither a "removal" nor a "transfer." Notably, Defendants acknowledge that the "Act's notice requirement applies . . . to transfers 'to another . . . location'" (Defs. Mem. 14), but do not attempt to explain how Mr. Walpin's immediate and permanent eviction from his office is not a transfer of location. Instead, Defendants arguments boil down to two points: (1) a "removal" does not occur unless pay is terminated; and (2) a "transfer" to another "position" does not occur unless the Inspector General is given a "different assignment with different duties" (Defs. Mem. 14).

Yet Defendants provide no authority for the extraordinary claim that an Inspector General is not removed from his office, although he is removed from any ability to perform his IG duties, as long as he is paid. Similarly, no law is cited for the proposition that relocation occurs only if it is to a different assignment with different duties, as opposed to a new assignment with no duties.[7]  Also, placing Mr. Walpin on

---

[7] Defendants implicitly admit that they have no authority for their argument by citing four cases that are totally removed from the instant issue. Unlike here, no statute was enacted to protect the independence or

administrative leave, thereby removing him from any ability to continue to perform his IG duties, is inconsistent with one of the stated legislative purposes for the 30-day advance notice provision: to give the affected IG time "to get the things [done] they need to get done" in "the middle of an investigation." 154 CONG. REC. H9881. Accepting the facts alleged as true, clearly the so-called administrative leave was imposed precisely to remove Mr. Walpin in the middle of an investigation of the politically connected.

Defendants claim that the President was authorized to bar Mr. Walpin from performing his duties because § 3(b) states that "[n]othing in this subsection shall prohibit a personnel action otherwise authorized by law . . . ." But the statute expressly excepts from allowable personnel actions those which effect a "transfer or removal." Defendants offer no basis to allow avoidance of the 30-day advance notice requirement by merely labeling a "removal or transfer" as placement on administrative leave when such placement has the same effect as a "removal or transfer" on the IG's ability to continue to perform his IG duties. Neither the IGA nor any other provision of law authorizes the President to block an Inspector General from performing his duties absent compliance with the IGA. Particularly in light of Mr. Eisen's June 16, 2009, letter, it is disingenuous for Defendants to assert Mr. Walpin was anything other than "removed"

---

time to conclude work of the postal worker-plaintiff in *Oliver v. U.S. Postal Service*, 696 F.2d 1129 (5th Cir. 1983) (Defs. Mem. 14). The court there explained that the purpose of the 30-day notice was to give all employees 30 days to answer the charge, retain an attorney, and receive a written decision. Given that the purpose of that statute was to "protect[] the employees from violation of their rights," that purpose would not "be served by requiring the employee [to] remain on active duty ..." The two cases from the M.S.P.B. merely hold that the M.S.P.B. does not have jurisdiction over decisions to place an employee on administrative leave. But interestingly, the Board in *LaMell v. Armed Forces Retirement Home*, 104 M.S.P.R. 413, 416 (M.S.P.B. 2007), stated that it would accept jurisdiction if "the employee's placement on administrative leave so closely followed the proposed . . . removal." Here, they occurred at the same time. Finally, the plaintiff in *Ghaly v. U.S. Dep't of Agriculture*, 228 F. Supp. 2d 283 (S.D.N.Y. 2002), complained of a suspension with pay, but the controlling statute allowed an appeal only if the suspension was without pay. Overall, none of Defendants' four citations involved a statute prohibiting "removal" or "transfer" unless conditions precedent were met.

from office. Plaintiff agrees with Defendants that "the terms 'removal' and 'transfer' should be limit[ed] . . . to their ordinary meaning" (Defs. Mem. 15 n.6). But Defendants never even attempt to provide such ordinary dictionary meanings.   By definition, the action taken against Mr. Walpin fits within the ordinary meanings of the prohibited "removal" and "transfer."  "Removal" is defined as "to change the location, position." *Merriam Webster Online Dictionary.*  That is what was done to Mr. Walpin:  both his location and position were changed; he was barred from his office and his position was changed from Inspector General to Administrative Leave status.

Likewise, transfer is defined as "to convey from one . . . situation to another." *Id.* That definition also describes exactly what was done to Mr. Walpin, in that he was transferred out of his office and position to so-called administrative leave status.  Adding to these definitions the reality of the action taken by the White House on June 10th, as described by the White House itself — that it was immediately "to suspend [Mr. Walpin's] service" as Inspector General — underlines that it violated the statute.  The word "suspend" means "to bar for a period from a . . . position" (Free Online Dictionary). Someone barred from his position is the equivalent of removal from that position, particularly where, as here, the period of that bar is immediately followed by a simultaneously announced permanent termination.  The action taken against Mr. Walpin on June 10th thus violated the statutory prohibition against removal or transfer of Mr. Walpin without 30-days' advance notice to Congress.

The White House effectively confirmed that it ignored the IGA when it removed and transferred Mr. Walpin.  The President, in his letter, specified the authority for his action as the President's general power to remove all "other positions where I, as

President, have the power of appointment, by and with the advice and consent of the Senate." (Defs. Mem. Exs. A & B.)  He expressly confirmed that he was ignoring, and thereby violating, the congressionally mandated condition precedent to removal of an Inspector General.  The IGA imposes limitations on the President's power of removal, but the President simply disregarded it.

> ### b. The June 11, 2009 Letter to Congress Failed to State a Reason for Removal

Assuming, *arguendo,* Defendants were correct in arguing that the 30-day administrative leave was not a removal or transfer, the firing of Mr. Walpin must still be held to have violated the IGA on the grounds the President never gave any timely notice to both Houses of Congress of the decision to remove Mr. Walpin **and** "the reasons" therefore.  The **only** letter sent to both Houses of Congress was the President's June 11, 2009, letter, which, if it were to be considered as complying with statutory requirements, would have to have set forth the substance of the notice required by the statute.

Section 3(b) of the IGA requires that the President inform Congress of the "reason" for the then "pending" removal.  The President gave no reason for removing Mr. Walpin from his duties.  Instead, the President merely wrote that he had concluded he "no longer" has "the fullest confidence in" Mr. Walpin.  This assertion is a conclusion, equivalent to the conclusion that he did not want Mr. Walpin to remain, without any reason for reaching that conclusion.  At bottom, it is tautological and necessarily inherent in all presidential removals.

Defendants argue that the letter was sufficient because "the IG Act does not specify that the President should provide any particular level of detail." (Defs. Mem. 16.)

That argument makes a mockery of the provision requiring the reason, and would allow the statement that "I removed Mr. Walpin because I wanted to remove him." In reality that is essentially what the White House wrote. However, the Senate, wise in the ways of the executive branch, declared that more substance is necessary. The Senate Report on the IGA provided: "some justification [must be given] — other than the desire to remove an Inspector . . . General who is performing his duties in a way which embarrasses the executive — to warrant the removal action." S. REP. NO. 95-1071, at 2701.[8]

The three cases Defendants cite as authority for their assertion that the Court must accept whatever text the President has put into his communication to Congress regarding Mr. Walpin's removal are inapposite. (*See* Defs. Mem. 11.) Contrary to Defendants' argument, *Natural Resources Defense Council Inc. v. Hodel,* 865 F.2d 288 (D.C. Cir. 1988), does not preclude the Court from granting relief in this case. There, "the contention is not that the Secretary failed entirely to" comply with the statutory requirement that he "report" to Congress, "but that the Secretarial response lacked the requisite detail." *Id.* at 318. Here, the President failed to report at all prior to removing Mr. Walpin.

In *Hodel*, the Court reviewed the Secretary of the Interior's compliance with the National Environmental Policy Act (NEPA), the Outer Continental Shelf Lands Act

---

[8] Defendants repeatedly raise and knock down a non-existent version of Plaintiff's Amended Complaint—one that seeks to impose a "good cause" limitation on the President's power to remove an Inspector General. (Defs. Mem. 19- 21 & n.11.) Plaintiff makes no such claim. What was missing from the White House's untimely notice to both Houses of Congress was its reason for removing Mr. Walpin, which reason the President was mandated by law to give it. As applicable here, "reason" means "an underlying fact or cause that provides logical sense for a premise or occurrence." (Free Online Dictionary). A "conclusion," on the other hand, is defined as "a decision made or an opinion formed after considering the relevant facts. *Id.* No longer having the fullest confidence in Mr. Walpin is a conclusion, not "the underlying fact or cause" for that conclusion, and thus not a reason.

(OCSLA), and the direct congressional reporting requirements of Section 111 of Public Law 99-591. NEPA and OCSLA, which both provide for judicial review, require the Court to "'ensure that the statement contain sufficient discussion of the relevant issues,'" *id.* at 294, and "ensure that agencies faithfully follow Congress' direction," *id.* at 299. Therefore, courts will defer to the agency only if "the agency advances a permissible construction" of its communication as meeting the "standard" fixed in the "statute," but "when it does not," the court must so find. *Id.* at 300. Thus, under *Hodel,* this Court is not precluded from reviewing whether the letter complies with the IGA. Even though Section 111 did not provide for judicial review, the Court sanctioned review of whether the Secretary met the base requirement to provide a report at all — even though the Court would not take the next step of reviewing the sufficiency of the detail in the report the Secretary did provide.

Again, here, when the President reported to Congress on June 11, 2009, he failed to provide any reasons for the removal.[9] This omission is as problematic and equally an end run around the IGA as the failure to provide notice in advance of removing an IG. If the courts decline to review whether the President met the minimal reporting requirement of setting forth a reason, as opposed to reviewing the sufficiency of such reasons, the Congress will be powerless to judge the Executive's reasons for removal and to ensure that they are politically free.

*Guerrero v. Clinton,* 157 F.3d 1190, 1195 (9th Cir. 1998), is also inapposite. There the court declined to question the text of an agency report to Congress "[b]ecause it triggers no legal consequences and determines no rights or obligations." Here in contrast,

---

[9] As discussed above, Defendants have not offered any basis to sustain the June 11 letter as containing "sufficient [indeed, any] discussion of" reasons, as distinct from "conclusions."

the communication to Congress is what triggers the 30-day notice period and, if the communication meets statutory requirements, the removal of Mr. Walpin. Under these circumstances, as the *Guerrero* court explained, court review is required. *Id.* at 1196.

**B.     The IGA Imposes a Clear Ministerial Duty On the Defendants to Permit Mr. Walpin to Perform His Duties By Reinstating Him to His Office.**

Defendants argue that Mr. Walpin is not entitled to mandamus relief because there is no clear duty to reinstate Mr. Walpin. Defendants essentially argue that no remedy is necessary because this is simply a procedural statute, but to the extent it is of substance then Defendants are not in a position to make such a decision because it is not a simple "ministerial duty."

Contrary to Defendants' position, controlling authorities have held that when a duly appointed federal official is deprived of his position and ability to perform his duties, in violation of the statutory conditions imposed by Congress, that official is entitled to a judicial remedy of a writ of mandamus in the form of an affirmative injunction directing his reinstatement in his position.

The D.C. Circuit determined in a case analogous to Mr. Walpin's that a writ of mandamus is properly issued when a newly inaugurated President acts to remove his predecessor's appointees in contravention of a statutory protection against such removal.[10]   *See Swan*, 100 F.3d at 976.   In that case, the plaintiff directly sued the

---

[10] As far as the statutory protection involved, Mr. Walpin's termination presents an *a fortiori* situation because the statute in *Swan* did not contain an express protection provision; the Court assumed the protection implicit in the fixed term tenure. 100 F.3d. at 988. In the end, the Court denied relief only because the Plaintiff had in fact served his full term and was then in holdover status, which was held not to be within the statutory protection. *Id.* at 988 & n.10.

President himself, and the Court considered the propriety of issuing a writ to the President. The court reasoned that the President's "duty to comply with removal restrictions contained in the . . . statute . . . is ministerial and not discretionary, for the President is bound to abide by the requirements of duly enacted and otherwise Constitutional statutes." *Id.* at 977. The court acknowledged some concern about issuing "injunctive relief against the President himself," *id.*, and determined that it could best reconcile judicial reticence with the need to protect the plaintiff's legal rights by — as here — "injunctive relief against subordinate officials," *id.* at 978, who "were instrumental in enforcing [plaintiff's] removal from office," which would "provide [plaintiff] with an adequate remedy" because one of the subordinates has the relevant "responsibility" which would "allow[] [plaintiff] to exercise the privileges of that office[,]" *id.* at 979.[11]

Defendants' treatment of *Swan* is a tacit admission that it contradicts their contentions. Defendants essentially ignore the case and assert that its relevant passages are mere dicta. (Defs. Mem. 21 n.11). Defendants are wrong. The court had to address those issues to decide the jurisdictional questions. The D.C. Circuit was not issuing advisory opinions but holding that it "had jurisdiction to hear Swan's appeal" because "[i]n order for there to be an Article III case or controversy over which this Court has jurisdiction and can exercise jurisdiction, Swan must have standing," which means

---

[11] In the face of this express statement in *Swan* (quoted above) that, even for the President himself, as well as to subordinates, the "duty to comply with removal restrictions contained in the . . . statute . . . is ministerial and not discretionary," Defendants' citation of cases involving discretionary acts by Government personnel, (Defs. Mem. 18), for the assertion that Defendants' action in effecting Mr. Walpin's removal as IG was not ministerial, demonstrates their inability to provide any supporting authority. *E.g., Jackson v. Holder,* No. 09-1453, 2009 WL 2382949, at * 1 (D.D.C. July 31, 2009) ("[P]ower to investigate and prosecute is a discretionary function....").

finding that "'the plaintiff must have suffered an 'injury in fact' — an invasion of a legally protected interest ... [which] likely ... will be redressed by a favorable decision." *Id.* at 976 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

*Swan* is consistent with a long line of authorities starting with the seminal decision of *Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803), when Secretary Madison refused to convey a commission to the plaintiff, Marbury, who had been duly appointed to a federal position with five-year tenure by the predecessor President. The Court famously held that delivery of the commission was a ministerial act and could not legally be refused. In words even more applicable to this case, the Supreme Court held that "if he was not removable at the will of the President," it "would either give [the duly-appointed officer] a right to his commission [formalizing his holding the position], or enable him to perform the duties without it." *Id.* at 156. The Court explained "when the constitutional power of appointment has been exercised," the "power of the executive over an officer, not removable at his will, must cease." *Id.* at 157.

Defendants do not openly question that the IGA withdrew Inspectors General from the category of Presidential appointees removable at will. Congress created an appointee that can only be removed if the President gives Congress 30 days' advance notice of the intent to do so and a corresponding reason for doing so. The Amended Complaint alleges that the President did not comply with that statutory prerequisite to Mr. Walpin's removal. Therefore, as the *Marbury* Court held, "the right to the office" of Inspector General is "in the person appointed," Mr. Walpin, "and he has the absolute,

unconditional power" to opt to remain in it, because the removal, without complying with the statutory condition precedent is "violative of a vested legal right." *Id.*[12]

The *Marbury* Court addressed the obligation of the ministerial actor within the Government, the Secretary of State, who was given an illegal order to deprive the duly appointed official of his position and ability to perform his duties:

> It is the duty of the secretary of state to conform to the law, and in this he is an officer of the United States, bound to obey the laws. He acts, in this respect, . . . under the authority of law, *and not by the instructions of the President.* It is a ministerial act which the law enjoins on a particular officer for a particular purpose.

*Id.* at 158 (emphasis added).   The Defendants have the duty to keep Mr. Walpin's employment records and, thus, are subject to the same obligation as the defendant in *Marbury*.

The Supreme Court then turned to the issue of the remedy that exists for this violation of the appointee's "vested legal right" in the position. Commencing from the general principle that "every right, when withheld, must have a remedy," it held that "where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems . . . clear that the individual who considers himself

---

[12] In view of the holding in *Marbury,* and following cases discussed above, that a Presidential appointee has a "vested legal right" in his position, unless removed pursuant to lawful procedure, Defendants' citation of cases limited to procedural violations without any effect on the plaintiff's vested rights, is totally inapposite. (*See* Defs. Mem. 22.)   Mr. Walpin is seeking to vindicate his substantive right to continued employment. Defendants' attempt to cast the immediate removal of an Inspector General in contravention of the law as a mere procedural violation is yet another attempt to minimize the importance of IG's independence. Regardless, even the cases cited by Defendants affirm a cause of action if the procedural violation "caused a substantive violation or themselves worked a substantive harm." *Gagliano v. Reliance Standard Life. Ins. Co.,* 547 F.3d 230, 240 (4th Cir. 2008).

injured has a right to resort to the laws of his country for a remedy."[13]  *Id.* at 163, 166. Thus, "if the officer is by law not removable at the will of the President, the rights he has acquired are protected by the law, and are not resumeable by the President.  They cannot be extinguished by executive authority, and he has the privilege of asserting them in like manner as if they had been derived from any other source."  *Id.* at 167.  The Supreme Court held that a duly appointed federal official, on whose removal Congress has imposed conditions limiting the President's firing-at-will authority, has the right to keep his position unless and until those conditions are met.[14]

More than 150 years after *Marbury,* the Supreme Court reached the same conclusion that a presidential appointee removed in violation of the law had a cause of action and is entitled to a remedy in *Wiener v. United States,* 357 U.S. 349 (1958).  There a new President asked for the resignation of a Truman appointee because he wanted "personnel of my own selection."  *Id.* at 350.  When Wiener refused to resign, the President removed him.  Rather than seeking reinstatement, Wiener sued for recovery of his salary for the period for which he was wrongly removed.  The Supreme Court reversed a lower court's dismissal of the complaint and upheld his right to a remedy for his removal, ordering full reimbursement to Wiener.

The *Wiener* Court first noted that *Myers v. United States,* 272 U.S. 52 (1925), which had been cited as upholding a President's inherent right to remove Presidential appointees, had been severely limited "to include only 'all purely executive officers'."

---

[13] This express holding is ignored by Defendants when they assert, without apposite authority, that "there may be no judicial remedy available at all."  (Defs. Mem.  22.)

[14] The Supreme Court declined to provide the relief only because the Constitution assigned original jurisdiction to that Court and not to the court in which the action had been commenced.

*Id.* at 352. Quoting *Humphrey's Executor v. United States,* 295 U.S. 602, 625-26 (1935), the Court referred to "a sharp line of cleavage between officials who were part of the Executive establishment and were thus removable by virtue of the President's constitutional powers, and those who are members of a body 'to exercise its judgment without the leave or hindrance of any other official or any department of the government.'" *Id.* at . Clearly, the IGA and the relevant legislative history establish that Inspectors General fit into the category of those expected to exercise independent judgment.

The *Wiener* Court explained the basis for this special protection from the President's unconditioned right to remove as: "'one who holds office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will.'" *Id.* at 357 (quoting *Humphrey's Executor,* 295 U.S. at 629)). Wiener had a valid cause of action because Congress, in creating the position to which he had been appointed, had fixed the term for that position and thus it "was not the conception of Congress in creating" the position that an appointee who had not finished his term could be removed because the President wished to appoint someone else. *Id.* at 354.

Significantly, the Supreme Court, in both *Humphrey's Executor* and *Wiener,* recognized that Congress had not specifically imposed any condition that limited the President's right of removal. Yet it precluded the President from exercising that right because it found Congress intended to maintain the independence of the appointee from any pressure: "Congress did not wish to have hang over the [appointee] the Damocles'

sword of removal for no reason other than that he preferred to have . . . men of his own choosing." 357 U.S. at 356.

In line with these Supreme Court decisions, this Court (Johnson, J.) previously reinstated a presidential appointee whom a succeeding President removed in *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983). The plaintiffs there had been duly appointed by President Carter and confirmed by the Senate to positions as Commissioners of the Civil Rights Commission, only to be removed by President Reagan. Plaintiffs sought an injunction to prevent any interference with their positions or the performance of their duties. This Court granted the requested preliminary injunction. Relying on *Humphrey's Executor* and *Wiener,* it reasoned that the President's unrestricted right of removal of presidential appointees is limited to those who are purely executive officers, but not to those who perform investigations and report thereon to Congress and exercise judgment "without the leave or hindrance of any other official or any department of the government." *Id.* at *2 (citation omitted). The statute creating the Civil Rights Commission did not expressly impose any limitation on the President's inherent right of removal of those appointees.[15] Nevertheless, the Court found such limitation based on "extensive legislative history . . . that Congress intended to create a Commission . . . independent of Presidential control and directive . . . free from any control or coercive influence by the President. *Id.* at *4.

---

[15] Recognizing that mandamus was issued in *Berry* to reinstate that plaintiff for only two weeks, Defendants have previously sought to distinguish the case on the ground that there "the Commission would be unable to fulfill its function within the time allotted by statute if it were 'left without a quorum,'" arguing that "[t]here is no fixed deadline at issue here." (Reply In Support Of Defs.' Mot. For Extension Of Time 4 n.4.) This distinction fails because Congress also fixed a deadline here: Congress gave the to-be-removed Inspector General 30 days to complete any investigation or audit.

It is even more clear here that IGs are not purely executive officials. They too perform investigations on behalf of Congress. They too report to Congress. And unlike in *Berry*, Congress expressly imposed the condition precedent of 30-days' advance notice to Congress as a means of protecting Inspectors General from "the Damocles' sword of removal for no reason other than [the President] preferred to have . . . men of his own choosing." As previously demonstrated above, the Inspector's General "independence is clear and [his] responsibility runs . . . ultimately to Congress" S. REP. NO. 95-1071, at 2682.

## C.     Failure to Grant Relief Will Eliminate the Independence of Inspectors General

Defendants  argue that even though there has been a clear violation of the statutory protection Congress afforded to an Inspector General, "mandamus is not warranted" in that it "would extend plaintiff's tenure as Inspector General for no more than 30 days" (Def. Mem. p. 3), making it "largely an empty gesture" because the "President could simply once again notify Congress of his intent to remove Plaintiff" (Defs. Mem. at 23).[16]  Defendants' position belies its other claim that Mr. Walpin is seeking "life tenure" or a "for cause" limitation on the President's removal power.

But Defendants go too far in suggesting the Court should ignore Congress' judgment that 30 days is an appropriate and necessary amount of time for an Inspector

---

[16] Defendants' use of the word "could" emphasizes the speculative nature of their argument. In view of the facts now publicly disclosed since the filing of the Amended Complaint negating any factual basis to the "reasons" belatedly offered as the reasons for Mr. Walpin's removal, and the substantial objections voiced by members of Congress, there is reason to believe that the President would avoid a repeat. For example, the White House belatedly relied on the Integrity Committee complaint against Mr. Walpin filed by the Acting U.S. Attorney. As discussed above, the Integrity Committee ruled that the complaint contained no meritorious charge against Mr. Walpin. As to Defendants other assertion for its "empty gesture" phrase, the statute does not permit that during the extended 30 days "plaintiff might again be put on paid administrative leave" (Defs. Mem. 3).

General to remain in office in order to complete investigations and audits and to allow Congress to evaluate the removal decision, and instead afford the President an unfettered right to remove an Inspector General. Defendants' argument that the 30-days' advance notice can be ignored because it may have little effect (even if it were a correct prediction) renders the provision nugatory, and is "at odds with one of the most basic interpretive canons, that 'a statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant'." *Corley v. United States,* 129 S. Ct. 1558, 1560 (2009) (quoting *Hibbs v. Winn,* 542 U.S. 88, 101 (2004)). That axiom of statutory construction is particularly applicable here given that the 30-day notice provision was added only recently in 2008 to a statute which had theretofore contained no such requirement.

## V.     CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss must be denied.

Dated: November 9, 2009

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

/s/ Sanford M. Saunders, Jr.
Sanford M. Saunders, Jr.
D.C. Bar No. 376098
Joe D. Whitley
D.C. Bar. No. 422385
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone:     (202) 331-3100
Facsimile:     (202) 261-0150
saunderss@gtlaw.com
whitleyj@gtlaw.com

*Counsel for Plaintiff Gerald Walpin*

Gerald Walpin
Of Counsel
875 Park Avenue
New York, New York 10075